# EXHIBIT A

# ARCADE BUILDING

# OFFICE LEASE

BY AND BETWEEN

**ST. LOUIS LEASED HOUSING ASSOCIATES MASTER TENANT V, LLLP**
**as "Landlord"**

AND

WEBSTER UNIVERSITY

as "Tenant"

**Dated June 4, 2014**

# TABLE OF CONTENTS

**ARTICLE / INDEX**                                                                            **PAGE**

ARTICLE 1. DEFINITIONS ............................................................................................. 1

ARTICLE 2. DEMISING CLAUSE/TERMINATION RIGHTS .................................................. 7

ARTICLE 3. TERM AND POSSESSION ............................................................................. 7

ARTICLE 4. RENT ....................................................................................................... 10

ARTICLE 5. PERMITTED USE AND ACCESS ................................................................... 14

ARTICLE 6. UTILITIES; SERVICES ................................................................................ 16

ARTICLE 7. SUBLETTING AND ASSIGNMENT ................................................................ 17

ARTICLE 8. QUIET POSSESSION AND SUBORDINATION ................................................. 18

ARTICLE 9. LANDLORD'S RESERVED RIGHTS ............................................................... 19

ARTICLE 10. CONSTRUCTION AND ACCEPTANCE OF PREMISES .................................... 20

ARTICLE 11. ALTERATIONS AND IMPROVEMENTS ........................................................ 22

ARTICLE 12. REPAIRS AND REPLACEMENTS ................................................................ 23

ARTICLE 13. DESTRUCTION BY FIRE OR OTHER CASUALTY ......................................... 24

ARTICLE 14. CONDEMNATION ..................................................................................... 26

ARTICLE 15. HOLDING OVER ...................................................................................... 26

ARTICLE 16. SURRENDER OF POSSESSION ................................................................... 27

ARTICLE 17. DEFAULT AND REMEDIES ........................................................................ 27

ARTICLE 18. BANKRUPTCY ......................................................................................... 29

ARTICLE 19. INSURANCE AND WAIVER OF RECOVERY ................................................. 30

ARTICLE 20. TAXES ON TENANT'S PROPERTY ............................................................. 32

ARTICLE 21. AMERICANS WITH DISABILITIES ACT, NON-DISCRIMINATION
         AND FAIR EMPLOYMENT ............................................................................. 32

ARTICLE 22. HAZARDOUS MATERIALS ........................................................................ 33

ARTICLE 23. GENERAL PROVISIONS ............................................................................ 34

Exhibit A.    BOMA Report

Exhibit B.    Tenant Final Space Plan

Exhibit C.    Work to be Performed on the Premises

Exhibit D.    Landlord Condominium Rules

Exhibit E.    Certificate of Occupancy

Exhibit F.    Nondisturbance and Subordination Agreement

Exhibit G.    Signage Plan

Exhibit H.    Premises Parking Stalls

Exhibit I.    Budget

# ARCADE BUILDING
## OFFICE LEASE ("LEASE")

**THIS OFFICE LEASE** (this "Lease") made and entered into this 4th day of June, 2014 (the "Date of this Lease"), by and between ST. LOUIS LEASED HOUSING ASSOCIATES MASTER TENANT V, LLLP, a Missouri limited liability limited partnership, (hereinafter referred to as "Landlord"), and WEBSTER UNIVERSITY, a Missouri nonprofit corporation ("Tenant").

### RECITALS:

**WHEREAS,** the Building was built in 1906 and 1919 with approximately 500,000 square feet and is one of the major historic buildings in the central business district of St. Louis. The Building will be acquired by the Owner from the Land Clearance for Redevelopment Authority of the City of St. Louis, a public body corporate and politic ("LCRA"), pursuant to that Real Estate Contract dated July 1, 2013. Upon acquisition of the Building, Owner shall lease all of its right, title and interest in the Commercial Unit, which includes the Premises, and the Market Rate Unit, to Landlord pursuant to a certain Master Lease that will be entered into between Owner and Landlord (the "Master Lease"). To the extent that any mortgage is placed on the fee ownership of the landlord under the Master Lease, it is contemplated that the Master Lease will be recorded prior to such mortgage. Although unrelated in all aspects to the Premises, it is acknowledged that the Tenant leases space in an adjacent building commonly known as the Old Post Office and that Landlord shall cooperate with Tenant with respect to any extensions of the Term to make this Lease co-terminous with the Old Post Office lease to permit Tenant to maintain the Old Post Office space and the Premises as a single university campus that will also include leased parking in the building commonly known as the Ninth Street Garage.

**WHEREAS,** Landlord desires to lease the Premises to Tenant pursuant to this Lease.

**NOW, THEREFORE,** in consideration of the premises and mutual covenants, promises and conditions herein, the parties agree as follows:

### ARTICLE 1.
### DEFINITIONS

As used in this Lease the following terms shall have the following meanings:

1.1     **Addendum.** None pages (if none - so indicate).

1.2     **Approved Construction Documents.** Shall have the meaning set forth on Exhibit C.

1.3     **BOMA.** Shall have the meaning set forth in Article 2.

1.4     **Budget.** Shall have the meaning set forth in Exhibit C.

1.5    **Building**.   The land and historic building in the City of St. Louis, located at 800 Olive Street, known as the Arcade Building, consisting of approximately 500,000 square feet including all facilities and improvements thereon.   The Building will contain a mix of commercial and residential uses as follows: (i) the Commercial Unit, located on the first, mezzanine, and second floors, along with 40 below grade Parking Spaces, which comprises the Premises; (ii) the Market Rate Unit, located on part of the third floor along with floors 15-18, which will contain 80 market rate rental apartment units and 89 below grade Parking Spaces; and (iii) the LIHTC Unit, located on part of floor 3 and throughout floors 4-14, which will contain 202 affordable apartment units.  The Building is a national historic landmark that is subject to the national historic monument program and historic building preservation restrictions.   As such, certain alterations and improvements to the Building may be subject to review and approval by the National Park Service and various historical preservation agencies.

1.6    **Common Areas**.  Those common areas described in Section 3.3.

1.7    **Common Area Improvements**.  Shall have the meaning set forth in Section 10.1.

1.8    **Construction Period**.  That period of construction described in Section 10.2.

1.9    **Contract Sum**.  Shall have the meaning set forth in Exhibit C.

1.10   **Contractor**.  Shall have the meaning set forth in Exhibit C.

1.11   **Cosmetic Change**.  Shall have the meaning set forth in Article 11.

1.12   **Date of Substantial Completion**.   To be determined in accordance with Article 10 hereof.   The parties estimate that Substantial Completion shall occur on or about October 31, 2015, subject to Article 10, Section 3.2 and the other terms hereof.

1.13   **Date of this Lease**.  June 4, 2014.

1.14   **Declaration**. That Declaration of Condominium and By-Laws of Arcade Building Condominium pursuant to Missouri Statutes Chapter 448 of the Uniform Condominium Act of the State of Missouri.

1.15   **Escrow Agent**.  Shall have the meaning set forth in Section 10.4.

1.16   **Escrow Agreement**.  Shall have the meaning set forth in Section 10.4.

1.17   **Final Space Plan**.  Shall have the meaning set forth in Exhibit C.

1.18   **Landlord**.  St. Louis Leased Housing Associates Master Tenant V, LLLP, a Missouri limited liability limited partnership, having as its address for notice purposes 2905 Northwest Boulevard, Ste. 150, Plymouth, Minnesota 55441..

1.19   **Landlord's Architect**.  Shall have the meaning set forth in Exhibit C.

1.20   **Landlord Condominium**.   The Commercial Unit and the Market Rate Unit created pursuant to the Declaration, collectively consisting of approximately 151,564 gross square feet, including, as limited common elements for the Landlord Condominium, one hundred twenty-nine (129) underground Parking Spaces in the Building, along with all common areas of the Landlord Condominium pursuant to the Declaration.

1.21   **Landlord's Development Affiliate**.   Shall mean St. Louis Leased Housing Associates V, LLC, a Minnesota limited liability company.

1.22   **Landlord's Work**. Shall have the meaning set forth in Section 10.1.

1.23   **Lease Commencement Date**.   The day after Landlord delivers exclusive possession of the Premises to Tenant having achieved Substantial Completion of all of the Landlord's Work or such earlier date when Tenant, in its sole discretion, takes possession of and operates its business in any portion of the Premises (provided, however, entry by Tenant for purposes of installing improvements, moving in furniture, conducting tours, and readying the Premises for the opening of its business shall not constitute operating its business), and after receipt of a temporary certificate (provided, however, such temporary certificate of occupancy may contain no conditions other than minor conditions the noncompletion of which will not materially interfere with Tenant's occupancy and use of the Building for its business operations and provided further that Landlord shall cause any conditions to the certificate of occupancy to be promptly satisfied and a permanent certificate of occupancy to be issued)   or permanent certificate of occupancy for the Premises, subject to Section 3.2 hereof.

1.24   **Lease Expiration Date**.  The expiration of the Term.

1.25   **Master Lease**.  The Master Lease referenced in the Recitals.

1.26   **Operating Expenses**.   Those costs of operating the Landlord Condominium as described in Section 4.3.

1.27   **Owner**.  St. Louis Leased Housing Associates V, Limited Partnership, a Missouri limited partnership.

1.28   **Permitted Transfer**.  Shall have the meaning set forth in Section 7.2.

1.29   **Permitted Use**.   Educational uses (including use of classrooms by various colleges within the Webster University system as long as Webster University  or any affiliate thereof is the Tenant), and uses incidental thereto as well as cultural, charitable events, seminars, symposia, and professional development programs and other co-curricular uses hosted or sponsored by Tenant.  Landlord shall not execute or consent in writing to any amendment to the Prime Documents after they are fully executed if the effect of such amendment is to materially and adversely affect Tenant's ability to use the Premises for its intended educational use and other uses set forth in this Section 1.29 or require Tenant to pay additional costs hereunder or create additional liability for Tenant hereunder. Landlord agrees that Tenant's use of the (i) first floor as an art gallery, auditorium and office, and (ii) the mezzanine as offices, are Permitted Uses. Subject to the provisions of Article 5, Tenant may designate, with Landlord's reasonable approval, in its reasonable discretion, its uses for the second floor, which may include, without

limitation, facilities for (i) a trading floor as part of a financial and accounting curriculum or mock operating rooms as part of a nursing curriculum; (ii) video, sound and other production and post-production facilities as part of the arts and theater curriculum; or (iii) other reasonable educational uses. Notwithstanding the foregoing, at no time, shall any Permitted Use include any use which (i) is not a lawful use; (ii) any use that would violate or cause a breach under that certain Federal Historic Tax Credit Pass-Through Agreement between Owner and Landlord relating to the pass-through of the rehabilitation tax credits under Section 50 of the Internal Revenue Code arising from the Owner's rehabilitation of the Building; (iii) any use as residential rental property; or (iv) any trade or business consisting of the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, or any other store the principal purpose of which is the sale of alcoholic beverages for consumption off premises; or any other trade, business or activity as may be prohibited by the Section 45D of the Internal Revenue Code.

1.30    **Premises**. Approximately 54,507 rentable square feet as set forth in that Arcade Building – BOMA Area Measurement Report prepared by ebersoldt + associates (the "BOMA Report") as attached in Exhibit A and as set forth on the Tenant Final Space Plan in Exhibit B of this Lease and as improved in accordance with the provisions of Exhibit C of this Lease, along with the Premises Parking Stalls.

1.31    **Premises Parking Stalls**. Those forty (40) underground Parking Spaces in the Building which shall be reserved and set aside for the exclusive use of Tenant located on floors P2 and P3 of the Building. The Parking Stalls are depicted on Exhibit H.

1.32    **Prime Documents**. That Master Lease; the Declaration; the Redevelopment Agreement by and between Owner and the Land Clearance for Redevelopment Authority of the City of St. Louis, dated July 1, 2013 (the "Redevelopment Agreement") and the Secretary of Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings (the "Secretary's Standards") as now established by the National Park Service, U.S. Department of the Interior, or its successor (and any additional historic preservation standards applicable to and imposed on the Building by Federal or State agencies, including, without limitation, the Advisory Council on Historic Preservation, and/or the State Historic Preservation Officer of the State of Missouri). Tenant acknowledges receipt of and acceptability of the Declaration, the Redevelopment Agreement and the Secretary's Standards.

1.33    **Proportionate Share**. As used in this Lease, the term "Tenant's Proportionate Share" shall mean thirty-five and 96/100 percent (35.96%) (calculated as rentable area of the Premises divided by total rentable area of the Landlord Condominium).

1.34    **Qualified Rehabilitation Expenditures**.    As referenced in Section 10.4, Qualified Rehabilitation Expenditures means those costs described in Section 47(c)(2) of the Internal Revenue Code of 1986, as amended. The determination of whether any cost constitutes a Qualified Rehabilitation Expenditure shall be determined by a third party accountant selected by Landlord.

- 4 -

1.35  **Rent**.  Annual rent consists of "Annual Base Rent" and "Additional Rent" as defined as follows:

(a)  Annual Base Rent:  From the Rent Commencement Date through the Lease Expiration Date of the initial Term the Annual Base Rent shall be $3.00 per rentable square foot annually, plus $72,000 annually for the Premises Parking Stalls ($150 per month per Parking Stall), amounting to $19,626.75 in monthly installments for Annual Base Rent; provided, that during each of the two (2) ten (10) year extensions of the Term, as allowed in Section 3.1(b) hereof, if such extensions are exercised, Annual Base Rent shall be determined in accordance with Section 4.1 hereof.

(b)  Additional Rent:  Subject to the provisions of Section 4.2 and Section 4.3 hereof, Additional Rent means (i) the Tenant Improvement Contribution, (ii) Tenant's Proportionate Share of Operating Expenses; (iii) eighty percent (80%) of separately metered heat and electricity in that Common Area located on the first floor of the Building, consisting of approximately 4,869 square feet, commonly referred to as the "Arcade" as shown on the Floor Plan under Exhibit A; (iv) one hundred percent (100%) of the cost of on-site, in-person building security guard(s) and/or concierge personnel for the Landlord Condominium to the extent provided by Landlord in consultation with Tenant; (v) one hundred percent (100%) of the actual cost of incremental charges relating to any events held exclusively by Tenant in the Common Areas including, without limitation, additional charges for electricity, heat, air conditioning and cleaning; (vi) pro rata share of the cost of cleaning, maintaining, repairing and replacing the Premises Parking Stalls based on the fraction of Tenant's Premises Parking Stalls divided by 129 total underground Parking Spaces in the Building; (vii) one hundred percent (100%) of any capital improvements wholly located within or solely benefiting the Premises; (viii) all real estate taxes payable solely with respect to the Premises; (ix) any insurance solely relating to the Premises, if any; (x) property management fees for the Premises; estimated at such time at five percent (5%) of gross receipts received from Tenant pursuant to this Lease; provided that in no event shall Tenant's property management fee for the Premises be less than $2,500 monthly; provided, further, that for purposes of the management fee calculation, gross receipts shall not include receipts from Tenant for the management fee portion of Operating Expenses, casualty insurance proceeds, or condemnation proceeds; (xi) replacement reserves at the rate of $.75 per rentable square foot of the Premises, per annum provided that such amount may increase annually (starting the day after the end of the first full calendar year of the Term) by an amount equal to the prior year's reserve requirement multiplied by three percent (3%) annually; and (xi) one hundred percent (100%) of the cost of any other agreements, contracts or other obligations entered into by Landlord solely with respect to the Premises including, without limitation, any janitorial contracts solely for the Premises, contracts for service, repair and maintenance of any elevators exclusively serving the Premises or HVAC contracts for HVAC units solely serving the Premises.

Notwithstanding anything to the contrary set forth in this Lease, the first lease year beginning with the Lease Commencement Date and ending on the date one (1) year thereafter, Tenant's Additional Rent shall not exceed $272,535 (calculated at five dollars ($5.00) for each rentable square foot of the Premises).

1.36    **Rent Commencement Date**. Shall have the meaning set forth in Section 3.2 hereof.

1.37    **Substantial Completion**.    The substantial completion of construction of the Landlord's Work as defined in Section 10.3.

1.38    **Tenant**.    Webster University, a Missouri non-profit corporation, having as its address for notice purposes 470 East Lockwood Avenue, Webster Groves, MO 63119, Attn.: Vice President and Chief Financial Officer, with a copy to:  Bryan Cave LLP, 211 N. Broadway, Suite 3600, St. Louis, MO 63102, Attn:  Heather Boelens Rucker.

1.39    **Tenant's Architect**.    Shall have the meaning set forth in Exhibit C.

1.40    **Tenant Delays**.    Those delays in completion of the Landlord's Work resulting from any delays relating to special or unique equipment, fixtures or materials ordered by Tenant or any installations made by or on behalf of Tenant which are not set forth specifically and with detail as to model, colors, brand, material and other options in the Approved Construction Documents or because of any delays resulting from Tenant's failure to timely submit (timely shall mean responding to Change Orders and other requests within five (5) business days) and/or approve plans in accordance with the provisions of Exhibit C or resulting from Change Orders or other Tenant's requested modifications to the Approved Construction Documents.

1.41    **Tenant Improvements**.    Those improvements to the Premises described in Section 10.1.

1.42    **Tenant Improvement Contribution.**    Tenant Improvement Contribution means the amounts to be deposited by Tenant to Landlord's Development Affiliate as further set forth in Section 10.4.

1.43    **Tenant Improvement Plans.**    Shall have the meaning set forth in Exhibit C.

1.44    **Term**.    The lesser of two hundred forty (240) months (subject to extension under Section 3.1 hereof) or the term of the Master Lease.

The following Exhibits attached to this Lease are incorporated herein by this reference:

| | |
|---|---|
| Exhibit A. | BOMA Report |
| Exhibit B. | Tenant Final Space Plan |
| Exhibit C. | Work to be Performed on the Premises |
| Exhibit D. | Landlord Condominium Rules |
| Exhibit E. | Certificate of Occupancy |
| Exhibit F. | Nondisturbance and Subordination Agreement |
| Exhibit G. | Signage Plan |
| Exhibit H. | Premises Parking Stalls |
| Exhibit I. | Budget |

## ARTICLE 2.
## DEMISING CLAUSE/TERMINATION RIGHTS

Landlord, for and in consideration of the rents, covenants and agreements hereinafter mentioned and hereby agreed to be paid, kept and performed by Tenant, does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises on the terms and conditions contained herein. The parties agree that the Premises and Landlord Condominium shall be deemed for all purposes hereunder to consist of the square feet described in <u>Sections 1.30</u> and <u>1.20</u>, hereof respectively. Landlord represents that the Premises and Landlord Condominium have been measured in accordance with the standards of the Building Owner's and Manager's Association Method of Measurement – 1996 (ANSI/BOMA – Z65.1-1996) ("BOMA"). The BOMA Report is attached as <u>Exhibit A</u> hereto. Landlord's interest in the Landlord Condominium will be derived from the Master Lease. In no event shall the rentable square footage of the Premises be increased due to any modifications made by Landlord with respect to the Common Areas, nor shall Tenant's Proportionate Share be increased due to any reason other than an expansion of the Premises.

The Master Lease is not yet executed and therefore, this Lease, until such time as the Master Lease is executed, and notwithstanding anything herein to the contrary, does not create a leasehold estate and is a contractual agreement to enter into a sublease upon the terms hereof upon the execution of the Master Lease as reviewed by Tenant as set forth hereinbelow. Immediately upon the execution of the Master Lease, and without any further act, the sublease estate as set forth herein shall be automatically created, subject to the Contingencies set forth in Section 23.28 below.

In connection with this Lease, Landlord hereby represents and warrants to Tenant that the following statements are true and correct: (i) as of the Lease Commencement Date, Owner will be the owner of the Building and the Landlord under the Master Lease; (ii) as of the Lease Commencement Date, Landlord will have a valid leasehold estate in the Building pursuant to the Master Lease, which shall be in full force and effect; and (iii) no joinder or approval of another person is required with respect to Landlord's right and authority to enter into this Lease that has not heretofore been obtained.

## ARTICLE 3.
## TERM AND POSSESSION

3.1     <u>Term</u>.

(a)     The Term shall commence on the Lease Commencement Date and shall continue for the Term.

(b)     Provided Tenant is not in default or breach hereunder beyond all applicable notice and cure periods, both at the time of exercise and at the time of extension, and provided that the Master Lease shall be extended for a term at least as long as any extended Term pursuant to any extension option set forth in this Section 3.1, Tenant shall have two (2) options to extend the Term hereof for ten (10) years each. Each option may only be exercised by giving Landlord written notice of exercise not more than thirty (30) months nor less than eighteen (18) months

prior to the expiration of the then current term and if not properly exercised within such time period, such option and all subsequent options shall at Landlord's election be cancelled. All terms and conditions which apply to the initial Term (other than with respect to construction of Landlord's Work) shall apply to the extended Term except the Annual Base Rent and Monthly Base Rent Installment (which shall be determined in accordance with Section 4.1 below) and the number of remaining options to extend and except as set forth herein. Landlord agrees to cooperate with Tenant to request that any extension of the lease on the Old Post Office Building also be extended to be coterminous with the Term under the Lease.

(c)     If Tenant assigns this Lease or if Tenant sublets, licenses or otherwise grants occupancy rights to more than fifty percent (50%) of the useable square feet of floor area within the Premises (whether in a single sublease, license or grant or collectively), all remaining unexercised options to extend the Term hereunder shall be null and void and of no further force or effect (previously exercised options to extend shall not be void); provided, however, that the foregoing shall not apply to any Permitted Transfer.

3.2     **Possession/Tenant Termination Right**. If Substantial Completion (as defined in Section 10.3 hereof) of the Premises has not occurred on the date estimated for Substantial Completion in Section 1.12 hereof, this Lease shall nevertheless continue in effect, and, except as otherwise expressly set forth herein, Landlord shall have no other liability whatsoever on account thereof. If Substantial Completion of the Premises has not occurred by said estimated date due to Tenant Delays (as defined in Section 1.40 hereof), then Rent (as defined in Section 4.1 hereof) and the Term shall commence and the Rent Commencement Date and Lease Commencement Date shall be the date it would have been without the Tenant Delays as reasonably determined by Landlord, notwithstanding any other provision hereof to the contrary. Landlord shall promptly provide Tenant with written notice of any claimed Tenant Delay together with a reasonably detailed description of the facts and circumstances giving rise to such claimed Tenant Delay. The Premises shall be deemed ready for occupancy upon Substantial Completion of the Premises as defined in Section 1.37 hereof. Tenant's taking possession of and operating its business in any portion of the Premises (provided, however, entry by Tenant for purposes of installing improvements, moving in furniture, conducting tours, and readying the Premises for the opening of its business shall not constitute operating its business), shall be conclusive evidence of Substantial Completion and that such portion of the Premises was, subject to Landlord's representations and warranties expressly set forth in this Lease, in good order and satisfactory condition when Tenant took possession, except as to latent defects and damage caused by Tenant or Tenant's agents, and punch list items agreed upon by Landlord and Tenant, if any. On the Lease Commencement Date, the parties shall execute a Certificate of Occupancy substantially in the form attached hereto as Exhibit E confirming the Lease Commencement Date and Rent Commencement Date and setting forth any incomplete items (if any), but failure to execute such document or include any incomplete item in such document shall not in any manner affect the obligations of the parties hereunder. Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the Premises or the Landlord Condominium, except as specifically set forth herein, or with respect to the suitability of either for the conduct of Tenant's business. Upon such time that Landlord delivers exclusive possession of the Premises to Tenant with the Tenant Improvements Substantially Complete, the Rent Commencement Date shall begin as follows:

(i) in the event Landlord delivers exclusive possession of the Premises to Tenant with the Landlord's Work Substantially Complete on or before December 1, 2015, then the Rent Commencement Date shall begin as of December 1, 2015;

(ii) in the event Landlord delivers exclusive possession of the Premises to Tenant with the Landlord's Work Substantially Complete on or before August 1, 2016 but after December 1, 2015 then the Rent Commencement Date shall begin as of August 1, 2016;

(iii) in the event Landlord delivers exclusive possession of the Premises to Tenant with the Landlord's Work Substantially Complete on or before December 1, 2016 but after August 1, 2016, then the Rent Commencement Date shall begin as of December 1, 2016;

(iv) in the event Landlord delivers exclusive possession of the Premises to Tenant with the Landlord's Work Substantially Complete on or before August 1, 2017 but after December 1, 2016 then the Rent Commencement Date shall begin as of August 1, 2017;

(v) in the event Landlord fails to deliver exclusive possession of the Premises to Tenant with the Landlord's Work Substantially Complete on or before August 1, 2017 and such delay is not due to Tenant Delays and which date shall be extended for any delays caused by Tenant Delays and delays caused by force majeure, then Tenant shall have the right to terminate this Lease by providing at any time ten (10) days' written notice to Landlord, in which event Tenant will have no obligation to pay for any work performed hereunder, all improvements to the Premises will become and remain the property of Landlord, and neither Landlord nor Tenant shall have any further obligation to each other under the Lease, except for the Surviving Obligations.  As used herein, "Surviving Obligations" shall refer to the following obligations: (1) Landlord shall refund to Tenant any portion of the Tenant Improvement Contribution paid to Landlord by Tenant in connection with the Lease which is held by Landlord at such time, and Landlord shall obligate Owner to refund to Tenant any portion of the Tenant Improvement Contribution paid to Landlord by Tenant in connection with the Lease which was deposited with the Escrow Agent pursuant to Section 10.4 hereof; (2) Landlord shall reimburse Tenant for its reasonable out-of-pocket expenses incurred in connection with this Lease, including, without limitation, any payments to the architect or other contractors of construction costs (including, without limitation, the Tenant Improvement Contribution) and design fees for the Premises and Tenant's attorneys' fees; (3) Landlord shall permit Tenant to remove any personal property, furniture or trade fixtures in the Premises or at the Building which Landlord permitted Tenant to theretofore install or store (and Tenant shall promptly repair any damage caused by such removal); and (4) any indemnification obligations which expressly survive termination.  Landlord shall pay to Tenant any amounts due hereunder in connection with the termination of this Lease, within thirty (30) days following Landlord's receipt of Tenant's written request(s) therefor, together with copies of documentation reasonably substantiating the amounts therein claimed.

Notwithstanding the foregoing, there shall be no deferral of the Rent Commencement Date for any period of time in which Substantial Completion is delayed due to Tenant Delays.

3.3     **Common Areas**.  Tenant shall have the nonexclusive right to use the Common Areas (hereinafter defined) in common with other tenants in the Building (subject to Tenant's right to reserve the Common Areas for Tenant's use during private events), as well as all Common Areas in the Landlord Condominium in common with other tenants in the Landlord Condominium, and their respective agents, employees, occupants, invitees and guests and subject to the Landlord Condominium Rules (as defined in Article 5 hereof). For purposes hereof, "Common Areas" shall be (as initially constructed or as the same may at any time thereafter be enlarged or reduced) those areas designated on the Floor Plan under Exhibit A with respect to all areas, parking, space, facilities, equipment, signs and special services made available by Landlord in the common and joint use and benefit of Landlord, Tenant and other tenants and occupants of the Building or Landlord Condominium, as applicable, and their respective employees, agents, concessionaires, subtenants, licensees, customers, and other invitees; provided, however, that exclusive of ingress and egress, Tenant's sole right to the underground Parking Spaces shall be limited to the Premises Parking Stalls set aside for Tenant as specified in Section 1.31.  Landlord may, from time to time, modify, alter, repair, restore, replace, change, remodel and/or reconstruct all or any part of the Common Areas at Landlord's reasonable election, which such actions may include the elimination of or addition of particular components of the Common Areas, improvements thereon or services provided thereto, provided that such actions do not prevent reasonable ingress and egress to and from the Premises or unreasonably impair Tenant's use of the Premises.

## ARTICLE 4.
## RENT

4.1     **Rent**.

(a)     Commencing on the Rent Commencement Date, Tenant shall pay the Annual Base Rent specified in Article 1 by Automatic Clearing House (ACH) payment to Landlord at the address designated in Section 1.18, or such other location as Landlord may designate from time to time in writing to Tenant, in the Monthly Base Rent Installment specified in Article 1 or in twelve (12) equal monthly installments, if not specified, in advance, on, or prior to the first day of each and every month during the Term commencing on the Rent Commencement Date without demand, set off, deduction or recoupment whatsoever (except as expressly set forth herein). The Rent for any partial month or year shall be prorated on the basis of thirty (30) days to the month and three hundred sixty-five (365) days to the year and shall be paid on the first day of such partial period. The Annual Base Rent, including the adjustments made pursuant to this Article 4, the Additional Rent and all other amounts due to Landlord hereunder is referred to in this Lease collectively as the "Rent."

(b)     The Annual Base Rent for the extensions allowed in Section 3.1(b) hereof, if exercised, shall be the greater of (1) the immediately prior Annual Base Rent or (ii) the Fair Market Rent of the Premises. The "Fair Market Rent" shall be determined within thirty (30) days of the date that Tenant provides written notification to Landlord of Tenant's exercise of the extensions. If Landlord and Tenant fail to agree upon the Fair Market Rent within thirty (30) days of the date that Tenant notifies Landlord of Tenant's exercise of the extension, the Fair Market Rent shall be determined by appraisal in accordance with the provisions of this Section 4.1(b). Any agreement reached by the parties hereto with respect to the Fair Market

- 10 -

Rent for the extended term shall be expressed in writing and shall be executed by the parties hereto, and a copy thereof delivered to each of the parties. Upon an established date, at an established time, three (3) appraisers one (1) selected by Landlord, one (1) selected by Tenant and one (1) selected by the two (2) appraisers selected by Landlord and Tenant shall simultaneously submit their determinations as to Fair Market Rent, such determinations to be submitted in sealed envelopes and to be opened jointly by Landlord and Tenant. The Fair Market Rent for the extended term shall be determined by averaging the two (2) appraisers' Fair Market Rent determinations which are closest in amount to each other (or if one appraisal is less than one of the other appraisals and more than the other appraisal by the same amount, all three appraisals shall be averaged). This determination of Fair Market Rent shall be final and binding on the parties. All appraisers appointed by or on behalf of either party or appointed pursuant to the provisions hereof shall be MAI members of the American Institute of Real Estate Appraisers with not less than ten (10) years of experience in the appraisal of improved commercial and industrial real estate in the St. Louis, Missouri metropolitan area and be devoting substantially all of their time to professional appraisal work at the time of appointment and be in all respects impartial and disinterested.

    4.2    **Additional Rent**. In addition to Annual Base Rent during the Term, commencing on the Rent Commencement Date, Tenant shall also pay monthly installments of Additional Rent. For purposes of calculating the Additional Rent during any part of the Term (and to the extent that any payments of Additional Rent are not paid directly to the applicable party owed such amounts), (a) prior to the Rent Commencement Date, Landlord will provide Tenant with a written notice setting forth estimated Additional Rent and/or Operating Expenses for the then current calendar year and Tenant shall pay estimated monthly Additional Rent installments based on Landlord's good faith projection of the Additional Rent and/or Operating Expenses for the then current calendar year, and (b) as soon as practicable after the end of each calendar year (or portion thereof) thereafter during the Term (but in any event, prior to March 1), Landlord will provide Tenant with a written notice ("Statement") setting forth a statement of Additional Rent and/or Operating Expenses (detailed by category of Additional Rent and/or Operating Expense) for the previous calendar year along with any adjustment to estimated payments of Additional Rent as applicable, said adjustment to take into consideration any underpayment or overpayment of actual Additional Rent and/or Operating Expenses for the previous calendar year, as well as estimated Additional Rent and/or Operating Expenses for the then current calendar year. Within thirty (30) days following receipt of the Statement, Tenant shall pay to Landlord any underpayment of Operating Expenses for the previous calendar year and an estimated adjustment to Additional Rent for the months which have elapsed in the current calendar year based on Landlord's good faith projection of the Operating Expenses during the current calendar year after credit for any estimated payments made by Tenant; provided, however that if any Additional Rent are not included in the Statement but arise during such fiscal year, Landlord may separately invoice Tenant for such items of Additional Rent (detailed by category of Additional Rent) and Tenant shall pay such amount within thirty (30) days of receipt. Commencing with the month following the month in which the Statement is dated and continuing until such time as Tenant receives Landlord's next Statement, Tenant shall pay estimated monthly Additional Rent installments based on Landlord's good faith projection of the Operating Expenses for the current calendar year. If the Statement shows that Tenant has overpaid, Landlord shall either, at Tenant's option, promptly refund such overpayment to Tenant or credit such overpayment against the next accruing payments of any Additional Rent and/or Operating Expenses until the

overpayment is reduced to zero, provided Landlord shall not be required to credit any such overpayment while Tenant is in default or breach hereunder beyond all applicable notice and cure periods. The obligation to refund or pay Additional Rent shall survive any termination of the Term. After receipt of each Statement of actual Additional Rent and/or Operating Expenses, Tenant may, for ninety (90) days thereafter, review Landlord's records related to Additional Rent and/or Operating Expenses for such Statement and related to Additional Rent and/or Operating Expenses for the previous calendar year only, at a location reasonably designated by Landlord. If Tenant does not deliver written notice to Landlord of any objections to Landlord's Statement before the expiration of such ninety (90) day period, Tenant shall be deemed to approve and agree with the Statement and it shall be deemed correct. If Tenant timely objects to Landlord's Statement, Tenant shall have an additional ninety (90) day period to review Landlord's records related to such Statement and related to Operating Expenses for the previous calendar year only, at a location reasonably designated by Landlord. If Tenant's examination accurately discloses an underpayment of Additional Rent, Tenant shall promptly pay to Landlord the amount of the underpayment. If Tenant's examination accurately discloses an overpayment of Additional Rent, Landlord shall promptly pay to Tenant the amount of the overpayment.

     4.3   **Operating Expenses**. Operating Expenses shall mean all expenses and costs reasonably incurred in connection with operating, maintaining, repairing and protecting the Landlord Condominium (which are not separately charged to Tenant as Additional Rent), including, without limitation, the following costs:

     (a)    reimbursement to Landlord for all service contracts for independent contractors and for the cost to Landlord of wages, employment taxes and benefits of all Landlord Condominium and staff management and maintenance employees directly employed at or in connection with the Landlord Condominium management, including any shared staff (subject to reasonable cost proration);

     (b)    janitorial labor, supplies, equipment and materials for the Landlord Condominium and standard cleaning and all repairs and maintenance Landlord is required to perform in space leased to tenants but excluding tenant finish and special services paid directly by a particular tenant;

     (c)    building security systems (excluding in-person security which shall be payable by Tenant as Additional Rent) which are reasonably allocable to or included within the Landlord Condominium;

     (d)    interior and exterior maintenance and repairs and replacements reasonably allocated to the Landlord Condominium;

     (e)    landscaping maintenance reasonably allocated to the Landlord Condominium;

     (f)    legal fees and expenses related to the operations and management of the Landlord Condominium, all accounting fees and expenses, including without limitation annual audits, partnership administrative fees, costs of partnership audits of Landlord's partnership and cost certifications;

(g)     other incidental and reasonable costs related to the management and operations of the Landlord Condominium;

(h)     to the extent not included as Additional Rent, or to the extent not separately metered to Tenant (utilities separately metered to Tenant shall be payable solely by Tenant), electricity, gas, sewer, water, trash disposal and all other utilities reasonably allocated to the Landlord Condominium;

(i)     insurance premiums (specifically including, but not limited to, commercial general liability and casualty coverage and other coverages as required by the Prime Documents or financing documents or otherwise deemed prudent by Landlord in Landlord's reasonable discretion reasonably allocated to the Landlord Condominium (excluding any insurance premiums attributable solely to the Market Rate Unit);

(j)     real estate taxes, if any, special need general assessments, personal property taxes, special need personal property taxes and assessments, and Community Improvement District assessments reasonably allocated to the Landlord Condominium (excluding any real estate taxes attributable solely to the Market Rate Unit);

(k)     costs of capital improvements (excluding completion of Landlord's Work initial construction and rehabilitation of the Landlord Condominium, systems, common areas and tenant finish whether such initial construction and rehabilitation occurs prior to the Lease Commencement Date or after, but including any later construction or rehabilitation of such improvements and excluding any capital improvements located solely within the Market Rate Unit as described in the Declaration) such as repair or replacement of heating, ventilation and air conditioning systems for the Landlord Condominium  necessary to comply with changes to applicable governmental rules, regulations, codes, orders, ordinances or Prime Documents that are enacted, or first interpreted to apply to the Landlord Condominium after the Date of this Lease (such costs to be amortized by Landlord over the useful life and Operating Expenses to include only the cost as so amortized by Landlord during the calendar year for which such computation is made); and

(l)     all association dues, assessments and related charges, fees, and amounts due with respect to the Building which are payable by the Landlord Condominium pursuant to the Declaration.

Notwithstanding anything to the contrary in the definition of Operating Expenses herein or in any other provision of the Lease, "Operating Expenses" shall not include: (i) depreciation; (ii) principal payments of mortgage and other non-operating debts of Landlord; (iii) organizational expenses associated with the creation of the entity which constitutes Landlord; (iv) any penalties or damages that Landlord pays to Tenant under this Lease or to other tenants in the Landlord Condominium under their respective leases; (v) costs of repairs, restoration, replacements or other work (1) covered entirely by insurance required to be carried by Landlord under the Lease or which would have been covered by such insurance had Landlord not elected to self-insure, or (2) paid by the proceeds of any condemnation award; (vi) leasing commissions, attorneys' fees, costs, disbursements and other expenses incurred in connection with negotiations for leases with tenants (including Tenant), other occupants, or prospective tenants or other occupants of the

buildings (without regard to costs and expenses incurred with respect to reletting the Premises under Article 17); (vii) costs incurred in connection with the investigation, removal, remediation or clean-up of Hazardous Materials from Building (including the fees of any environmental consultants) unless caused directly or indirectly by any act or omission of Tenant, (viii) costs incurred in connection with the sales, mortgaging, selling or change of ownership of the Landlord Condominium or any part thereof, including brokerage commissions, consultants', (ix) attorneys' and accountants' fees, (x) closing costs, (xi) title insurance premiums, (xii) transfer taxes and interest charges; (xiii) advertising and promotional costs associated with the leasing of the Landlord Condominium (without regard to costs and expenses incurred with respect to reletting the Premises under Article 17) and the costs of signs in or on the Building identifying the owners of the Building or any tenant of the Building; (xiii) any "tap fees" or one-time lump sum sewer or water connection fees for the Landlord Condominium payable in connection with the original construction of the Building; (xiv) costs incurred for any item to the extent covered by a manufacturer's, materialman's, vendor's or contractor's warranty and paid by such manufacturer, materialman, vendor or contractor (Landlord shall pursue a breach of warranty claim for items covered by a warranty); (xv) political or charitable contributions; (xvi) development fees, impact fees and similar charges; (xvii) costs or expenses of utilities directly metered to other tenants of the Landlord Condominium and payable separately by such tenants or electric power costs for which any tenant directly contracts with the local public service company; (xviii) any specific allocation for specific expenses which are solely imposed on the owner of the Market Rate Unit under the Declaration, or (xix) any income, capital levy, transfer, capital stock, gift, estate or inheritance tax, any state, corporate or franchise taxes, any transfer taxes, deed stamps or mortgage taxes, or any interest or penalties for late payment of any taxes; allowances, concessions and other costs and expenses incurred in completing, fixturing, furnishing, renovating or otherwise improving, decorating or redecorating space for tenants (without regard to costs and expenses incurred with respect to reletting the Premises under Article 17), prospective tenants or other occupants and prospective occupants of the building(s) within the Building; costs of repairing, replacing or otherwise correcting defects or deficiencies in the design, construction or components of the Building (Landlord hereby agreeing to promptly repair and correct all such defects, latent or otherwise, and deficiencies, at Landlord's sole cost and expense, including defects and/or deficiencies in the Landlord Condominium and/or the design or construction of the same and/or the materials, fixtures, equipment and the like relating thereto) occurring within one (1) year of Substantial Completion; moving expense costs of tenants of the Building; and any expenses payable by Tenant as Additional Rent pursuant to Section 1.35(b) of this Lease.

## ARTICLE 5.
## PERMITTED USE AND ACCESS

Subject to breaks in Tenant's academic calendar, Tenant shall continuously use and occupy the Premises only for the Permitted Use. Tenant shall ensure that all persons permitted by Tenant to come upon the Premises shall comply with the Landlord Condominium Rules identified in Exhibit D, as may be modified from time to time by Landlord in Landlord's reasonable discretion; provided, however, any such future modifications of such rules and regulations hereunder shall not be inconsistent with the provisions of this Lease (and in the event of any conflict, this Lease shall control) (the "Landlord Condominium Rules"). Subject to breaks in Tenant's academic calendar, commencing on the Lease Commencement Date and

- 14 -

continuing throughout the Term of this Lease and during the Normal Business Hours, as defined in Section 6.2, Tenant shall keep the Premises continuously open and occupied and shall continuously operate its business in the Premises. To the extent that Tenant fails to keep the Premises open and occupied as herein set forth for a period of more than thirty (30) days after written notice by Landlord, such failure shall constitute a default under this Lease. In addition, at no time (whether or not during Normal Business Hours) shall Tenant prohibit or impede access of other tenants or their employees, agents, contractors, guests or invitees of the Landlord Condominium to any Common Areas in the Building; provided, that Landlord acknowledges that from time to time Tenant shall conduct functions in the Arcade and access to such area shall be restricted.

Tenant shall not make or permit to be made any use of the Premises which directly or indirectly is forbidden or prohibited by any of the Prime Documents (provided that Tenant shall not be bound by any amendment to the Master Lease which changes the Permitted Use of Tenant under this Lease), applicable law or governmental regulation or which may be dangerous to persons or property or which may invalidate or increase (unless Tenant pays to Landlord an amount equal to such increase in insurance) the premium cost of any policy of insurance carried on the Landlord Condominium. Tenant may have access to the Premises twenty four (24) hours per day, seven (7) days per week, three hundred sixty five (365) days per year, inclusive of holidays and weekends but subject to Sections 6.1 and 6.2, all reasonable Landlord Condominium security requirements, interruption for force majeure, casualty events, repairs and reconstruction, and interruption in the utility service. Tenant shall comply with all applicable laws, rules, regulations, ordinances, orders, recorded restrictions and permits as well as all Prime Documents with respect to the Tenant's particular use of, conduct in and activities in the Premises. Landlord shall promptly comply with all applicable laws, rules, regulations, ordinances, orders, recorded restrictions and permits as well as all Prime Documents with respect to the Building, and Tenant shall promptly comply with all applicable laws, rules, regulations, ordinances, orders, recorded restrictions and permits as well as all Prime Documents with respect to the Premises, whether now in effect or which may hereafter come into effect whether or not they reflect a change in policy from that now existing during the term or any part hereof.

Tenant shall not allow or permit any noise, smoke or odor to escape from the Premises. Tenant shall not permit any loitering in the Common Areas (other than as may be applicable with respect to special events), and Tenant covenants not to do or allow or permit any waste or damage, disfigurement or injury to the Premises or Landlord Condominium or allow or permit any overloading of the floors or walls of the Premises. The Prime Documents are incorporated into this Lease by this reference to the extent necessary to interpret, enforce, explain or set forth the parties respective rights, obligations, covenants and liabilities, all the same as if fully set forth herein. Tenant shall comply with the Prime Documents with respect to its use of, conduct in and activities in the Premises and Landlord Condominium. Landlord shall provide any security reasonably required by Landlord or Tenant for the Premises and its employees, agents, invitees and permittees.

## ARTICLE 6.
## UTILITIES; SERVICES

6.1    **Landlord Condominium Standard Services Provided by Landlord**. Landlord shall furnish Tenant with the following services, twenty-four (24) hours per day, seven (7) days per week, three hundred sixty-five (365) days per year, inclusive of holidays and weekends (unless otherwise expressly provided herein): (a) heat, ventilation and air conditioning to provide a seasonable temperature (subject to governmental regulations) for normal and comfortable occupancy and use of the Premises under normal business operations; (b) cold water from the public supply for drinking, lavatory and toilet purposes and hot water for lavatory purposes from regular building supply drawn through fixtures installed by Landlord; (c) if requested by Tenant, janitor service and customary cleaning; (d) two (2) passenger elevators providing access to the Premises; (e) window washing of all exterior windows in the Premises, at reasonable intervals; (f) elevator service and maintenance when required; and (g) electricity (which shall be separately metered to the Premises). Tenant shall report to Landlord any deficiency in the services provided by Landlord or Landlord's agents. Landlord, by furnishing any of the above services, shall not be deemed to have warranted the same to be free from any interruption or discontinuance that is beyond the reasonable control of the Landlord or which may result from occasional damage or malfunctions of equipment and distribution facilities, and Tenant shall be required to pay Tenant's Proportionate Share of such services as Additional Rent (subject to the exclusions and limitations set forth herein). Any such interruption or discontinuance shall not constitute an eviction (actual or constructive) or a disturbance of Tenant's possession, use or quiet enjoyment of the Premises. Landlord shall use reasonable efforts to minimize any period of interruption or discontinuance, however, Tenant agrees that, except as expressly set forth herein, Landlord shall not be liable for damages resulting from any such interruption or discontinuance, nor shall Tenant be relieved of the performance of any of Tenant's covenants or obligations under this Lease.

6.2    **Additional Landlord Condominium Standard Services**. If Tenant does not reasonably maintain the Premises or Common Areas, after any event conducted by Tenant in any Common Areas pursuant to which Tenant is obligated to clean and restore the Common Area, after such event, or, upon Tenant's reasonable prior written request, Landlord shall provide additional janitorial services which shall be invoiced to Tenant who shall pay such invoice within fifteen (15) days after receipt thereof accompanied by documentation reasonably substantiating the amounts therein. During hours other than from 7:00 A.M. to 10:00 P.M., Monday through Friday, and 7:00 A.M. to 5:00 P.M. on Saturday, excluding holidays ("Normal Business Hours") and upon reasonable prior notice to Landlord, heating, ventilation and air conditioning ("HVAC") will be available to Tenant in the Common Areas, upon Tenant's request, at Tenant's expense from time to time at Tenant's sole cost. Landlord reserves the right to install submeters or to conduct an electric consumption audit or otherwise reasonably estimate or determine electrical consumption in the Arcade, provided that upon written request of Tenant, Landlord will deliver reasonable information available to Landlord with respect to Landlord's estimate of electrical consumption. Landlord and Tenant shall have access to any metering devices in the Premises or the Arcade at all reasonable times.

- 16 -

## ARTICLE 7.
## SUBLETTING AND ASSIGNMENT

7.1     **Subleasing and Assignment**.  Tenant shall not by operation of law or otherwise
have the right to assign, sublet, hypothecate, mortgage, encumber or convey this lease or any
interest in or under it, or to license or otherwise permit occupancy by any other person or entity
of all or any portion of the Premises unless Landlord grants its prior written consent.  Landlord
shall not unreasonably withhold, condition or delay its consent for any assignment of the Lease
or sublease of all or any portion of the Premises provided that Tenant agrees that Landlord shall
not be unreasonable in withholding consent if Landlord is not satisfied with the proposed
transferee's net worth, Landlord is not satisfied with the quality of the proposed transferee's
business operations, Landlord has not obtained any consents or approvals required under the
Prime Documents or any financing documents, or Landlord has determined that such proposed
transfer creates a risk of a material adverse event or liability for Landlord under any agreement,
law, order or regulation.  In no event shall any consent by Landlord to an assignment or sublease
of the Lease release Tenant from any obligations hereunder.  Tenant acknowledges and confirms
that Landlord's consent may be subject to the prior written consent of the Owner under the
Master Lease, lenders to Landlord or Owner, and any other consent required under the Prime
Documents.  Other than in connection with a Permitted Transfer, upon any assignment or the
subleasing, licensing or grant of occupancy rights to more than fifty percent (50%) of the
Premises, any remaining unexercised options to extend this Lease shall be void (previously
exercised options to extend shall not be void).  No subtenant or assignee shall use the Premises
for any purpose other than which is allowed under the Master Lease.  No permitted sublease or
assignment shall in any way release Tenant from Tenant's primary liability under this Lease.

     If Tenant desires the consent of Landlord to sublease or assign, at least thirty (30) but no
more than one hundred twenty (120) days prior to the date on which Tenant desires the
assignment or sublease to be effective (the "Transfer Date"), Tenant must submit the proposed
sublease or assignment to Landlord for Landlord's approval, together with the following (as
applicable): (a) a detailed description of the portion of the Premises proposed to be sublet
(which must be a single, self-contained unit (the "Space")); (b) a complete financial statement of
the subtenant or assignee with an authorization to verify the same; (c) a declaration by the
subtenant or assignee as to the type of business to be carried out and the number of employees to
occupy the Space; (d) payment of a reasonable fee but no less than One Thousand and 00/100
Dollars ($1,000.00) for processing of the sublease or assignment documents; (e) proof of
payment of all leasing commissions, if applicable; and (f) an executed lease estoppel certificate
from Tenant.  Tenant shall be responsible for all reasonable legal fees incurred by Landlord for
the preparation or review of any sublease or assignment documents and shall pay for such fees
within thirty (30) following receipt of Landlord's invoice.   Landlord, in Landlord's sole
discretion, may disapprove a sublease for a rent of less than the rent being offered by Landlord
for comparable space in the Landlord Condominium or for a rent of less than that set forth in this
Lease.  In the event Tenant obtains Landlord's written consent to sublet or assign Tenant's
interest in this Lease in accordance with the terms contained herein, and Tenant defaults in the
payment of any installment of Rent or in the payment of any other sum required to be paid by
Tenant under this Lease, and such default shall continue for five (5) days after payment thereof is
due, then Landlord, in addition to Landlord's other remedies, may collect, as long as such default
remains uncured, directly from such transferee all rents becoming due to Tenant and apply such

- 17 -

rents against Rent.  Tenant hereby authorizes Tenant's transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so and authorized Landlord to collect rent directly from a subtenant.  In the event of any sublease or assignment, Tenant shall remain obligated to provide to Landlord all of the categories and types of information required in Article 21 including such information applicable to both the Tenant and the subtenant or assignee and such requirements shall be expressly set forth in the sublease or assignment.

 7.2 **Permitted Transfers**.  Notwithstanding anything to the contrary set forth in this Lease, the consent of Landlord shall not be required for, and no profit sharing shall be triggered by, any sublease or assignment to any entity (collectively, a "Permitted Transfer") (i) into or with which Tenant or Tenant's parent company is merged or consolidated, (ii) which acquires ownership interests in Tenant or Tenant's parent company by way of sale, transfer or issuance of stock or other ownership interests, (iii) which acquires all or substantially all of Tenant's or Tenant's parent company's assets by purchase, merger or other means, and/or (iv) controlled by, controlling or under common control with Tenant.  Changes of ownership or control (direct or indirect) in Tenant (including through the sale of substantially all of its assets or through merger) shall not require the consent of Landlord hereunder or otherwise.

### ARTICLE 8.
### QUIET POSSESSION AND SUBORDINATION

 Landlord covenants and agrees with Tenant that so long as Tenant is not in default hereunder, Tenant shall peaceably and quietly enjoy the Premises through the Term without hindrance or molestation by anyone claiming through or under Landlord, subject, however, to the terms of this Lease and the Prime Documents.  This Lease is subject and subordinate to all present or future mortgages, deeds of trust and related financing documents on the Landlord Condominium, the Master Lease and any amendment thereto or replacement thereof (provided that such amendments to or replacements of the Master Lease do not materially and adversely affect Tenant's ability to use the Premises for the Permitted Use and do not require Tenant to pay additional material costs hereunder or create additional material liabilities hereunder for Tenant), the Prime Documents (whether entered into prior to or after the date hereof) and to all modifications and replacements thereof and to all advances made or hereafter to be made on the security thereof (the "Superior Instruments").  Landlord shall secure from the holder of such Superior Instrument a commercially reasonable non-disturbance and attornment agreement in the standard form of such holder pursuant to which such holder shall have agreed in writing, and shall be bound thereby, to honor all of Tenant's rights under this Lease, including Tenant's rights of quiet and exclusive use and enjoyment of the Premises, the form of which shall be in recordable form.  This Lease is further subject to all present and future easements and present conditions and encumbrances of record, and to all applicable laws, ordinances and governmental rules and regulations (hereinafter "Laws", and with the above described financial encumbrances, collectively called the "Conditions"). Tenant shall at any time hereafter, at the request of Landlord or any lienholder, execute any reasonable instruments that may be required by any lienholder for the purpose of confirming such subordination.  In the case of subordination to mortgages, deeds of trust and related financing documents only, any such agreement shall contain adequate assurances that so long as Tenant is not in default hereunder:

       (1)    If by foreclosure, a lender, or any successor in interest, shall come into possession of the Premises, or shall become the owner of the Premises, such lender, or any successor in interest, shall not, unless Tenant is in default, beyond all applicable notice and cure periods disturb the possession of the Premises by Tenant, its successors or permitted assigns; and

       (2)    Tenant shall not be named or joined in any action or proceeding to foreclose such mortgage or deed of trust or other lien. If Landlord requests Tenant to confirm its subordination to all or any of the Prime Documents such subordination form shall not be required to contain the foregoing assurances.

Tenant specifically agrees that the form attached as Exhibit F is acceptable. If any purchaser at a foreclosure sale (including any mortgagee by purchase or by deed in lieu of foreclosure) becomes the owner of the Premises and/or in the event of a termination of the Master Lease, Tenant shall attorn to and recognize such entity's becoming such owner, or the Owner under the Master Lease as the case may be, for all purposes in place of the Landlord named in this Lease subject to the provisions hereinabove. Landlord shall obtain a commercially reasonable non-disturbance agreement from Owner and any holder of a deed of trust encumbering the fee interest including the Premises. Landlord shall have no liability to Tenant if this Lease is terminated due to the termination of the Master Lease at any time.

## ARTICLE 9.
## LANDLORD'S RESERVED RIGHTS

       Provided such rights are exercised in a manner consistent with the maintenance of the Building and are exercised in a reasonable manner so as not to materially and adversely interfere with Tenant's peaceful and quiet enjoyment of the Premises or otherwise to unreasonably interrupt the conduct of Tenant's business in the Premises, Landlord reserves the following rights: (a) to change the name or street address of the Building; (b) to maintain a sign or signs on the exterior of the Building; (c) to designate and control all sources furnishing building related services by Landlord to tenants; (d) during the Term (subject to breaks in Tenant's academic calendar, if Tenant has vacated the Premises) to display "for rent" signs on and exhibit and otherwise prepare the Premises for reoccupancy; (e) to retain passkeys to all doors within and into the Premises; (f) during the last twelve (12) months of the Term to display a "For Lease" sign and to exhibit the Premises to prospective lessees; (g) to grant to anyone the exclusive right to conduct any particular business in the Landlord Condominium except the Permitted Uses; (h) to close the Landlord Condominium after Normal Business Hours and on legal holidays and to affect such reasonable security measures as Landlord may deem appropriate and in the best interests of the Landlord Condominium and tenants; subject, however, to Tenant's right to admittance at all times under such reasonable security regulations as Landlord may prescribe from time to time; (i) to approve the weight, size, and location of safes or other heavy objects, which objects may be moved in, about or out of the Building or Premises only at such times and in such manner as Landlord shall reasonably direct, and in all events at Tenant's sole risk and responsibility; (j) subject to Section 6.1, to take any and all measures necessary or desirable for the operation, safety, protection or preservation of the Landlord Condominium, including repairs, alterations, decorations, additions or improvements, whether structural or otherwise, in and about the Landlord Condominium or any part thereof, and installation of an energy management system to more accurately monitor and control HVAC in the Landlord Condominium, and during

the continuance of any such work to temporarily close doors, entry ways, public spaces and corridors in the Landlord Condominium and to interrupt or temporarily suspend building services or facilities (provided that Landlord shall make reasonable efforts to minimize material disruption to Tenant's operations except in case of acute or critical need); (k) to alter, modify, remodel, repair, replace, reconstruct, eliminate, restore all or part of the Common Areas, the improvements thereon or services provided thereto, provided that such actions do not prevent reasonable ingress and egress to and from the Premises or unreasonably impair Tenant's use of the Premises; and (l) to enjoy access to the Premises upon reasonable prior notice to Tenant and grant such access to others as is necessary to satisfy the terms of the Master Lease and other Prime Documents upon reasonable prior notice to Tenant. Subject to <u>Section 6.1</u>, Landlord may enter upon the Premises and may exercise any or all of the foregoing rights without being deemed guilty of an eviction (actual or constructive) or disturbance of Tenant's use or possession and without being liable in any manner to Tenant and without abatement of rent or without affecting Tenant's obligations hereunder.

**ARTICLE 10.**
**CONSTRUCTION AND ACCEPTANCE OF PREMISES**

10.1    **Landlord's Construction**.  According to the terms hereof, Landlord shall require to be performed, and "Landlord's Work" shall mean, all labor, supervision, materials, fixtures, special facilities, equipment, tools, supplies, taxes, permits and related inspections and other property and work and services necessary to timely and properly construct all alterations, improvements and construction described in the Work to be Performed on the Premises, as set forth in <u>Exhibit C</u>, and on the Approved Construction Documents, all in accordance with the terms set forth herein.  The Work to be Performed on the Premises as further described in the Approved Construction Documents which are located in the Premises are sometimes referred to herein as "Tenant Improvements," and the Work to be Performed on the Premises which are described in the Approved Construction Documents which are located in the Common Areas are sometimes referred to herein as the "Common Area Improvements."  Landlord acknowledges that its obligations with respect to the Common Area Improvements include making certain improvements to the building systems, the Landlord Condominium and the common areas of the Building reasonably necessary for Tenant to have reasonable access to and from the Premises and reasonably use and occupy the Premises for Tenant's Permitted Use hereunder including completion of fire safety systems and emergency exits to the extent necessary for Tenant to reasonably use the Premises.  Approval procedures setting forth the process for Change Orders shall be as set forth in <u>Exhibit C</u> hereto.  Tenant shall be responsible for all costs associated with (a) any moving expenses of Tenant, (b) all of Tenant's furnishings and equipment, and (c) Change Orders.

10.2    **Construction Period**.  Construction of the Landlord's Work shall commence as soon as practical after receipt of any necessary permits or approvals, and the Landlord anticipates achieving Substantial Completion of Landlord's Work in accordance with the Approved Construction Documents and other provisions of this Lease and <u>Exhibit C</u> on or before September 30, 2015 (the "Construction Period"), subject to Tenant Delays, force majeure, and other provisions of this Lease.

10.3    **Substantial Completion**.

- 20 -

(a)    "Substantial Completion" shall be irrevocably and conclusively determined to occur upon satisfaction of all of the following: (i) completion of construction of the all of Landlord's Work in accordance with the Approved Construction Documents and this Lease, subject only to insubstantial details of construction, mechanical adjustment, or decoration, and other punch list items, the completion of which will not materially interfere with Tenant's intended use and occupancy of the Premises, as evidenced by an AIA Certificate of Substantial Completion; and by the issuance of a permanent or temporary certificate of occupancy by the appropriate governmental authority.

(b)    When Landlord has achieved Substantial Completion, Landlord shall cause Contractor to inspect the Premises with representatives of Tenant and Landlord and to prepare a punch list of unfinished items of the Landlord's Work. At such time authorized representatives for Landlord and Tenant shall execute the agreed upon punch list which shall be completed within sixty (60) days after the approval of such punch list (except for items which cannot reasonably be completed within such 60-day period, which items shall be completed as promptly as practicable thereafter). Failure to include an item on such list does not alter the responsibility of Landlord to complete all aspects of the Landlord's Work in accordance with the terms hereof, including the Approved Construction Documents.

10.4    **Tenant Improvement Contribution**. Upon the date of this Lease, Tenant shall deliver into escrow with the Landlord's Development Affiliate who will coordinate the deposit of such funds with [St. Louis Leased Housing Associates V, LLC], the escrow agent of Owner (the "Escrow Agent") an amount equal to the Tenant Improvement Contribution, as defined in Exhibit C; provided, however, that if the Escrow Agreement (defined below) is not executed at a date commensurate with the execution of this lease, the Tenant's deposit of the Tenant Improvement Contribution shall be delayed until such date that an Escrow Agreement acceptable to Landlord and Tenant has been executed by all parties. Landlord, Tenant and Escrow Agent and any other applicable parties shall execute an escrow agreement in a form acceptable to Landlord and Tenant pursuant to which Escrow Agent agrees to coordinate the holding and disbursement of the Tenant Improvement Contribution in accordance with the agreements set forth in this Lease, including Exhibit C (the "Escrow Agreement"):

(a)    The Tenant Improvement Contribution determined as of the Date of this Lease shall be calculated as follows:

      1.)    The initial budgeted amount of Landlord's Work set forth in the Approved Construction Documents (only that portion of the Landlord's Work that Landlord reasonably deems to be Qualified Rehabilitation Expenditures ("QRE")).

      2.)    Less a Tenant Improvement Allowance calculated as $25/square foot multiplied by the square footage of the Premises.

      3.)    The difference between #1 and #2 above is multiplied by 74% -- the product of this multiplication is the QRE portion of the Tenant Improvement Contribution.

4.) The portion of the Landlord's Work that the Landlord reasonably deems to be Non-Qualified Rehabilitation Expenditures shall be multiplied by 110% -- the result of this multiplication is the non-QRE portion of the Tenant Improvement Contribution.

5.) The sum of #3 and #4 above reflects the Tenant Improvement Contribution which Tenant agrees to promptly deposit with Escrow Agent in accordance with the terms of this Lease and the Escrow Agreement.

(b)      The Tenant Improvement Contribution as applicable to any Change Order shall be calculated as follows:

1.) The amount of any Change Order that is classified as a QRE, shall be multiplied by 74% -- the product of this multiplication is the QRE portion of the Change Order

2.) The amount of any Change Order that is not classified as a QRE, shall be multiplied by 110% -- the result of this multiplication is the non-QRE portion of the Change Order.

10.5   **Additional Construction Terms**.  Additional terms and conditions relating to the initial buildout of the Premises and Landlord's Work are set forth on Exhibit C, attached hereto and incorporated herein by reference.

## ARTICLE 11.
## ALTERATIONS AND IMPROVEMENTS

Tenant shall not make any alterations, improvements or additions to the Premises or install any decorations visible from outside the Premises or in windows (hereinafter collectively referred to as a "Change") without Landlord's prior written consent which may not be unreasonably withheld or delayed. All Changes must comply with the Secretary's Standards and the requirements of the Advisory Council on Historic Preservation, and/or the State Historic Preservation Office of the State of Missouri. If Tenant desires or is otherwise required by law or this Lease to make a Change, it shall provide notice thereof to Landlord and, except with respect to a Cosmetic Change, Landlord may consider making such Change for Tenant at Tenant's cost (in which case Tenant may not make any such Change). Landlord shall have no obligation to make any such Change, however, if Landlord consents to make such Change, it shall be at the sole cost and expense of Tenant. Such costs shall include a construction management fee equal to ten percent (10%) of the cost of such work, together with the payment of all actual, out-of-pocket reasonable costs to be incurred in connection with the Change, insurance against liabilities which may arise out of such work and the plans and specifications together with all necessary permits for such Change. Landlord may require that Tenant deposit one hundred ten percent (110%) of the Landlord's estimated cost of such Change with Landlord prior to making such Change as security for payment. The work necessary to make such Change shall be done by Landlord (Landlord shall work with Tenant and shall competitively bid all work related to such Change) at Tenant's expense by employees or contractors hired by Landlord except to the extent that Landlord may agree otherwise, and shall be performed in such manner and at such

times as Landlord shall direct to minimize disturbance to other tenants. Tenant shall promptly pay any invoice, within thirty (30) days after receipt thereof accompanied by documentation reasonably substantiating the amounts therein, for the cost of all such work and of all decorating required by reason thereof. Notwithstanding anything herein to the contrary, in all events any Change must comply with all of the Prime Documents. Tenant understands that, due to requirements in the Prime Documents, even minor decorations such as hanging drapes and pictures shall be considered a Change for purposes of this Article 11 to the extent such decoration (i) is visible from outside the Premises or Landlord Condominium, (ii) is prohibited or requires a consent or approval under any of the Prime Documents, (iii) is located within certain designated historic preservation zones within the Premises, or (iv) includes the attachment of anything to the molding around the windows. In connection with any further alterations or Change, Tenant may not utilize tax exempt financing in violation of Section 23.25 hereof. Any Change must comply with the Prime Documents. If required by the Prime Documents, or if requested by Landlord for any change other than a Cosmetic Change, Tenant shall remove, at Tenant's sole cost and expense, any Change designated by Landlord (except for any cables and/or wiring in the Premises which Tenant shall have no obligation to remove) at the end of the Term and restore any damage caused by such removal; in the event of Tenant's failure to do so, Landlord may remove same and Tenant shall reimburse Landlord for the cost of said removal immediately upon Landlord's delivery of an invoice to Tenant (and same shall be considered Rent hereunder). Notwithstanding anything to the contrary set forth in this Lease, and provided the same complies with the Prime Documents, Landlord's consent shall not be required for, and Tenant shall have no obligation to pay any construction management, coordination, oversight or other fee to Landlord, any Change that satisfies all of the following criteria (a "Cosmetic Change"): (1) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (2) is not visible from the exterior of the Premises or in windows; (3) will not affect the systems or structure of the Landlord Condominium or Building; (4) the cost of which will not exceed $15.00 per square foot per project; and (5) is not in conflict with the Prime Documents.

## ARTICLE 12.
## REPAIRS AND REPLACEMENTS

Landlord shall provide the services required in Article 6 hereof (or, to the extent that the condominium association for the Building is performing any such services, Landlord shall exercise its best efforts to assure that the association performs such services), except for services required as a result of damage to the Premises or Building caused by acts or omissions of Tenant, Tenant's agents, employees, contractors, guests or invitees, in which event Tenant will bear the cost of such services and any related maintenance and repair. Landlord shall operate and maintain the Landlord Condominium systems, structure and Common Areas of the Landlord Condominium consistent with other historic office buildings in St. Louis, Missouri and in compliance with the Prime Documents using commercially reasonable efforts to prudently expend and incur Operating Expenses including prudent utilization of replacement reserves. Landlord shall promptly perform all maintenance and repairs in a commercially reasonable manner upon the: (a) exterior and structural elements and components of the Landlord Condominium; (b) mechanical, electrical, plumbing and fire/life safety systems serving the Landlord Condominium (including the HVAC system) in general; (c) Common Areas; (d) roof of the Building; (e) exterior windows of the Building; (f) elevators serving the Building; (g) the

- 23 -

slab of the Building; (h) the ceiling tiles and ceiling grid in the Premises; (i) all restrooms and plumbing fixtures; and (j) landscaped areas, parking areas and structures, paved areas, sidewalks and drives at or serving the Building. In addition, Landlord shall make all repairs or replacements becoming necessary by reason of any structural or latent defects in the Building existing as of the date hereof (or hereinafter existing with respect to any improvements made by or under the direction of Landlord hereafter).

Subject to Landlord's obligations to repair and maintain pursuant to this Lease, Tenant, at Tenant's expense, shall at all times keep the interior of the Premises in a clean, safe and tenantable condition and in good order, repair and appearance and shall be responsible for the repair of any damage to the Premises caused by Tenant and/or its employees, agents, licensees and permittees and not actually paid for by insurance maintained by Landlord (or self insurance maintained by Owner in the event Owner becomes the Landlord hereunder and elects to self insure) and shall be responsible for normal, customary and routine repairs and maintenance within the interior of the Premises. All such repairs and maintenance, whether performed by Landlord or Tenant, shall be made in accordance with the requirements and covenants of the Prime Documents including without limitation Landlord's covenants under the Master Lease and the other Prime Documents. Any and all major repairs and replacements (a "major repair and replacement" being defined as a repair or replacement in excess of $50,000) for which Tenant is responsible for shall be performed by Landlord at Tenant's expense. Tenant shall have the right to perform minor repairs and/or minor maintenance within the Premises in accordance with the Prime Documents. If Landlord performs any such major repairs and replacements, Tenant shall reimburse Landlord for the cost thereof as reasonably determined by Landlord within thirty (30) days after invoice therefor accompanied by documentation reasonably substantiating the amounts therein. Tenant shall notify Landlord when any major repairs and replacements are required and request that Landlord make such repairs and replacements. This section shall not apply to damage or destruction (including any major repair required due to a casualty when Landlord elects in Landlord's sole discretion to submit such claim to its insurance company and such insurance company pays such claim) to the extent of actual insurance coverage and condemnation proceedings otherwise provided for in this Lease.

## ARTICLE 13.
## DESTRUCTION BY FIRE OR OTHER CASUALTY

If during the Term of this Lease the Premises are damaged by fire or other casualty, and as a result thereof all or a material portion of the Premises are rendered wholly unfit for occupancy, and if the same cannot be substantially repaired three hundred sixty-five (365) days from the date of such damage, as reasonably determined by Landlord, Landlord may either (a) terminate this Lease as of the date of such damage by written notice to Tenant within sixty (60) days after the date of the damage, and in such case Tenant shall pay Rent hereunder apportioned to the time of such damage and immediately surrender the Term and the Premises to Landlord, and thereupon Landlord may enter upon and repossess same or (b) repair same, after receipt of adequate insurance proceeds at Landlord's expense, without terminating this Lease and provided the casualty or damage did not result from the negligent acts or omissions of Tenant or its invitees, agents, employees, permittees or contractors, Rent hereunder shall be apportioned or entirely suspended as shall be equitable and right while such repairs are being effected.

If such damage results in a material portion of the Premises being rendered wholly unfit for occupancy, but can be substantially repaired within the aforesaid period of three hundred sixty-five (365) days, Landlord shall notify Tenant and shall enter upon and repair same, after receipt of adequate insurance proceeds made available to Landlord for such repair, without terminating this Lease, and provided the casualty or damage did not result from the negligent actions or omissions of Tenant or its invitees, agents, employees, invitees, permittees or contractors, Rent hereunder shall be apportioned or entirely suspended as shall be equitable and right while such repairs are being effected. If Landlord does not receive adequate proceeds (in excess of the policy deductible) to repair such damage and/or proceeds are unavailable to pay for repairs and restoration Landlord shall not have any obligation to repair such damage, and if Landlord does not elect, in Landlord's sole discretion, to repair such damage notwithstanding the lack of available insurance proceeds, Landlord or Tenant may terminate this Lease. In no event shall Tenant be entitled to any abatement of rent if the casualty or damage resulted from the negligent actions or omissions of Tenant or its invitees, agents, servants, employees, permittees or contractors. If the Premises be so slightly damaged by such fire or other casualty so as not to be unfit for occupancy in any material part, Landlord shall repair same with reasonable promptness and the payment of Rent shall not be affected thereby.

In addition, in the event the parking areas or other Common Areas serving the Premises or access to the Premises is partially or totally destroyed or damaged by fire or other casualty and, as a result thereof, Tenant's use of the Premises for its business is materially and adversely affected, then Tenant's obligation to pay Rent hereunder shall be apportioned as shall be equitable and right for so long as Tenant's use of the Premises is affected or this Lease terminates. Notwithstanding anything to the contrary set forth herein, in the event of any damage to the Premises which cannot be substantially repaired and restored by Landlord within three hundred sixty-five (365) days from the occurrence of such damage or in the event that repair and restoration of any such damage is not substantially completed within such three hundred sixty-five (365) day period for any reason other than force majeure or Tenant Delay, then Tenant shall have the option to terminate this Lease effective immediately by providing written notice to Landlord.

In case of such occurrence, whether this Lease is thereby terminated or not, Landlord shall remove all of the rubbish and debris of Tenant's property at Tenant's cost, and, if this Lease is not thereby terminated, Tenant shall not do anything to unreasonably hinder or delay Landlord's work or repair, and will reasonably cooperate with Landlord in such work. Except as otherwise expressly set forth herein, Landlord shall not be liable for inconvenience to Tenant by making repairs to any part of the Premises or the Landlord Condominium nor for the restoration of any improvements made by Tenant (except for the initial improvements) nor for the restoration of any personal property of Tenant. Landlord shall have no liability to Tenant if, after a casualty event, this Lease is terminated in connection with such casualty due to the termination of the Master Lease or otherwise, whether such termination is voluntary by Landlord or otherwise.

## ARTICLE 14.
## CONDEMNATION

14.1    **Taking of the Building or Common Areas**.  If the Building or the Common Areas or any portion thereof which includes a part of the Premises or which prevents the economical operation of the Landlord Condominium shall be taken or condemned by any competent authority for any public or quasi-public use or purpose, or sold under the threat of same (all of which are herein called "condemnation"), the term of this Lease and the term and estate hereby granted shall, at the option of the Landlord (communicated in writing to Tenant within twenty (20) days after written notice of such taking, or in the absence of such notice, within twenty (20) days after the condemning authority shall have taken possession) end upon, and not before, the date when the possession of the part so taken shall be required for such use or purpose and without apportionment of the condemnation award.  Except as set forth in Section 14.3 below, Tenant shall have no right to share in such award.  If Landlord elects to make comparable space available to Tenant which is acceptable to Tenant (such acceptance shall be in Tenant's sole discretion) under the same rent and terms as herein provided, Tenant shall accept such space and this Lease shall then apply to such space.  If this Lease is not terminated in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be abated in proportion to the reduction in square footage of the Premises taken in the condemnation.

14.2    **Taking of the Premises**.  If more than fifty percent (50%) of the floor area of the Premises or access to the Premises or the Parking Spaces are taken by condemnation, either party may at its option to be exercised in writing within twenty (20) days after written notice of such taking (or in the absence of such notice, within twenty (20) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If this Lease is not terminated in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be abated in proportion to the reduction in square footage of the Premises taken in the condemnation.  Landlord shall have no liability to Tenant if, after a condemnation, this Lease is terminated in connection with such condemnation due to the termination of the Master Lease or otherwise, whether such termination is voluntary by Landlord or otherwise.

14.3    **Awards**.  Tenant may make application for a separate award from the condemning authority for moving expenses; provided, however, that no such application for a separate award shall include an award for the unexpired term of this Lease or reduce or affect in any other way the Landlord's award.

## ARTICLE 15.
## HOLDING OVER

If Tenant without the consent of Landlord retains possession of the Premises or any part thereof after termination of the Term, Tenant shall pay to Landlord an amount equal to one hundred fifty percent (150%) of the Rent payable for the month immediately preceding the commencement of said holding over computed on a per month basis for each month or part thereof (without reduction for any partial month) that Tenant remains in possession.  Such retention of possession shall be at sufferance and shall not be a month to month tenancy.

## ARTICLE 16.
## SURRENDER OF POSSESSION

Upon the termination of the Term, Tenant shall immediately surrender the Premises to Landlord in ordinary wear, the obligations of Landlord under this Lease, and casualty and condemnation losses for which Tenant is not responsible excepted, and shall remove all office furniture and equipment, trade fixtures and other items of Tenant's personal property on the Premises in accordance with the requirements of this Lease and the Prime Documents and restore any damage caused by such removal. Tenant shall pay Landlord for the cost of repairing any damage to the Premises and to the Landlord Condominium caused by any such removal within thirty (30) days after invoice therefor accompanied by documentation reasonably substantiating the amounts therein. If Tenant fails or refuses to remove any such property from the Premises, Tenant shall be conclusively presumed to have abandoned the same and Landlord may dispose of the same without incurring any liability therefor.

## ARTICLE 17.
## DEFAULT AND REMEDIES

If Tenant shall default in the payment of any installment of the Rent and such default shall continue for five (5) days after written notice that payment thereof is due, or if Tenant shall default in the payment of any other sum required to be paid hereunder and such default continues for ten (10) days after written notice that same is due and payable or if Tenant shall default in the observance or performance of any of the other covenants or conditions in this Lease which Tenant is required to observe or perform and such default shall continue for thirty (30) days after written notice to Tenant (provided, however, if Tenant's failure to comply with a non-monetary default cannot reasonably be cured within thirty (30) days, Tenant shall be allowed additional time not to exceed thirty (30) days to cure the failure so long as Tenant promptly commences and diligently pursues to cure), or if a default involves a hazardous condition (meaning any condition which could reasonably cause injury to person or property or any release, discharge, storage or disposal of Hazardous Materials in violation of applicable environmental laws) for which Tenant is responsible hereunder and is not cured by Tenant as promptly as reasonably possible but in any event within ten (10) days after written notice to Tenant, or if the interest of Tenant in this Lease shall be levied upon under execution or other legal process and same shall not have been cured to Landlord's satisfaction within sixty (60) days following such action, or if any voluntary petition in bankruptcy or for corporate reorganization or any similar relief shall be filed by Tenant, or if any involuntary petition in bankruptcy shall be filed against Tenant under any federal or state bankruptcy or insolvency act and shall not have been dismissed within sixty (60) days following the filing thereof, or if a receiver shall be appointed for Tenant or any of the property of Tenant by any court and such receiver shall not be dismissed within sixty (60) days from the date of appointment, or if Tenant shall make an assignment for the benefit of creditors, or if Tenant shall admit in writing Tenant's inability to meet Tenant's debts as they mature, or, subject to breaks in Tenant's academic calendar, if Tenant shall abandon the Premises or if any of Tenant's actions (to the extent Tenant is required to act hereunder) or Tenant's failure to act (to the extent Tenant's failure to act is a breach hereunder) causes a breach under the Master Lease or any of the other Prime Documents and such actions or failure to act is not cured thereby eliminating the breach under the Prime Document(s) within thirty (30) days after notice from Landlord (provided, however, if Tenant's actions or failure to act cannot reasonably be cured

- 27 -

within thirty (30) days, Tenant shall be allowed additional time as is reasonably necessary to cure so long as Tenant promptly commences to cure, with cumulative time to cure not to exceed ninety (90) days in total), then Landlord may treat the occurrence of any one or more of the foregoing events as a breach of this Lease and thereupon at Landlord's option may, without notice or demand of any kind to Tenant or any other person, exercise one or more of the following described remedies, in addition to all other rights and remedies provided at law or in equity:

(a)     Landlord may terminate this Lease and the estate created hereby, in which event Landlord may forthwith repossess the Premises and be entitled to recover forthwith, in addition to any other sums or damages for which Tenant may be liable to Landlord as damages, an amount, if any, equal to (i) the cost of all leasing commissions paid by Landlord in connection with this Lease, the cost to Landlord of the leasehold improvements to the Premises, and all other amounts paid to or on behalf of Tenant in connection with Tenant's entry into this Lease and occupancy of the Premises (including without limitation any moving cost allowance, payments on lease(s) assumed by Landlord, payment for preparation of plans, construction documents and the like), including Landlord's interest expense thereon, all amortized on a straight line basis over the Term, (ii) a sum of money equal to the then present value of the Rent (using a commercially reasonable discount rate) provided to be paid by Tenant for the balance of the Term; and (iii) all anticipated reasonable expenses of reletting for said period.

(b)     Landlord may terminate Tenant's right of possession and may repossess the Premises by forcible entry or unlawful detainer suit, by taking peaceful possession or otherwise without terminating this Lease, in which event Landlord may, but shall be under no obligation to, relet the same for the account of Tenant, for such rent and upon such terms as shall be satisfactory to Landlord. For the purpose of such reletting, Landlord is authorized to decorate, repair, remodel or alter the Premises. If Landlord shall fail to relet the Premises, Tenant shall pay to Landlord as damages a sum equal to the then present value (using a commercially reasonable discount rate) of the amount of the Rent reserved in this Lease for the balance of the then-existing Term of this Lease. If the Premises are relet and a sufficient sum shall not be realized from such reletting after paying all of the costs and expenses of all decoration, repairs, remodeling, alterations and additions and the expenses of such reletting to satisfy the Rent provided for in this Lease and the amounts recoverable (including broker's fees) by Landlord from Tenant pursuant to subparagraph (a) of this paragraph, Tenant shall satisfy and pay the same upon demand therefor from time to time. Landlord may file suit to recover any sums falling due from time to time and no suit or recovery of any portion due Landlord hereunder shall be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord.

In the event Landlord shall default in the performance of any of the provisions of this Lease, Tenant may so notify Landlord, and if Landlord shall fail to cure such default within thirty (30) days after notice of such default, or if the default is of such character as to require more than thirty (30) days to cure after notice is given and Landlord does not thereafter diligently proceed

to cure such default, then Tenant may cure such default, whereupon any expenses incurred by Tenant shall be payable by Landlord to Tenant upon demand by Tenant and, if not immediately paid, may be deducted by Tenant from the Base Rent otherwise coming due and the balance of such expenses after such deduction shall be a claim owing to Tenant by Landlord which claim shall survive the termination of this Lease. The rights and remedies of Tenant set forth herein shall not be exclusive, but instead shall be in addition to any other right and remedy now or hereafter provided by law or in equity.

No waiver of any default by either party shall be implied from any omission by such party to take any action on account of said default if such default persists or shall be repeated, and no express waiver shall affect any default other than the default specified in the express waiver and then only for the time and to the extent therein stated. No failure of either party to exercise any power given to such party hereunder or to insist upon strict compliance with any obligation hereunder and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of such party's right to demand exact compliance with the terms hereof. The provisions of this Section shall survive any termination of this Lease.

## ARTICLE 18.
## BANKRUPTCY

If a petition is filed by or against Tenant for relief under the bankruptcy laws of the United States (the "Bankruptcy Code"), and Tenant (including for the purposes of this section Tenant's successor in bankruptcy, whether a trustee or Tenant as debtor in possession) assumes and proposes to assign, or proposes to assume and assign, this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who has made or accepted a bona fide offer to accept an assignment of this Lease on the terms acceptable to Tenant, then notice of the proposed assignment setting forth (a) the name and address of the proposed assignee, (b) all of the terms and conditions of the offer and proposed assignment, and (c) the adequate assurance to be furnished by the proposed assignee of the proposed assignee's future performance under this Lease, shall be given to Landlord by Tenant no later than twenty (20) days after Tenant has made or received such offer, but in no event later than ten (10) days prior to the date on which Tenant applies to a court of competent jurisdiction for authority and approval to enter into the proposed assignment. Landlord shall have the prior right and option, to be exercised by notice to Tenant given at any time prior to the date on which the court order authorizing such assignment becomes final and non-appealable, to receive an assignment of this Lease upon the same terms and conditions, and for the same consideration, if any, as the proposed assignee, less any brokerage commission which may otherwise be payable out of the consideration to be paid by the proposed assignee for the assignment of this Lease. If this Lease is assigned pursuant to the provisions of the Bankruptcy Code, Landlord: (i) may require from the assignee a deposit or other security for the performance of assignee's obligations under this Lease in an amount substantially the same as would have been required by Landlord upon the initial leasing to a tenant similar to the assignee; and (ii) shall be entitled to receive as additional Rent, any amounts received by Tenant in connection with such assignment. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or documentation to have assumed all of the Tenant's obligations arising under this Lease on and after the date of such assignment. Any such assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption. No provision of this Lease shall be

deemed a waiver of Landlord's rights or remedies under the Bankruptcy Code to oppose any assumption and/or assignment of this Lease, or to regain possession of the Premises if this Lease has neither been assumed nor rejected within sixty (60) days after the date of the order for relief or within such additional time as a court of competent jurisdiction may have fixed. Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as rent, shall constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code.

## ARTICLE 19.
## INSURANCE AND WAIVER OF RECOVERY

19.1   **Insurance**. (a) Tenant shall at all times during the Term maintain in full force and effect with respect to the Premises general commercial liability insurance having the limits of not less than $1,000,000.00 per occurrence, $2,000,000.00 annual aggregate with $10,000,000.00 of umbrella coverage, all risk property insurance upon all property owned by Tenant in the Premises in an amount not less than ninety percent (90%) of the full replacement cost thereof, workers' compensation and employer's liability insurance in form and amount required by law, contractual indemnity coverage for the obligations as set forth herein, each in the standard form generally of use in the State of Missouri. Such insurance shall be subject to modification or cancellation only upon thirty (30) days' notice to each certificate holder. Tenant, at or prior to the Lease Commencement Date, and thereafter not less than thirty (30) days prior to the expiration of any such policy, shall furnish Landlord with a certificate of insurance in such coverage, such certificate to be in a form reasonably acceptable to Landlord and, at the request of Landlord, to name Landlord, the Owner and any such mortgagee identified in writing by Landlord as an additional insured (or in the case of a mortgagee, by means of a standard mortgagee endorsement) on any liability and/or property policies. If Tenant does not maintain the insurance coverages required hereunder, Landlord may elect to procure and maintain such insurance, in which case the cost thereof shall be fully paid by Tenant as an adjustment to Rent.

(b)   Landlord (or Landlord shall assure that the condominium association for the Building) shall at all times during the Term maintain in full force and effect with respect to the Landlord Condominium, at a minimum, general commercial liability insurance having the limits of not less than $1,000,000.00 per occurrence, $2,000,000.00 annual aggregate with $10,000,000.00 of umbrella coverage, all risk property insurance insuring the Building in an amount not less than ninety percent (90%) of the full replacement cost thereof, workers' compensation and employer's liability insurance in form and amount required by law, contractual indemnity coverage for the obligations as set forth herein, each in the standard form generally of use in the State of Missouri. Upon written request Landlord shall deliver a copy of a certificate of insurance coverage to Tenant.

19.2   **Waiver of Recovery**. Notwithstanding anything herein to the contrary, Landlord and Tenant hereby mutually waive any and all rights of recovery against one another, and do hereby release each other, based upon the negligence or otherwise of either Landlord or Tenant or their agents, employees, permittees or invitees for real or personal property loss or damage occurring to the Premises or to the Landlord Condominium or any part thereof or any personal property located therein from perils to the extent actually insured against or required to be insured against hereunder. Landlord and Tenant shall cause their insurance carriers to consent to

- 30 -

a waiver of all rights of subrogation against each other subject to the foregoing, by inclusion of such a clause in their respective policies or by endorsement thereto. The effect of such waiver is not limited by the amount of such insurance actually carried or required to be carried, to the actual proceeds received after a loss or to any deductible applicable thereto (i.e., the insured party is liable for any and all deductibles in its insurance policies and it shall not be entitled to any payment or reimbursement thereof), and either party's failure to carry insurance required under this Lease shall not invalidate such waiver.

19.3    **Indemnification**.

(a)    Tenant, in consideration of Landlord's agreement to lease the Premises to Tenant pursuant hereto, agrees that subject to <u>Section 19.2</u> hereof, Tenant shall defend and indemnify Landlord and its affiliates, agents, employees, partners, members, officers, directors, lenders, investors, and their respective affiliates, agents, employees, partners, members officers, and directors (collectively, the "Landlord Parties") and save the Landlord Parties harmless from and against any and all claims against the Landlord Parties to the extent arising from (i) Tenant's use of the Premises or the conduct of Tenant's business or from any activity, work or thing done, permitted or allowed by Tenant in or about the Premises or Building, (ii) the nonperformance of any covenant or agreement on Tenant's part to be performed pursuant to the terms of this Lease, or (iii) any negligent act of Tenant or of any of Tenant's agents, contractors, employees, invitees or licensees, and from and against all costs, reasonable counsel fees, expenses and liabilities incurred in any such claim or in any action or proceeding brought thereon; and in case any action or proceeding be brought against the Landlord Parties by reason of any such claim, Tenant upon notice from Landlord, covenants to resist or defend at Tenant's expense such action or proceeding by counsel reasonably satisfactory to Landlord; provided that the foregoing provision shall not be construed to make Tenant responsible for loss, damage, liability or defense caused by the negligent actions of the Landlord Parties. Tenant further agrees that, subject to <u>Section 19.2</u>, Tenant will protect, indemnify, defend and save the Landlord Parties harmless from and against any and all claims, suits, demands and causes of action of any nature whatsoever, and any expense incidental to the defense thereof, arising from or based upon any default by Tenant under this Lease or any breach by Tenant of any of its agreements, obligations and covenants contained in this Lease or any penalty, damage or charge imposed for any violation of any applicable laws or ordinances or the Prime Documents (to the extent the obligation to comply with such applicable laws or ordinances or the Prime Documents is Tenant's express responsibility hereunder) by Tenant, its agents, employees or anyone acting on behalf of Tenant. Tenant further agrees that, subject to <u>Section 19.2</u>, Tenant will protect, indemnify, defend and save the Landlord Parties harmless from and against any and all claims, suits, demands and causes of action of any nature whatsoever, and any expense incidental to the defense thereof, for personal injury, loss of life or damage to property sustained or alleged to have been sustained in or about the Premises or sustained or alleged to have been sustained as a result, in whole or in part, of the acts or omissions of Tenant or its agents, employees, officers, contractors, subtenants, licensees, permittees or invitees; excepting to the extent that any of same are caused by the acts or negligent omissions of the Landlord Parties or its agents, employees and contractors.

(b)    Subject to <u>Section 19.2</u>, Landlord agrees that Landlord will protect, indemnify, defend and save Tenant harmless from and against any and all claims, suits, demands and causes

of action of any nature whatsoever, and any expense incidental to the defense thereof, for personal injury, loss of life or damage to property sustained or alleged to have been sustained as a result, in whole or in part, of the acts or omissions of Landlord or its agents, employees, officers or contractors; excepting to the extent that any of same are caused by the acts or negligent omissions of Tenant or its agents, employees and contractors.  It is expressly understood and agreed that none of Landlord's covenants, undertakings and agreements under this Lease are made or intended as personal covenants, undertakings or agreements by Landlord's partners, and any liability for damage or breach or nonperformance by Landlord shall be collectible only out of Landlord's interest in the Landlord Condominium, and no personal liability is assumed by or at any time may be asserted against Landlord.

(c)    The Tenant's and Landlord's obligations under this Section 19.3 shall survive the termination or the expiration of the Lease for a period of two (2) years.

## ARTICLE 20.
## TAXES ON TENANT'S PROPERTY

20.1    **Personal Property Taxes**.  Tenant shall be liable for and shall pay before delinquency, taxes levied (if any) against any personal property or trade fixtures placed by Tenant in the Premises.  If any such taxes on Tenant's personal property or trade fixtures are levied against Landlord or Landlord's property or if the assessed value of the Landlord Condominium is increased by the inclusion therein of a value placed upon such personal property or trade fixtures of Tenant and if Landlord, after written notice to Tenant, pays the taxes based upon such increased assessments, which Landlord shall have the right to do regardless of the validity thereof, but only under proper protest if requested by Tenant, Tenant shall within thirty (30) days after invoice therefor accompanied by documentation reasonably substantiating the amounts therein repay to Landlord the taxes levied against Landlord, or the proportion of such taxes resulting from such increase in the assessment; provided that in any such event, at Tenant's sole cost and expense, Tenant shall have the right, in the name of Landlord and with Landlord's full cooperation, to bring suit in any court of competent jurisdiction to recover the amount of any such taxes so paid under protest, any amount so recovered to belong to Tenant.

## ARTICLE 21.
## AMERICANS WITH DISABILITIES ACT,
## NON-DISCRIMINATION AND FAIR EMPLOYMENT

21.1    Subject to certain exceptions due to historical requirements that may take precedence or otherwise create exceptions from compliance obligations, Landlord shall be responsible for present and future compliance with the requirements of the Americans With Disabilities Act (the "ADA") with respect to the Landlord Condominium shell, lobbies, restrooms, and other Common Areas of the Landlord Condominium and to indemnify and hold Tenant harmless with respect to failure by Landlord to fulfill Landlord's obligations under the ADA with respect to those areas.  Subject to certain exceptions due to historical requirements that may take precedence or otherwise create exceptions from compliance obligations.  Tenant shall be responsible for present and future compliance with the requirements of the ADA with respect to the Premises and agrees to indemnify and hold Landlord harmless with respect to failure by Tenant to fulfill Tenant's obligations under the ADA with respect to the Premises.

- 32 -

The Tenant's and Landlord's indemnification obligations under this Section shall survive the termination or the expiration of the Lease.

21.2    Landlord and Tenant agree to observe and comply with the Equal Opportunity and Nondiscrimination Guidelines set forth hereinbelow.  Neither Landlord nor Tenant shall discriminate upon the basis of race, creed, color, national origin, sex, age, marital status or physical handicap in the occupancy, lease or use of the Premises or Landlord Condominium. Landlord and Tenant shall comply with all applicable federal, state and local laws, ordinances, regulations, rules and orders governing equal opportunity and nondiscrimination.  In any contract for work in connection with the Landlord Condominium performed by Landlord or Tenant, Landlord, Tenant and their respective contractors and subcontractors shall comply with all applicable federal, state and local laws, ordinances or regulations governing equal opportunity and nondiscrimination (the "ND Laws").  Moreover, Landlord and Tenant shall require its contractors and subcontractors performing any work in the Premises to comply with the ND Laws.  Neither Landlord nor Tenant and its contractors or subcontractors shall contract with any party actually known by Landlord or Tenant (without further inquiry or investigation) to have been found in violation of the ND Laws.  Tenant shall, to the extent applicable to Tenant as a tenant in the Landlord Condominium pursuant to its terms, observe Executive Order #28 dated July 24, 1997, related to minority and women-owned business participation in city contracts with respect to all contracts related directly or indirectly to Premises.  Tenant shall, if and to the extent applicable to Tenant as a tenant in the Landlord Condominium according to its terms, observe the provisions of City Ordinance #60275, codified at Chapter 3.90 of the Revised Ordinances of the City of St. Louis, Missouri, and referenced in Section 6.27 of the Redevelopment Agreement as First Source Jobs Policy, related to the negotiation of an employment agreement with the St. Louis Agency on Training and Employment if and to the extent related to operations or employees in the City of St. Louis, and Tenant shall, upon written request of Landlord (not more frequently than on a quarterly basis) also report the number of permanent full time equivalent jobs created Tenant in accordance with Section 6.30 of the Redevelopment Agreement.  Tenant acknowledges that it has received a copy of the Redevelopment Agreement and is familiar with its terms.

## ARTICLE 22.
## HAZARDOUS MATERIALS

Landlord agrees to comply with all applicable laws and regulations relating to Hazardous Materials associated with the Landlord Condominium structure, building systems, initial construction of the Premises and Common Areas.  Tenant agrees to comply with all applicable laws and regulations relating to Hazardous Materials associated with any use or release of Hazardous Materials by Tenant in the Premises or the Landlord Condominium.  The foregoing does not relate to compliance with laws which are applicable to the use or occupancy of premises in the Landlord Condominium by individual tenants or the conduct of such tenant's business in those premises and compliance with those Laws shall be the sole responsibility of the individual tenants.  Tenant (for itself and its employees, agents, successors and assigns) covenants, promises and agrees that it will not use, manufacture, store, treat, transport, refine, handle, produce or dispose of any Hazardous Materials in, at, on, under, upon or from the Premises or the Building except with respect to de minimis amounts which are not subject to regulation. Tenant (for itself and its employees, agents, successors and assigns) further covenants, promises

and agrees that it will not discharge, deposit, inject, dump, leak, spill, place or allow escape of any Hazardous Materials in, at, on, under, upon or from the Premises or the Building, or into the sewer system serving the Premises or the Building.

As used herein the term "Hazardous Materials" shall mean any asbestos, flammable substances, explosives, radioactive materials, PCB-laden oil, hazardous materials, hazardous waste, pollutants, contaminates, toxic substances, under any federal, state or local laws, ordinances, rules, regulations or policies governing use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of such materials, including without limitation, Section 9601 of Title 42 of the United States Code. Subject to Section 19.2, Tenant agrees to and shall indemnify, defend and hold the Landlord Parties harmless from and against any and all claims, demands, liabilities, damages, suits, actions, judgments, fines, penalties, losses, removal and/or remedial costs and/or charges, costs and expenses (including attorney's fees and expenses) arising or resulting from, or suffered, sustained or incurred by the Landlord Parties to the extent caused by any breach by Tenant of any of its covenants in this Article 22. The terms and provisions of this Article 22 shall survive the expiration or early termination of this Lease. Notwithstanding the foregoing provisions of this Article 22, Tenant shall not be in default under this Article 22, should Tenant or any subtenant store or use minimal quantities of substances on the Premises which technically could be considered Hazardous Materials, provided that such substances are a type and are held only in a quantity normally used in connection with the occupancy or operation of an office or educational institution (such as cleaning fluids, and supplies normally used in the day to day operation of an office or educational institution), such substances are being held, stored used or disposed of in complete and strict compliance with any applicable federal or state laws or regulations relating to the use, generation, manufacture, installation, release, discharge, storage or disposal of Hazardous Materials or other applicable environmental laws, and the indemnity in this Article 22 of this Lease shall always apply to such substances, and it shall be and continue to be the responsibility of Tenant to take all remedial actions required under and in accordance with this Article 22 of this Lease in the event of any unlawful release of any such substance.

Tenant is hereby informed and does acknowledge that the Landlord Condominium is presumed to contain lead-based paint and asbestos-containing materials. Tenant is on notice as to lead-based paint and asbestos-containing materials in the Landlord Condominium prior to the date of this Lease. Tenant acknowledges that operations of the Landlord Condominium shall comply with all applicable laws and will be subject to an Operations and Maintenance Plan (the "O&M Plan") which shall be provided by Landlord to Tenant. To the extent that any repairs or maintenance are performed by Landlord or Tenant, each of Landlord and Tenant agree to comply in all respects with the requirements of the O&M Plan.

### ARTICLE 23.
### GENERAL PROVISIONS

23.1   **Costs and Expenses of Enforcement**: Tenant shall pay upon demand all of Landlord's costs and expenses, including, but not limited to, court costs, witness fees, investigation costs, the reasonable fees of counsel, incurred by Landlord in connection with a breach of this Lease by Tenant beyond all applicable notice and cure periods.

23.2   **Interest Charges, Late Fees and Service Charges**: All amounts due Landlord under this Lease shall be considered past due for the purposes hereof on the fifth (5th) day after the same is past due and shall bear interest from such date until paid at an annual rate equal to four percent (4%) in excess of the then publicly announced Prime Rate. As used herein, the Prime Rate shall mean the corporate base rate of interest as published in the *Wall Street Journal* being charged by banks to their most creditworthy corporate customers for short-term unsecured loans. The Prime Rate shall change when and on the date of any change as published in the *Wall Street Journal*. If the *Wall Street Journal* no longer publishes such a rate, then the equivalent or similar rate as published by a comparable national authority shall be used. Further, whenever any installment of Rent has not been received by Landlord within five (5) days after the Rent's due date, Landlord shall be entitled, as a service charge, to a fee of five percent (5%) of the amount of the Monthly Rent then due hereunder. Landlord shall also be entitled to a handling fee of Fifty Dollars ($50.00) each time a check tendered by Tenant and presented for deposit by Landlord is returned to Landlord.

23.3   **Notices**: All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, return receipt requested, postage prepaid, or (b) prepaid overnight delivery service, either commercial (such as FedEx) or United States Postal Service, with proof of delivery, addressed in each case if to Landlord at Landlord's address set forth in Article 1 hereof, or at such other address designated in writing from time to time by Landlord, or if to Tenant, at Tenant's address set forth in Article 1 hereof, or at such other address designated in writing from time to time by Tenant. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; or in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery upon delivery on a Business Day. A copy of any notice to Tenant shall be provided to Tenant's limited partner at the following address:

Tenant:             Webster University
                    470 East Lockwood Avenue
                    Webster Groves, MO 65119
                    Attn: Vice President and Chief Financial Officer

with a copy to:     Bryan Cave LLP
                    211 North Broadway
                    Suite 3600
                    St. Louis, MO 63102
                    Attn: Heather Boelens Rucker

Landlord:           St. Louis Leased Housing Associates Master Tenant V, LLLP
                    2905 Northwest Boulevard
                    Suite 150
                    Plymouth, MN 55441
                    Attn: Jeffrey R. Hugget

with a copy to:     Winthrop & Weinstine, P.A.
                    225 South Sixth Street

Suite 3500
Minneapolis, MN 55402
Attn: Jon L. Peterson, Esq.

with a copy (during such period of time that US Bancorp Community Development Corporation is a partner of the Landlord) to:

U.S. Bancorp Community Development Corporation
1307 Washington Ave., Suite 300
St. Louis, MO 63103
Attention: Director of Asset Management – NMTC & HTC

23.4   **Landlord's Right to Transfer Interest**: Landlord has, subject to the Prime Documents, the right to transfer Landlord's interest in the Landlord Condominium and/or the Master Lease and in this Lease, and upon any such transfer Landlord shall be released from all liability under this Lease accruing after the date of such transfer so long as the transferee shall have assumed all of such obligations and covenants thereafter arising, and Tenant shall look solely to such transferee for the performance of Landlord's obligations hereunder. Landlord may assign Landlord's interest in this Lease to a mortgage lender as additional security provided that such assignment shall not release Landlord from Landlord's obligations hereunder.

23.5   **Entire Agreement**: This Lease, together with the Prime Documents and the Exhibits referenced in Article 1 and Addendum(s) (which are hereby incorporated herein by reference), if any, constitutes the entire agreement between the parties with respect to the subject matter hereof, and shall be binding upon the parties hereto and their respective successors and permitted assigns, as the case may be. All terms used in this Lease shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the context may require.

23.6   **Applicable Law and Partial Invalidity**: This Lease shall be governed by and enforced in accordance with the laws of the State of Missouri. The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

23.7   **Amendment**: This Lease may not be altered, amended, modified, or extended except by written instrument signed by Landlord and Tenant.

23.8   **Waiver**: The waiver by Landlord or Tenant of any breach of any term, condition or covenant of this Lease shall not be deemed to be a waiver of any subsequent breach of the same or any other term, condition or covenant of this Lease. No failure by Landlord or Tenant to take action against the other on account of any failure by either to perform any of its obligations under this Lease shall be deemed to be a waiver by Landlord or Tenant, except where such party has provided to the other a written waiver, signed by the waiving party.

23.9   **Brokerage**: Each of the parties hereto warrants to the other that, except with respect to the Landlord's agreement with DFC Group, Inc. (whose commissions shall be payable by Landlord), neither party has dealt with any other finders, brokers or other agents in connection with this Lease and each party shall indemnify and hold the other party harmless from and against any and all claims for such fees alleged to have been incurred by such party.

23.10 **Lease Estoppel Certificate**: Tenant from time to time, upon not less than twenty (20) days prior written request by Landlord, will promptly deliver to Landlord a duly executed estoppel certificate certifying to the best of Tenant's knowledge whether the Lease is in force and effect and whether Tenant has actual knowledge of any defaults beyond applicable cure periods under the Lease. Landlord shall from time to time upon the written request of Tenant promptly deliver to Tenant a duly executed estoppel certificate certifying to the best of Landlord's knowledge whether the Master Lease and Lease are in force and effect and whether Landlord has actual knowledge of any defaults beyond applicable cure periods under the Master Lease and Lease.

23.11 **Force Majeure**: Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials, governmental restrictions, regulations or controls, enemy or hostile government action, civil commotion, fire or other casualty, interruption in any utility service, inclement weather or other causes beyond the reasonable control of the party required to perform shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage, except for the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease which in all events shall be deemed absolute and shall not be subject to delay for any reason.

23.12 **Lease Termination**: This Lease may be terminated only in accordance with its terms, and no unilateral termination by Tenant or voluntary surrender of this Lease by Tenant shall be effective unless such termination or surrender shall be accepted by Landlord in writing.

23.13 **Relationships**: Nothing contained in this Lease shall be deemed to constitute or be construed to create any relationship between Landlord and Tenant other than that of lessor and lessee.

23.14 **Non-Binding Unless Signed**: Submission of the form of this Lease for examination shall not bind Landlord or Tenant in any manner, and no lease or other obligation of Landlord or Tenant shall arise until this instrument is signed by both Landlord and Tenant, approved by the holder of any mortgage, deed of trust or other financial encumbrance on the Landlord Condominium having such approval rights, and delivery is made to each party.

23.15 **Rights**: No rights to any view or to light or air over any property, whether belonging to Landlord or any other person are granted to Tenant by this Lease.

23.16 **Requirements of Lender**: If a lender requires as a condition to lender's lending funds, the repayment of which is to be secured by a financial encumbrance on the Landlord Condominium, that certain minor modifications be made to this Lease, which modifications will not require Tenant to pay any additional amounts or otherwise materially change the rights, obligations or liabilities of Tenant hereunder, Tenant shall, upon Landlord's reasonable request, execute reasonable appropriate instruments effecting such modifications.

23.17 **Lease Payments**: Landlord shall have the right to apply payments received from Tenant pursuant to this Lease (regardless of Tenant's designation of such payments) to satisfy any accrued obligations of Tenant hereunder in such order and amounts as Landlord in Landlord's sole discretion may elect.

23.18  **Landlord's Liability**:  Except as expressly set forth herein, no Landlord Parties shall be liable for any damage to property entrusted to employees or agents of Landlord, nor for loss of or damage to any property by theft or otherwise, nor for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the Landlord Condominium or from the pipes, appliances or plumbing works therein or from the roof, street or sub-surface or from any other place or resulting from dampness or any other cause whatsoever.  No Landlord Parties shall be liable for interference with the light or other incorporeal hereditaments, nor, except as expressly provided for in this Lease, shall the Landlord be liable for any latent defect in the Premises or in the Landlord Condominium.  Tenant shall give prompt notice to Landlord in case of fire or accidents in the Premises or in the Building or of defects therein or in the fixtures or equipment.

23.19  **Landlord's Default**:  In the event of any default on the part of Landlord, Tenant shall give a copy of any default notice given to Landlord by certified mail to any holder of a financial encumbrance covering the Landlord Condominium, if such address shall have been furnished to Tenant in writing, and shall offer such holder a reasonable opportunity to cure the default, including time to obtain possession of the Landlord Condominium by power of sale or a judicial foreclosure, if such should prove necessary to effect a cure, but in any event not to exceed the cure periods provided in this Lease for Landlord to cure a default.

23.20  **Signage**:  Landlord shall engage Trivers and Associates ("Trivers") to assist with Tenant's signage on the Building.  Landlord and Tenant shall mutually direct Trivers to prepare an exterior signage plan for the Premises modeled after the diagrams set forth in Exhibit G (the "Signage Plan").  The Signage Plan shall comply with all requirements of the Declaration, National Park Service, and City of St. Louis ordinances, and shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord and Tenant shall cooperate in good faith to ensure that the Signage Pan does not interfere with Building lighting and other signage on the Building.

23.21  **Waiver of Trial by Jury**:  Tenant and Landlord hereby agree not to elect a trial by jury of any issue triable of right by jury, and waives any right to trial by jury fully to the extent that any such right shall now or hereafter exist with regard to the claim, counterclaim or other action arising in connection therewith.  This waiver of right to trial by jury is given knowingly and voluntarily by Tenant and Landlord, and is intended to encompass individually each instance and each issue to which the right to a trial by jury would otherwise accrue.  Landlord and Tenant are hereby authorized to file a copy of this paragraph in any proceeding as conclusive evidence of this waiver.

23.22  **Headings**:  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

23.23  **Time Of The Essence**:  Time is of the essence with respect to the performance and observance of all of the terms, covenants and conditions hereof by Tenant.

23.24  **Authority**:  Tenant and Landlord and the persons executing this Lease on behalf of Tenant and Landlord acknowledge that Tenant and Landlord have obtained all legal and

- 38 -

required approvals, whether legislative or otherwise to execute and cause this Lease to be fully binding upon Tenant and Landlord in accordance with the terms hereof.

23.25   **Tax Exempt Financing**.  Tenant may not seek or utilize tax exempt financing for any future improvements, alterations or other Change to or use of the Premises.

23.26   **Tenant's Exclusive**.  Other than with respect to Tenant, Landlord shall not lease any portion of the Landlord Condominium to any private or public or for profit college or university which offers, at the time such other lease is executed, a Bachelor of Arts or Bachelor of Science degree.  In addition, Landlord shall not allow or permit any other tenant in the Landlord Condominium ("Other Tenant") to conduct post high school level classes or educational programs which are substantially similar to the classes or educational programs conducted by Tenant, at the time of execution of the lease for such Other Tenant, without Tenant's prior written consent, which consent may be withheld in Tenant's sole discretion.  At any time and from time to time Tenant shall, within a reasonable period of time after written request: (i) provide Landlord with a written list of the classes and educational programs then currently conducted by Tenant within the Landlord Condominium including reasonable information describing such classes and educational programs and/or (ii) inform Landlord of whether one or more proposed classes or educational programs as described by Landlord are, in Tenant's reasonable opinion, substantially similar to classes and educational programs then conducted by Tenant within the Landlord Condominium.

23.27   **Recording**.  Tenant may not record this Lease or any memorandum, short form or affidavit hereof in the public records provided that Landlord may execute a memorandum of this Lease in a form reasonably approved by Landlord and Tenant, and Tenant may record such memorandum in the public records.

23.28   **Lease Contingencies**.  This Lease and Tenant's obligation to perform hereunder shall be contingent upon (collectively, the "Contingencies") (i) Owner's acquisition of fee simple title to the Land, subject only to this Lease and the Prime Documents (such date of acquisition being the "Acquisition Date"), obligations to lenders of Landlord and other matters of record in the form of a copy of a recorded deed confirming such acquisition of fee simple title to the Land; (ii) Tenant's receipt and approval of the final, executed Declaration and the Master Lease (which approval shall not be unreasonably withheld); (iii) Tenant's receipt and approval (which approval shall not be unreasonably withheld) of the O&M Plan; (iv) Tenant's receipt of a commercially reasonable subordination, non-disturbance and attornment agreement (an "SNDA"), executed and delivered by any holder of any deed of trust or mortgage encumbering the Landlord Condominium, pursuant to which such holder shall have agreed in writing, and shall be bound thereby, to honor all of Tenant's rights under this Lease, including Tenant's rights of quiet and exclusive use and enjoyment of the Premises, the form of which shall be in recordable form and approved in advance and in writing by Tenant (Tenant specifically agrees that the form attached as Exhibit F is acceptable); and (v) Tenant's receipt of a commercially reasonable direct recognition agreement (a "DRA"), executed and delivered by Owner, pursuant to which Owner shall have agreed in writing, and shall be bound thereby, to honor all of Tenant's rights under this Lease, including Tenant's rights of quiet and exclusive use and enjoyment of the Premises, the form of which shall be approved in advance and in writing by Tenant; all of which must be satisfied on or before December 31, 2014 (the "Lease Contingency Date").  If the Contingencies

- 39 -

have not satisfied or waived (the parties hereby acknowledge and agree that any waiver of the Contingencies must be in writing by Tenant) on or before the Lease Contingency Date, the Lease shall become null and void and neither Landlord nor Tenant shall have any ongoing or further obligation to one another hereunder, except for the Surviving Obligations. Landlord covenants and agrees to provide to Tenant, within 30 days after the Acquisition Date, an updated title commitment dated as of the Acquisition Date or a copy of Landlord's title policy for the Land, confirming that Landlord acquired fee simple title to the Land, subject only to this Lease and the Prime Documents.

[The remainder of this page has intentionally been left blank.]

IN WITNESS WHEREOF, the undersigned have caused this Lease to be signed and delivered on their behalf as of the date first above written.

**TENANT:**

**WEBSTER UNIVERSITY**

By: _____          By: _____
Dr. Elizabeth J Stroble                         Dr. Greg Gunderson

Its: _President_____          Its: _UPicFO_____

41

**LANDLORD:**

**ST. LOUIS LEASED HOUSING ASSOCIATES V
MASTER TENANT, LIMITED PARTNERSHIP**

By:   St. Louis Leased Housing Associates Master Tenant V, LLC
     Its:  General Partner

By:_____
     Jeffrey R. Huggett
     Vice President

8171006v16

**EXHIBIT A**

**FLOOR PLAN**



## Arcade Building – BOMA Area Measurement Report

The purpose of this report is to provide a clear and concise summary of the square footage calculations and area apportionments in this building. The information in this report is intended for the use by the building owners for the purpose of providing accurate building measurements for leasing the Commercial Tenant areas of the building and to accurately measure proportionate share of the building areas between uses (Commercial, Market Rate & LIHTC).

To ensure accuracy and consistency, the information within this report has been generated from a full scale computerized model of the building. All areas, or spaces, within the building have been measured and identified so computations can be verified and repeated. The result is a report based on the parameters set forth within, and designed for use throughout the life of the building. Please keep in mind that this report has been designed and produced as a single document for all building calculations and is the basis from which all computations for tenant calculations may be derived. Tenant calculations arrived at by other standards or methods cannot be verified or justified by this report.

Calculations in this report use the Building Owners and Managers Association International (BOMA) Standards as a guideline. The BOMA method provides general information on how to measure Usable and Rentable Area for office and multi-use buildings.

The following list of parameters used when measuring and apportioning areas in this building. Refer to the Glossary, Floor Calculations and Component Listings section for more specific information.

Measurement:
- This building is measured using the ANSI/BOMA Z1996
- The building is measured as a "Multi-Tenant Occupant Building" where all vertical penetrations, except those for the exclusive use of one tenant, are excluded from the rentable square footages of this building.
- Measurements at exterior walls are taken to the Dominant Portion, which is either to the inside face for the existing wall surface or to the glass line of storefronts and windows.
- Measurements at the first floor street fronting spaces are measured as Store Area with the exterior measurement taken at the building line at street facing storefront walls.

Corridors:
- Corridors are measured to the tenant side of their enclosing walls.
- The Arcade Common Lobby is measured to the glass line of the storefront walls.

Additional notes (exerts from BOMA's *Answers To 26 Key Questions About The BOMA Standard*):
- BOMA standards state specifically that "vertical penetrations built for the private use of a tenant occupying Office Areas on more than one floor" are counted as rentable.
- All floor space in a building is measured, including mezzanines. The purpose of the Standard is to measure the actual square feet contained in a building. The usefulness of a particular space is not addressed by the Standard.
- Corridors and elevator lobbies that are for exclusive use of a single tenant are counted as part of the tenant usable area.

■   1006 olive street, suite 200     st. louis, missouri 63101     314 + 241 4566 p     314 + 241 4939 f     eplusa-arch.com



**Building Area Calculations**

| | | |
|---|---|---|
| BOMA Gross Measured Area: | 441,361 SF | |
| Vertical Penetrations: | -23,652 SF | 5.36% |
| BOMA Floor Rentable Area: | 417,709 SF | 94.64% |
| | | |
| Building Common Areas: | -13,125 SF | 2.97% |
| Residential Common Areas: | -19,335 SF | 4.37% |
| BOMA Usable Area: | 385,249 SF | 87.29% |
| | | |
| Commercial Tenant Usable Area: | 52,711 SF | 13.68% of Building Usable Area |
| LIHTC Apartments Usable Area: | 241,513 SF | 62.69% of Building Usable Area |
| Market Rate Apartments Usable Area: | +91,024 SF | 23.63% of Building Usable Area |
| BOMA Usable Area: | 385,249 SF | |

**Commercial Tenant Rentable Area Calculations**

| | |
|---|---|
| Building Common Area: | 13,125 SF |
| Commercial Tenant Proportionate Share | x 13.68% |
| Commercial Tenant Building Common Share: | 1,796 SF |
| | |
| Commercial Tenant Usable Area: | 52,711 SF |
| Commercial Tenant Building Common Share: | +1,796 SF |
| Commercial Tenant Rentable | 54,507 SF |

2



**Table of Arcade Building areas by floor**

| Floor | BOMA Gross Measured Area * | Vertical Penetrations | Building Rentable Area ** | Building Common Areas | Residential Common Areas | Building Usable Area *** | LIHTC Apartments | Market Rate Apartments | Commercial Tenant | Building R/U Ratio **** |
|---|---|---|---|---|---|---|---|---|---|---|
| Parking P3 | 99 | 99 | 0 | | | | | | | |
| Parking P2 | 1,212 | 744 | 468 | 381 | | 87 | | | 87 | 5.38 |
| Parking P1 | 6,311 | 1,639 | 4,672 | 3,277 | 219 | 1,176 | 1,101 | | 75 | 3.97 |
| 1 | 33,971 | 1,596 | 32,375 | 9,241 | 2,244 | 20,890 | | | 20,890 | 1.55 |
| 1M | 12,218 | 1,921 | 10,297 | 226 | 1,255 | 8,816 | | | 8,816 | 1.17 |
| 2 | 24,177 | 1,334 | 22,843 | | | 22,843 | | | 22,843 | 1.00 |
| 3 | 32,030 | 1,656 | 30,374 | | 7,745 | 22,629 | 11,582 | 11,047 | | 1.34 |
| 4 | 7,479 | 827 | 6,652 | | | 6,652 | 6,652 | | | 1.00 |
| 5 | 28,806 | 1,276 | 27,530 | | | 27,530 | 27,530 | | | 1.00 |
| 6 | 28,788 | 1,288 | 27,500 | | | 27,500 | 27,500 | | | 1.00 |
| 7 | 7,462 | 779 | 6,683 | | | 6,683 | 6,683 | | | 1.00 |
| 8 | 28,815 | 1,263 | 27,552 | | | 27,552 | 27,552 | | | 1.00 |
| 9 | 27,312 | 1,429 | 25,883 | | | 25,883 | 25,883 | | | 1.00 |
| 10 | 23,747 | 907 | 22,840 | | 1,434 | 21,406 | 21,406 | | | 1.07 |
| 11 | 22,168 | 762 | 21,406 | | | 21,406 | 21,406 | | | 1.00 |
| 12 | 22,168 | 762 | 21,406 | | | 21,406 | 21,406 | | | 1.00 |
| 13 | 22,168 | 762 | 21,406 | | | 21,406 | 21,406 | | | 1.00 |
| 14 | 22,168 | 762 | 21,406 | | | 21,406 | 21,406 | | | 1.00 |
| 15 | 22,168 | 762 | 21,406 | | | 21,406 | | 21,406 | | 1.00 |
| 16 | 20,352 | 758 | 19,594 | | | 19,594 | | 19,594 | | 1.00 |
| 17 | 18,286 | 758 | 17,528 | | | 17,528 | | 17,528 | | 1.00 |
| 18 | 18,199 | 758 | 17,441 | | | 17,441 | | 17,441 | | 1.00 |
| 19 | 11,257 | 810 | 10,447 | | 6,438 | 4,009 | | 4,009 | | 2.61 |
| Roof | | | | | | | | | | |
| Total | 441,381 | 23,852 | 417,709 | 13,125 | 19,335 | 385,249 | 241,513 | 91,025 | 52,711 | 1.08 |

| |
|---|
| * Total area enclosed by the Dominant Portion (First Floor measured using Store Area method). |
| ** Gross Measured Area minus Vertical Penetrations. |
| *** Sum of Rentable Areas less Building Common Elements & Residential Common Elements. |
| **** Building Rentable Area divided by Building Usable Area. |
| NOTE: Parking areas not included in floor areas |

3



**Area Component listings by floor (refer to attached floor plans)**

### Floor P3 – Component Listing

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial |
|---|---|---|---|---|---|
| Parking | (Not counted in Gross Measured Area) | | | | |
| Mech. air intake | Mechanical | 99 SF | | | |
| Totals | | 99 SF | | | |

Floor Total (Gross Measured Area): 99 SF

### Floor P2 – Component Listing

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial |
|---|---|---|---|---|---|
| Parking | (Not counted in Gross Measured Area) | | | | |
| Mech. air intake | Mechanical | 99 SF | | | |
| Mech. exhaust fan | Mechanical | 55 SF | | | |
| Stair #5 | Stair | 207 SF | | | |
| Stair #3 | Stair | 151 SF | | | |
| Res. elevators | Elevator | 232 SF | | | |
| Building Storage | Other | | 381 SF | | |
| Tenant elevator #6 | Commercial | | | | 87 SF |
| Totals | | 744 SF | 381 SF | | 87 SF |

Floor Total (Gross Measured Area): 1,212 SF

### Floor P1 – Component Listing

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial | LIHTC |
|---|---|---|---|---|---|---|
| Parking | (Not counted in Gross Measured Area) | | | | | |
| Mech. air intake | Mechanical | 179 SF | | | | |
| Mech. air exhaust | Mechanical | 64 SF | | | | |
| Mech. air exhaust | Mechanical | 200 SF | | | | |
| Arcade mech. room | Mechanical | | 340 SF | | | |
| Unused flue | Other | 85 SF | | | | |
| Electrical sub-station | Electrical | | 1,556 SF | | | |
| Electrical transformer | Electrical | | 372 SF | | | |
| Second power room | Electrical | | 299 SF | | | |
| Sprinkler pump | Fire Protection | | 171 SF | | | |
| Stair #5 | Stair | 356 SF | | | | |
| Stair #3 | Stair | 252 SF | | | | |
| Stair #1 | Stair | 48 SF | | | | |
| Res. elevators | Elevator | 334 SF | | | | |
| Res. elevators | Elevator | 121 SF | | | | |
| Janitor & storage | Other | | | 219 SF | | |
| Building maint. shop | Other | | 539 SF | | | |
| Sound Studios | LIHTC Condo | | | | | 954 SF |
| Sound Studio | LIHTC Condo | | | | | 147 SF |
| Commercial elevator #6 | Commercial | | | | 75 SF | |
| Totals | | 1,639 SF | 3,277 SF | 219 SF | 75 SF | 1,101 SF |

Floor Total (Gross Measured Area): 6,311 SF

4



**First Floor – Component Listing**

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial |
|---|---|---|---|---|---|
| Arcade Lobby | Lobby | | 5,110 SF | | |
| Olive St. entrance ext. | Other | | 104 SF | | |
| Pine St. entrance ext. | Other | | 132 SF | | |
| Management Office | Other | | 1,260 SF | | |
| Fire Command | Other | | 227 SF | | |
| Janitor | Other | | 31 SF | | |
| Building Storage | Other | | 80 SF | | |
| Recycle / Trash | Service | | 568 SF | | |
| Receiving Corridor | Service | | 1,439 SF | | |
| Service Corridor | Service | | 290 SF | | |
| Stair #5 | Stair | 239 SF | | | |
| Stair #3 | Stair | 166 SF | | | |
| Stair #2 | Stair | 187 SF | | | |
| Stair #1 | Stair | 144 SF | | | |
| Stair | Stair | 92 SF | | | |
| Shaft | Shaft | 86 SF | | | |
| Mech. chase | Mech. | 123 SF | | | |
| Shaft | Shaft | 126 SF | | | |
| Residential Lobby | Residential | | | 1,410 SF | |
| Includes Lobby, Res. Elevator Lobby and Mail Room. | | | | | |
| Res entrance ext. | Residential | | | 265 SF | |
| Bike Storage | Residential | | | 490 SF | |
| Electrical Room | Residential | | | 79 SF | |
| Res. elevators | Elevator | 317 SF | | | |
| Res. elevators | Elevator | 116 SF | | | |
| Comm. lease space | Commercial | | | | 11,104 SF |
| Comm. lease space | Commercial | | | | 2,129 SF |
| Comm. lease space | Commercial | | | | 3,109 SF |
| Comm. lease space | Commercial | | | | 3,109 SF |
| Comm. lease space | Commercial | | | | 408 SF |
| Comm. lease space | Commercial | | | | 884 SF |
| Comm. display case | Commercial | | | | 4 SF |
| Comm. elevator #5 | Commercial | | | | 67 SF |
| Comm. elevator #6 | Commercial | | | | 76 SF |
| Totals | | 1,596 SF | 9,241 SF | 2,244 SF | 20,890 SF |

Floor Total (Gross Measured Area): 33,971 SF



## Floor 1M – Component Listing

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial |
|---|---|---|---|---|---|
| Mechanical Loft | Mechanical | | 226 SF | | |
| Stair #5 | Stair | 260 SF | | | |
| Stair #3 | Stair | 175 SF | | | |
| Stair #2 | Stair | 484 SF | | | |
| Stair #1 | Stair | 136 SF | | | |
| Shaft | Shaft | 65 SF | | | |
| Shaft | Shaft | 82 SF | | | |
| Shaft | Shaft | 161 SF | | | |
| Shaft | Shaft | 177 SF | | | |
| Bike Storage | Residential | | | 1,255 SF | |
| Res. elevators | Elevator | 264 SF | | | |
| Res. elevators | Elevator | 117 SF | | | |
| Commercial lease space | Commercial | | | | 8,431 SF |
| Commercial lease space | Commercial | | | | 196 SF |
| Commercial elect. room | Commercial | | | | 56 SF |
| Commercial elevator #5 | Commercial | | | | 66 SF |
| Commercial elevator #6 | Commercial | | | | 67 SF |
| Totals | | 1,921 SF | 226 SF | 1,255 SF | 8,816 SF |

Floor Total (Gross Measured Area): 12,218 SF

## Second Floor – Component Listing

| Description | Category | Vertical Pen. | Bldg. Common | Res. Common | Commercial |
|---|---|---|---|---|---|
| Stair #5 | Stair | 154 SF | | | |
| Stair #3 | Stair | 194 SF | | | |
| Stair #2 | Stair | 176 SF | | | |
| Stair #1 | Stair | 141 SF | | | |
| Shaft | Shaft | 80 SF | | | |
| Shaft | Shaft | 43 SF | | | |
| Shaft | Mechanical | 115 SF | | | |
| Trash Chute | Shaft | 12 SF | | | |
| Res. elevators | Elevator | 314 SF | | | |
| Res. elevators | Elevator | 105 SF | | | |
| Commercial lease space | Commercial | | | | 20,379 SF |
| Commercial lease space | Commercial | | | | 683 SF |
| Commercial lease space | Commercial | | | | 1,219 SF |
| Commercial lease space | Commercial | | | | 323 SF |
| Comm. trash & elect. | Commercial | | | | 167 SF |
| Commercial elevator #5 | Commercial | | | | 72 SF |
| Totals | | 1,334 SF | | | 22,843 SF |

Floor Total (Gross Measured Area): 24,177 SF

6



### Third Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 204 SF | | | | |
| Stair #3 | Stair | 190 SF | | | | |
| Stair #2 | Stair | 335 SF | | | | |
| Stair #1 | Stair | 119 SF | | | | |
| Shaft | Shaft | 71 SF | | | | |
| Shaft | Shaft | 60 SF | | | | |
| Shaft | Shaft | 159 SF | | | | |
| Shaft | Mechanical | 90 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 321 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Resident Common Areas | Residential | | | 7,745 SF | | |
| Includes corridors, elevator lobby, Theater Rm., Sculpture Gallery, Fitness Rms., Yoga Studio and restrooms | | | | | | |
| Market Rate Apartments | Market | | | | 11,047 SF | |
| Includes residential units and the allocated portion of the corridor. | | | | | | |
| Dance / Performance | LIHTC | | | | | 1,864 SF |
| Artist Storage | LIHTC | | | | | 303 SF |
| LIHTC Apartments | LIHTC | | | | | 9,415 SF |
| Includes residential units and the allocated portion of the corridor. | | | | | | |
| Totals | | 1,656 SF | | 7,745 SF | 11,047 SF | 11,582 SF |

Floor Total (Gross Measured Area): 32,030 SF

### Fourth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 204 SF | | | | |
| Stair #1 | Stair | 118 SF | | | | |
| Shaft | Shaft | 71 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 277 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 6,652 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 827 SF | | | | 6,652 SF |

Floor Total (Gross Measured Area): 7,479 SF

7



### Fifth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 160 SF | | | | |
| Stair #3 | Stair | 197 SF | | | | |
| Stair #2 | Stair | 131 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Shaft | Shaft | 168 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 27,530 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 1,276 SF | | | | 27,530 SF |

Floor Total (Gross Measured Area): 28,806 SF

### Sixth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 178 SF | | | | |
| Stair #3 | Stair | 190 SF | | | | |
| Stair #2 | Stair | 132 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 68 SF | | | | |
| Shaft | Shaft | 53 SF | | | | |
| Shaft | Shaft | 168 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 27,500 SF |
| Includes res. units, elev. lobby, corridors, Photography, Flex Studios, Media Studios, Private Studio & restroom | | | | | | |
| Totals | | 1,288 SF | | | | 27,500 SF |

Floor Total (Gross Measured Area): 28,788 SF

### Seventh Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 163 SF | | | | |
| Stair #1 | Stair | 118 SF | | | | |
| Shaft | Shaft | 66 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 6,683 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 779 SF | | | | 6,683 SF |

Floor Total (Gross Measured Area): 7,462 SF

8



### Eighth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 161 SF | | | | |
| Stair #3 | Stair | 188 SF | | | | |
| Stair #2 | Stair | 132 SF | | | | |
| Stair #1 | Stair | 118 SF | | | | |
| Shaft | Shaft | 64 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Shaft | Shaft | 168 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 27,552 SF |
| Includes res. units, elev. lobby corridors, Artist, Flex Studios, Work & Paint Rms., Private Studio and restroom | | | | | | |
| Totals | | 1,263 SF | | | | 27,552 SF |

Floor Total (Gross Measured Area): 28,815 SF

### Ninth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #5 | Stair | 178 SF | | | | |
| Stair #4 | Stair | 141 SF | | | | |
| Stair #3 | Stair | 190 SF | | | | |
| Stair #2 | Stair | 132 SF | | | | |
| Stair #1 | Stair | 118 SF | | | | |
| Shaft | Shaft | 65 SF | | | | |
| Shaft | Shaft | 55 SF | | | | |
| Shaft | Shaft | 168 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 25,883 SF |
| Includes residential units, elevator lobby, corridors and Private Studios | | | | | | |
| Totals | | 1,429 SF | | | | 25,883 SF |

Floor Total (Gross Measured Area): 27,312 SF

9



### Tenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #2 | Stair | 145 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Res. Mechanical Room | LIHTC | | | 1,434 SF | | |
| LIHTC Apartments | LIHTC | | | | | 21,406 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 907 SF | | 1,434 SF | | 21,406 SF |

Floor Total (Gross Measured Area): 23,747 SF

### Eleventh Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 21,406 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 762 SF | | | | 21,406 SF |

Floor Total (Gross Measured Area): 22,168 SF

### Twelfth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 21,406 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 762 SF | | | | 21,406 SF |

Floor Total (Gross Measured Area): 22,168 SF



### Thirteenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 21,406 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 762 SF | | | | 21,406 SF |

Floor Total (Gross Measured Area): 22,168 SF

### Fourteenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| LIHTC Apartments | LIHTC | | | | | 21,406 SF |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 762 SF | | | | 21,406 SF |

Floor Total (Gross Measured Area): 22,168 SF

### Fifteenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 54 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Market Rate Apartments Market | | | | | 21,406 SF | |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 762 SF | | | | 21,406 SF |

Floor Total (Gross Measured Area): 22,168 SF

11



### Sixteenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Market Rate Apartments | Market | | | | 19,594 SF | |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 758 SF | | | 19,594 SF | |

Floor Total (Gross Measured Area): 20,352 SF

### Seventeenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Market Rate Apartments | Market | | | | 17,528 SF | |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 758 SF | | | 17,528 SF | |

Floor Total (Gross Measured Area): 18,286 SF

### Eighteenth Floor – Component Listing

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 142 SF | | | | |
| Stair #1 | Stair | 117 SF | | | | |
| Shaft | Shaft | 67 SF | | | | |
| Shaft | Shaft | 50 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Market Rate Apartments | Market | | | | 17,441 SF | |
| Includes residential units, elevator lobby and corridors | | | | | | |
| Totals | | 758 SF | | | 17,441 SF | |

Floor Total (Gross Measured Area): 18,199 SF



**Nineteenth Floor – Component Listing**

| Description | Category | Vert. Pen. | Bldg. Com. | Res. Com. | Market | LIHTC |
|---|---|---|---|---|---|---|
| Stair #4 | Stair | 123 SF | | | | |
| Stair #1 | Stair | 84 SF | | | | |
| Elev. Penthouse Stair | Stair | 113 SF | | | | |
| Shaft | Shaft | 73 SF | | | | |
| Shaft | Shaft | 35 SF | | | | |
| Trash Chute | Shaft | 12 SF | | | | |
| Res. elevators | Elevator | 275 SF | | | | |
| Res. elevators | Elevator | 95 SF | | | | |
| Resident Common Areas Residential | | | | 6,438 SF | | |
| Includes corridors, elevator Lobby, Community Rm., Lounge, Storage and restrooms | | | | | | |
| Market Rate Apartments Market | | | | | 4,009 SF | |
| Totals | | 810 SF | | 6,438 SF | 4,009 SF | |

Floor Total (Gross Measured Area): 11,257 SF

## DEFINITIONS

*FINISHED SURFACE* shall mean a wall, ceiling or floor surface, including glass, as prepared for tenant use, excluding the thickness of any special surfacing materials such as panelling, furring strips and/or carpet.

*DOMINANT PORTION* shall mean the portion of the inside *FINISHED SURFACE* of the permanent outer building wall which is 50% or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall. *DOMINANT PORTION* itself is a vertical measurement between *FINISHED SURFACE*s (or a series of vertical measurements), with the number of measurements needed based upon the conditions found along the wall. If, for instance, a window system is 4'-6" (1.372 meters) high and the floor to ceiling dimension is 9'-0" (2.743 meters), the *DOMINANT PORTION* is the inside surface of the glass for the full width of the window system. If, however, the window system is 4'-5" (1.346 meters), the *DOMINANT PORTION* is the inside surface of the wall. In designs of alternating window systems and wall sections, the *DOMINANT PORTION* will move in and out as often as conditions dictate. If no *FINISHED SURFACE* of the permanent outer building wall is 50% or more of the vertical floor-to-ceiling dimension, or if the permanent outer building wall is not vertical, the *DOMINANT PORTION* shall be the inside finished surface of the wall where it intersects the finished floor. In the case of *STORE AREA* with street level frontage, the *DOMINANT PORTION* shall be the building line.

*GROSS MEASURED AREA* shall mean the total area of a building enclosed by the *DOMINANT PORTION*, excluding parking areas and loading docks (or portions of same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis.

*MAJOR VERTICAL PENETRATION*s shall mean stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying *OFFICE AREA*s on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be *MAJOR VERTICAL PENETRATION*s.

*FLOOR RENTABLE AREA* shall mean the result of subtracting from the *GROSS MEASURED AREA* of a floor the *MAJOR VERTICAL PENETRATION*s on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration.

*USABLE AREA* shall mean the measured area of an *OFFICE AREA, STORE AREA*, or *BUILDING COMMON AREA* on a floor. The total of all the *USABLE AREA*s for a floor shall equal *FLOOR USABLE AREA* of that same floor.

*OFFICE AREA* shall mean the area where a tenant normally houses personnel and/or furniture, for which a measurement is to be computed.

*STORE AREA* shall mean the area of an office building suitable for retail occupancy. *STORE AREA*s are included in FLOOR *RENTABLE AREA* and *RENTABLE AREA*.

## DEFINITIONS

*BUILDING COMMON AREA* shall mean the areas of the building that provide services to building tenants but which are not included in the *OFFICE AREA* or *STORE AREA* of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas, food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from *BUILDING COMMON AREA* are *FLOOR COMMON AREAs*, parking space, portions of loading docks outside the building line, and *MAJOR VERTICAL PENETRATIONs*.

*FLOOR USABLE AREA* shall mean the sum of *USABLE AREAs* of *OFFICE AREAs*, *STORE AREAs* and *BUILDING COMMON AREAs* of a floor. The amount of *FLOOR USABLE AREA* can vary over the life of a building as corridors expand and contract and as floors are remodeled.

*FLOOR COMMON AREA* shall mean the areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor.

*FLOOR R/U RATIO* shall mean the conversion factor that, when applied to *USABLE AREA*, gives the *BASIC RENTABLE AREA* of the *OFFICE AREA, STORE AREA* or *BUILDING COMMON AREA*.

*BUILDING RENTABLE AREA* shall equal the sum of all the *FLOOR RENTABLE AREAs*.

*BUILDING R/U RATIO* shall mean the conversion factor that distributes the BUILDING COMMON AREA of a building.

*RENTABLE AREA* shall mean the *USABLE AREA* of an *OFFICE AREA* or *STORE AREA* with its associated share of *FLOOR COMMON AREAs* and *BUILDING COMMON AREAs*. *RENTABLE AREA* is determined by multiplying the *USABLE AREA* of an *OFFICE AREA* or *STORE AREA* by the *R/U RATIO*. The total of all *RENTABLE AREAs* equals the *BUILDING RENTABLE AREA* for the building.

*R/U RATIO* shall mean the conversion factor that, when applied to *USABLE AREA*, gives the *RENTABLE AREA* of the *OFFICE AREA* or *STORE AREA*.

## EXHIBIT B

### TENANT FINAL SPACE PLAN



## 1ST FLOOR - PROPOSED

SCALE: 1" = 20'

**LEGEND:**

- LIHTC CONDO
- MARKET RATE CONDO
- COMMERCIAL CONDO
- COMMON ELEMENTS
- LIMITED COMMON ELEMENTS - LIHTC
- LCE - MARKET RATE
- LCE - COMMERCIAL
- LCE - RESIDENTIAL
- LCE - COMMERCIAL/ MARKET RATE

## ARCADE BUILDING
612 OLIVE ST.
SAINT LOUIS, MO 63101



**LEGEND:**

- LIHTC CONDO
- MARKET RATE CONDO
- COMMERCIAL CONDO
- COMMON ELEMENTS
- LIMITED COMMON ELEMENTS – LIHTC
- LCE – MARKET RATE
- LCE – COMMERCIAL
- LCE – RESIDENTIAL
- LCE – COMMERCIAL/ MARKET RATE

## LEVEL 1M - PROPOSED

SCALE: 1" = 20'



N 



developer

**DOMINIUM**
2905 NORTHWEST BLVD., STE 150
PLYMOUTH, MN 55441
763-354-5865
WWW.DOMINIUMAPARTMENTS.COM

**ARCADE BUILDING**
812 OLIVE ST.
SAINT LOUIS, MO 63101

e+a

© copyright 2013 ekstrand, e+associates



LEGEND:

- LIHTC CONDO
- MARKET RATE CONDO
- COMMERCIAL CONDO
- COMMON ELEMENTS
- LIMITED COMMON ELEMENTS - LIHTC
- LCE – MARKET RATE
- LCE – COMMERCIAL
- LCE – RESIDENTIAL
- LCE – COMMERCIAL/ MARKET RATE

## 2ND FLOOR - PROPOSED

SCALE: 1" = 20'







developer    2/17/14
DOMINIUM
2905 NORTHWEST BLVD., STE 150
PLYMOUTH, MN 55441
763-354-5605
WWW.DOMINIUMAPARTMENTS.COM

ARCADE BUILDING
812 OLIVE ST.
SAINT LOUIS, MO 63101

## EXHIBIT C

## WORK TO BE PERFORMED ON THE PREMISES

A.     Tenant represents and warrants that it has caused to be prepared by Trivers and Associates ("Tenant's Architect"), at Tenant's cost and expense, subject to the terms of Section D below, the design and engineering plans, specifications and documents relating to the completion of the Tenant Improvements and the Common Area Improvements, provided at the date of this Lease such documents have not been finalized (the "Tenant Improvement Plans" or the "Approved Construction Documents"). Upon finalization, the Tenant Improvements Plans and Approved Construction Documents shall be provided by Tenant to Landlord for its review and approval. The parties shall proceed in good faith and due diligence to address and resolve any open issues or concerns regarding the Approved Construction Documents in connection with the Landlord's Work.  The parties acknowledge that the Building is a National Historic Landmark subject to various preservation restrictions.  The parties agree that all Landlord's Work may be subject to approval by various government agencies such as the National Park Service, Missouri State Historic Preservation Office and Advisory Council on Historic Preservation. Tenant represents and warrants to Landlord that (a) the design and engineering work required for the Landlord's Work has been performed only by qualified architects, engineers and other design professionals duly licensed in the State of Missouri, and selected by Tenant; (b) the design and engineering work for the Landlord's Work has been performed in compliance, and in a manner consistent with, applicable standards of professional skill, care and diligence, all applicable laws, rules, regulations, ordinances, orders, recorded restrictions and permits, including but not limited to the Americans with Disabilities Act; and (c) Tenant shall require the correction and/or modification of any Landlord's Work that do not so comply, with reasonable promptness and at no cost to Landlord. Landlord makes no warranty as to Approved Construction Documents and bears no responsibility for defects therein.

B.     Landlord's Work.  As used herein, Landlord's Work, shall mean and include all labor, supervision, materials, fixtures, special facilities, equipment, tools, supplies, taxes, permits and related inspections and other property and work and services necessary to timely and properly construct the Tenant Improvements and produce all completed construction required by, the Final Space Plan and the Approved Construction Documents, and in accordance with the Tenant Improvements Plans. Landlord agrees to perform Landlord's Work in accordance with the terms of this Lease, including this Exhibit C. Landlord agrees that Landlord's Work shall be performed in a manner consistent with those standards of professional skill, care and diligence applicable to contractor's providers of comparable experience and knowledge in similar circumstances.

C.     Contractor; Guaranteed Maximum Price.

1.     Landlord shall cause Paric Corporation to be engaged as the general contractor ("Contractor") for the construction and performance of Landlord's Work. The construction contract (the "Construction Contract") with Contractor shall establish an initial guaranteed, maximum price of $6,902,644 for the proper performance of all of Landlord's Work (the "Contract Sum"). Landlord and Contractor and shall conform to the initial budget for the

Landlord's Work attached to this Lease as <u>Exhibit I</u> (the "<u>Budget</u>"), which Budget identifies the initial budgeted cost of the various components of Landlord's Work. Landlord and Tenant acknowledge that amount of the Contract Sum is based on those plans and specifications prepared and relied upon by Trivers Associates in its preparation of that Pricing Set dated November 11, 2013, and that any change in the plans and specifications that causes an adjustment in the Pricing Set shall result in a corresponding change in the Contract Sum (with any increase being paid to the Escrow Agent in accordance with Section 10.4 and any decrease being refunded by Landlord).

2.     Tenant shall, in accordance with the terms of <u>Article 10</u> of the Lease, deposit with Escrow Agent the Tenant Improvement Contribution calculated in accordance with the terms of <u>Section 10.4</u>, as such amount shall be adjusted from time to time pursuant to the terms of <u>Section 10.4</u> following the execution of Change Orders (the "<u>Tenant Improvement Contribution</u>"). No increases to the Contract Sum shall be permitted without Tenant's prior written consent. The Construction Contract shall require Contractor to maintain reasonable and customary insurance coverage and shall otherwise conform to the applicable requirements of the Lease, including this <u>Exhibit C</u>.

3.     Landlord shall require Contractor to submit its payment applications in forms acceptable to Landlord directly to Landlord and Tenant. Funds owed to Contractor and its subcontractors on account of the Contract Sum shall be paid directly by Escrow Agent to Contractor, and Escrow Agent shall only be permitted to disburse funds following its receipt of approval of each payment application from Landlord and from Tenant. Landlord shall be required to ensure that the General Contract with Contractor and the Escrow Agreement conform to the requirements of this <u>Exhibit C</u>, including this <u>Section C</u>.

D.     Separate and apart from the terms of <u>Section C</u> above, Landlord has paid for the first $175,000 incurred by Tenant on account of the preparation of the Approved Construction Documents. All design costs in addition to this are entirely the obligation of Tenant.

E.     Changes to the Approved Construction Documents may only be made upon the execution of a Change Order. A "Change Order" is a written agreement between Contractor, Tenant and Landlord issued after execution of this Lease, authorizing a change in the Landlord's Work, or an adjustment in the Contract Sum or date for Substantial Completion. The Landlord's Work, the Contract Sum or date for Substantial Completion may be changed only by Change Order. Neither Landlord nor Contractor shall commence the performance of any work that it believes entitles Landlord or Contractor to an increase in the Contract Sum or extension in the date for Substantial Completion without first receiving Tenant's written authorization to proceed with such work and Tenant's agreement as to any increases in the Contract Sum or extension of time resulting therefrom pursuant to a Change Order that is signed by Tenant. A Change Order signed by Landlord indicates its agreement therewith, including any adjustments in compensation or the time as a result of the issuance of the Change Order and shall constitute a final settlement of all matters relating to the work required by the Change Order, including all delays, compression, impact or other costs or expenses associated therewith.

1.     If Tenant requests a Change Order, Landlord shall not unreasonably withhold its consent to any requested changes provided such Change Order otherwise complies with all

aspects of this Lease. Following its receipt of a request for a Change Order from Tenant Landlord shall notify Tenant of the amount of such increased cost prior to performance of any work, which cost shall be established on a stipulated sum basis and reflected in the Change Order as an increase in the Contract Sum, and Tenant shall have the right to withdraw its request for such change within three (3) business days of Landlord's notice of the estimated increased cost. Upon written notice to Landlord within five (5) days after Tenant receives such statement, Tenant shall have the right to require Landlord to have any one or more items related to the changes rebid and to join in any negotiation related to such changes with the Contractor or subcontractor.

2.      Tenant agrees to make an additional Tenant Improvement Contribution in such amount as is determined under Section 10.4 for any Change Order pertaining to the Landlord's Work at such time as the Change Order is required to be paid pursuant to the Construction Contract.

F.      Inspections. Upon reasonable notice, Landlord agrees at all times to provide Tenant and Tenant's consultants with access to the Landlord's Work, wherever it is in preparation or progress, in order to allow the inspection of the preparation, construction or progress thereof. Landlord and Tenant with their respective consultants shall make periodic joint inspections, observations, tests, and certifications of the Premises from time to time during construction at reasonable times on business days, and each time shall endeavor to jointly approve a written statement or assessment of the status of construction, the tasks remaining to be completed and the date of completion of Landlord's Work. Landlord shall deliver to Tenant all written studies, inspection reports, tests, analyses or assessments of the improvements being constructed which are received by Landlord from Landlord's design professional and which relate solely to the Premises and the Landlord's Work. Tenant and its consultants may attend construction meetings with Landlord for the Landlord's Work. Landlord acknowledges and agrees, however, that the performance of the Landlord's Work under the observation or supervision of Tenant or Tenant's consultants, or the failure of them to make inspection, or testing, or to discover or dispute any defective Work or materials during any inspection, shall not prejudice the rights of Tenant hereunder, and shall not relieve, reduce or diminish Landlord's responsibility for performance of the Work as required by this Exhibit C.

G.      From and after the execution of this Lease, through and to Substantial Completion of the Landlord's Work and prior to such time that Tenant takes occupancy of any portion of the Premises, Landlord shall be responsible for and bear all risk of damage to or loss or theft of all materials furnished by Landlord for the Landlord's Work on the Premises, and all equipment furnished or used by Landlord at the Premises. Landlord shall arrange for and be responsible for storage of all such materials and equipment during the course of the Landlord's Work. All temporary facilities, equipment or services necessary in connection with Landlord's Work on the project shall be provided by Landlord at its sole cost and expense.

H.      Landlord shall take all necessary precautions to properly protect the Landlord's Work and the Premises from damages caused by the actions of Landlord or any of its contractors. Through Substantial Completion, Landlord shall be liable for any loss of, or damage to, any such property that is caused by the action or neglect of Landlord or any of its contractors.

Ex. C-3

I.      Landlord shall indemnify and hold harmless Tenant, and its respective agents and employees from and against all damages, losses and expenses, including, without limitation, attorneys' fees paid or incurred in connection with the settlement or defense of any lien, claim, demand or action by a Contractor retained by, through or on behalf of Landlord or any of its Contractors arising out of or in connection with the failure of Landlord to make or ensure payment to any such Contractor, provided, however, that Landlord shall be entitled to contest any faulty Work or mechanics' liens arising from faulty Work.  In the event any lien should be asserted against or attach to the Premises on account of Landlord's failure to pay, or to ensure payment of, a Contractor retained by, through or on behalf of Landlord, Landlord shall, within ten (10) days after the date such lien is filed, remove the lien of record unless such lien is otherwise contested by Landlord, in which case Landlord shall have a reasonable period of time to contest such lien.

J.      Landlord Representations and Warranties.  Landlord hereby represents, warrants and covenants to Tenant, as an inducement to Tenant to enter into the Lease, (i) that when completed, the Landlord's Work shall be completed in accordance with the Approved Construction Documents and free from liens of material suppliers, contractors, subcontractors, laborers, and all other mechanic's liens; (ii) Landlord's Work shall be completed in a good and workmanlike manner, and in accordance with the Approved Construction Documents and conditions of the Lease (including this Exhibit C); (iii) no material deviations or changes shall have been made in connection with the Approved Construction Documents and the Landlord Work without the prior written consent of Tenant; (iv) all of the Landlord's Work shall have been completed using first quality workmanship and materials of good quality, which are new; (v) Landlord's Work shall be free from defects in material or workmanship not inherent in the nature or quality of the Work for a period of one (1) year after the date of Substantial Completion and Landlord shall execute a non-exclusive assignment to Tenant of warranties by the Contractor for any work solely performed within the Premises providing that (1) Landlord's Work performed in the Premises shall be free from defects or material workmanship not inherent in the nature or qualify of the Work; and (2) any defects in Landlord's Work arising within one (1) year of the date of completion of the Work performed by Contractor solely within the Premises shall be repaired or corrected by Contractor at no cost to Tenant promptly after receipt of written notice by Tenant of any defect in the Work performed by Contractor in the Premises.  Any breach of the foregoing representations, warranties and covenants shall be promptly corrected and/or replaced, as the case may be, and fully remedied by Landlord, at Landlord's expense (and no such cost and expense shall be charged to Tenant).

## EXHIBIT D

## LANDLORD CONDOMINIUM RULES

Tenant's use of the Landlord Condominium and Premises shall be governed by the following rules, which Landlord shall enforce on a uniform basis. Landlord reserves the right to unilaterally amend or add to the rules, and such amendments and additions shall be effective when notice of the same is given to Tenant in the manner provided in the Lease.

1.       Nothing shall be displayed, painted or affixed by Tenant on any part of the exterior or interior of the Building (except within the Premises) without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, and then only of such color, size, style and material as shall be reasonably approved by Landlord. Nothing shall be affixed by Tenant within the Premises in areas that are visible from the Common Areas or the exterior of the Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord acknowledges that Tenant plans to use the street level store-front window for electronic display and agrees to accept such plan, provided that such display is in accordance with the Prime Documents and all governmental requirements.

2.       Landlord shall furnish Tenant such amount of keys or access cards to each door lock for the Premises as agreed to by Landlord and Tenant. Additional keys or access cards shall be procured from Landlord and paid for by Tenant. No additional or replacement locks shall be placed on any door of the Premises, and Tenant shall not permit duplicate keys or access cards to be made. Tenant shall be solely responsible for the security of all keys or access cards to the Premises. All keys or access cards furnished to Tenant shall be surrendered to Landlord at the termination of the Term.

3.       If Tenant desires additional wiring connections, Landlord shall direct the electricians as to where the wires are to be introduced and without such directions no boring or cutting for wiring shall be permitted.

4.       Without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall not install or operate any steam or internal combustion engine, boiler, space heater, machinery, refrigerating or heat generating device or air conditioning apparatus in or about the Premises or carry on any mechanical business therein. Tenant shall not install any vending machines other than for use by Tenant's employees and students; however Tenant may install a refrigerator, microwave or coffee maker in the Premises for use solely by Tenant's employees and students.

5.       The Common Areas of the Building shall not be obstructed by Tenant or used in any way except for ingress and egress to and from the offices. Tenant shall place no objects outside Tenant's Premises. Landlord acknowledges and agrees that from time to time Tenant will use the Arcade for events, during these events ingress and egress will be limited. Tenant will coordinate these events with the Landlord.

6.    The bathroom fixtures shall not be used for purposes other than those for which they were constructed.  The cost of repairing any damage caused by Tenant resulting from misuse of such fixtures shall be borne by Tenant.

7.    Tenant shall not permit littering of the Common Areas of the Building.

8.    Tenant shall not cause disturbances or vibrations or use any electrical or electronic devices or other devices that emit sound or other waves or disturbances or create odors, any of which are offensive to other tenants of the Building or which would interfere with the operation of any device or equipment or radio or television broadcasting or reception from or within the Building or elsewhere.  The use thereof, if permitted, shall be subject to control of Landlord to the end that others shall not be disturbed or annoyed.  Tenant shall not permit any loitering in the Common Areas other than with respect to special events held therein.

9.    Tenant shall not waste utility services and shall reasonably cooperate with Landlord to assure the most effective operation of the Building's HVAC system and shall not adjust any controls other than thermostats installed for Tenant's use.  Tenant shall keep corridor doors closed and locked.

10.    Tenant assumes full responsibility for protecting Tenant's space from theft, robbery and pilferage, which includes keeping doors locked and other means of entry to the Premises closed and secured subject to the access rights of Landlord and others hereunder, for which Tenant shall not be responsible.

11.    No animals, birds, bicycles or other vehicles shall be allowed in any part of the Building without the prior consent of Landlord.

12.    Any person or persons (other than the janitor of Landlord) who shall be employed for the purpose of cleaning or maintaining the Premises shall be employed at Tenant's cost, subject to the terms of the Lease, and Landlord shall in no way be responsible for any loss of property on or from the Premises, however occurring, by a janitor.

13.    Tenant shall not accumulate or store on the Premises any waste paper, discarded records, sweepings, rags, rubbish or other combustible matter.  Tenant shall not place in any trash receptacle any material which cannot be disposed of in the ordinary course, and Tenant shall keep all trash within Tenant's Premises.  All garbage and refuse disposal shall be made in accordance with Landlord's reasonable instructions as designated from time to time.

14.    Tenant shall not make any room to room canvass to solicit business from other tenants in the Building and shall not exhibit, sell, or offer to sell, use, rent or exchange any item or service in or from the Premises unless within the Permitted Use.

15.    Landlord reserves the right to exclude from the Landlord Condominium all disorderly persons, persons under the influence of alcohol or a controlled substance, idlers and peddlers, solicitors, and persons entering in crowds or in such unusual numbers as to cause inconvenience to the tenants of the Landlord Condominium.

Ex. D-2

16.     All deliveries to the Premises shall be subject to the reasonable control of Landlord as to place and time of deliveries.

17.     The Common Areas of the Building are a no smoking area in which no smoking of any kind, including but not limited to cigarettes, cigars, pipes, or any other device, is permitted except in an area specifically designated by Landlord as an area where smoking is permitted. Landlord shall not be responsible for violations of this provision by any Tenant of the Landlord Condominium, Tenant's employees, visitors, contractors, or subcontractors.    In the event Landlord seeks to enforce this provision against Tenant, Tenant shall pay all costs and expenses of every kind including, without limitation, all court costs and reasonable attorneys' fees and charges. In the event Landlord seeks any injunctive relief to prevent violations of this provision of the Lease, Tenant agrees that if a bond is required by the court, that the amount of such bond not exceed $100.00. Landlord further reserves the absolute right to designate the entire areas of the Building, grounds and Premises as non-smoking.

**EXHIBIT E**

**CERTIFICATE OF OCCUPANCY**

**TENANT:**          WEBSTER UNIVERSITY

**LANDLORD:**        ST. LOUIS LEASED HOUSING ASSOCIATES MASTER
                     TENANT V, LLLP

**BUILDING:**        ARCADE BUILDING

**DATE OF ORIGINAL
LEASE EXECUTION:**   June 4, 2014

This Certificate of Occupancy is executed by Tenant and Landlord pursuant to the provisions of the Lease referenced above, and shall be attached thereto and become a part thereof for all purposes.

1.    Tenant hereby acknowledges that it has inspected the Premises and finds same to be substantially complete, in a tenantable condition and now suitable for Tenant's intended use.

2.    Tenant and Landlord hereby agree that all work done to the Premises is acceptable and that the only work remaining to be done to the Premises, all of which is of a minor nature, is as follows: _____
_____

Such work is the responsibility of Landlord to complete and said party hereby agrees to promptly undertake the completion of same. Tenant hereby agrees that such work may be completed after it has taken occupancy of the Premises and the term of the Lease has commenced; and further, that Tenant shall not be entitled to any abatement of Tenant's rent or other compensation as a result thereof.

3.    Tenant and Landlord hereby agree, pursuant to Section 3.2 of the Lease, that the actual Commencement Date of the term of the Lease shall be _____, 2015 and that the rent, as provided for in the Lease, shall commence as of such date, and further, that the Lease will terminate at Midnight (local time) on _____, if not otherwise terminated pursuant to the provisions of the Lease.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Occupancy this
_____ day of _____, 2014.

**TENANT:**

**WEBSTER UNIVERSITY**


By:_____
     Name:_____
     Its:_____



**LANDLORD:**

**ST. LOUIS LEASED HOUSING ASSOCIATES V
MASTER TENANT, LIMITED PARTNERSHIP**

By:  St. Louis Leased Housing Associates Master Tenant V, LLC
    Its:  General Partner


     By:_____
       Jeffrey R. Huggett
       Vice President

Ex. E-2

## EXHIBIT F

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

This SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is made and entered into this _____ day of _____, 2014, by and among WEBSTER UNIVERSITY, a Missouri nonprofit corporation, organized and existing under the laws of the State of Missouri ("Tenant"), ST. LOUIS LEASED HOUSING ASSOCIATES MASTER TENANT V, LLLP, a Missouri limited liability limited partnership, organized and existing under the laws of the State of Missouri ("Landlord"), and BMO HARRIS BANK NA., a national banking association ("Mortgagee").

WITNESSETH:

WHEREAS, Mortgagee is the holder of the leasehold deed of trust set forth on Schedule 1 attached hereto and hereby made a part thereof (the "Mortgage") encumbering Landlord's leasehold interest in the real property which comprises a portion of the building known as the Arcade Building in the City of St. Louis, State of Missouri, which portion is more particularly described on Exhibit A attached hereto and hereby made a part hereof (the "Real Estate"; Landlord's leasehold interest in the Real Estate is hereinafter referred to as the "Leasehold Estate");

WHEREAS, Landlord and Tenant have entered into that certain Arcade Building Office Lease dated June 4, 2014 (the "Lease"), demising to Tenant a portion of the Real Estate as more particularly described in the Lease (the "Premises"); and

WHEREAS, the parties hereto desire to affirm the subordination of the Lease to the Mortgage and to set forth herein the agreements of Tenant, Landlord and Mortgagee regarding the relationship between the Lease and the Mortgage and between Tenant and Mortgagee.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, the parties hereto stipulate, covenant and agree as follows:

1.    Subordination.  Subject to the terms and conditions of this Agreement, the Lease, as the same may hereafter be modified, amended or extended, is hereby made junior and subordinate to the Mortgage and to all renewals, modifications, consolidations, replacements and extensions of the Mortgage, so that all rights of the Tenant under the Lease shall be subject, junior and subordinate to the rights of the Mortgagee under the Mortgage and to all renewals, modifications, consolidations, replacements and extensions of the Mortgage as fully as if such instruments had been executed, delivered and recorded prior to the Lease, provided that any and all such modifications, consolidations, replacements and extensions shall nevertheless be subject to the terms of this Agreement.

2.    Attornment.  In the event of foreclosure of the Mortgage, or upon transfer of the Leasehold Estate by deed in lieu of foreclosure (each party acquiring legal title to the Leasehold Estate thereby, including Mortgagee, if applicable, being referred to as an "Acquiring Party"),

Ex. F-1

Tenant agrees to recognize and attorn to any such Acquiring Party as landlord under the Lease without the necessity of any other or further attornment than in this paragraph contained (and this paragraph shall be considered an attornment). Tenant hereby waives any and all rights to terminate the Lease by reason of the foreclosure of the Mortgage or transfer of the Leasehold Estate by a deed in lieu thereof. If any court holds the Lease to be terminated by reason of a foreclosure of the Mortgage or transfer of the Leasehold Estate by a deed in lieu thereof or if the Lease is terminated due to a default by Landlord that is not susceptible of cure by the Mortgagee or if the Lease is terminated for any other reason (other than pursuant to Section 3.2(v) of the Lease) including, without limitation, as a result of a rejection in a bankruptcy or similar proceeding, (i) this Agreement shall be deemed to be a new lease between the Acquiring Party, as landlord, and Tenant, as tenant, for the balance of the term of the Lease for the Premises at the same rental therein provided and upon the identical terms and conditions as therein provided, and (ii) at the written request of Tenant or the Acquiring Party, Tenant and such Acquiring Party shall execute and deliver to each other a new lease for the balance of the term of the Lease for the Premises at the same rental and upon the same terms and conditions as provided in the Lease.

3.     Nondisturbance. Mortgagee agrees for itself, its successors and assigns that so long as Tenant is not in default under the Lease beyond all applicable notice, grace and cure periods, Tenant shall not be named or joined in any action or proceeding to foreclose the Mortgage. Further, Mortgagee agrees for itself, its successors and assigns that so long as Tenant is not in default under the Lease beyond all applicable notice, grace and cure periods, any foreclosure of the Mortgage (or proceeding or deed in lieu in respect thereof) shall not disturb Tenant's exclusive and quiet possession of the Premises provided for in the Lease or divest, impair, abrogate, modify, disturb or otherwise adversely affect the interest and rights of Tenant under the Lease, but rather the Lease shall continue in full force and effect and be binding as a direct lease between the Acquiring Party, as landlord, and Tenant, as tenant, under the Lease subject to the terms and conditions of the Lease, provided, however, that any Acquiring Party shall not be:

(a) liable for any act or omission of a prior landlord (including the Landlord);

(b) subject to any offsets or defenses which Tenant might have against any prior landlord (including the Landlord);

(c) (i) liable for or bound by any payment of rent or additional rent which Tenant might have paid more than one month in advance of the date due under the Lease (including, without limitation, payment of the Tenant Improvement Contribution (as defined in the Lease), or (ii) any deposit, rental security or any other sums deposited with any prior landlord (including the Landlord) for any period beyond the month in which the foreclosure or deed in lieu thereof occurs unless, other than with respect to the Tenant Improvement Allowance, the Acquiring Party actually receives such funds;

(d) bound by any agreement or modification of the Lease without the consent of the Acquiring Party, provided, however, the Acquiring Party's consent shall not be unreasonably withheld, conditioned or delayed and, in addition, notwithstanding anything to the contrary in this Agreement, the consent of the Acquiring Party shall not be required for an amendment or modification which confirms the exercise by Tenant of a specific

right or option pursuant to the express terms of the Lease, such as a renewal right that conforms to the express terms of the Lease;

(e) except with respect to Permitted Transfers (as defined in the Lease), bound by any sublease or assignment entered into without the Acquiring Party's consent;

(f) bound by any warranty, representation or indemnity of any nature whatsoever made by any prior landlord (including Landlord) under the Lease except that Acquiring Party shall be liable for any breach of its obligations as landlord under the Lease occurring during its period of ownership (including any indemnity obligations as landlord under the Lease arising during its period of ownership);

(g) liable to Tenant for construction or restoration, or delays in construction or restoration, of Landlord's Work (as defined in the Lease), or for the obligations of any prior landlord (including Landlord) to reimburse Tenant for or indemnify Tenant against any costs, expenses or damages arising from such construction or any delay in Tenant's occupancy of the Premises; provided, that notwithstanding anything to the contrary herein, nothing in this subparagraph (g) shall abrogate or diminish (nor shall the consent of the Acquiring Party be required for the exercise of) Tenant's right to terminate the Lease under Section 3.2(v) of the Lease. Notwithstanding the foregoing, in no event shall any Mortgagee or any Acquiring Party be obligated  to reimburse (or cause the reimbursement to) Tenant of the Tenant Improvement Contribution (as defined in the Lease) if Tenant terminates the Lease pursuant to Section 3.2(v) of the Lease after Acquiring Party succeeds to the landlord's interest under the Lease and acquires title to the Premises; or

(h) bound by any provision regarding the use of insurance proceeds or condemnation proceeds with respect to the Premises which is inconsistent with the terms of the Mortgage; provided, notwithstanding anything to the contrary herein, if repairs (i.e. repairs and restoration which are the landlord's obligation under the Lease) are required as a result of fire or other casualty or by reason of condemnation and restoration is not undertaken and completed by Acquiring Party following a casualty or condemnation in accordance with the Lease, Tenant may terminate the Lease.

Notwithstanding the foregoing or anything to the contrary herein, (A) nothing in this Agreement shall relieve the Acquiring Party from the obligation to cure any maintenance or repair default under the Lease with respect to the Premises by any prior landlord under the Lease (including Landlord) which is continuing when such Acquiring Party succeeds to the landlord's interest under the Lease and acquires title to the Premises, provided that (and on the conditions that) such Acquiring Party's obligation to cure such default shall be limited solely to performing or causing performance of the maintenance and repair obligations as required pursuant to the terms of the Lease (and in no event shall such Acquiring Party have any other liability or obligation with respect to such default or be liable for any damages in connection therewith); (B) nothing in this Agreement shall abrogate or diminish (nor shall the consent of the Acquiring Party be required for the exercise of) (i) any express right of Tenant to terminate the Lease pursuant to the terms of Section 3.2(v) of the Lease if the Acquiring Party fails to complete Landlord's Work at the time required by Section 3.2(v) (it being acknowledged that the

Ex. F-3

Acquiring Party will not be obligated to complete Landlord's Work), (ii) any other express right of Tenant to terminate the Lease which is set forth in the Lease, or (iii) Tenant's right, under the Lease, to receive reimbursement of the Tenant Improvement Contribution pursuant to Section 3.2(v) of the Lease; provided, however, that in no event shall Mortgagee or any other Acquiring Party be liable for any such reimbursement, Tenant agreeing to look solely to Landlord under the Lease for such reimbursement. and (C) nothing in this Agreement shall relieve the Acquiring Party from honoring any extensions of the commencement of rent in compliance with the terms of the Lease, even though the same resulted from the conduct of a prior landlord.

4.    <u>Mortgagee Opportunity to Cure Landlord Defaults</u>.  Tenant agrees that, until the Mortgage is released by Mortgagee, it will not exercise any remedies under the Lease following a Landlord default without having first given to Mortgagee (a) written notice of the alleged Landlord default and (b) the opportunity to cure such default within (i) a period of fifteen (15) business days following such notice in the instance of a default which may be cured by the payment of money, or (ii) a period of thirty (30) days after receipt of such notice in the instance of a default other than one listed in the preceding clause (i); provided, however, with respect to a default listed in the preceding clause (ii), that if such default cannot reasonably be cured within such 30-day period , but Mortgagee commences to cure such default promptly within such 30-day period and diligently proceeds to effect a cure, such 30-day period shall be extended for such reasonable period of time as it shall require Mortgagee, in the exercise of due diligence, to cure such default (it being understood and agreed that if such time period will  extend more than ninety (90) days following such notice of default, such extended cure right shall not materially and adversely affect Tenant's use and occupancy of the Premises).  Tenant acknowledges that Mortgagee is not obligated to cure any Landlord default, but if Mortgagee elects to do so, Tenant agrees to accept cure by Mortgagee as that of Landlord under the Lease and (except with respect to Tenant's rights to terminate the Lease pursuant to Section 3.2(v) of the Lease) will not exercise any right or remedy under the Lease for a Landlord default.  Performance rendered by Mortgagee on Landlord's behalf is without prejudice to Mortgagee's rights against Landlord under the Mortgage or any other documents executed by Landlord in favor of Mortgagee in connection with the Mortgage or the loan secured by the Mortgage.

5.    <u>Notices</u>.  All notices and other communications under this Agreement are to be in writing and addressed as set forth below:

If to Tenant          Webster University
                      470 East Lockwood Avenue
                      Webster Groves, MO 63119
                      Attn:  Vice President and Chief Financial Officer

With a copy to:       Bryan Cave LLP
                      211 North Broadway
                      Suite 3600
                      St. Louis, MO  63102
                      Attn: Heather Boelens

If to Landlord:       St. Louis Leased Housing Associates Master Tenant V, LLLP
                      2905 Northwest Boulevard

Suite 150
Plymouth, MN 55441
Attn: Jeffrey R. Huggett

With a copy to:      Winthrop & Weinstine, P.A.
225 South Sixth Street
Suite 3500
Minneapolis, MN 55402
Attn: Jon L. Peterson, Esq.

And (during such period of time that US Bancorp Community Development Corporation is a partner of the Landlord) with a copy to:

U.S. Bancorp Community Development Corporation
1307 Washington
Suite 300
St. Louis, MO 63103
Attn: Stephen Kramer

If to Mortgagee:     BMO Harris Bank N.A.
50 South 6th Street, Suite 1000
Minneapolis, MN 55402
Attention: Joseph Schweitzer

With a copy to:      Dentons US LLP
233 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Attention: Marlene D. Nations

Default or demand notices shall be deemed to have been duly given upon the earlier of: (i) actual receipt; (ii) one (1) business day after having been timely deposited for overnight delivery, fee prepaid, with a reputable overnight courier service having a reliable tracking system; (iii) one (1) business day after having been sent by telecopier (with answer back acknowledged), provided, an additional notice is given pursuant to subsection (ii); or (iv) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail, postage prepaid, return receipt requested. A new address for notice may be established by written notice to the other parties; provided, however, that no address change will be effective until written notice thereof actually is received by the party to whom such address change is sent.

6.      _Successors and Assigns_. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, including any Acquiring Party. Upon a subsequent transfer by any Acquiring Party, all obligations shall terminate as to such Acquiring Party, provided such obligations are binding upon the transferee of such Acquiring Party.

7.      _Governing Law_. This Agreement shall be governed by the laws of the State of Missouri.

Ex. F-5

8.    <u>Entire Agreement; Modification</u>.    This Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes and replaces all prior discussions, representations, communications and agreements (oral or written).  This Agreement shall not be modified, supplemented, or terminated, nor any provision hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.

9.    <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, legal representatives, successors, and assigns, whether by voluntary action of the parties or by operation of law.

10.    <u>Unenforceable Provisions</u>.  Any provision of this Agreement which is determined by a court of competent jurisdiction or government body to be invalid, unenforceable or illegal shall be ineffective only to the extent of such determination and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

11.    <u>Duplicate Originals; Counterparts</u>.    This Agreement may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original. This Agreement (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed Agreement even though all signatures do not appear on the same document.

12.    <u>Construction of Certain Terms</u>.  Defined terms used in this Agreement may be used interchangeably in singular or plural form, and pronouns shall be construed to cover all genders.   Article and section headings are for convenience only and shall not be used in interpretation of this Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or other subdivision; and the word "section" refers to the entire section and not to any particular subsection, paragraph or other subdivision; and "Agreement", "Mortgage" and each of the Loan Documents referred to herein mean the agreement as originally executed and as hereafter modified, supplemented, extended, consolidated, or restated from time to time.

13. <u>Consent to Jurisdiction</u>.  Each party hereto irrevocably consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and state where the Premises are located with respect to any legal action arising with respect to this Agreement and waives all objections which it may have to such jurisdiction and venue.

14.    <u>WAIVER OF JURY TRIAL</u>.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY HERETO WAIVES AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT.

*(Signatures appear on the following page)*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Subordination, Nondisturbance and Attornment Agreement as of the day and year first above written.


**TENANT:**

**WEBSTER UNIVERSITY**


By:_____
    Name:_____
    Its:_____


**LANDLORD:**

**ST. LOUIS LEASED HOUSING ASSOCIATES V MASTER TENANT, LLLP**

By:  St. Louis Leased Housing Associates Master Tenant V, LLC
     Its:  General Partner


    By:_____
        Jeffrey R. Huggett
        Vice President


**MORTGAGEE:**

**BMO HARRIS BANK N.A.**


By:_____
    Name:_____
    Its:_____


Ex. F-7

STATE OF _____ )
                                   )ss.
COUNTY OF _____ )

       On this _____ day of _____, 2014, before me appeared _____,
to me personally known, who, being by me duly sworn did say that s/he is the
_____ of WEBSTER UNIVERSITY, a Missouri nonprofit corporation, and
that said instrument was signed on behalf of said corporation by authority of its board of
directors, and said _____ acknowledged said instrument to be the free act and
deed of said corporation.

       IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in
the county and state aforesaid, the day and year first above written.

_____

Notary                                    Public
Printed Name:_____

*Please affix stamp in area designated above*

Ex. F-8

STATE OF _____ )
                                  )ss.
COUNTY OF _____ )

On this ____ day of _____, 2014, before me appeared Jeffrey R. Huggett, to me personally known, who, being by me duly sworn did say that he is the Vice President of St. Louis Leased Housing Associates Master Tenant V, LLC, a Minnesota limited liability company, and that said instrument was signed on behalf of said limited liability company by authority of its members, and said Jeffrey R. Huggett acknowledged said instrument to be the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the county and state aforesaid, the day and year first above written.

_____
Notary                                Public
Printed Name:_____

*Please affix stamp in area designated above*

Ex. F-9

STATE OF _____ )
                                  )ss.
COUNTY OF _____ )

On this _____ day of _____, 2014, before me appeared _____, to me personally known, who, being by me duly sworn did say that s/he is the _____ of BMO Harris Bank N.A., a national banking association, and that said instrument was signed on behalf of said association by authority of its _____, and said _____ acknowledged said instrument to be the free act and deed of said association.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the county and state aforesaid, the day and year first above written.

_____
Notary                                   Public
Printed Name:_____

```
+-----------------------------------------------+
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|                                               |
|        Please affix stamp in area designated above |
|                                               |
+-----------------------------------------------+
```

Ex. F-10

**EXHIBIT G**

**SIGNAGE PLANS**



Olive Street and 8th Street View







Olive Street Entrance View I



Olive Street Entrance View II

ARCADE BUILDING
812 OLIVE ST
SAINT LOUIS, MO 63101




Pine Street Entrance

# EXHIBIT H

## PREMISES PARKING STALLS



**EXHIBIT I**

**BUDGET**

Ex. I-1

| Webster Tenant Improvement Contribution |
|---|

|  | Current Estimate | With 10% Contingency |
|---|---|---|
| Current TI Cost Estimate | $6,573,947 | $6,573,947 |
| Contingency @ 5% |  | $ 328,697 |
| Total TI Cost | $6,573,947 | $6,902,644 |
| Less TI allowance @ $25/sq ft | ($1,362,675) | ($1,362,675) |
| (54,507 sq ft x $25 = $1,362,675) |  |  |
| TI Cost after TI allowance | $5,211,272 | $5,539,969 |
| Less non-QRE eligible costs | ($ 207,709)* | ($ 207,709)* |
| Equals QRE eligible costs | $5,003,563 | $5,332,260 |
| Webster TI Contribution |  |  |
| QRE eligible costs x 74% | $3,702,636 | $3,945,873 |
| Non-QRE eligible costs x 110% | $ 228,480 | $ 228,480 |
| Total Webster TI Contribution | $3,931,116 | $4,174,352 |

* Includes signage, accessories, and specialties.

## Webster Tenant Improvement

### EXHIBIT 1 - Schedule of Values

| | Total Commercial Tenant Improvement Costs |
|---|---|
| General Conditions | $ 489,947 |
| Contractor Fee | $ 204,283 |
| Abatement | $ |
| Demolition | $ 243,598 |
| Earthwork | $ |
| Sidewalk / Curbs | $ |
| Landscape | $ |
| Concrete (inc. testing) | $ 5,514 |
| Concrete Topping Slab / Sound Mat | $ 36,420 |
| Masonry Restoration | $ 4,004 |
| Masonry | $ |
| Structural Steel (inc. testing) | $ 490,342 |
| Balconies, Stairs, Railings | $ 53,041 |
| Rough Carpentry | $ 118,579 |
| Finish Carpentry | $ 214,936 |
| Wood Trim Hallways | $ |
| Waterproofing | $ |
| Roofing | $ |
| Flashing / Sheet Metal | $ |
| Joint Sealant | $ |
| Walls / Marble / Elev. doors-frames at Elev. Lobbies | $ |
| Hollow Metal Doors / Frames | $ 160,267 |
| Wood Doors / Frames / Hardware - Interior unit | $ |
| Wood Doors / Frames / Hardware - Common areas | $ |
| Overhead Doors | $ |
| Entries / Storefronts | $ 100,000 |
| Wood Windows | $ |
| Aluminum Windows | $ |
| Glass & Glazing | $ |
| Pavers / Roof Deck | $ |
| Specialties (inc. postal boxes, lockers, splash pool) | $ 119,673 |
| Plaster - Hallways | $ 23,869 |
| Plaster - Arcade | $ |
| Drywall / Insulation (inc. sound testing) | $ 623,901 |
| Sound Clips / Hat Channel | $ |
| Acoustical Ceiling | $ 239,227 |
| Tile Work | $ |
| Carpet / Vinyl Base | $ 297,145 |
| Marble Restoration | $ 105,965 |
| Painting | $ 127,482 |
| Signage | $ 81,227 |
| Bath / Closet Accessories | $ 6,809 |
| Appliances | $ |
| Window Coverings | $ |
| Cabinets / Countertops / Sills | $ |
| Waste Chute / Compactor | $ |
| Elevators (inc. smoke guard) | $ 219,958 |
| Plumbing (inc. storm & sanitary, roof drainage) | $ 175,739 |
| Mechanical | $ 1,033,685 |
| Electrical | $ 1,191,157 |
| Fire Protection | $ 207,189 |
| **Total** | $ 6,573,947 |

---

Construction Alternates and Issues

Webster University

---

1. Re-locate auditorium truss to 2nd floor                                    ($31,985)

2. Add water side economizer to VSCUs (7 – 10 year payback)          $ 23,069

3. Provide direct digital control system.                                       $ 50,268

4. Signage is just a carried allowance.                                        TBD

5. Light fixtures and door package are allowances.                           TBD

6. Change to electric heat added load to building,                            TBD
   which may require additional costs per Ameren UE.

---

**Design Fee Allowance**

**Webster University**

---

| | |
|---|---|
| Total Design Allowance | $175,000 |
| Trivers Invoices (Architectural) | (123,015) |
| KPFF Invoices (Structural)* | (21,257) |
| Design Allowance Remaining | $ 30,728 |

\* KPFF has provided a proposal of approximately $18,000 to complete structural work for Webster University space.