# EXHIBIT B



```
8 3 0 5 1 2 4
Tx:4635664
```

BOOK          PAGE
**07082014-0352**

RECORDER OF DEEDS
CITY OF ST. LOUIS
RECORDED-CERTIFIED ON
07/08/2014 3:22 PM

SHARON QUIGLEY CARPENTER
RECORDER OF DEEDS

PAGES: 111
AMOUNT DUE: 573.00
4635664

---

Space Above Line Reserved For Recorder's Use

1.    <u>Title of Document</u>:    Declaration of Condominium and By-Laws
of Arcade Building Condominium

2.    <u>Date of Document</u>:    July *8*, 2014

3.    <u>Grantor(s)</u>:    **LAND CLEARANCE FOR REDEVELOPMENT**
**AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**
<u>Mailing Address</u>:    1520 Market Street, Suite 2000
St. Louis, Missouri 63103

4.    <u>Grantee(s)</u>:    **LAND CLEARANCE FOR REDEVELOPMENT**
**AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**
<u>Mailing Address</u>:    1520 Market Street, Suite 2000
St. Louis, Missouri 63103

5.    <u>Legal description</u>: See <u>Exhibit A</u> annexed to the document.

6.    <u>Reference(s) to Book and Page(s)</u>:    Condominium Plat Recorded in
Book <u>07082014</u>
Page <u>0353</u>

<u>Note</u>:    The terms "grantor" and "grantee" as used in this Cover Page are for recording and indexing purposes only.  The instrument itself refers to the parties by other designations.

---

### DECLARATION OF CONDOMINIUM AND BY-LAWS
### OF ARCADE BUILDING CONDOMINIUM

This **DECLARATION OF CONDOMINIUM AND BY-LAWS OF ARCADE BUILDING CONDOMINIUM** (the "Declaration") is made and entered into as of **July 8, 2014**, by **LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI** ("Declarant"), whose mailing address is 1500 Market Street, Suite 2000, St. Louis, Missouri 63103.

**WITNESSETH, that:**

**WHEREAS**, Declarant is the owner of certain real property situated in the **City of St. Louis, Missouri**, hereinafter more particularly described in **Exhibit A** to this Declaration, as depicted on the Plat that is described in **Exhibit B** to this Declaration, which real property is subject to all restrictions of record and all applicable laws and regulations.

**WHEREAS**, it is the desire and intention of Declarant to enable said real property, together with the building and all other structures, improvements and other permanent fixtures of whatsoever kind now or hereafter thereon, and all rights and privileges belonging or in anywise pertaining thereto (hereinafter constituting a part of the "Property," as hereinafter defined) to be owned by Declarant and by each successor in interest of Declarant under that certain type of ownership commonly known as condominium ownership.

**WHEREAS**, Declarant intends that the Property, together with all building, improvements and appurtenances of whatsoever kind hereafter located thereon, and all other facilities thereon, shall be submitted to the provisions of the **Uniform Condominium Act of the State of Missouri, as contained in Chapter 448 thereof, Missouri Revised Statutes** (the "Act").

**WHEREAS**, Declarant is further desirous of establishing for its own benefit and for the mutual benefit of all future owners or occupants of the Property, or any part thereof, which shall be known as "**Arcade Building Condominium**", certain easements, interests and rights in, over and upon said premises and certain mutually beneficial restrictions, options and obligations with respect to the proper use, conduct and maintenance thereof.

**WHEREAS**, Declarant desires and intends that the several owners, mortgagees, occupants and other Persons hereafter acquiring any interest in said Property, shall at all times enjoy the benefit of, and shall hold their interests subject to the rights, options, easements, privileges and restrictions as set forth in said Act and in this Declaration.

**NOW, THEREFORE**, Declarant hereby declares that the real property described herein and such additions thereto as may hereafter be made pursuant hereto is and shall be held, transferred, sold, conveyed and occupied subject to the protective conditions, covenants, restrictions, reservations, easements, charges, liens, by-laws, rules and regulations, and assessments hereinafter set forth.

## INDEX TO CONDOMINIUM DECLARATION

| | | | Page |
|---|---|---|---|
| **Article 1 –Definitions** | | | 9 |
| 1.1 | Definitions | | 9 |
| | (1) | Act | 9 |
| | (2) | Administrative & Operating Expenses | 9 |
| | | ▪ Commercial Administrative & Operating Expenses | |
| | | ▪ LIHTC Administrative & Operating Expenses | |
| | | ▪ Market Rate Administrative & Operating Expenses | |
| | | ▪ Residential Administrative & Operating Expenses | |
| | | ▪ Residential Marketing Expenses; Residential Marketing | |
| | | ▪ Common Administrative & Operating Expenses | |
| | (3) | Allocated Interest | 11 |
| | (4) | Arcade Main Lobby | 11 |
| | (5) | Arcade Main Lobby Common Expense(s) | 11 |
| | (6) | Arcade Main Lobby Common Expense Liability | 12 |
| | (7) | Arcade Main Lobby Maintenance | 12 |
| | (8) | Arcade Main Lobby Security | 12 |
| | (9) | Arcade Main Lobby Security Common Expense(s) | 12 |
| | (10) | Arcade Main Lobby Security Common Expense Liability | 12 |
| | (11) | Arcade Main Lobby Security System | 12 |
| | (12) | Arcade Main Lobby Sub-Allocated Expense Share | 12 |
| | (13) | Association | 13 |
| | (14) | Board of Directors | 13 |
| | (15) | Boundaries | 13 |
| | (16) | Building | 13 |
| | (17) | By-Laws | 13 |
| | (18) | Casualty Restoration Conditions and Requirements | 13 |
| | (19) | Certification Application | 13 |
| | (20) | Code | 13 |
| | (21) | Commercial Common Expense(s) | 13 |
| | (22) | Commercial Common Expense Liability | 13 |
| | (23) | Commercial Elevator | 13 |
| | (24) | Commercial Elevator Shaft | 13 |
| | (25) | Commercial LCE or LCE Commercial | 14 |
| | (26) | Commercial Unit | 14 |
| | (27) | Commercial Unit Owner | 14 |
| | (28) | Commercial Use | 14 |
| | (29) | Compliance Period | 15 |
| | (30) | Common Cleaning & Janitorial | 15 |
| | (31) | Common Cleaning & Janitorial Expense(s) | 15 |
| | (32) | Common Cleaning & Janitorial Expense Liability | 15 |
| | (33) | Common Electric Expense(s) | 15 |
| | (34) | Common Electric Expense Liability | 15 |
| | (35) | Common Electric Facilities | 15 |
| | (36) | Common Electric Maintenance & Operation | 15 |
| | (37) | Common Electric Service | 16 |
| | (38) | Common Element(s) or C.E. or CE | 16 |
| | (39) | Common Expense(s) | 16 |
| | (40) | Common Expense Liability | 16 |
| | (41) | Common HVAC Expense(s) | 18 |
| | (42) | Common HVAC Expense Liability | 18 |
| | (43) | Common HVAC Facilities | 19 |
| | (44) | Common HVAC Maintenance and Operation | 19 |
| | (45) | Common HVAC Service | 19 |

(46)  Common Roof ............................................................... 19
(47)  Condominium ............................................................... 19
(48)  Condominium Member ................................................. 19
(49)  Declarant ...................................................................... 19
(50)  Declarant Control Period ............................................. 19
(51)  Declaration ................................................................... 19
(52)  Designated Commercial Parking User ......................... 19
(53)  Designated Market Rate Parking User ........................ 20
(54)  Development Period ..................................................... 20
(55)  Development Right(s) ................................................... 20
(56)  Director ......................................................................... 20
(57)  Executive Board ........................................................... 20
(58)  Exterior Window ........................................................... 20
(59)  First Floor Residential Lobby ....................................... 20
(60)  Ground Lease ............................................................... 20
(61)  Hazardous Materials .................................................... 20
(62)  Historic Tax Credits ..................................................... 20
(63)  Historic Consultant ...................................................... 21
(64)  Historic Recapture Period ........................................... 21
(65)  Historic Standards ....................................................... 21
(66)  HTC Investor Member ................................................. 21
(67)  HVAC ........................................................................... 21
(68)  Improvements .............................................................. 21
(69)  Individual Dwelling Unit ............................................... 21
(70)  Insurance Approval Party(ies) ..................................... 21
(71)  Insurance Benefited Party(ies) .................................... 21
(72)  Insurance Trustee ........................................................ 21
(73)  Internal Revenue Code ................................................ 21
(74)  LCE or L.C.E. or Limited Common Element ................ 22
(75)  LCE Commercial .......................................................... 22
(76)  LCE Residential or LCE Res. ...................................... 22
(77)  LIHTC Compliance Period ........................................... 22
(78)  LIHTC LCE or LCE LIHTC .......................................... 21
(79)  LIHTC Unit .................................................................... 22
(80)  LIHTC Unit Owner ........................................................ 22
(81)  Limited Common Element or LCE or L.C.E. ................ 22
(82)  Limited Partner of LIHTC Unit Owner .......................... 23
(83)  Limited Partner of NMTC Unit Owner .......................... 23
(84)  Loan Default ................................................................. 23
(85)  Low Income Housing Tax Credits ................................ 23
(86)  Major Casualty ............................................................. 23
(87)  Market Rate LCE or LCE Market Rate ......................... 23
(88)  Market Rate Unit .......................................................... 24
(89)  Market Rate Unit Owner ............................................... 24
(90)  Master Landlord ........................................................... 24
(91)  Master Lease ................................................................ 24
(92)  Master Tenant .............................................................. 24
(93)  Material Commercial Amendment ................................ 24
(94)  Material Condominium Amendment ............................. 25
(95)  Material LIHTC Amendment ......................................... 25
(96)  Material Market Rate Amendment ................................ 26
(97)  Minor Casualty ............................................................. 26
(98)  Monthly Parking Fee .................................................... 26
(99)  New Markets Tax Credits ............................................. 26
(100) New Markets Compliance Period ................................. 27
(101) NMTC Limited Partner Designated Representative ....... 27

(102)  NMTC Unit .................................................................................... 27
(103)  NMTC Unit Owner ......................................................................... 27
(104)  Owner or Unit Owner .................................................................... 27
(105)  Owner's Reserved Right ............................................................... 27
(106)  Parcel ........................................................................................... 27
(107)  Parking Common Expenses .......................................................... 27
(108)  Parking Common Expense Liability ............................................... 27
(109)  Parking Facilities ......................................................................... 27
(110)  Parking Space ............................................................................. 27
(111)  Parking Sub-Allocated Expense Share .......................................... 28
(112)  Part 2 Approval ........................................................................... 28
(113)  Part 3 Approval ........................................................................... 28
(114)  Period of Declarant Control or Declarant Control Period ................ 29
(115)  Permitted Home Business Use ..................................................... 29
(116)  Person ......................................................................................... 29
(117)  Plat or Condominium Plat ............................................................ 29
(118)  Prohibited Use ............................................................................. 29
(119)  Property ....................................................................................... 30
(120)  QREs or Qualified Rehabilitation Expenditures ............................. 30
(121)  Real Property ............................................................................... 30
(122)  Recapture Event .......................................................................... 30
(123)  Record ......................................................................................... 30
(124)  Residential Common Amenity Area(s) ........................................... 31
(125)  Residential Common Expense(s) ................................................... 31
(126)  Residential Common Expense Liability .......................................... 31
(127)  Residential Elevator ..................................................................... 31
(128)  Residential Elevator Shaft ............................................................ 31
(129)  Residential Hallways, Corridors & Etc. Areas ................................ 31
(130)  Residential Hallways & Etc. Expense(s) ........................................ 31
(131)  Residential Hallways & Etc. Expense Liability ............................... 31
(132)  Residential Hallways & Etc. Maintenance ..................................... 31
(133)  Residential LCE or Res. LCE or LCE Residential or LCE Res. ......... 32
(134)  Residential Marketing ................................................................... 32
(135)  Residential Marketing Expense(s) ................................................. 32
(136)  Residential Marketing Expense Liability ........................................ 32
(137)  Residential Marketing Sub-Allocated Expense Share ..................... 32
(138)  Residential Sub-Allocated Expense Share ..................................... 32
(139)  Residential Tenant ....................................................................... 33
(140)  Residential Unit ........................................................................... 33
(141)  Residential Unit Owner ................................................................. 33
(142)  Residential Use or Res. Use ......................................................... 33
(143)  Rooftop Terrace Area ................................................................... 33
(144)  Rooftop Terrace Structure ............................................................ 33
(145)  Secretary ..................................................................................... 33
(146)  Secretary's Standards .................................................................. 34
(147)  Security Holder ............................................................................ 34
(148)  Security Interest .......................................................................... 34
(149)  SHPO ........................................................................................... 34
(150)  Unit .............................................................................................. 34
(151)  Unit Expense ............................................................................... 34
(152)  Unit Owner or Owner .................................................................... 34
(153)  Unused Parking Space .................................................................. 34
(154)  Vote ............................................................................................. 35
(155)  Water & Sewer Utility Charges ..................................................... 35
(156)  Water & Sewer Utility Common Expense(s) ................................... 35
(157)  Water & Sewer Utility Common Expense Liability ........................... 35

**Article 2 – Submission of the Property to the Act** ................................................................ 36
2.1     Submission .................................................................................................................. 36
2.2     Name ........................................................................................................................... 36
2.3     Division of Property Into Separate Owned Units and Common Elements.................... 36
2.4     Identification of Units .................................................................................................. 36
2.5     Ownership of Certain Items ........................................................................................ 36
2.6     Limited Common Elements ......................................................................................... 36
2.7     Covenants Against Partition ....................................................................................... 36
2.8     Condominium Ordinances ........................................................................................... 36
2.9     Location ...................................................................................................................... 36
2.10    Unit Allocations – Allocated Interests of the Units...................................................... 36
2.11    Number of Units .......................................................................................................... 37
2.12    No Right of First Refusal ............................................................................................ 37

**Article 3 – Common Elements**..................................................................................................... 37
3.1     Common Elements ...................................................................................................... 37
3.2     Windows  and Window Frames.................................................................................... 37

**Article 4 – Easements** ................................................................................................................. 38
4.1     Encroachment ............................................................................................................. 38
4.2     Easements to Unit Owners.......................................................................................... 38
4.3     Easements in Gross .................................................................................................... 38
4.4     Utility Easements ........................................................................................................ 38
4.5     Effect of Easements .................................................................................................... 39
4.6     Existing Easements, Building Lines, Restrictions and Other Title Matters of Record.................. 39
4.7     Miscellaneous Additional Easements.......................................................................... 39

**Article 5 – Unit Owners' Rights and Restrictions** ..................................................................... 39
5.1     Commercial  Unit ......................................................................................................... 39
5.2     Residential Unit ........................................................................................................... 39
5.3     All Units – Prohibited Uses .......................................................................................... 39
5.4     All Units – Hazardous Materials .................................................................................. 39
5.5     All Units – Telecommunications Facilities .................................................................... 40
5.6     Intentionally Deleted ................................................................................................... 40
5.7     Compliance With Declaration, By-Laws and Rules and Regulations............................ 40
5.8     Obstructions ............................................................................................................... 40
5.9     Maintenance of Units................................................................................................... 40
5.10    Signage & Etc. on Exterior of Building ........................................................................ 41
5.11    Sound and Vibrations .................................................................................................. 41
5.12    Use Not to Increase Insurance; No Waste .................................................................. 41
5.13    Alterations of Units ...................................................................................................... 42
5.14    Rules and Regulations ................................................................................................ 43

**Article 6 – Assessments** ............................................................................................................. 44
6.1     Assessments for Common Expenses (All Units)........................................................... 44
6.2     Special Allocations of Specific Expenses..................................................................... 44
6.3     Assessment Liens ....................................................................................................... 46
6.4     Sale of a Unit............................................................................................................... 46
6.5     Prohibition from Exemption of Liability for Contribution Towards Common Expenses.................. 46

**Article 7 – Maintenance, Repairs, Alterations and Improvements of Common Elements & Etc.** .. 46
7.1    Common Elements and Residential Hallways, Corridors & Etc. Areas by the Association ........ 46
7.2    Self-Management Provisions ........................................................................... 50
7.3    Incidental Damage to Units ............................................................................ 52
7.4    Waiver of Claims ........................................................................................... 52
7.5    Common Roofs of Building; Rooftop Terrace Areas and Rooftop Terrace Structures ............... 53
7.6    Alterations and Improvements to Limited Common Elements .................................... 53
7.7    Tax Attributes ............................................................................................... 56

**Article 8 – Insurance**
8.1    Insurance ..................................................................................................... 57
8.2    Insurance Documentation ............................................................................... 58
8.3    Appointment of Insurance Trustee .................................................................... 59
8.4    Personal Property Insurance ............................................................................ 63
8.5    Liability Insurance for Units ............................................................................. 64

**Article 9 – Damage, Destruction, Repair and Termination** ........................................... 64
9.1    General ........................................................................................................ 64
9.2    Termination .................................................................................................. 66
9.3    Waiver of Subrogation .................................................................................... 69
9.4    Damage Caused by Unit Owner, Not Covered by Insurance ................................... 69

**Article 10 – Condemnation** ........................................................................................ 69
10.1   Condemnation ............................................................................................. 69

**Article 11 – No Subdivision of Units** ........................................................................... 70
11.1   No Right to Subdivide Units ............................................................................ 70
11.2   Partition Walls Within Units ............................................................................ 70

**Article 12 – Declarant Rights** ..................................................................................... 70
12.1   Right of Declarant to Vote .............................................................................. 70
12.2   Development Rights ....................................................................................... 70
12.3   Allocations of Certain Common Elements .......................................................... 71
12.4   Rights of Declarant's Successors ..................................................................... 71

**Article 13 – Amendments** .......................................................................................... 71
13.1   Amendments ............................................................................................... 71

**Article 14 – Security Holder and Master Lease Provisions** ............................................ 72
14.1   Notice to Association ..................................................................................... 72
14.2   Master Lease Provisions ................................................................................ 73
14.3   Payments of Charges and cure of Defaults by Security Holders and Master Tenants ............... 73
14.4   Security Holder's and Master Tenant's Rights .................................................... 74
14.5   Notice to Security Holders and Master Tenants ................................................. 74
14.6   Security Holders Failure to Agree or Respond .................................................... 75

**Article 15 – General Provisions** ................................................................................. 75

| 15.1 | Captions | 75 |
| 15.2 | Rules and Regulations | 75 |
| 15.3 | Manner of Giving Notice | 75 |
| 15.4 | Acceptance by Grantee | 75 |
| 15.5 | No Waiver | 76 |
| 15.6 | Savings Clause | 76 |
| 15.7 | Interpretation | 76 |
| 15.8 | Bonds | 76 |
| 15.9 | Operative Effect | 76 |
| 15.10 | Lease of Unit | 76 |
| 15.11 | Financial Statement of Association | 77 |
| 15.12 | Contracts During Declarant Control Period | 77 |
| 15.13 | Certificate of Substantial Completion | 77 |
| 15.14 | Disputes | 78 |
| 15.15 | Conflict Between Declaration and By-Laws | 78 |
| 15.16 | Exhibits to Declaration | 78 |

Consent of Mortgagee

| Exhibit A | -- | Legal Description of Real Property |
| Exhibit B | -- | Condominium Plat of Arcade Building Condominium |
| Exhibit C | -- | Allocated Interests of Units |
| Exhibit D | -- | Arcade Main Lobby Sub-Allocated Expense Shares of Units |
| Exhibit E-1 | -- | Residential Marketing Sub-Allocated Expense Shares of Residential Units |
| Exhibit E-2 | -- | Residential Sub-Allocated Expense Shares of Residential Units |
| Exhibit F | -- | Parking Sub-Allocated Expense Shares of Commercial Unit and of Market Rate Unit |
| Exhibit G | -- | Existing Easements, Buildings Lines, Restrictions and Other Title Matters of Record |
| Exhibit H | -- | Certificate of Substantial Completion |
| Exhibit I | -- | By-Laws of Arcade Building Condominium Association, Inc. |
| Exhibit J | -- | Casualty Restoration Conditions and Requirements |

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## ARTICLE 1 – DEFINITIONS

**1.1 -- Definitions**.  The words and phrases hereinafter set forth, when used in this Declaration and in the By-Laws, shall have the meanings hereinafter set forth, unless the context shall prohibit or shall clearly indicate or require otherwise.  This Section 1.1 and the following definitions also contain substantive terms, conditions and provisions of this Declaration.  In the event of a conflict between or among any of the terms, provisions, conditions and definitions of this Section 1.1, on the one hand, and any of the terms, provisions, conditions and definitions of the other Sections of this Declaration, or any of the terms, provisions, conditions and definitions of the By-Laws, on the other hand, then in all such events the terms, provisions, conditions and definitions of this Section 1.1 shall apply, govern, control and prevail, and the terms, provisions, conditions and definitions of the other Sections of this Declaration, and the terms, provisions, conditions and definitions of the By-Laws, shall be construed and amended to implement the intent of the terms, provisions, conditions and definitions of this Section 1.1; unless the context shall clearly indicate that the terms, provisions, conditions and definitions of the other Sections of this Declaration, and/or the terms, provisions, conditions and definitions of the By-Laws, are intended to prevail.

**(1)**    "Act" means the Uniform Condominium Act of 1983, Chapter 448 of the Revised Statutes of Missouri, as amended.

**(2)**    "Administrative & Operating Expense" means any general administrative cost and expense incurred by the Association in its administration, management and operation of the Building; provided that the Association shall track, allocate and divide such costs and expenses into the following categories: "Commercial Administrative & Operating Expenses", "LIHTC Administrative & Operating Expenses", "Market Rate Administrative & Operating Expenses", "Residential Administrative & Operating Expenses", "Residential Marketing Expenses", and "Common Administrative & Operating Expenses"; in accordance with the following:

**(a)**    "Commercial Administrative & Operating Expenses" shall consist of any specific legal, leasing, operating, marketing and accounting expenses associated exclusively with the Commercial Unit or any Commercial LCE. The Association shall specifically track and allocated the following expenses associated with leasing, operating and marketing of the Commercial Unit as Commercial Administrative & Operating Expenses: **(1)** management fees for the Commercial Unit; **(2)** the costs and expenses of any signage which is applicable only to the Commercial Unit; **(3)** the costs and expenses of compliance by each of the Commercial Owner and the Commercial Unit with legal and contractual requirements and obligations applicable each of to the Commercial Owner and the Commercial Unit under the organizational documents applicable to the Commercial Owner and its constituent partners and members, and under the tax credit, financing and Master Lease arrangements applicable to each of the Commercial Owner and the Commercial Unit; **(4)** all real estate taxes assessed against the Commercial Unit, and any taxes and licenses that are specifically allocable to the Commercial Unit; and **(5)** any other items which are any Unit Expenses for the Commercial Unit.  All of the Commercial Administrative & Operating Expenses are Commercial Common Expenses; to be borne solely by the Owner of the Commercial Unit.

**(b)**    "LIHTC Administrative & Operating Expenses" shall consist of any specific legal, leasing, operating, marketing and accounting expenses associated exclusively with any LIHTC Unit or any LIHTC LCE.  The Association shall specifically track and allocated the following expenses associated with leasing, operating and marketing of the Individual Dwelling Units within the LIHTC Unit as LIHTC Administrative & Operating Expenses: **(1)** any electric and gas utility expenses for any vacant Individual Dwelling Units within any LIHTC Units; **(2)** management fees for the Individual Dwelling Units within the LIHTC Units; **(3)**

locator services; **(4)** resident referrals; **(5)** costs and furnishings of any apartment unit models within any LIHTC Unit; **(6)**, credit reports; **(7)** portal costs; **(8)** resident surveys, leasing incentives, and interest due on security deposits; **(9)** the costs and expenses to make the Individual Dwelling Units with any LIHTC Unit "rent ready"; **(10)** the costs and expenses of any signage which is applicable only to the LIHTC Units; **(11)** the costs and expenses of compliance by each of the LIHTC Owners and the LIHTC Units with legal and contractual requirements and obligations applicable to each of the LIHTC Owners and the LIHTC Units under the organizational documents applicable to the LIHTC Owners and their constituent partners and members, and under the tax credit, financing and Master Lease arrangements applicable to each of the LIHTC Owners and the LIHTC Units; **(12)** all real estate taxes assessed against any LIHTC Unit, and any other taxes and licenses that are specifically allocable to any LIHTC Unit; and **(13)** any other items which are any Unit Expenses for the LIHTC Units.  All of the LIHTC Administrative & Operating Expenses shall be borne solely by the Owners of the LIHTC Units.

**(c)**    "Market Rate Administrative & Operating Expenses" shall consist of any specific legal, leasing, operating, marketing and accounting expenses associated exclusively with the Market Rate Unit or any Market Rate LCE.  The Association shall specifically track and allocated the following expenses associated with leasing, operating and marketing of the Individual Dwelling Units within the Market Rate Unit as Market Rate Administrative & Operating Expenses: **(1)** any electric and gas utility expenses for any vacant Individual Dwelling Units within the Market Rate Unit; **(2)** management fees for the Individual Dwelling Units within the Market Rate Unit; **(3)** locator services; **(4)** resident referrals; **(5)** costs and furnishings of any apartment unit models within the Market Rate Unit; **(6)**, credit reports; **(7)** portal costs; **(8)** resident surveys, leasing incentives, and interest due on security deposits; **(9)** the costs and expenses to make the Individual Dwelling Units with Market Rate Unit "rent ready"; **(10)** the costs and expenses of any signage which is applicable only to the Market Rate Unit; **(11)** the costs and expenses of compliance by each of the Market Rate Owner and the Market Rate Unit with legal and contractual requirements and obligations applicable to each of the Market Rate Owner and the Market Rate Unit under the organizational documents applicable to the Market Rate Owner and its constituent partners and members, and under the tax credit, financing and Master Lease arrangements applicable to each of the Market Rate Owner and the Market Rate Unit; **(12)** all real estate taxes assessed against the Market Rate Unit, and any other taxes and licenses that are specifically allocable to the Market Rate Unit; and **(13)** any other items which are any Unit Expenses for the Market Rate Unit.  All of the Market Rate Administrative & Operating Expenses shall be borne solely by the Owner of the Market Rate Unit.

**(d)**    "Residential Administrative & Operating Expenses" shall consist of any specific legal, leasing, operating and accounting expenses associated on a combined basis with the LIHTC Units and the Market Rate Unit, or associated with any Residential LCE; other than and excluding any Residential Marketing Expenses for any Residential Marketing.  In addition, the following specific costs and expenses are and shall be a part of the Residential Administrative & Operating Expenses: **(1)** the costs and expenses of any common CATV, Internet or other telecommunication services or systems that are provided in common to the various Individual Dwelling Units within any Residential Unit; **(2)** the payroll and other expenses of the corporate leasing specialist ("CLS") and all other CLS expenses; **(3)** the payroll and other expenses of the residential leasing employees for the leasing of the Individual Dwelling Units within the Residential Units; and **(4)** the costs and expenses of any common signage for the

Residential Units. All of the Residential Administrative & Operating Expenses are Residential Common Expenses; to be borne solely by the Residential Unit Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(e)    "Residential Marketing Expenses" shall consist of any specific marketing expenses associated on a combined basis with the common marketing, advertising and similar promotional activities for the LIHTC Units and the Market Rate Unit (collectively, the "Residential Marketing"), including (but not limited to): (1) the costs and expenses of any common marketing supplies; and (2) the costs and expenses of any on-going common marketing, advertising and similar promotional activities. All of the Residential Marketing Expenses shall be borne solely by the Residential Unit Owners of the Residential Units, in proportion to the Residential Marketing Sub-Allocated Expense Shares of the Residential Units.

(f)    "Common Administrative & Operating Expenses" shall consist of any other Administrative & Operating Expenses that are not a part of any of the Commercial Administrative & Operating Expenses, the LIHTC Administrative & Operating Expenses, the Market Rate Administrative & Operating Expenses, the Residential Administrative & Operating Expenses. In addition, the following specific costs and expenses for the Building as a whole are and shall be a part of the Common Administrative & Operating Expenses: (1) trash and debris containers and dumpsters, and services for the removal of trash and debris from the Building; (2) fire protection services; (3) extermination and pest control; (4) exterior landscaping; (5) any utility and energy consultants and similar consulting and engineering services; (6) decorating and furnishing of Common Elements (other than any Limited Common Elements); (7) the payroll and other expenses of the common office employees (other than leasing employees and the CLS employees) for the administration, management and operation of the Building as a whole; and (8) any miscellaneous taxes and licenses that are not specifically allocable to a particular Unit. All of the Common Administrative & Operating Expenses are Common Expenses; to be borne by all of Unit Owners of the Units, in proportion to the Allocated Interests of the Units.

(3)    "Allocated Interest" means the interest attributed and allocated to each Unit in the aggregate in interest of the undivided ownership of the Common Elements and Common Expense Liability. The Allocated Interest of the Units has been determined based on a combination of: (a) the ratio of the approximate square footage of each Unit to the approximate total square footage of all of the Units in the Condominium; and (b) the ratio of the approximate amount of LCE Common Expenses attributable to such Unit to the approximate amount of all LCE Common Expenses. The Allocated Interest percentage interest attributed and allocated to each Unit is set forth in **Exhibit C** annexed hereto and incorporated herein by this reference.

(4)    "Arcade Main Lobby" means the main interior common lobby on the first (1st) floor of the Building which is shown as "Arcade Main Lobby" or "Arcade Common Lobby" or similar on the Plat, together with all air space of such interior Arcade Main Lobby extending to and including the ceiling of the second (2nd) floor of the Building. The Arcade Main Lobby is part of the Common Element of the Condominium.

(5)    "Arcade Main Lobby Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Arcade Main Lobby, together with any allocations of reserves therefor; subject, however, to the exclusions set forth in the remainder of this definitional paragraph. The Arcade Main Lobby Common Expenses shall include all expenditures made by or financial liabilities of the Association for Arcade Main Lobby Maintenance, and for the maintenance, repair, replacement, reconstruction and operating

of the Arcade Main Lobby (including lighting, but excluding providing water & sewer to, providing Common HVAC Service to, providing Common Electric Service to, and cleaning of the Arcade Main Lobby).  The Arcade Main Lobby Common Expenses shall exclude all Arcade Main Lobby Security Common Expenses, and all applicable Water & Sewer Utility Charges, Common Cleaning & Janitorial Expenses, Common HVAC Expenses and Common Electric Expenses associated with the Arcade Mail Lobby.  All Arcade Main Lobby Common Expenses incurred for the Arcade Main Lobby Maintenance shall be borne by the Owners of the Units in proportion to the Arcade Main Lobby Sub-Allocated Expense Shares of the Units.

(6)     "Arcade Main Lobby Common Expense Liability" means the liability for Arcade Main Lobby Common Expenses allocated to the Owner of each Unit.

(7)     "Arcade Main Lobby Maintenance" means maintenance, repair, replacement, reconstruction and operating of the Arcade Main Lobby (including lighting, but excluding providing water & sewer, providing Common HVAC Service to, providing Common Electric Service to, and cleaning of the Arcade Main Lobby), and any separate insurance for or of, the Arcade Main Lobby of the Building.  The Arcade Main Lobby Maintenance shall exclude providing the Arcade Main Lobby Security, the Arcade Main Lobby Security System, and providing Common HVAC Service to, providing Common Electric Service to, and cleaning of the Arcade Main Lobby.

(8)     "Arcade Main Lobby Security" means providing security for the Arcade Main Lobby of the Building.

(9)     "Arcade Main Lobby Security Common Expense(s)" means expenditures made by or financial liabilities of the Association for providing the Arcade Main Lobby Security and the Arcade Main Lobby Security System, together with any allocations of reserves therefor; subject, however, to the exclusions set forth in the remainder of this definitional paragraph.  The Arcade Main Lobby Security Common Expenses shall include all expenditures made by or financial liabilities of the Association for providing the Arcade Main Lobby Security and the Arcade Main Lobby Security System for the Arcade Main Lobby, and for maintenance, repair, replacement and operating (but excluding electric and excluding water & sewer) the Arcade Main Lobby Security System.  All Arcade Main Lobby Security Common Expenses incurred for providing the Arcade Main Lobby Security and the Arcade Main Lobby Security System shall be borne solely by the Owner of the Commercial Unit, and specially allocated to the Commercial Unit pursuant to the Articles 6 & 7 hereof.

(10)    "Arcade Main Lobby Security Common Expense Liability" means the liability for Arcade Main Lobby Security Common Expenses allocated to the Owner of the Commercial Unit.

(11)    "Arcade Main Lobby Security System" means the security system, apparatus and facilities for providing Arcade Main Lobby Security for the Arcade Main Lobby of the Building.

(12)    "Arcade Main Lobby Sub-Allocated Expense Share" means the percentage share portion attributed and allocated to each Unit in the aggregate of the Arcade Main Lobby Common Expenses and the Arcade Main Lobby Common Expense Liability, and specially allocated to and among the Units pursuant to the Articles 6 & 7 hereof.  The Arcade Main Lobby Sub-Allocated Expense Share of the Commercial Unit is eighty percent (80%), determined based on the estimated usage of the Arcade Main Lobby by the Commercial Unit. The remaining twenty percent (20%) of the Arcade Main Lobby Sub-Allocated Expense Share is attributed and allocated to the Market Rate Unit and the LIHTC Units, and is attributed and allocated among the Market Rate Unit and the LIHTC Units on the basis of the ratio of the approximate square footage of each of the Market Rate Unit and

each of the LIHTC Units to the total approximate square footage within all of the Market Rate Unit and all of the LIHTC Units. The Arcade Main Lobby Sub-Allocated Expense Share percentage interest attributed and allocated to each Unit is set forth in **Exhibit D** annexed hereto and incorporated herein by this reference.

(13) "Association" means **Arcade Building Condominium Association, Inc.,** a Missouri non-profit corporation owned by the Owners and organized pursuant to and in accordance with the Act to manage and preserve the Property, the Building and the Improvements.

(14) "Board of Directors" means those individuals designated as directors of the Association, said Board of Directors being authorized to act on behalf of the Association.

(15) "Boundaries" means the boundaries of each Unit, both as to vertical and horizontal planes, as configured on the Plat and as further described in this Declaration.

(16) "Building" mean the building that is located on the Real Property as depicted on the Plat of said Real Property.

(17) "By-Laws" means those By-Laws of the Association attached hereto as **Exhibit I** as the same may be amended from time to time in accordance herewith and in accordance with the Act.

(18) "Casualty Restoration Conditions and Requirements" means the casualty restoration conditions and requirements set forth in **Exhibit J** annexed hereto and incorporated herein by this reference.

(19) "Certification Application" means each Historic Preservation Certification Application for the Building on Real Property provided for in Title 36 of the Code of Federal Regulations, Part 67 and all modifications thereto, submitted to the SHPO and the Secretary respecting the Historic Tax Credits.

(20) "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(21) "Commercial Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Commercial LCE, the Commercial Administrative & Operating Expenses, the Commercial Elevators and the Commercial Elevator Shafts, together with any allocations of reserves therefor; except for and excluding therefrom any expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses.

(22) "Commercial Common Expense Liability" means the liability for Commercial Common Expenses allocated to the Owner of Commercial Unit.

(23) "Commercial Elevator" means any elevator that is identified or labeled on the Plat as a Commercial Elevator or similar designation, or any elevator that is used exclusively by the Commercial Unit and located entirely within the area of the Commercial Unit (in which case, the area of such Commercial Elevator may not be separately designated on the Plat, and instead may be labeled on the Plat as unit area of the Commercial Unit). The Commercial Elevators (together with all mechanical and electrical equipment that exclusively serve the Commercial Elevators) are Commercial LCE.

(24) "Commercial Elevator Shaft" means any elevator shaft that is identified or labeled on the Plat as a Commercial Elevator Shaft or similar designation, or any elevator shaft that is

used exclusively by a Commercial Elevator and located entirely within the area of the Commercial Unit (in which case, the area of such Commercial Elevator Shaft may not be separately designated on the Plat, and instead may be labeled on the Plat as unit area of the Commercial Unit). The Commercial Elevator Shafts are Commercial LCE.

(25)    "Commercial LCE" or "LCE Commercial" means all Limited Common Elements that are designated or designed for the exclusive use and benefit of the Commercial Unit (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees). The following areas hereby are designated as Commercial LCE, to-wit: **(a)** any area that is identified or labeled on the Plat as a Commercial LCE or similar designation; **(b)** the Commercial Elevators and all mechanical and electrical equipment that exclusively serve the Commercial Elevators, and the Commercial Elevator Shafts; and **(c)** any other area that any other provision of this Declaration designates as Limited Common Element allocated to the Commercial Unit. The Commercial LCE hereby are allocated and assigned for the exclusive use and benefit of the Commercial Unit (and the Owners thereof and their tenants and subtenants and their respective contractors, agents and invitees). (Except for and excluding therefrom any of the following expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses, and also except as otherwise expressly provided in this Declaration, and subject to application provisions of the Declaration,) all Commercial Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the Commercial Elevators and the Commercial Elevator Shafts shall be borne solely by the Owner of the Commercial Unit. All other Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, any other Commercial LCE likewise shall be borne solely by the Owner of the Commercial Unit.

(26)    "Commercial Unit" means the areas that are depicted on the Plat as the Commercial Unit, comprising the applicable portions of the Building that are shown on the Plat as the Commercial Unit. On each floor of the Building, the Commercial Unit extends from the upper surface of the slab, joists or beams supporting each floor of the Commercial Unit to the lower surface of the joists and beams supporting the next upper floor of the Building, excluding: **(a)** the floor joists or slabs and support beams separating each floor of the Building from each other floor of the Building; and **(b)** any and all Common Elements and Limited Common Elements to the extent that such Common Elements and Limited Common Elements are located within the boundaries of the Commercial Unit. The Commercial Unit expressly excludes all Exterior Windows that physically abut the Commercial Unit; each such Exterior Window being Limited Common Element assigned to such Commercial Unit to which such Exterior Window physically abuts.

(27)    "Commercial Unit Owner" means the party or parties owning fee title to the Commercial Unit.

(28)    "Commercial Use" means the lawful use and occupancy of any portion of a Unit only and exclusively for any one or more of any of the following uses or purposes (but in all cases excluding all Prohibited Uses), to-wit: **(a)** school, schoolrooms, classrooms, educational facilities, conference rooms, auditoriums, practice studios, art studios, and school administrative offices; **(b)** the retail sales of goods and merchandise; **(c)** restaurant (including a restaurant which serves alcoholic beverages for on-premises consumption, but excluding a bar which is not a part of and within a restaurant); **(d)** providing of retail professional services to the public, such as Insurance agents or brokerage offices, or

computer & copy services (such as Kinkos), that offer retail services to the public; **(e)** general business office; and **(f)** any supporting incidental compatible uses to any of the foregoing specified uses, such as lounges, kitchen areas, hallways, entrances, lobbies, stairways, elevators, meeting rooms, conference rooms, banquet rooms, community rooms, gym or fitness area, janitorial rooms, mechanical & electrical rooms, utility rooms, supply rooms and cabinets, and management offices, and the like.

**(29)** "Compliance Period" means the latest of the Historic Recapture Period, the New Markets Compliance Period and the LIHTC Compliance Period.

**(30)** "Common Cleaning & Janitorial" means the cleaning of and janitorial services for the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.  The Association shall cause to be performed the Common Cleaning & Janitorial of the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.

**(31)** "Common Cleaning & Janitorial Expense(s)" means expenditures made by or financial liabilities of the Association for the Common Cleaning & Janitorial of the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.  The Common Cleaning & Janitorial Expenses include cleaning and janitorial supplies.  All Common Cleaning & Janitorial Expenses incurred for the Common Cleaning & Janitorial shall be borne by the Owners of the Units in proportion to the Allocated Interests of the Units.

**(32)** "Common Cleaning & Janitorial Expense Liability" means the liability for Common Cleaning & Janitorial Expenses allocated to the Owner of each Unit.

**(33)** "Common Electric Expense(s)" means expenditures made by or financial liabilities of the Association for Common Electric Maintenance and Operation and to provide the Common Electric Service.  All Common Electric Expenses incurred in connection with the Common Electric Facilities, to perform the Common Electric Maintenance and Operation, and/or to provide the Common Electric Service, shall be borne by the Owners of the Units in proportion to the Allocated Interests of the Units.

**(34)** "Common Electric Expense Liability" means the liability for Common Electric Expenses allocated to the Owner of each Unit.

**(35)** "Common Electric Facilities" means the electric lines, system, equipment, components, devices and facilities for providing electricity to the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.

**(36)** "Common Electric Maintenance & Operation" means maintenance, repair, replacement, reconstruction and operating of the Common Electric Facilities to provide the Common Electric Service.  The Association shall cause the performance of the Common Electric Maintenance and Operation of the Common Electric Facilities.

(37) "Common Electric Service" means the electricity that is provided to the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby (including for operating the Arcade Main Lobby Security System), the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas by means of the Common Electric Facilities. The Association shall cause the Common Electric Service to be provided by means of the Common Electric Facilities to the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.

(38) "Common Element(s)" or "C.E." or "CE" means all portions of the Property other than the Units, together with and specifically including: **(a)** the building shell and foundation of the Building; **(b)** the basements (if any) and sub-basements (if any) of the Building; **(c)** the exterior walls and the Exterior Windows; **(e)** the roofs, roof membranes, roof structures and roof systems of the Building; **(e)** the floor joists or slabs and support beams separating a Unit from the foundation or basement or from another Unit, and the floor joists or slabs and support beams separating each floor of the Building from each other floor of the Building (being the downward face of the floor joists and support beams of each floor of the Building to the upper surface of said joists and beams); **(f)** the utility corridors and shafts of the Building; **(g)** the electrical, mechanical and other utility systems located on the Property and servicing more than one Unit; **(h)** any common entrances, common hallways, and common lobbies that are identified or labeled on the Plat as Common Elements or Common Elements; and **(i)** any other areas that are identified or labeled on the Plat as Common Elements or Common Elements or C.E. or CE or similar designation. Portions of the Common Elements are Limited Common Elements.

(39) "Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Common Elements, the Common Administrative & Operating Expenses and the Residential Hallways, Corridors & Etc. Areas, together with any allocations of reserves therefor. The Common Expenses shall include all expenditures made by or financial liabilities of the Association for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security (other than Arcade Main Lobby Security), providing Common HVAC Service, providing Common Electric Service, and providing other utilities), and cleaning and insuring of the Common Elements (including, but not limited to, the Exterior Windows, the First Floor Residential Lobby, the Residential Common Amenity Areas, the Rooftop Terrace Areas and the Rooftop Terrace Structures), and cleaning of and providing Common HVAC Service and providing Common Electric Service to the Residential Hallways, Corridors & Etc. Areas. The Unit Owners may from time-to-time by their unanimous written agreement (and at all times prior to the termination of the LIHTC Compliance Period as approved in writing by the Limited Partner of the LIHTC Unit Owner, and at all times prior to the termination of the New Markets Compliance Period as approved in writing by the NMTC Limited Partner Designated Representative, and during the Historic Recapture Period as approved in writing by the HTC Investor Member) elect to treat any other expenses incurred by the Association or by any one or more of the Unit Owners in connection with the ownership, management, operation and leasing of any portion of the Building as a Common Expense under and governed by this Declaration.

(40) "Common Expense Liability" means the liability for Common Expenses allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements. The Common Expense Liability shall include all expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security (other than Arcade Main Lobby Security), providing Common HVAC Service,

providing Common Electric Service, and providing other utilities), and cleaning and insuring of the Common Elements and the Residential Hallways, Corridors & Etc. Areas, and performing Residential Hallways & Etc. Maintenance. Provided, However, that:

(a)    All Commercial Common Expenses and Commercial Common Expense Liability incurred by the Association shall be borne solely by the Owner of the Commercial Unit.

(b)    All Residential Common Expenses and Residential Common Expense Liability incurred by the Association shall be borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(c)    All Residential Hallways & Etc. Expenses and Residential Hallways & Etc. Expense Liability incurred by the Association shall be borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(d)    All Residential Marketing Expenses and Residential Marketing Expense Liability incurred by the Association shall be borne solely by the Owners of the Residential Units, in proportion to the Residential Marketing Sub-Allocated Expense Shares of the Residential Units.

(e)    All Arcade Main Lobby Security Common Expenses and Arcade Main Lobby Common Security Expense Liability incurred by the Association shall be borne solely by the Owner of the Commercial Unit.

(f)    All Arcade Main Lobby Common Expenses and Arcade Main Lobby Common Expense Liability incurred by the Association shall be borne by the Owners of the Units, in proportion to the Arcade Main Lobby Sub-Allocated Expense Shares of the Units.

(g)    All Parking Common Expenses and Parking Common Expense Liability incurred by the Association shall be borne solely by the Commercial Unit Owner of the Commercial Unit and the Market Rate Unit Owner of the Market Rate Unit, in proportion to the Parking Sub-Allocated Expense Shares of the Commercial Unit and the Market Rate Unit.

(h)    Notwithstanding any other provisions of this Declaration (and even though some of the Exterior Windows are Limited Common Element), the costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the Exterior Windows of the Building shall be and are a part of the Common Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

(i)    Notwithstanding any other provisions of this Declaration (and even though the First Floor Residential Lobby is Limited Common Element), the costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the First Floor Residential Lobby shall be and are a part of the Common Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

(j)    Notwithstanding any other provisions of this Declaration (and even though the Residential Common Amenity Areas are Limited Common Element), the costs and expenses of electricity, cleaning and HVAC for the Residential

Common Amenity Areas shall be and are a part of the Common HVAC Expenses, the Common Electric Expenses and the Common Cleaning & Janitorial Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

**(k)** Notwithstanding any other provisions of this Declaration (and even though the Rooftop Terrace Areas and the Rooftop Terrace Structures are Limited Common Element), the costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the Rooftop Terrace Areas and the Rooftop Terrace Structures shall be and are a part of the Residential Common Expenses, allocated to and borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

**(l)** All Water & Sewer Utility Common Expenses and Water & Sewer Utility Common Expense Liability incurred by the Association, and all  Common Cleaning & Janitorial Expenses and Common Cleaning & Janitorial Expense Liability incurred by the Association, and all Common HVAC Expenses and Common HVAC Expense Liability incurred by the Association, and all Common Electric Expenses and Common Electric Expense Liability incurred by the Association, shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units.

**(m)** Notwithstanding any other provisions of this Declaration, if the Unit Owners have by their unanimous written agreement (and at all times prior to the termination of the LIHTC Compliance Period with the written consent of the Limited Partner of the LIHTC Unit Owner, at all times prior to the termination of the New Markets Compliance Period with the written consent of the NMTC Limited Partner Designated Representative, and during the Historic Recapture Period with the written consent of HTC Investor Member) elected to treat any particular expenses incurred by the Association or by any one or more of the Unit Owners in connection with the ownership, management, operation and leasing of any portion of the Building as a Common Expense, then the particular expense shall be a part of the Common Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

**(n)** With respect to any other Common Expenses incurred in connection with any other Limited Common Elements (other than any expenses described in the foregoing Items (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l) and (m) ), all expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities) and cleaning of, and any separate insurance for or of, such other Limited Common Elements shall be assessed against the Unit or Units to which such Limited Common Element was allocated at the time the expense was incurred, in proportion to the relative Allocated Interests of the Units benefited.

(41)    "Common HVAC Expense(s)" means expenditures made by or financial liabilities of the Association for Common HVAC Maintenance and Operation and to provide the Common HVAC Service.  All Common HVAC Expenses incurred in connection with the Common HVAC Facilities, to perform the Common HVAC Maintenance and Operation, and/or to provide the Common HVAC Service, shall be borne by the Owners of the Units in proportion to the Allocated Interests of the Units.

(42)    "Common HVAC Expense Liability" means the liability for Common HVAC Expenses allocated to the Owner of each Unit.

(43) "Common HVAC Facilities" means the HVAC system, equipment, components, devices and facilities for providing HVAC to the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.

(44) "Common HVAC Maintenance & Operation" means maintenance, repair, replacement, reconstruction and operating of the Common HVAC Facilities (including providing electricity and other utilities for the operation thereof) to provide the Common HVAC Service. The Association shall cause the performance of the Common HVAC Maintenance and Operation of the Common HVAC Facilities.

(45) "Common HVAC Service" means the HVAC that is provided to the Common Elements (excluding the Limited Common Elements, except for any area hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas by means of the Common HVAC Facilities. The Association shall cause the Common HVAC Service to be provided by means of the Common HVAC Facilities to the Common Elements (excluding the Limited Common Elements, except for any are hereinafter specifically mentioned in this definitional item which is LCE), the Arcade Main Lobby, the First Floor Residential Lobby, the Residential Common Amenity Areas, and the Residential Hallways, Corridors & Etc. Areas.

(46) "Common Roof" means each roof, roof membrane, roof structure and roof system of the Building; excluding, however, any Rooftop Terrace Structures.

(47) "Condominium" means the condominium development and regime established upon all of the Property by this Declaration and the Plat, portions of which are the Units that are designated for separate ownership, and the remainder of which is the Common Element and the Limited Common Element.

(48) "Condominium Member" means all Persons who are members of the Association. Each Unit Owner shall be a Condominium Member with respect to the Unit owned by such Unit Owner. Where more than one Person owns a Unit, all such Persons together shall be and constitute one (1) Condominium Member with respect to the Unit owned by such Persons.

(49) "Declarant" means **LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**, whose mailing address is 1500 Market Street, Suite 2000, St. Louis, Missouri 63103, or any successor Declarant to which said Declarant transfer its entire interests in the Property, the Building, the Improvements and the rights and duties of the Declarant under the Declaration.

(50) "Declarant Control Period" means – see definition of Period of Declarant Control.

(51) "Declaration" means this Declaration of Condominium of Arcade Building Condominium, as the same may be amended from time-to-time by written agreement in accordance with Article 13 hereof. Any such amendment shall be signed by each Unit Owner, and shall be approved in writing by each of the persons who has a right of approval with respect to such amendment pursuant to and in accordance with Article 13 hereof.

(52) "Designated Commercial Parking User" means a Person who is designated in writing by the Commercial Unit Owner as the Person with the right to use for vehicular parking a Parking Space in the Parking Facilities. The Designated Commercial Parking Users may

be the Commercial Unit Owner, its tenants, subtenants, and their respective employees, customers, contractors, agents and other invitees.  The number of Designated Commercial Parking Users shall not exceed forty (40) <u>plus</u> the from time-to-time number of Unused Market Rate Parking Spaces.  The Commercial Unit Owner shall from time-to-time designate in writing the number of Designated Commercial Parking Users and the Persons who are the then applicable Designated Commercial Parking Users; each such written designation to remain in force and effect, until changed by subsequent written designation by the Commercial Unit Owner.

(53)    "<u>Designated Market Rate Parking User</u>" means a Person who is designated in writing by the Market Rate Unit Owner as the Person with the right to use for vehicular parking a Parking Space in the Parking Facilities.  The Designated Market Rate Parking Users may be the Market Rate Unit Owner, its tenants, subtenants, and their respective employees, customers, contractors, agents and other invitees.  The number of Designated Market Rate Parking Users shall not exceed eighty-nine (89) <u>plus</u> the from time-to-time number of Unused Commercial Parking Spaces.  The Market Rate Unit Owner shall from time-to-time designate in writing the number of Designated Market Rate Parking Users and the Persons who are the then applicable Designated Market Rate Parking Users; each such written designation to remain in force and effect, until changed by subsequent written designation by the Market Rate Unit Owner.

(54)    "<u>Development Period</u>" means the period commencing on the date of recording hereof and continuing until the **third (3rd)** anniversary of the date of recording of this Declaration.

(55)    "<u>Development Right(s)</u>" means the right, or combination of rights, reserved by the Declarant, to create and add to the Condominium the Units, Common Elements, or Limited Common Elements within the Building constructed on the Real Property, to convert Units into Common Elements or Limited Common Elements, or convert Common Elements or Limited Common Elements into Units.  The Development Rights are more particularly set forth in <u>Article 12</u> hereof.

(56)    "<u>Director</u>" means a member of the Board of Directors of the Association.

(57)    "<u>Executive Board</u>" means the Board of Directors of the Association.

(58)    "<u>Exterior Window</u>" means each window located on the exterior façade of the Building, together with the window frame for such exterior window.

(59)    "<u>First Floor Residential Lobby</u>" means the interior common lobby on the first (1st) floor of the Building which is shown as "Residential Lobby" or similar on the Plat.  The First Floor Residential Lobby is Residential LCE.

(60)    "<u>Ground Lease</u>" means a Master Lease.  See Definition of Master Lease.

(61)    "<u>Hazardous Material(s)</u>" means any asbestos, flammable substances, explosives, radioactive materials, PCB-laden oil, hazardous materials, hazardous waste, pollutants, contaminates, toxic substances regulated under any applicable federal, state or local laws, ordinances, rules, regulations or policies governing use, storage, treatment, transportation, manufacture, refinement, handling, production or disposal of such materials, including without limitation, Section 9601 of Title 42 of the United States Code in amounts subject to such regulation.

(62)    "<u>Historic Tax Credits</u>" means the historic rehabilitation tax credit allowed for qualified rehabilitation expenditures incurred in connection with the "certified rehabilitation" of "certified historic structure" pursuant to Section 47 of the Internal Revenue Code, and/or

the Missouri Historic Preservation Tax Credit program, as amended from time to time, or any corresponding provision or provisions of prior or succeeding law.

(63) "Historic Consultant" means E+A Architecture, the initial historic preservation consultant approved by 100% of the Unit Owners, or any replacement historic preservation consultant approved by 100% of the Unit Owners and the HTC Investor Member.

(64) "Historic Recapture Period" means as to the Building on the Real Property the period beginning on the date of placement in service of the first QREs in such Building and ending on the 5th anniversary of the date of placement in service of the last QREs placed in service in such Building, or, if later, the last date on which the failure to adhere to the Historic Standards with respect to any work undertaken in connection with the Building on the Real Property could cause a recapture or disallowance of the Historic Tax Credits respecting any Building(s) on the Real Property pursuant to the Internal Revenue Code.

(65) "Historic Standards" means, collectively, the Secretary's Standards, each Certification Application, each Part 2 Approval, each Part 3 Approval and all requirements of the SHPO respecting historic compliance.

(66) "HTC Investor Member" means, collectively, the Person or Persons (and their successors and/or assigns) who is (are) the investor member of a Master Tenant of a Unit.

(67) "HVAC" means heating, ventilating and air conditioning of the Building or portions thereof.

(68) "Improvements" means all structures erected on the Property, including but not limited to, the Building and fixtures and all other structures of any type or kind, whether located above or below ground, including both the original and all later changes and/or additions thereto.

(69) "Individual Dwelling Unit" means a portion of a Unit that is a separate individual residential dwelling unit or apartment.

(70) "Insurance Approval Party(ies)" means each of the following parties, to-wit: **(a)** the Association; **(b)** each Unit Owner; **(c)** each Master Tenant of a Unit; **(d)** the Security Holder of the first lien Security Interest encumbering each Unit; **(e)** the Security Holder of the first lien Security Interest encumbering a Master Tenant's interest in a Unit; **(f)** at all times prior to the termination of the LIHTC Compliance Period, the Limited Partner of the LIHTC Unit Owner; **(g)** at all times prior to the termination of the New Markets Compliance Period, the Limited Partner of each NMTC Unit Owner; and **(h)** during the Historic Recapture Period, the HTC Investor Member of each Master Tenant.

(71) "Insurance Benefited Party(ies)" means each of the following parties, to-wit: **(a)** the Association; **(b)** each Unit Owner; **(c)** each Master Tenant of a Unit; **(d)** the Security Holder of a Security Interest encumbering a Unit; **(e)** the Security Holder of a Security Interest encumbering a Master Tenant's interest in a Unit; **(f)** at all times prior to the termination of the LIHTC Compliance Period, the Limited Partner of the LIHTC Unit Owner; **(g)** at all times prior to the termination of the New Markets Compliance Period, the Limited Partner of each NMTC Unit Owner; and **(h)** during the Historic Recapture Period, the HTC Investor Member of each Master Tenant.

(72) "Insurance Trustee" means **U.S. Bank, N.A**, or any replacement successor Insurance Trustee unanimously approved in writing by all of the Insurance Approval Parties.

(73) "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

(74)    "LCE" or "L.C.E." or "Limited Common Element" means -- see definition of Limited Common Element.

(75)    "LCE Commercial" means -- see definition of Commercial LCE.

(76)    "LCE Residential" or "LCE Res." means -- see definition of Residential LCE.

(77)    "LIHTC Compliance Period" means, when used with respect to a LIHTC Unit in the Condominium, the period specified in Section 42(i)(1) of the Internal Revenue Code with respect to such LIHTC Unit and when used with respect to all LIHTC Units in the Condominium as a whole, the period starting with the beginning of the first period under Section 42(i)(1) of the Internal Revenue Code to start for a LIHTC Unit in the Condominium and ending with the end of the last period under Section 42(i)(1) of the Internal Revenue Code for the last applicable LIHTC Unit in the Condominium.

(78)    "LIHTC LCE" or "LCE LIHTC" means all Limited Common Elements that are designated or designed for the exclusive use and benefit of LIHTC Units (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees).  The following areas hereby are designated as LIHTC LCE, to-wit: (a) any area that is identified or labeled on the Plat as a LIHTC LCE or similar designation; and (b) any other area that any other provision of this Declaration designates as Limited Common Element allocated to the LIHTC Units. The LIHTC LCE hereby are allocated and assigned for the exclusive use and benefit of the LIHTC Units (and the Owners thereof and their tenants and subtenants and their respective contractors, agents and invitees).  (Except for and excluding therefrom any of the following expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses, and also except as otherwise expressly provided in this Declaration, and subject to application provisions of the Declaration,) all Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the LIHTC LCE shall be a part of the Residential Common Expenses of the Association, allocated to and borne by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(79)    "LIHTC Unit" means each of the twelve (12) separate Unit areas that is depicted on the Plat as a LIHTC Unit, comprising the applicable portions of the Building that are shown on the Plat as a LIHTC Unit.  On each floor of the Building, each applicable LIHTC Unit extends from the upper surface of the slab, joists or beams supporting each floor of the LIHTC Unit to the lower surface of the joists and beams supporting the next upper floor of the Building, excluding: (a) the floor joists or slabs and support beams separating each floor of the Building from each other floor of the Building; and (b) any and all Common Elements and Limited Common Elements to the extent that such Common Elements and Limited Common Elements are located within the boundaries of a LIHTC Unit.  A LIHTC Unit expressly excludes all Exterior Windows that physically abut such LIHTC Unit; each such Exterior Window being Limited Common Element assigned to such LIHTC Unit to which such Exterior Window physically abuts.

(80)    "LIHTC Unit Owner" means the party or parties owning fee title to a LIHTC Unit.

(81)    "Limited Common Element" or "LCE" or "L.C.E." means any portion of the Common Element that is designed or designated to serve or benefit exclusively any one or more Units, but fewer than all of the Units.  The Limited Common Elements hereby are allocated and assigned exclusively to the Unit or Units for which the Limited Common Element is designed or designated to serve and benefit, for the exclusive use of the Owner of such

Unit or Units and their respective tenants and subtenants, and their respective employees, contractors, agents and invitees. All areas that are identified or labeled on the Plat as Limited Common Elements or Limited Common Element (or L.C.E. or LCE or similar designation) allocated to a particular Unit or Units, or that this Declaration designates as Limited Common Element allocated to a particular Unit or Units, hereby are established as Limited Common Element for the exclusive use of the owner of the applicable Unit or Units, and their tenants and subtenants and their respective employees, contractors, agents and invitees. (Except for and excluding therefrom any of the following expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses, and also except as otherwise expressly provided in this Declaration, and subject to application provisions of the Declaration,) all expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the Limited Common Elements shall be borne solely by the Owner or Owners of the Unit or Units to which such Limited Common Elements are allocated or assigned. If applicable, any sub-basement(s) of the Building is(are) Common Element; provided that the equipment and machinery that are located in any such sub-basements of the Building (and the specific areas occupied by such equipment and machinery) are Limited Common Element allocated to the particular Unit or Units that are served by such equipment and machinery. The utility corridors and shafts of the Building are Common Element; provided that the utility lines and facilities that are located in utility corridors and shafts are Limited Common Element allocated to the particular Unit or Units that are served by such utility lines and facilities. A balcony is Limited Common Element allocated and assigned to the Unit or Units to which the applicable balcony physically abuts, for the exclusive use of the Owners of such Unit or Units and their respective tenants and subtenants, and their respective employees, contractors, agents and invitees. The Residential Hallways, Corridors & Etc. Areas are located within and are part of the Residential Units, and are not Limited Common Elements.

(82)   "Limited Partner of LIHTC Unit Owner" (or similar) means, collectively, each Person which is a limited partner of the LIHTC Unit Owner under the organizational documents of the LIHTC Unit Owner, and its successors and/or assigns.

(83)   "Limited Partner of NMTC Unit Owner" (or similar) means, collectively, each Person which is a limited partner of an NMTC Unit Owner under the organizational documents of an NMTC Unit Owner, and its successors and/or assigns.

(84)   "Loan Default" means a default under the documents evidencing or securing a first lien Security Interest in a Unit or in a Master Tenant's interest in a Unit.

(85)   "Low Income Housing Tax Credits" means the federal low income housing tax credits available respecting the LIHTC Units in the Condominium, as defined under Section 42 of the Internal Revenue Code.

(86)   "Major Casualty" means any damage by casualty the repair and restoration of which costs more than Five Hundred Thousand Dollars ($500,000) to repair and restore, as reasonably estimated by an architect or engineer jointly selected by the Association and by the Insurance Trustee.

(87)   "Market Rate LCE" or "LCE Market Rate" means all Limited Common Elements that are designated or designed for the exclusive use and benefit of the Market Rate Unit (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees). The following areas hereby are designated as Market Rate LCE, to-wit: (a) any area that is identified or labeled on the Plat as a Market Rate

LCE or similar designation; and **(b)** any other area that any other provision of this Declaration designates as Limited Common Element allocated to the Market Rate Unit. The Market Rate LCE hereby are allocated and assigned for the exclusive use and benefit of the Market Rate Unit (and the Owners thereof and their tenants and subtenants and their respective contractors, agents and invitees). (Except for and excluding therefrom any of the following expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses, and also except as otherwise expressly provided in this Declaration, and subject to application provisions of the Declaration,) all Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the Market Rate LCE shall be a part of the Residential Common Expenses of the Association, allocated to and borne by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(88)    "Market Rate Unit" means the areas that are depicted on the Plat as the Market Rate Unit, comprising the applicable portions of the Building that are shown on the Plat as the Market Rate Unit. On each floor of the Building, the Market Rate Unit extends from the upper surface of the slab, joists or beams supporting each floor of the Market Rate Unit to the lower surface of the joists and beams supporting the next upper floor of the Building, excluding: **(a)** the floor joists or slabs and support beams separating each floor of the Building from each other floor of the Building; and **(b)** any and all Common Elements and Limited Common Elements to the extent that such Common Elements and Limited Common Elements are located within the boundaries of the Market Rate Unit. The Market Rate Unit expressly excludes all Exterior Windows that physically abut the Market Rate Unit; each such Exterior Window being Limited Common Element assigned to such Market Rate Unit to which such Exterior Window physically abuts.

(89)    "Market Rate Unit Owner" means the party or parties owning fee title to the Market Rate Unit.

(90)    "Master Landlord" means the party or parties which is the landlord under a Master Lease of a Unit.

(91)    "Master Lease" (or "Ground Lease") means any master lease of a Unit between the Owner of the Unit (as Master Landlord) and another party (as Master Tenant) which is entered into for the purpose of pass-through of the Historic Tax Credits with respect to the Unit and/or for financing of the Unit.

(92)    "Master Tenant" means the party or parties which is the tenant under a Master Lease of a Unit.

(93)    "Material Commercial Amendment" means, with respect to the Commercial Unit and the Owner of such Commercial Unit, any amendment to the Declaration or the Plat which, if enacted, would: **(a)** result in a change in the permitted uses of such Commercial Unit, or a change in the size or configuration or location of the Commercial Unit or of any Limited Common Elements allocated to such Commercial Unit; or **(b)** materially adversely affect the structural integrity of or impair access to the Commercial Unit or the Limited Common Elements allocable to the Commercial Unit; or **(c)** materially adversely affect the functionality of any of the utilities or operating systems serving the Commercial Unit or the Limited Common Elements allocable to the Commercial Unit; or **(d)** materially increase the cost to be incurred by the Owner of the Commercial Unit of maintaining, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities), or insuring the Commercial Unit or the Limited Common Elements

allocable to the Commercial Unit (other than increases in Common Expense Liability that are shared by the Owners of all of the Units in accordance with the respective Allocated Interests allocated to the Units); or **(e)** increase the Allocated Interest of Common Expense Liability payable by the Owner of the Commercial Unit, or increase the Parking Sub-Allocated Expense Share of Parking Common Expense Liability payable by the Owner of the Commercial Unit, or increase the Arcade Main Lobby Sub-Allocated Expense Share payable by the Owner Of the Commercial Unit; or **(f)** grant to the Association or to the Owner of any other Unit any additional easements or any additional other rights, or enlarge or expand any existing easements or any other rights, to enter upon or use or occupy the Commercial Unit or any of the Limited Common Elements allocated to the Commercial Unit that materially and adversely affect the use and enjoyment of the Commercial Unit or any of the Limited Common Elements allocated to the Commercial Unit; or **(g)** amend or modify any of <u>Article 11</u> or <u>Article 12</u> or <u>Article 13</u> hereof; or **(h)** amend or modify any of the provisions of this Declaration that govern or apply to amendments to this Declaration; or **(i)** change or alter the Vote or Voting rights to which the Owner of such Commercial Unit is entitled; or **(j)** enable the Association or the Owners of the other Units to act unilaterally to cause an occurrence under any of the foregoing **clauses (a) through (i)** above. The Owner of the Commercial Unit shall have the absolute right to disapprove any amendment to the Declaration or the Plat which, if enacted, would, with respect to the Commercial Unit owned by the Commercial Unit Owner, be a Material Commercial Amendment to the Declaration or the Plat.

(94)     "<u>Material Condominium Amendment</u>" means as applicable: **(a)** with respect to the Commercial Unit, a Material Commercial Amendment; or **(b)** with respect to the Market Rate Unit, a Material Market Rate Amendment; or **(b)** with respect to a LIHTC Unit, a Material LIHTC Amendment.

(95)     "<u>Material LIHTC Amendment</u>" means, with respect to an applicable LIHTC Unit and the applicable Owner of such LIHTC Unit, any amendment to the Declaration or the Plat which, if enacted, would: **(a)** result in a change in the permitted uses of such LIHTC Unit, or a change in the size or configuration or location of such LIHTC Unit or of any Limited Common Elements allocated to such LIHTC Unit; or **(b)** materially adversely affect the structural integrity of or impair access to such LIHTC Unit or the Limited Common Elements allocable to such LIHTC Unit; or **(c)** materially adversely affect the functionality of any of the utilities or operating systems serving such LIHTC Unit or the Limited Common Elements allocable to such LIHTC Unit; or **(d)** materially increase the cost to be incurred by the Owner of such LIHTC Unit of maintaining, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities), or insuring such LIHTC Unit or the Limited Common Elements allocable to such LIHTC Unit (other than increases in Common Expense Liability that are shared by the Owners of all of the Units in accordance with the respective Allocated Interests allocated to the Units); or **(e)** increase the Allocated Interest of Common Expense Liability payable by the Owner of such LIHTC Unit, or increase the Residential Sub-Allocated Expense Share of Residential Common Expense Liability payable by the Owner of such LIHTC Unit, or increase the Arcade Main Lobby Sub-Allocated Expense Share payable by the Owner of such LIHTC Unit, or increase the Residential Marketing Sub-Allocated Expense Share of Residential Marketing Expense Liability payable by the Owner of such LIHTC Unit; or **(f)** grant to the Association or to the Owner of any other Unit any additional easements or other rights, or enlarge or expand any existing easements or other rights, to enter upon or use or occupy such LIHTC Unit or any of the Limited Common Elements allocated to such LIHTC Unit that materially and adversely affect the use and enjoyment of such LIHTC Unit or any of the Limited Common Elements allocated to such LIHTC Unit; or **(g)** amend or modify any of <u>Article 11</u> or <u>Article 12</u> or <u>Article 13</u> hereof; or **(h)** amend or modify any of the provisions of this Declaration that govern or apply to amendments to this Declaration; or **(i)** change or alter the Vote or Voting rights to which the Owner of such LIHTC Unit is entitled; or **(j)** enable the Association or the Owners of the other Units

to act unilaterally to cause an occurrence under any of the foregoing **clauses (a) through (i)** above. The Owner of a LIHTC Unit shall have the absolute right to disapprove any amendment to the Declaration or the Plat which, if enacted, would, with respect to the applicable LIHTC Unit owned by the applicable LIHTC Unit Owner, be a Material LIHTC Amendment to the Declaration or the Plat.

(96) "Material Market Rate Amendment" means, with respect to the Market Rate Unit and the Owner of such Market Rate Unit, any amendment to the Declaration or the Plat which, if enacted, would: **(a)** result in a change in the permitted uses of such Market Rate Unit, or a change in the size or configuration or location of the Market Rate Unit or of any Limited Common Elements allocated to such Market Rate Unit; or **(b)** materially adversely affect the structural integrity of or impair access to the Market Rate Unit or the Limited Common Elements allocable to the Market Rate Unit; or **(c)** materially adversely affect the functionality of any of the utilities or operating systems serving the Market Rate Unit or the Limited Common Elements allocable to the Market Rate Unit; or **(d)** materially increase the cost to be incurred by the Owner of the Market Rate Unit of maintaining, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities), or insuring the Market Rate Unit or the Limited Common Elements allocable to the Market Rate Unit (other than increases in Common Expense Liability that are shared by the Owners of all of the Units in accordance with the respective Allocated Interests allocated to the Units); or **(e)** increase the Allocated Interest of Common Expense Liability payable by the Owner of the Market Rate Unit, or increase the Parking Sub-Allocated Expense Share of Parking Common Expense Liability payable by the Owner of the Market Rate Unit, or increase the Residential Sub-Allocated Expense Share of Residential Common Expense Liability payable by the Owner of the Market Rate Unit, or increase the Arcade Main Lobby Sub-Allocated Expense Share payable by the Owner of the Market Rate Unit, or increase the Residential Marketing Sub-Allocated Expense Share of Residential Marketing Expense Liability payable by the Owner of the Market Rate Unit; or **(f)** grant to the Association or to the Owner of any other Unit any additional easements or any additional other rights, or enlarge or expand any existing easements or any other rights, to enter upon or use or occupy the Market Rate Unit or any of the Limited Common Elements allocated to the Market Rate Unit that materially and adversely affect the use and enjoyment of the Market Rate Unit or any of the Limited Common Elements allocated to the Market Rate Unit; or **(g)** amend or modify any of Article 11 or Article 12 or Article 13 hereof; or **(h)** amend or modify any of the provisions of this Declaration that govern or apply to amendments to this Declaration; or **(i)** change or alter the Vote or Voting rights to which the Owner of such Market Rate Unit is entitled; or **(j)** enable the Association or the Owners of the other Units to act unilaterally to cause an occurrence under any of the foregoing **clauses (a) through (i)** above. The Owner of the Market Rate Unit shall have the absolute right to disapprove any amendment to the Declaration or the Plat which, if enacted, would, with respect to the Market Rate Unit owned by the Market Rate Unit Owner, be a Material Market Rate Amendment to the Declaration or the Plat.

(97) "Minor Casualty" means any damage by casualty which is not a Major Casualty (as defined above).

(98) "Monthly Parking Fee" means as of any applicable month an amount equal to: **(a)** Parking Common Expenses incurred during the prior calendar year, multiplied by **(b)** a fraction, the numerator of which is one (1), and the denominator of which is One Thousand Five Hundred Forty-Eight (1548). (By way of explanation, 1548 is 129 Parking Spaces, multiplied by 12; so that the Monthly Parking Fee then corresponds to the aggregate annual Parking Common Expenses on a monthly basis for one (1) Parking Space.)

(99) "New Markets Tax Credits" means any New Market Tax Credits under Section 45D of the Internal Revenue Code.

(100) "New Markets Compliance Period" means the seven-year credit period applicable to any "qualified equity investment" (as that term is defined in Section 45D of the Internal Revenue Code), the proceeds of which are used to fund the Commercial Unit and the Market Rate Unit in the Building in the Condominium.

(101) "NMTC Limited Partner Designated Representative" means **U.S. Bancorp Community Development Corporation**, as the initial party designated by the Limited Partners of the NMTC Unit Owners, or the successor to such initial NMTC Limited Partner Designated Representative designated by the unanimous written agreement of the Limited Partners of the NMTC Unit Owners.

(102) "NMTC Unit" means each of the Commercial Unit and the Market Rate Unit.

(103) "NMTC Unit Owner" means the party or parties owning fee title to an NMTC Unit.

(104) "Owner" or "Unit Owner" means the party or parties owning fee title to a Unit.

(105) "Owner's Reserved Right" means the right of the Owner of a Unit to disapprove any amendment to the Declaration or the Plat which, if enacted, would be a Material Condominium Amendment with respect to the applicable Unit owned by the applicable Unit Owner.

(106) "Parcel" means the Property submitted to the provisions of the Act.

(107) "Parking Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Parking Facilities, together with any allocations of reserves therefor. The Parking Common Expenses shall also include the costs and expenses of providing electricity and HVAC to the rooms and areas in the basement of the building that are identified or labeled on the Plat as LCE LIHTC or similar.

(108) "Parking Common Expense Liability" means the liability for Parking Common Expenses allocated to the Owners of the Commercial Unit and the Market Rate Unit.

(109) "Parking Facilities" means the parking garage, parking ramp, Parking Spaces, drive lines, paving, curbing, roundings, entrances, exits, garage doors, gates and other related parking facilities that are identified or labeled on the Plat as Parking Facilities or LCE Parking Facilities or similar designation. The Parking Facilities shall be used for vehicular parking in the Parking Spaces located within the Parking Facilities, for vehicular and pedestrian ingress, egress and access to and from the Parking Spaces located within the Parking Facilities, and for other uses incidental to the foregoing (such as an office area for parking management). Said Parking Facilities (together with all mechanical and electrical equipment that exclusively serve such Parking Facilities) are LCE allocated and assigned for the exclusive use and benefit of the Commercial Unit and the Market Rate Unit (and the Owners thereof and their tenants and subtenants and their respective employees, customers, contractors, agents and other invitees). All Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the Parking Facilities LCE shall be borne solely by the Owners of the Commercial Unit and the Market Rate Unit, in proportion to the Parking Sub-Allocated Expense Shares of the Commercial Unit and the Market Rate Unit.

(110) "Parking Space" means an individual Parking Space or parking stall within the Parking Facilities. At all times (unless the Commercial Unit Owner expressly agrees otherwise in writing), the Commercial Unit Owner of the Commercial Unit shall have the right to use for

vehicular parking **at least forty (40)** of the Parking Spaces located within the Parking Facilities (such parking use of said Parking Spaces to be by the from time-to-time Designated Commercial Parking Users). At all times (unless the Market Rate Unit Owner expressly agrees otherwise in writing), the Market Rate Unit Owner of the Market Rate Unit shall have the right to use for vehicular parking **at least eighty-nine (89)** of the Parking Spaces located within the Parking Facilities (such parking use of said Parking Spaces to be by the from time-to-time Designated Market Rate Parking Users). The Commercial Unit Owner and the Market Rate Unit Owner may by a written agreement between the Commercial Unit Owner and the Market Rate Unit Owner change the foregoing minimum number of Parking Spaces which each such Unit Owner has the right to use; any such change to be on such terms, conditions and basis as may be agreed to in writing by the Commercial Unit Owner and the Market Rate Unit Owner

**(111)** "Parking Sub-Allocated Expense Share" means the percentage share portion attributed and allocated to each of the Commercial Unit and the Market Rate Unit in the aggregate of the Parking Common Expenses and Parking Common Expense Liability, and specially allocated to and between the Commercial Unit and the Market Rate Unit pursuant to the Articles 6 & 7 hereof. **The Parking Sub-Allocated Expense Share of the Commercial Unit is Thirty-One Percent (31%)**, corresponding the fraction, the numerator of which is 40, and the denominator of which is 129. **The Parking Sub-Allocated Expense Share of the Market Rate Unit is Sixty-Nine Percent (69%)**, corresponding the fraction, the numerator of which is 89, and the denominator of which is 129. The foregoing Parking Sub-Allocated Expense Share percentage interest attributed and allocated to each of the Commercial Unit and the Market Rate Unit also is set forth in **Exhibit F** annexed hereto and incorporated herein by this reference. The Parking Sub-Allocated Expense Share of each of the Commercial Unit and the Market Rate Unit has been determined on the basis of the ratio of the minimum number of Parking Spaces to which each of the Commercial Unit and the Market Rate Unit has the right to use, to the one hundred twenty-nine (129) total number of Parking Spaces in the Parking Facilities. The Parking Sub-Allocated Expense Share of each of the Commercial Unit and the Market Rate Unit shall NOT change in the event of there being Unused Parking Spaces, or in the event that the Commercial Unit Owner or the Market Rate Unit Owner uses any then available Unused Parking Spaces; and, instead of change in the Parking Sub-Allocated Expense Share, **(a)** as applicable the Commercial Unit Owner shall pay the Market Rate Unit Owner the Monthly Parking Fee for each Unused Market Rate Parking Space used by a Designated Commercial Parking User; and **(b)** as applicable the Market Rate Unit Owner shall pay the Commercial Unit Owner the Monthly Parking Fee for each Unused Commercial Parking Space used by a Designated Market Rate Parking User. The Commercial Unit Owner and the Market Rate Unit Owner may by a written agreement between the Commercial Unit Owner and the Market Rate Unit Owner change the Parking Sub-Allocated Expense Share percentage interest attributed and allocated to each of the Commercial Unit and the Market Rate Unit; any such change to be on such terms, conditions and basis as may be agreed to in writing by the Commercial Unit Owner and the Market Rate Unit Owner.

**(112)** "Part 2 Approval" means the unconditional determination by the National Park Service and the SHPO, pursuant to Part 2 of the Certification Applications, that the rehabilitation of the Building situated on the Real Property is consistent with the historic character of such Building and contributes to the significance of the Historic District of which the Building is a part, and meets the Secretary's Standards and the requirements of the SHPO. For the avoidance of doubt, this definition of Part 2 Approval shall include such unconditional determination for all portions of the Certification Applications for the Building situated on the Real Property, and any and all additions and amendments thereto.

**(113)** "Part 3 Approval" means the determination by the National Park Service, pursuant to Part 3 of the Certification Applications, that the completed rehabilitation of the Building

situated on the Real Property is a "certified rehabilitation" of a "certified historic structure" under Section 47 of the Code.

(114) "Period of Declarant Control" or "Declarant Control Period" means the period commencing with the Recording of this Declaration and ending on the date that Declarant first deeds and conveys any Unit to a third-party, or otherwise as provided under the Act.

(115) "Permitted Home Business Use" means use of an Individual Dwelling Unit for any occupation, business or commercial activity carried on, at or in an Individual Dwelling Unit or apartment by the resident or occupant of the Individual Dwelling Unit, or by a member of the immediate family of the resident or occupant residing at the Individual Dwelling Unit, which occupation, business or activity employs in the Individual Dwelling Unit no more than one (1) nonrelated employee, and which use of the Individual Dwelling Unit is otherwise in strict compliance with all applicable laws, ordinances and occupancy permit requirements relating to home businesses and home occupations applicable to property zoned residential, including (without limitation) the applicable City of St. Louis Zoning Ordinances and Occupancy Permit Requirements for residential property. Notwithstanding anything to the contrary contained in this Declaration, Permitted Home Business Uses are and shall be permitted uses of the Individual Dwelling Units. Permitted Home Business Use includes any business activity in the Individual Dwelling Unit that consists of usage of telephone, computer, e-mail, and/or mail. In its leases of the Individual Dwelling Units within a Residential Unit, the Unit Owner of a Residential Unit may impose additional limitations and restrictions on, and requirements with respect to, the use and occupancy of the Individual Dwelling Units within a Residential Unit.

(116) "Person" means a natural individual, corporation, partnership, trustee or other legal entity capable of holding title to real property. "Natural Person" means a natural individual.

(117) "Plat" or "Condominium Plat" means the recorded Plat of Arcade Building Condominium, platting the Real Property described in **Exhibit A** to this Declaration, which Plat is described in **Exhibit B**. The Plat shall contain all of the information required by the provisions of Section 448.2-109 of the Act. The "Plat" also include any plans or drawings that are prepared by a registered architect or engineer which contains any of the information required by the provisions of Section 448.2-109 of the Act. Said Plat hereby is made a part of this Declaration, the same as if fully set forth herein.

(118) "Prohibited Use" means any of the following uses or purposes or activities, to-wit: **(a)** any use that is not a permitted use of the Building under the regulations and agreements that are applicable to a Unit(s) and/or the Building and the Owners by reason of the issuance with respect to the Building of New Markets Tax Credits, Historic Tax Credits or Low Income Housing Tax Credits; **(b)** any use that would cause the Building to be in non-compliance with any of the regulations and agreements that are applicable to the Building and the Owners by reason of the issuance with respect to the Building of New Markets Tax Credits, Historic Tax Credits or Low Income Housing Tax Credits; **(c)** private or commercial golf course; **(d)** country club; **(e)** operation of a massage parlor; **(f)** operation of a hot tub facility or a suntan facility; **(g)** bowling alley, pool hall, race track, game arcade or other facility used for gambling or lottery; **(h)** bar or nightclub; **(i)** liquor store, convenience store or 24 hour commercial establishment, or other store the principal business of which is the sale of alcoholic beverages for consumption off premises; **(j)** any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation; or other industrial or manufacturing uses; **(k)** a warehouse or other storage facility (provided that any area for the storage of household goods, and any area for the storage of goods intended to be used or sold at any business establishment located in the Condominium, shall not be deemed a warehouse or store facility, and storage and storage space that is incidental to an Owner's use shall be permitted); **(l)** "Second-hand" store whose principal business is selling used merchandise, thrift shops, salvation army type stores, "goodwill"

type stores, and similar businesses, except that a "vintage clothing" store or a "memorabilia store" shall not be a Prohibited Use, so long as the square footage of the "vintage clothing" store or of the "memorabilia store" does not exceed Two Thousand Five Hundred (2500) Square Feet; **(m)** dumping, disposing, incinerating, or reducing of garbage or other business using or emitting noxious, toxic or pollutant materials or an onsite commercial dry cleaning facility (exclusive of dumpsters for the temporary storage of garbage compactors, in each case which are regularly emptied so as to minimize offensive odors); **(n)** fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order); **(o)** a "job lot" store of any type; **(p)** a "dollar" store of any type; **(q)** veterinary hospital or animal raising or boarding facilities; **(r)** flea market; **(s)** tattoo parlors; **(t)** church, related religious facility or religious reading room; **(u)** pornographic book, pornographic video or pornographic novelty store; **(v)** adult entertainment, escort service or dating bureau; **(w)** gun shop; **(x)** medical marijuana dispensary, drug paraphernalia or "head shop"; **(y)** vehicle repair services; **(z)** pawn shop, check cashing payday loan business or bailbonds business; **(aa)** any use that is illegal or for which applicable occupancy, health and safety requirements, approvals or licenses have not been received; **(bb)** funeral parlor; **(cc)** dry cleaning establishments in which cleaning services occur on the premises (excluding drop-off dry cleaners); **(dd)** cinema; **(ee)** soup kitchen or other free food distribution center; **(ff)** day laborer employment agency; **(gg)** bus station or other transportation depot; **(hh)** political campaign office or headquarters; **(ii)** check-cashing operation; **(jj)** hair and/or nail salon; **(kk)** voodoo/palm-reading business; **(ll)** any use that would reasonably result in excessive noise and causing a disturbance to the residents of the LIHTC Unit or the Market Rate Unit; **(mm)** except as hereinafter set forth, any use that would reasonably lead to an increase in crime around the Building; and **(nn)** with respect to the Commercial Unit only, any Residential Use. Notwithstanding the foregoing <u>Item (mm)</u>, said <u>Item (mm)</u> shall <u>NOT</u> under any circumstances: **(1)** prohibit the Residential Use of a Residential Unit or portion thereof; nor **(2)** prohibit any Webster Permitted Use (as hereinafter defined) of the Commercial Unit or portion thereof. "<u>Webster Permitted Use</u>" means any one or more of the following uses: **(A)** educational uses (including classrooms) and uses incidental thereto; **(B)** cultural, charitable events, seminars, symposia, and professional development programs and other co-curricular uses; **(C)** art gallery, auditorium and offices; **(D)** a trading floor as part of a financial and accounting curriculum or mock operating rooms as part of a nursing curriculum; and **(E)** video, sound and other production and post-production facilities as part of the arts and theater curriculum.

**(119)**   "<u>Property</u>" means the Real Property described in **<u>Exhibit A</u>** to this Declaration, and the Building, structures, improvements and other permanent fixtures now or hereafter thereon, which is subjected to this Declaration.  The Property includes the Units, the Common Elements and the Limited Common Elements.

**(120)**   "<u>QREs</u>" means "<u>Qualified Rehabilitation Expenditures</u>" as such term is defined in Section 47(c)(2) of the Internal Revenue Code and, as regards the State Historic Credits as determined by applicable Missouri law and the requirements of the SHPO.

**(121)**   "<u>Real Property</u>" means the real property described in **<u>Exhibit A</u>** to this Declaration.

**(122)**   "<u>Recapture Event</u>" means any event that results in any loss, reduction or recapture (under Section 50 of the Internal Revenue Code or related Internal Revenue Code sections or regulations) of the federal historic tax credit allowable pursuant to Section 47 of the Internal Revenue Code for qualified rehabilitation expenditures incurred in connection with any portion of the Property or the Building.

**(123)**   "<u>Record</u>" means to record in the Real Estate Records of the City of St. Louis, Missouri, which is the recording office for the jurisdiction in which the Property is located.

(124)   "Residential Common Amenity Area(s)" means each of: **(a)** the area on the second (2nd) floor of the Building which is identified or labeled on the Plat as "Bike Storage Residential LCE" or similar; **(b)** the area on the third (3rd) floor of the Building which is identified or labeled on the Plat as LCE LIHTC or similar; and **(c)** the area on the nineteenth (19th) floor of the Building which is identified or labeled on the Plat as Residential LCE (other than the Residential Elevator on said floor).

(125)   "Residential Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Residential LCE, the Residential Administrative & Operating Expenses, the Residential Elevators and the Residential Elevator Shafts, together with any allocations of reserves therefor; except for and excluding therefrom any expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses.   The Residential Unit Owners may from time-to-time by their unanimous written agreement elect to treat any other expenses incurred by any one or more of the Residential Unit Owners in connection with the ownership, management, operation and leasing of the Residential Units as a Residential Common Expense under and governed by this Declaration.

(126)   "Residential Common Expense Liability" means the liability for Residential Common Expenses allocated to the Owners of the Residential Units.

(127)   "Residential Elevator" means any elevator that is identified or labeled on the Plat as a Residential Elevator or similar designation, or any elevator that is used exclusively by the Residential Units and located entirely within the area of a Residential Unit (in which case, the area of such Residential Elevator may not be separately designated on the Plat, and instead may be labeled on the Plat as unit area of the Residential Unit).  The Residential Elevators (together with all mechanical and electrical equipment that exclusively serve the Residential Elevators) are Residential LCE.

(128)   "Residential Elevator Shaft" means any elevator shaft that is identified or labeled on the Plat as a Residential Elevator Shaft or similar designation, or any elevator shaft that is used exclusively by a Residential Elevator and located entirely within the area of a Residential Unit (in which case, the area of such Residential Elevator Shaft may not be separately designated on the Plat, and instead may be labeled on the Plat as unit area of the Residential Unit).  The Residential Elevator Shafts are Residential LCE.

(129)   "Residential Hallways, Corridors & Etc. Areas" means all of the interior common hallways, corridors, janitorial rooms and closets, utility rooms and closets, mechanical rooms and closets, and other similar rooms and closets, which are located within the boundaries of the Residential Units but which are located outside of the demising walls (and entrance doors) of the Individual Dwelling Units that are located within the Residential Units.  The Residential Hallways, Corridors & Etc. Areas are located within and are part of the Residential Units, and are not Residential LCE.

(130)   "Residential Hallways & Etc. Expense(s)" means expenditures made by or financial liabilities of the Association for Residential Hallways & Etc. Maintenance.  All Residential Hallways & Etc. Expenses incurred in connection with the Residential Hallways & Etc., and/or to perform the Residential Hallways & Etc. Maintenance, shall be borne by the Owners of the Residential Units in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units.

(131)   "Residential Hallways & Etc. Expense Liability" means the liability for Residential Hallways & Etc. Expenses allocated to the Owner of each Residential Unit.

(132)   "Residential Hallways & Etc. Maintenance" means maintenance, repair, replacement and

reconstruction of the Residential Hallways, Corridors & Etc. Areas. The Association shall cause the performance of the Residential Hallways & Etc. Maintenance of the Residential Hallways, Corridors & Etc. Areas.

(133)    "Residential LCE" or "Res. LCE" or "LCE Residential" or "LCE Res." means all Limited Common Elements that are designated or designed for the exclusive use and benefit of Residential Units (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees). The following areas hereby are designated as Residential LCE, to-wit: **(a)** any area that is identified or labeled on the Plat as a Residential LCE or similar designation; **(b)** the Residential Elevators, all mechanical and electrical equipment that exclusively serve the Residential Elevators, the Residential Elevator Shafts; and **(c)** any other area that any other provision of this Declaration designates as Limited Common Element allocated to the Residential Units. The Residential LCE hereby are allocated and assigned for the exclusive use and benefit of the Residential Units (and the Owners thereof and their tenants and subtenants and their respective contractors, agents and invitees). (Except for and excluding therefrom any of the following expenses which are included in the Water & Sewer Utility Common Expenses or in the Common Cleaning & Janitorial Expenses or in the Common HVAC Expenses or in the Common Electric Expenses, and also except as otherwise expressly provided in this Declaration, and subject to application provisions of the Declaration,) all Residential Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, the Residential Elevators and the Residential Elevator Shafts shall be borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units. All other Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities, but excluding water & sewer) and cleaning of, and any separate insurance for or of, any other Residential LCE likewise shall be borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units. The Residential Hallways, Corridors & Etc. Areas are located within and are part of the Residential Units, and are not Residential LCE.

(134)    Residential Marketing Expense(s)" means as set forth in the definition thereof in Section 1.1(2) above.

(135)    Residential Marketing" means as set forth in the definition thereof in Section 1.1(2) above.

(136)    "Residential Marketing Expense Liability" means the liability for Residential Marketing Expenses allocated to the Owners of the Residential Units.

(137)    "Residential Marketing Sub-Allocated Expense Share" means the percentage share portion attributed and allocated to each Residential Unit in the aggregate of the Residential Marketing Expenses, and specially allocated to and among the Residential Units pursuant to the Articles 6 & 7 hereof. The Residential Marketing Sub-Allocated Expense Shares are **sixty percent (60%)** for the Market Rate Unit, and **forty percent (40%)** in the aggregate for the LIHTC Units, with such forty percent (40%) share allocated and divided among the LIHTC Units on the basis of the ratio of the approximate square footage within each LIHTC Unit to the total approximate square footage within all LIHTC Units of the Condominium. The Residential Marketing Sub-Allocated Expense Share of each Residential Unit is set forth in **Exhibit E-1** annexed hereto and incorporated herein by this reference.

(138)    "Residential Sub-Allocated Expense Share" means the percentage share portion attributed and allocated to each Residential Unit in the aggregate of the Residential Common Expenses and Residential Common Expense Liability, and specially allocated to and

among the Residential Units pursuant to the <u>Articles 6 & 7</u> hereof. The Residential Sub-Allocated Expense Share of each Residential Unit is determined on the basis of the ratio of the approximate square footage within each Residential Unit to the total approximate square footage within all Residential Units of the Condominium. The Residential Sub-Allocated Expense Share of each Residential Unit is set forth in **Exhibit E-2** annexed hereto and incorporated herein by this reference.

(139)    "<u>Residential Tenant</u>" means any person holding a leasehold interest in an Individual Dwelling Unit pursuant to a Residential Lease.

(140)    "<u>Residential Unit</u>" means each Unit area that is depicted on the Plat as a Residential Unit, comprising the applicable portions of the Building that are shown on the Plat as a Residential Unit. On each floor of the Building, each applicable Residential Unit extends from the upper surface of the slab, joists or beams supporting each floor of the Residential Unit to the lower surface of the joists and beams supporting the next upper floor of the Building, <u>excluding</u>: **(a)** the floor joists or slabs and support beams separating each floor of the Building from each other floor of the Building; and **(b)** any and all Common Elements and Limited Common Elements to the extent that such Common Elements and Limited Common Elements are located within the boundaries of a Residential Unit. A Residential Unit expressly <u>excludes</u> all Exterior Windows that physically abut such Residential Unit; each such Exterior Window being Limited Common Element assigned to such Residential Unit to which such Exterior Windows physically abuts.

(141)    "<u>Residential Unit Owner</u>" means the party or parties owning fee title to a Residential Unit.

(142)    "<u>Residential Use</u>" or "<u>Res. Use</u>" means the lawful residential use and occupancy of any separately demised Individual Dwelling Unit portion of a Condominium Unit, and any supporting compatible uses within the Condominium Unit or within any LCE allocated to the Condominium Unit, such as hallways, entrances, lobbies, stairways, elevators, community rooms, clubhouse, gym or fitness area, janitorial rooms, mechanical & electrical rooms, utility rooms, supply rooms and cabinets, residential apartment leasing and management offices, and the like, located within the Condominium Unit or within any LCE allocated to the Condominium Unit. Residential Use of an Individual Dwelling Unit includes Permitted Home Business Uses of the Individual Dwelling Unit.

(143)    "<u>Rooftop Terrace Area</u>" means any area which is designated or depicted on the Plat as a "Rooftop Terrace" or "Roof Terrace" or "Private Terrace" or similar. Each Rooftop Terrace Area (together with the air-space over said area) is Limited Common Element allocated and assigned to the applicable Residential Unit or Residential Units as indicated or designated on the Plat (or if there is no such designation on the Plat, then to the applicable Residential Unit to which such Rooftop Terrace Area physically abuts), for the exclusive use and benefit of such Residential Unit or Residential Units (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees).

(144)    "<u>Rooftop Terrace Structure</u>" means any deck structure or other structure or improvement constructed and installed on a Rooftop Terrace Area portion of a Common Roof of the Building. Each Rooftop Terrace Structure is part of the Limited Common Element of the applicable Rooftop Terrace on which the Rooftop Terrace Structure is constructed, for the exclusive use and benefit of the same Residential Unit or Residential Units (and the Owners thereof and their respective tenants and subtenants and their respective contractors, agents and invitees) to which the Rooftop Terrace Area is allocated and assigned.

(145)    "<u>Secretary</u>" means the Secretary of the U.S. Department of the Interior or any authorized

representative thereof, including the National Park Service.

**(146)** "Secretary's Standards" means the standards for rehabilitation set forth in Title 36 of the Code of Federal Regulations, Part 67.7, or any successor provisions, as amended from time to time.

**(147)** "Security Holder" means the holder or legal owner or beneficiary of any Security Interest encumbering a Unit, or the holder or legal owner or beneficiary of any Security Interest encumbering a Master Tenant's interest in a Master Lease or Ground Lease of a Unit.

**(148)** "Security Interest" means any mortgage or deed of trust encumbering the fee interest in a Unit, or any leasehold mortgage or leasehold deed of trust encumbering the tenant's interest in a Master Lease or Ground Lease of a Unit.  The Security Holder of a Security Interest encumbering a tenant's interest in a Master Lease or Ground Lease of a Unit shall have the same rights hereunder as a Security Holder of a Security Interest encumbering the fee interest in a Unit. As used in this Declaration, the phrases "Security Interest encumbering a Unit", "Security Interest with respect to a Unit" and similar mean each of a Security Interest encumbering the fee interest in a Unit and a Security Interest encumbering a Master Lease or Ground Lease of a Unit.  If there is both a Master Lease or Ground Lease of a Unit and a Security Interest encumbering the fee interest in the same Unit, then, for all purposes of this Declaration, each (and both) of the first lien Security Interest encumbering the fee interest in the Unit and the first lien Security Interest encumbering the Master Lease of the Unit shall be deemed to be a first lien Security Interest with respect to such Unit.

**(149)** "SHPO" means the Missouri Historic Preservation Office.

**(150)** "Unit" means the Commercial Unit, or the Market Rate Unit, or a LIHTC Unit, as the case may be. Each Unit is a physical portion of the Condominium designated for separate ownership or occupancy.  Each Unit is designated and delineated on the Plat, and is designated by this Declaration for separate ownership. The boundaries of each Unit, both as to vertical and horizontal planes, are shown on the Plat.  Each Unit includes all spaces, interior partitions, fixtures, heating, hot water, air conditioning mechanical equipment and other improvements within the boundaries of the Unit; excepting that a Unit excludes all Common Elements and Limited Common Elements that are located within the boundaries of the Unit.

**(151)** "Unit Expense" means any cost and expense incurred by the Association under this Declaration with respect to a specific Unit or in connection with a specific Unit which Section 6.2(i) hereof or any other provision of this Declaration provides shall be a Unit Expense allocated to and borne solely by the Owner of the applicable Unit.

**(152)** "Unit Owner" or "Owner" means the party or parties owning fee title to a Unit.

**(153)** "Unused Parking Space" means an Unused Commercial Parking Space or an Unused Market Rate Parking Space, as applicable.  In the event that, at any time, the Commercial Unit Owner of the Commercial Unit designates less than forty (40) Designated Commercial Parking Users, then in such event applicable Parking Spaces by which the number of Designated Commercial Parking Users is less than forty (40) shall be deemed "Unused Commercial Parking Spaces" (and each such Parking Space, an "Unused Commercial Parking Space").  In the event that, at any time, the Market Rate Unit Owner of the Market Rate Unit designates less than eighty-nine (89) Designated Market Rate Parking Users, then in such event applicable Parking Spaces by which the number of Designated Market Rate Parking Users is less than eighty-nine (89) shall be deemed "Unused Market Rate Parking Spaces" (and each such Parking Space, an "Unused Market Rate Parking Space").  In the event that, at any time, the Commercial Unit Owner of the Commercial

Unit designates less than forty (40) Designated Commercial Parking Users, then in such event the Market Rate Unit Owner of the Market Rate Unit shall have the right to use for vehicular parking by Designated Market Rate Parking Users any Unused Commercial Parking Spaces; provided that, with respect to each month in which an Unused Commercial Parking Space is used by a Designated Market Rate Parking User, the Commercial Unit Owner shall have the right to charge the Market Rate Owner (and the Market Rate Unit Owner shall pay the Commercial Unit Owner) the then applicable Monthly Parking Fee for each such Unused Commercial Parking Space which is used by a Designated Market Rate Parking User. In the event that, at any time, the Market Rate Unit Owner of the Market Rate Unit designates less than eighty-nine (89) Designated Market Rate Parking Users, then the Commercial Unit Owner of the Commercial Unit shall have the right to use for vehicular parking by Designated Commercial Parking Users any Unused Market Rate Parking Spaces; provided that, with respect to each month in which an Unused Market Rate Parking Space is used by a Designated Commercial Parking User, the Market Rate Unit Owner shall have the right to charge the Commercial Owner (and the Commercial Unit Owner shall pay the Market Rate Unit Owner) the then applicable Monthly Parking Fee for each such Unused Market Rate Parking Space which is used by a Designated Commercial Parking User.

(154)  "Vote" means, as the context indicates "to vote", or "the vote" that is allocated and assigned to a Unit. Each Unit shall have the number of Votes in proportion to the Allocated Interest of such Unit. The Votes shall be exercised as provided in this Declaration and the By-Laws.

(155)  "Water & Sewer Utility Charges" means the periodic charges by the water utility company for water provided to and used by the Building and for the periodic charges by the sewer utility company for sanitary sewer and stormwater sewer service discharge from the Building. The Water & Sewer Utility Charges for the Building are billed by each utility company on a combined basis for the entire Building, including all Unit areas, all Common Element areas and all Limited Common Element areas; and such Water & Sewer Utility Charges shall be paid by the Association..

(156)  "Water & Sewer Utility Common Expense(s)" means expenditures made by or financial liabilities of the Association for the Water & Sewer Utility Charges. All Water & Sewer Utility Common Expenses incurred for the Water & Sewer Utility Charges shall be borne by the Owners of the Units in proportion to the Allocated Interests of the Units.

(157)  "Water & Sewer Utility Common Expense Liability" means the liability for Water & Sewer Utility Common Expenses allocated to the Owner of each Unit.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## ARTICLE 2 -- SUBMISSION OF THE PROPERTY TO THE ACT

**2.1 -- Submission**.  Declarant hereby submits the Property to the Act and this Declaration.

**2.2 -- Name**.  The Property shall hereafter be known as: **ARCADE BUILDING CONDOMINIUM.**

**2.3 -- Division of Property Into Separate Owned Units and Common Elements**.  Declarant, pursuant to the Act and to establish a plan of condominium ownership for the Units, does hereby divide the Property into separate Units and Common Elements (including Limited Common Elements), and does hereby designate such Units for separate ownership.  The Units are contained in the one (1) Building that is shown on the Plat of the Real Property.

**2.4 -- Identification of Units**.  Units (including certain Limited Common Elements, if any, allocated to such Units) in the Building located on the Property have been legally described on the Plat.  Each Unit constitutes a fee simple legal estate in the portion of the Property encompassed by the Unit.  The Unit Owner of a Unit holds and owns fee simple title to the particular Unit.  Every deed, lease, mortgage or other instrument may legally describe a Unit by its identifying number or symbol as shown on the Plat, and as set forth in the Declaration, and every such description shall be deemed good and sufficient for the purposes, and shall be deemed to convey, transfer, encumber or otherwise affect the Owner's corresponding Allocated Interest, even though the same is not expressly mentioned or described therein.  The description of each Unit shall include all rights and privileges of said Unit, along with Limited Common Elements, if any.  Each Unit Owner shall be entitled to the Allocated Interest appertaining to his Unit as computed and set forth in this Declaration.

**2.5 -- Ownership of Certain Items**.  No Unit Owner shall own any Common Elements and Limited Common Element located within the boundaries his Unit or otherwise running through his Unit, except to the extent of his Allocated Interest.

**2.6 -- Limited Common Elements**.  The Limited Common Elements are as defined and established in Section 1.1 hereof.  In addition to the Limited Common Elements as defined Section 1.1 hereof, the Limited Common Elements shall also include the items set forth as Limited Common Elements in and pursuant to the Act.  The Limited Common Elements, if any, serving or designed to serve or allocated or attributed to each respective Unit are hereby allocated solely and exclusively to each such Unit.

**2.7 -- Covenants Against Partition**.  In accordance with Section 448.2-107.5 of the Act, the Common Elements are not subject to partition, and any purported conveyance, encumbrance, judicial sale, or other voluntary or involuntary transfer of an undivided interest in the Common Elements made without the Unit to which that interest is allocated, is void.  Nothing contained herein shall prevent partition of a Unit between co-owners, if a co-owner has legal right thereto, except that any such partition shall not be in kind.

**2.8 -- Condominium Ordinances**.  The Condominium is not subject to any ordinances of the City of St. Louis, Missouri, which is not also imposed upon physically similar developments under different forms of ownership.  This statement is made pursuant to Section 448.1-106 of the Act for the purpose of providing marketable title to the Units of the Condominium.

**2.9 -- Location**.  The Condominium is located in the City of St. Louis, Missouri.

**2.10 -- Unit Allocations -- Allocated Interests of the Units**.

       **(a)**     The Allocated Interest percentage interest attributed and allocated to each Unit has been and shall be determined by the Declarant based on the ratio of the approximate square footage of each of the Units to the approximate total square footage of all of the Units in the Condominium.

       **(b)**     The Allocated Interests of the Units in the Common Elements and in the Common Expenses of the Association allocated and attributed to the Units are set forth in **Exhibit C** attached hereto and hereby made a part hereof; subject, however, to the terms and provisions of Section 1.1 hereof, Section

6.2 hereof, and Section 7.1 hereof, as pertain to Common Expenses attributable to Limited Common Elements.

(c)    Notwithstanding the Allocated Interests of the Units, the terms and provisions of Section 1.1 hereof and Articles 6 & 7 hereof contains certain special allocations to particular Units of certain Common Expenses and Common Expense Liability.  Refer to said Sections 6.2 & 7.1 hereof for the obligations and liabilities of each Unit Owner with respect to such specially allocated items of Common Expenses and Common Expense Liability.

**2.11 -- Number of Units**.  The Declarant reserves the right to create **fourteen (14) Units** in the aggregate in the Building within the Property.  The **fourteen (14) Units** shall be created on the date of recording of this Declaration, which **fourteen (14) Units** are shown on the Plat and are listed in **Exhibit C** annexed hereto.

**2.12 -- No Right of First Refusal**.  This Declaration does not contain any provisions for right of first refusal to purchase, option to purchase, or similar restrictions.  Each Owner may freely convey and transfer his Unit, subject only to the terms and conditions of this Declaration, the Plat, the By-Laws, and the applicable zoning ordinances.

ARTICLE 3 -- COMMON ELEMENTS

**3.1 -- Common Elements**.  The Common Elements are the Common Elements as defined in Section 1.1 hereof, including (without limitation):

(a)    All of the Property (excepting the Units).

(b)    All electrical wiring throughout the Property (except that within Units); all pipes, wires, cables and conduits throughout the Property (except those within Units); all utility installations, sanitary sewer facilities, laundry facilities and connections for gas, sanitary sewer, electricity, light, water and plumbing (except those within Units).  Any such installation exclusively serving only one Unit, whether such installation is located wholly or partially within or outside said Unit, shall be considered as being "within" and being a part of said Unit which is exclusively served by such installation.  In addition, any heating, hot water and air conditioning equipment exclusively serving only one such Unit, whether such equipment is located wholly or partially within or outside said Unit, shall be considered as being "within" and being a part of said Unit which is exclusively served by such equipment.

(c)    The foundations, exterior walls and interior walls separating Units (excluding all wall coverings and glass surfaces), roofs, gutters, downspouts, common hallways to basements with access from common hallways and all other common portions of the Property not included within Units.

(d)    Auxiliary buildings, if any, and any other structures and facilities which may at any time be situated on the Property.

**3.2    Windows and Window Frames**.

(a)    Each Exterior Window which physically abuts a Unit is Limited Common Element assigned to such Unit to which such Exterior Window physically abuts.  Any other Exterior Windows which do not physically abut a Unit are part of the interior Common Element areas to which they abut.  The Association shall perform and provide the maintenance, repair, replacement, reconstruction, cleaning and insuring of all such Exterior Windows, and the costs thereof shall be and are a part of the Common Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

(b)    Any interior windows and window frames are a part of the interior Common Element areas to which they abut.  In the event that any such windows and window frames abut an interior Common Element area which is a Limited Common Element area, then the applicable windows and

window frames are a part of the applicable Limited Common Element area.

## ARTICLE 4 -- EASEMENTS

**4.1 -- Encroachment**.  Through construction, settlement or shifting of the Building, should any part of the Common Elements encroach upon any part of a Unit, or should any part of a Unit encroach upon any part of the Common Elements or upon any other Unit, easements for the continuation and maintenance of any such encroachment and for the use of the space required thereby are hereby established and shall exist for the benefit of the Unit Owner or the Common Elements, as the case may be, for as long as encroachment exists, PROVIDED HOWEVER, that no easement shall be created in the event the encroachment is due to the willful conduct of a Unit Owner.

**4.2 -- Easements to Unit Owners**.  Perpetual easements are hereby established for all Unit Owners and their successors in title to the applicable Units for use and enjoyment of the Common Elements (other than Limited Common Elements) for the uses and purposes for which the applicable Common Elements (other than Limited Common Elements) are designed and constructed, subject to such rules as the Executive Board of the Association may determine, from time to time, in accordance with this Declaration and the By-Laws and as provided in writing to each Unit Owner, the Limited Partner of the LIHTC Unit Owner, the NMTC Limited Partner Designated Representative, and the HTC Investor Member.  In addition, each Unit Owner hereby is granted a perpetual non-exclusive easement through the common hallways of the Common Elements for ingress and egress to and from, and for access to, the Unit owned by such Unit Owner..

**4.3 -- Easements in Gross**.  Each Unit Owner shall have an easement in common with the Owners of the other Units to use all pipes, wires, ducts, cables, conduits, public utility lines, structural components and other Common Elements located in any of the other Units and serving his Unit.  Each Unit shall be subject to an easement in favor of the Owners of other Units to use the pipes, wires, ducts, cables, conduits, public utility lines, structural components and other Common Elements located in such Unit and serving other Units.  The Executive Board, its appointees, employees or agents, shall have the right of access to each Unit to inspect same and remove violations therefrom and to inspect, maintain, repair or replace the Common Elements contained wholly or partially therein.  The Property shall be subject to a perpetual easement to the Association for ingress and egress to perform its obligations and duties required by this Declaration and By-Laws.  Should it be necessary to enter a Unit to inspect and remove a violation or to inspect, maintain, repair or replace any Common Element, the appointees, employees or agents of the Executive Board shall be entitled to entrance by exhibiting to the Unit Owner or occupant an order from the Board; provided, however, that any such entrance into an Individual Dwelling Unit shall be only at reasonable times and with 48 hours written notice to the Residential Tenant residing in such Individual Dwelling Unit and to the LIHTC Unit Owner or the Market Rate Unit Owner, as applicable.  Each Unit Owner and/or occupant of a Unit shall not unreasonably interfere with such necessary entry.  Forced entry, deemed necessary by the Executive Board and only in the case of an emergency, shall not subject the Executive Board, its appointees, employees or agents to trespass, but any damage to the Unit as a result of forced entry or as a result of any repair of a Common Element from within the Unit shall be repaired by the Executive Board as part of the Common Expense.  In the event any Unit Owner or occupant shall fail to provide access to the Unit as herein provided, the Executive Board may (in addition to exercising other lawful remedies) obtain an order of court for such access, and the costs and reasonable attorney fees shall be taxed against the Unit Owner or occupant.

**4.4 -- Utility Easements**.  Easements, as shown on the Plat, or as may be subsequently granted by the Executive Board, are established and dedicated for sanitary and storm sewers, electricity, gas, water, telephones, CATV, other telecommunications facilities, and for all other Public utility purposes, including the right to install, lay, maintain, repair and replace water mains and pipes, sewer lines, drainage, gas mains, telephone wires and equipment, CATV wires and equipment, other telecommunications wires and equipment , and electrical conduits and wires over, under, along and on the portions of the Common Elements.

**4.5 -- Effect of Easements**. All easements, rights and restrictions herein established shall run with the land and inure to the benefit of, and be binding upon and enforceable by, the Declarant, its successors or assigns, and any Unit Owner, whether or not such easements are mentioned or described in any deed of conveyance.

**4.6 -- Existing Easements, Building Lines, Restrictions and Other Title Matters of Record**. The Property presently is subject to the existing easements, building lines, restrictions and other title matters of record described in **Exhibit G** annexed hereto and incorporated herein by this reference.

**4.7 -- Miscellaneous Additional Easements**.

(a)     In the event of a fire or casualty, or in the event of any other bona fide emergency, each Unit Owner (and its respective tenants and subtenants and its respective contractors, agents and invitees) are hereby granted a limited right of use of, access to and entry upon any and all hallways, corridors, lobbies, stairways, elevators, entrances and exits of the Building, for the purpose of egress from the Building.

(b)     The Association and each Unit Owner is hereby granted an easement for incidental, occasional and non-material use of, and ingress, egress and passage through, the various Units and Limited Common Element areas of the Building, for the purpose of access to Common Element areas and LCE areas, to the extent necessary for repair, maintenance and replacement of said Common Element areas and LCE areas.

(c)     The Association and each Unit Owner is hereby granted an easement for ingress, egress and passage through, any exterior areas of the Condominium that are Limited Common Elements, to the extent necessary for the purpose of ingress, egress and access to and from the Units, the Common Element areas and other LCE areas.

## ARTICLE 5 -- UNIT OWNERS' RIGHTS AND RESTRICTIONS

The use of the Units and Common Elements is restricted as follows:

**5.1 -- Commercial Unit**. Each Commercial Unit hereby is restricted to **Commercial Use**.

**5.2 -- Residential Unit**. Each Residential Unit hereby is restricted to **Residential Use**. No business, trade, occupation or profession of any kind shall be conducted, maintained or permitted in any Individual Dwelling Unit portion of a Residential Unit, excepting that Permitted Home Business Uses are and shall be permitted uses of the Individual Dwelling Units to the extent permitted by the Unit Owner of the Residential Unit in which such Individual Dwelling Units are situated.

**5.3 -- All Units -- Prohibited Uses**. Each Unit Owner covenants, promises and agrees that it will not use or occupy any portion of the Unit owned by such Unit Owner or any portion of the Common Elements for any of the Prohibited Uses, that it will cause this requirement to be included in all leases and subleases of space in its Unit and will enforce such provisions.

**5.4 -- All Units -- Hazardous Materials**.

(a)     Each Unit Owner covenants, promises and agrees that it will not use, manufacture, store, treat, transport, refine, handle, produce or dispose of any Hazardous Materials in, at, on, under, upon or from the Unit owned by such Unit Owner or any Common Elements, that it will cause this requirement to be included in all leases and subleases of space in its Unit and will enforce such provisions. Each Unit Owner further covenants, promises and agrees that it will not discharge, deposit, inject, dump, leak, spill, place or allow escape of any Hazardous Materials in, at, on, under, upon or from the Unit owned by such Unit Owner or the Common Elements, or into the sewer system serving the Unit owned by such Unit Owner or the Common Elements, that it will cause this requirement to be included in all leases and subleases of space in

its Unit and will enforce such provisions. Each Unit Owner agrees to and shall indemnify, defend and hold the other Unit Owners and the Association harmless from and against any and all claims, demands, liabilities, damages, suits, actions, judgments, fines, penalties, losses, removal and/or remedial costs and/or charges, costs and expenses (including attorney's fees) arising or resulting from, or suffered, sustained or incurred by any of the other Unit Owners or the Association as a result of any breach by such Unit Owner of any of its covenants in this Section 5.4(a).

       **(b)**       Notwithstanding the foregoing provisions of this Section 5.4(a), each Unit Owner may use and store minimal quantities of substances in the Unit owned by such Unit Owner which technically could be considered Hazardous Materials, provided that: **(1)** such substances are a type and are held only in a quantity normally used in connection with the use, occupancy or operation of comparable premises (such as cleaning fluids, and supplies normally used in the day to day operation of homes, apartments, schools, hotels, restaurants, retail establishments and business offices) and are in amounts not subject to regulation, **(2)** such substances are being held, stored and used in complete and strict compliance with all applicable environmental laws, **(3)** the indemnity contained in Section 5.4(a) shall always apply to such substances, and **(4)** it shall be and continue to be the responsibility of the Unit Owner to take all remedial actions required under and in accordance with this Section 5.4(a) in the event of any unlawful release of any such substance.

**5.5-- All Units -- Telecommunications Facilities**. For the purposes hereof, "Telecommunications Facility" means any telecommunications transmission or receiving tower, antenna, dish or other facility. No Telecommunications Facilities shall be located, placed, installed, erected, constructed or maintained on the exterior of any of the Units, on any exterior wall or roof of any Building, or on any other portion of the Common Elements; excepting in all events upon the prior written consent and approval of the Association; but subject to and except as may otherwise be provided under applicable federal, state and local law. The Association's consent and approval to Telecommunications Facilities may be withheld and denied for any reason or no reason, in the sole and absolute discretion of the Association; and any consent and approval that is granted, may thereafter be revoked and terminated by the Association for any reason or no reason, in the sole and absolute discretion of the Association. In addition, in the event that the Association consents to and approves a Telecommunications Facility in any one instance, the Association may withhold and deny consent and approval in other instances, for any reason or no reason, in the sole and absolute discretion of the Association. All such Telecommunications Facilities to which the Association consents shall be subject to such rules, regulations and requirements as the Association enacts regarding the location, placement, installation, erection, construction or maintenance of Telecommunications Facilities.

**5.6 – Intentionally Deleted**.

**5.7 -- Compliance With Declaration, By-Laws and Rules and Regulations**. Each Unit Owner shall comply with all applicable provisions of the Act, this Declaration, the By-Laws, and such rules and regulations, which are not in conflict with or inconsistent with this Declaration, as from time to time are promulgated by the Executive Board or the Association, as amended from time to time, and that it will require such compliance from its tenants, subtenants, agents, employees and licensees and failure to comply with any such provisions and rules and regulations which are not in conflict with or inconsistent with this Declaration shall be grounds for an action by the Association or by an aggrieved Unit Owner for appropriate relief, including recovery of damages, injunctive relief, or both. If a Declarant or a Unit Owner fails to comply with any provision of the Act or this Declaration or the By-Laws, any other Unit Owner adversely affected by such failure to comply has a claim for appropriate relief. Punitive damages may be awarded in the case of willful, wanton and malicious failure to comply with any provision of the Act. The court, in an appropriate case, may award reasonable attorney's fees.

**5.8 -- Obstructions**. There shall be no obstructions on any portions of the Common Elements nor any storage in the Common Elements (other than any storage within the Limited Common Elements of a Unit) without prior written consent of the Executive Board.

**5.9 -- Maintenance of Units**. Each Unit Owner shall maintain and keep its Unit in good order and repair and in compliance with the Historic Standards and the applicable occupancy, health and safety laws and

requirements; except that the Association shall cause the performance of the Residential Hallways & Etc. Maintenance of the Residential Hallways, Corridors & Etc. Areas (even though such areas are a part of the Residential Units).   See Section 9.1 for certain applicable provisions in the event of casualty or partial condemnation, and each Unit Owner's obligations under said provisions hereby are incorporated into this Section 5.9 as part of such Unit Owner's obligations under this Section 5.9.  If a Unit Owner does not maintain and keep its Unit in good order and repair, as set forth above, or does not so restore its Unit (when required above) (a "Non-Compliant Owner"), then the other Unit Owner(s) and/or the Association shall give written notice to such Non-Compliant Owner of such failure.  If, after thirty (30) days such failure continues to exist, then the other Unit Owner and/or the Association shall have the right to enter upon the premises of such Unit in order to make any repairs which may be needed in order for such Unit and the remainder of the Building to be compliant with applicable health and safety requirements, to board up such space and to address any noxious odors arising therefrom, so that the other Unit Owner(s) will be able to use their Unit(s) for their intended purposes.  The Limited Partner of the LIHTC Unit Owner shall have the right, but not the obligation, to cure any such failure on behalf of the LIHTC Unit Owner in the event the LIHTC Unit Owner is a Non-Compliant Owner.  The Limited Partner of the NMTC Unit Owner shall have the right, but not the obligation, to cure any such failure on behalf of the NMTC Unit Owner in the event the NMTC Unit Owner is a Non-Compliant Owner.  Any and all costs incurred by the Association and/or such other Unit Owner(s) shall be payable to such parties by the Non-Compliant Owner upon written demand therefor and such amounts shall be deemed to be assessments pursuant to Article 6 of this Declaration.

**5.10 – Signage & Etc. on Exterior of Building**.  No Unit Owner shall hang or display or affix or install any signage, awnings, canopies, shutters or other item on any interior or exterior Common Element of any Building, and no Unit Owner shall hang or display or affix or install any signage on the insides or outside of Exterior Windows, doors or walls of any Building that may be viewed from outside the Building, without the prior written consent of the Executive Board.  All exterior signage, awnings, canopies or shutters shall be subject to such reasonable rules, regulations and requirements as the Association enacts.  The Association shall not unreasonably condition, delay or withhold approval of installation of awnings, canopies or shutters on exterior Common Element, and  business signage above, and on the insides or outsides of, the First Floor Exterior Windows, doors and entrances advertising the business or businesses conducted within the Building, so long as:

- Such signage, awnings, canopies and shutters are in compliance with applicable laws and permit requirements.
- Such signage awnings, canopies and shutters are in compliance with all applicable Historic Tax Credit rules, regulations, restrictions and requirements applicable to the Building, including, without limitation, compliance with the Historic Standards and the applicable requirements of the Missouri State Historic Preservation Office.
- Such Unit Owner shall be keep and maintain such signage awnings, canopies and shutters in good condition, and in compliance with applicable laws and permit requirements, at its sole cost and expenses; and shall pay all costs of operation (including utilities) with respect to such signage awnings, canopies and shutters; and
- Upon the removal of any such signage awnings, canopies and shutters, the applicable Unit Owner shall (at its sole cost and expense) repair and restore any damage to the Common Element

**5.11 – Sound and Vibrations**.  Each Unit Owner (at such Unit Owner's expense) shall cause the Unit owned by such Unit Owner to contain appropriate sound batting, acoustical and sound barriers and materials, vibration barriers and materials, other insulation, and ventilation systems, so that sound, noise, vibrations, noxious odors or other emanations, do not emanate from and are not emitted from the Unit owned by such Unit Owner in levels and quantities that are unreasonable or are a nuisance or that materially disturb the comfortable use and occupancy of other Units of the Building.

**5.12 -- Use Not to Increase Insurance; No Waste**.  Nothing shall be done to or kept in any Unit or the Common Elements, and no Unit Owner shall do anything in any Unit or the Common Elements, that will increase any rate of insurance maintained with respect to the Condominium or which would be in violation of law, without the prior written consent of the Executive Board.   No Unit Owner or occupant shall permit anything to be done or to be kept in his Unit or the Common Elements that will result in the cancellation of

insurance maintained with respect to the Condominium, or that would be in violation of any law, or that will result in the commission of waste (damage, abuse or destruction) to or in his Unit or the Common Elements.

**5.13 – Alterations of Units**.

(a)    A "Material Unit Alteration" to a Unit is any alteration, installation, removal, reconstruction or repair to the Unit which **(1)** does not clearly comply with the Historic Standards or, during the Historic Recapture Period which requires an amendment to any Part 2 Approval pursuant to 36 CFR 67.7(d), or **(2)** will impair the structural integrity of said Unit or of any other portion of the Building in the Condominium, or which will impair any mechanical or electrical system of said Unit or of any other portion of the Building in the Condominium, or which will adversely affect either the thermal or acoustical character of said Unit or of any other portion of the Building in the Condominium, or which will lessen the support of any portion of said Unit or of any other portion of the Building in the Condominium.  In the event of doubt regarding whether proposed work requires an amendment to a Part 2 Approval, such work shall be submitted to the Historic Consultant, the HTC Investor Member and the Executive Board of the Association, and if any such party shall deem it necessary, an amendment to the applicable Part 2 Approval(s) shall be submitted to the Secretary and the SHPO.  A "Non-Material Unit Alteration" to a Unit is any other alteration, installation, removal, reconstruction or repair to a Unit which is not a Material Unit Alteration.

(b)    **Material Unit Alterations**.

(1)    Subject to Section 5.13(b)(2) hereof, each Unit Owner is prohibited from making any Material Unit Alterations to its Unit, unless, during the Historic Recapture Period, the Historic Consultant and the HTC Investor Member have each reviewed the plans and specifications and determined that they comply with the Historic Standards and, if applicable, the Secretary and SHPO have reviewed and approved an appropriate amendment to the Part 2 Approval, and, as to Material Unit Alterations both during and after the Historic Recapture Period, the Executive Board and the HTC Investor Member have approved in writing the plans and specifications, the contractor(s) and the construction contract(s) for such work (such approvals not to be unreasonably withheld).  For purposes of this Section 5.13(b), during the Historic Recapture Period, Executive Board approval shall require a vote of one hundred percent (100%) of the Board members, and such Material Alterations are performed by the Unit Owner in compliance with such reasonable terms, provisions, conditions and requirements as the Executive Board establishes and imposes, including compliance with the Historic Standards during the Historic Recapture Period.  Each Unit Owner is further prohibited from making any alterations, installations, removals, reconstruction or repair to his Unit which will **(A)** violate any applicable law, ordinance or governmental rule, regulation or order, or **(B)** give rise to a Recapture Event (as defined in the Code) or otherwise cause a recapture of any Historic Tax Credits relating to the Property..

(2)    During the Historic Recapture Period, Material Unit Alterations shall be subject to the provisions of this Section 5.3(b)(2).  The Unit Owners and the Association acknowledge that, pursuant to existing National Park Service procedures, any amendment to the Certification Application or the Part 2 Approval submitted by any Unit Owner or the Association with respect to any Material Unit Alterations may be consolidated under a single National Park Service project number with the original Certification Application covering all work done to the Condominium. Any and all such amendments related to any and all work in and around the Property shall be deemed the "Property Part 2 Application Amendment", irrespective of whether a particular Unit Owner's Material Unit Alteration is processed by the National Park Service under a unique project number with a unique Part 2 Application amendment or consolidated with the project number assigned to the Condominium and including any other Unit Owner's work, the Unit Owners acknowledge that the ultimate determination of whether any Unit Owner is entitled to Historic Tax Credits is expected to be made with reference to all the work undertaken in the Condominium.  Therefore, each Unit Owner agrees to cooperate and coordinate with all other Unit Owners in the preparation, submission and modification of any Property Part 2 Application Amendment, whether separate or consolidated, as the case may be.  No Unit Owner shall amend the Certification Application or any Building Part 2 Application Amendment without the unanimous consent of the Executive Board.  The Unit Owners acknowledge that they will submit any Building Part 2 Application Amendment to include subsequent work to the extent in the opinion of the Historic Consultant, such amendment is necessary or

advisable in connection with the National Park Service regulations or is determined to be necessary or advisable by a Unit Owner, and such amendment will be submitted only after its review by the Historic Consultant and only with the unanimous consent of the Executive Board and the consent of the HTC Investor Member, provided no work shall be commenced in the applicable Unit until an amendment to the Part 2 Application has been submitted to, and approved by, the Secretary and the SHPO, if it is determined, in accordance herewith that an amendment is necessary. In the event National Park Service approval of any such amendment is conditional, such affected Unit Owner agrees to comply with such conditions. If the Unit Owner chooses to not perform any work described in the Certification Application or a Building Part 2 Application Amendment, such Unit Owner acknowledges that it will submit a Property Part 2 Application Amendment to reflect such change. If the National Park Service determines that the Unit Owner's future work should be submitted under a separate project number with a new Part 2 application, the Unit Owner shall be required to submit such new Part 2 application after review of the Historic Consultant and the unanimous consent of the Executive Board and the consent of the HTC Investor Member, and such new Part 2 application shall be considered part of the Certification Application. Unit Owner, at Unit Owner's expense, shall cause such Part 2 application to be prepared in respect to the Material Unit Alteration required to be submitted under the Secretary's Standards. In the event the Material Unit Alteration is consolidated with the project number assigned to the other Unit Owner's work, the Unit Owner requesting the Material Unit Alteration shall bear the portion of the expense of such Part 2 application allocable to the Material Unit Alteration. Such Unit Owner shall advise the other Unit Owners of any material developments affecting the review and approval of such Part 2 application amendments, and all such Part 2 application amendments for any Material Unit Alterations shall be considered part of the Certification Application.

(c) **Non-Material Unit Alterations**. Each Unit Owner is permitted to make any Non-Material Unit Alterations to his Unit, so long as such Non-Material Unit Alterations are made in compliance with the terms, provisions and requirements of this Section 5.13(c). If any proposed alterations and improvements to a Unit is a Non-Material Unit Alteration, then in such event the applicable Unit Owner of the Unit shall have the right (at such Unit Owner's sole cost and expense) to perform Non-Material Unit Alteration to such Unit, without the consent or approval of the Association or any other Unit Owners being required; so long as **(1)** the applicable Unit Owner provides the Association, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner, and the HTC Investor Member  with copies of the plans and specifications for the work and the name(s) of the contractor(s) for the work, thirty (30) days prior to the commencement of any such work; and **(2)** at all times during the performance of the work, each contractor performing the work maintains general comprehensive liability insurance in an amount not less than One Million Dollars ($1,000,000.00), naming the Association as an additional insured, and the applicable Unit Owner provides the Association with certificate(s) of insurance evidencing that each contractor maintains such required insurance, within fifteen (15) days after the Association's request for the same. With respect to any and all Non-Material Unit Alterations which an applicable Unit Owner performs pursuant to this Section 5.13(c), the applicable Unit Owner covenants and agrees with the Association that: **(A)** the alterations and improvements shall be performed and completed in accordance with the applicable plans and specifications for the applicable Non-Material Unit Alterations, in accordance with the Historic Standards, in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements; **(B)** such work shall not impair the structural integrity of or lessen the structural support of any portion of the Building in the Condominium, and such work shall not alter or impair any mechanical systems of any of the Building; **(C)** any such alterations, additions or improvements shall not give rise to a Recapture Event (as defined above) or otherwise cause a recapture of any Historic Tax Credits relating to the Property; and **(D)** the Unit Owner (at his/her/its sole cost and expense) shall repair and remedy any damage to the Common Elements, the Limited Common Elements and/or any other Unit caused by or resulting from such work. At all times during the performance of any such work, the Association shall have the right to inspect the work, upon reasonable advance notification to the applicable Unit Owner.

**5.14 -- Rules and Regulations**. In addition to the foregoing restrictions, conditions and covenants concerning the use of the Condominium, reasonable rules and regulations supplementary thereto, which are not in conflict with the foregoing and which are not in conflict with or inconsistent with this Declaration, may be promulgated and amended from time to time by the Executive Board or the Association, as more fully

provided in Section 15.2 hereof and the By-Laws.

## ARTICLE 6 -- ASSESSMENTS

**6.1 -- Assessment for Common Expenses (All Units).**  The Association (acting by and through the Executive Board) shall levy assessments against all of the Units for Common Expense Liability for Common Expenses as established in the annual budget or any supplemental budget for operation of the Condominium, in accordance with the Allocated Interests of the Units; subject, however, to the terms, conditions and provisions of Section 1.1(40) hereof (definition of Common Expense Liability), Section 6.2 hereof, and Section 7.1 hereof.

**6.2 – Special Allocations of Specific Expenses.**  Notwithstanding the Allocated Interests of the Units, the following special allocations of applicable expenses shall apply:

(a)     **Commercial Common Expenses (Commercial Unit).**  To the extent that the Association incurs any Commercial Common Expenses in connection with the Commercial LCE, the Commercial Elevators and the Commercial Elevator Shafts, the Association (acting by and through the Executive Board) shall levy assessments against the Commercial Unit for Commercial Common Expense Liability for Commercial Common Expenses.

(b)     **Residential Common Expenses (Residential Units).**  To the extent that the Association incurs any Residential Common Expenses in connection with the Residential LCE, the Residential Elevators and the Residential Elevator Shafts, the Association (acting by and through the Executive Board) shall levy assessments against the Residential Units (in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units) for Residential Common Expense Liability for Residential Common Expenses.

(c)     **Residential Hallway & Etc. Expenses (Residential Units).**  To the extent that the Association incurs any Residential Hallway & Etc. Expenses in connection with the Residential Hallways, Corridors & Etc. Areas or for any Residential Hallways & Etc. Maintenance, the Association (acting by and through the Executive Board) shall levy assessments against the Residential Units (in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units) for Residential Hallway & Etc. Expense Liability for Residential Hallway & Etc. Expenses.

(d)     **Residential Marketing Expenses (Residential Units).**  To the extent that the Association incurs any Residential Marketing Expenses in connection with any Residential Marketing, the Association (acting by and through the Executive Board) shall levy assessments against the Residential Units (in proportion to the Residential Marketing Sub-Allocated Expense Shares of the Residential Units) for Residential Marketing Expense Liability for Residential Marketing Expenses.

(e)     **Arcade Main Lobby Security Common Expenses (Commercial Unit).**  To the extent that the Association incurs any Arcade Main Lobby Security Common Expenses for providing the Arcade Main Lobby Security or otherwise in connection with the Arcade Main Lobby Security System, the Association (acting by and through the Executive Board) shall levy assessments against the Commercial Unit for Arcade Main Lobby Security Common Expense Liability for Arcade Main Lobby Security Common Expenses.

(f)     **Arcade Main Lobby Common Expenses (All Units).**  To the extent that the Association incurs any Arcade Main Lobby Common Expenses in connection with the Arcade Main Lobby, the Association (acting by and through the Executive Board) shall levy assessments against the Units (in proportion to the Arcade Main Lobby Sub-Allocated Expense Shares of the Units) for Arcade Main Lobby Common Expense Liability for Arcade Main Lobby Common Expenses.

(g)     **Parking Common Expenses (Commercial Unit and Market Rate Unit).**  To the extent that the Association incurs any Parking Common Expenses in connection with the Parking Facilities, the

Association (acting by and through the Executive Board) shall levy assessments against the Commercial Unit and the Market Rate Unit (in proportion to the Parking Sub-Allocated Expense Shares of the Commercial Unit and the Market Rate Unit) for Parking Common Expense Liability for Parking Common Expenses.

**(h)     Water & Sewer Utility Common Expenses (All Units); Common Cleaning & Janitorial Expenses (All Units); Common HVAC Expenses (All Units); and Common Electric Expenses (All Units)**.  To the extent that the Association incurs any Water & Sewer Utility Common Expenses in connection with the Water & Sewer Utility Charges, or any Common Cleaning & Janitorial Expenses in connection with the Common Cleaning & Janitorial, or any Common HVAC Expenses in connection with the Common HVAC Facilities or providing the Common HVAC Service or performing the Common HVAC Maintenance & Operation, or any Common Electric Expenses in connection with the Common Electric Facilities or providing the Common Electric Service or performing the Common Electric Maintenance & Operation, then the Association (acting by and through the Executive Board) shall levy assessments against the Units (in proportion to the Allocated Interests of the Units) for Water & Sewer Utility Common Expense Liability for Water & Sewer Utility Common Expenses, and for Common Cleaning & Janitorial Expense Liability for Common Cleaning & Janitorial Expenses, and for Common HVAC Expense Liability for Common HVAC Expenses, and for Common Electric Expense Liability for Common Electric Expenses.

**(i)     Other Common Expenses**.  The Association (acting by and through the Executive Board) shall levy assessments against the Units (in proportion to the Allocated Interests of the Units) for any other particular expenses incurred by the Association or by any one or more of the Unit Owners in connection with the ownership, management, operation and leasing of any portion of the Building which the Unit Owners have (by their unanimous written agreement) agreed to treat as Common Expenses; provided, however, that in the event any such assessment exceeds $10,000, then: **(1)** at all times prior to the termination of the LIHTC Compliance Period, the prior written consent of the Limited Partner of the LIHTC Unit Owner is required before the LIHTC Unit Owner shall become obligated to pay any such assessments; **(2)** at all times prior to the termination of the New Markets Compliance Period, the prior written consent of the NMTC Limited Partner Designated Representative is required before the NMTC Unit Owner shall become obligated to pay any such assessments; and **(3)** during the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written consent of the Master Tenant of a Unit is required before the Unit Owner of the applicable Unit become obligated to pay any such assessments.

**(j)     Other Unit Expenses Related to Units**.  In the event that the Association incurs or pays for any expenses for any Unit Expenses of any Unit, then the Association (acting by and through the Executive Board) shall levy assessments against the applicable Unit for such Unit Expenses and the applicable Unit Owner of the applicable Unit shall pay (and reimburse the Association for) one hundred percent (100%) of such Unit Expenses incurred by the Association.  To the extent that the Association incurs or pays for any of the following expenses for a Unit, each of the following items of expense is a Unit Expense of the applicable Unit: **(1)** the janitorial and cleaning of the Commercial Unit or any portion thereof; **(2)** HVAC for the Commercial Unit or any portion thereof; **(3)** except as set forth in <u>Section 6.2(k)</u> hereof, the maintenance, repair, replacement, reconstruction, operating (<u>including</u> lighting, providing HVAC, and providing electricity and other utilities, but excluding water & sewer), and cleaning of a Unit itself (as distinguished from any Common Elements or Limited Common Elements), or of any HVAC system located within or otherwise exclusively serving a Unit, any doors within a Unit, any electric, plumbing or other system located within or otherwise exclusively serving a Unit, or any appliances located within a Unit; **(4)** except as set forth in <u>Section 6.2(k)</u> hereof, any electric and gas utility expenses for any Unit (including, but not limited to, any electric and gas utility expenses for any vacant Individual Dwelling Units within any Unit); **(5)** all cost of renovation and refurbishing of the interior areas of a Unit; **(6)** all real estate taxes assessed against a Unit; and **(7)** all debt service payments on all Security Interests encumbering a Unit; <u>provided, however, that</u>, before the Association shall incur any such expenses with respect to the LIHTC Unit, at all times prior to the termination of the LIHTC Compliance Period the written consent of the Limited Partner of the LIHTC Unit Owner must be obtained; and, before the Association shall incur any such expenses with respect to an NMTC Unit, at all times prior to the termination of the New Markets Compliance Period the written consent of the NMTC Limited Partner Designated Representative

must be obtained.

**(k)    Certain Expenses Of Residential Hallways, Corridors & Etc. Areas Are NOT Unit Expenses**.  Notwithstanding Section 6.2(j) hereof, and notwithstanding that the Residential Hallways, Corridors & Etc. Areas are located within and are part of the Residential Units, **(A)** the Common Cleaning & Janitorial Expenses of Common Cleaning & Janitorial of the Residential Hallways, Corridors & Etc. Areas is NOT a Unit Expense; **(B)** the Common HVAC Expenses of Common HVAC Maintenance & Operation and of Common HVAC Service to the Residential Hallways, Corridors & Etc. Areas is NOT a Unit Expense; **(C)** the Common Electric Expenses of Common Electric Maintenance & Operation and of Common Electric Service to the Residential Hallways, Corridors & Etc. Areas is NOT a Unit Expense; and **(D)** the Residential Hallways & Etc. Expenses of Residential Hallways & Etc. Maintenance of the Residential Hallways, Corridors & Etc. Areas is NOT a Unit Expense.

**6.3 -- Assessment Liens**.  The Executive Board shall levy assessments against the Units for Common Expense Liability as established in the annual budget for operation of the Condominium.  In addition, the Executive Board shall levy assessments against a particular Units for any Common Expense Liability that is specially allocated to the particular Unit pursuant to Section 6.2.  Such assessments shall be a lien on the Unit against which they are assessed, and if any payment thereof becomes delinquent, the lien may be foreclosed and the Unit sold, or a money judgment obtained against the Persons liable therefor, all as set forth in the By-Laws.  Assessments against a Unit (together with all applicable interest charges, late charges, administrative charges, costs and attorney's fees) shall be the personal obligation of the Unit Owner of the Unit at the time the assessment is levied.

Every assessment shall constitute a lien upon the Unit assessed from the date the assessment is levied prior to all other liens and encumbrances on the Unit except:

**(1)**    Liens and encumbrances recorded before the recordation of this Declaration;
**(2)**    A mortgage or deed of trust for the purchase of a Unit recorded before the date on which the assessment sought to be enforced becomes delinquent;
**(3)**    Liens for real state taxes and other governmental assessments or charges against the Unit; and
**(4)**    Except for delinquent assessments or fines, up to a maximum of six (6) months' assessments or fines, which are due prior to any subsequent refinancing of a Unit or for any subsequent second mortgage interest.

**6.4 -- Sale of a Unit**.  The sale or transfer of any Unit shall not affect the assessment lien against such Unit; except that, the sale or transfer of any Unit pursuant to judicial or nonjudicial foreclosure of a first lien Security Interest shall extinguish the lien of such assessments against such Unit as to assessments which became due prior to such foreclosure sale or transfer.  No sale or transfer of a Unit shall relieve such Unit from the lien for any assessments thereafter becoming due after such sale or transfer.  Where the holder of a first lien Security Interest or other purchaser of a unit obtains title pursuant to judicial or nonjudicial foreclosure of the Security Interest, such purchaser shall not be liable for the share of the Common Expenses or assessments chargeable to such Unit which became due prior to such acquisition of title.

**6.5 -- Prohibition of Exemption from Liability for Contributions Towards Common Expenses**.  No Unit Owner may exempt itself from liability for its share of the Common Expense Liability (or of the Commercial Common Expense Liability, or of the Residential Common Expense Liability) levied and assessed by the Association against the Unit owned by such Unit Owner, by waiver of the use of enjoyment of any of the Common Elements or by abandonment of its Unit.

## ARTICLE 7 – MAINTENANCE, REPAIRS, ALTERATIONS
## AND IMPROVEMENTS OF COMMON ELEMENTS AND ETC.

**7.1 -- Common Elements and Residential Hallways, Corridors & Etc. Areas by the Association**.

Subject to and except for any Self-Management or other similar arrangements approved and implemented pursuant to Section 7.2 hereof, the management, maintenance, repair, replacement, reconstruction, alteration, improvement and operation (including lighting, providing security (other than Arcade Main Lobby Security), of the Common Elements and the Common HVAC System, and providing Residential Hallways & Etc. Maintenance, providing Common HVAC Service, providing Common Electric Service, and providing other utilities), and cleaning and insuring, of the Common Elements, the Residential Common Amenity Areas, and of the Residential Hallways, Corridors & Etc. Areas shall be the responsibility of the Association on behalf of the Unit Owners, and the costs and expenses thereof shall be Common Expenses; Provided, However, that:

   (a)    All Commercial Common Expenses and Commercial Common Expense Liability incurred by the Association shall be borne solely by the Owner or Owners of the Commercial Unit.

   (b)    All Residential Common Expenses and Residential Common Expense Liability incurred by the Association shall be borne solely by the Owner or Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units. As amongst the Residential Units, each Residential Unit shall pay its Residential Sub-Allocated Expense Share portion of the Residential Common Expenses and Residential Common Expense Liability.

   (c)    Notwithstanding any other provisions of this Declaration (and even though the Residential Hallways, Corridors & Etc. Areas are part of the Residential Units), all Residential Hallway & Etc. Expenses incurred by the Association shall be borne solely by the Owner or Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units. As amongst the Residential Units, each Residential Unit shall pay its Residential Sub-Allocated Expense Share portion of the Residential Hallway & Etc. Expenses and Residential Hallway & Etc. Expense Liability.

   (d)    All Residential Marketing Expenses and Residential Marketing Expense Liability incurred by the Association shall be borne solely by the Owner or Owners of the Residential Units, in proportion to the Residential Marketing Sub-Allocated Expense Shares of the Residential Units. As amongst the Residential Units, each Residential Unit shall pay its Residential Marketing Sub-Allocated Expense Share portion of the Residential Marketing Expenses and Residential Marketing Expense Liability.

   (e)    All Arcade Main Lobby Security Common Expenses and Arcade Main Lobby Security Common Expense Liability incurred by the Association shall be borne solely by the Owner or Owners of the Commercial Unit.

   (f)    All Arcade Main Lobby Common Expenses and Arcade Main Lobby Common Expense Liability incurred by the Association shall be borne by the Owners of the Units, in proportion to the Arcade Main Lobby Sub-Allocated Expense Shares of the Units. As amongst the Units, each Unit shall pay its Arcade Main Lobby Sub-Allocated Expense Share portion of the Arcade Main Lobby Common Expenses and Arcade Main Lobby Common Expense Liability.

   (g)    All Parking Common Expenses and Parking Common Expense Liability incurred by the Association shall be borne solely by the Owner or Owners of the Commercial Unit and the Market Rate Unit, in proportion to the Parking Sub-Allocated Expense Shares of the Commercial Unit and the Market Rate Unit. As between the Commercial Unit and the Market Rate Unit, each such Unit shall pay its Parking Sub-Allocated Expense Share portion of the Parking Common Expenses and Parking Common Expense Liability.

   (h)    Notwithstanding any other provisions of this Declaration (and even though the Exterior Windows are Limited Common Element), all costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the Exterior Windows of the Building shall be and are a part of the Common Expenses to be incurred by the Association and shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units. As amongst the

Units, each Unit shall pay its Allocated Interest share or portion of the costs thereof.

(i)    Notwithstanding any other provisions of this Declaration (and even though First Floor Residential Lobby is Limited Common Element), all costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the First Floor Residential Lobby shall be and are a part of the Common Expenses to be incurred by the Association and shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units. As amongst the Units, each Unit shall pay its Allocated Interest share or portion of the costs thereof.

(j)    Notwithstanding any other provisions of this Declaration (and even though the Residential Common Amenity Areas are Limited Common Element), the costs and expenses of electricity, cleaning and HVAC for the Residential Common Amenity Areas shall be and are a part of the Common HVAC Expenses, the Common Electric Expenses and the Common Cleaning & Janitorial Expenses incurred by the Association, and shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units. As amongst the Units, each Unit shall pay its Allocated Interest share or portion of the costs thereof.

(k)    Notwithstanding any other provisions of this Declaration (and even though the Rooftop Terrace Areas and the Rooftop Terrace Structures are Limited Common Element), all costs and expenses of maintenance, repair, replacement, reconstruction, cleaning and insuring of the Rooftop Terrace Areas and the Rooftop Terrace Structures shall be and are a part of the Residential Common Expenses, allocated to and borne solely by the Owners of the Residential Units, in proportion to the Residential Sub-Allocated Expense Shares of the Residential Units. As amongst the Residential Units, each Residential Unit shall pay its Residential Sub-Allocated Expense Shares of the costs thereof.

(l)    All Water & Sewer Utility Common Expenses and Water & Sewer Utility Common Expense Liability incurred by the Association shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units. As amongst the Units, each Unit shall pay its Allocated Interests share portion of the Water & Sewer Utility Common Expenses and Water & Sewer Utility Common Expense Liability.

(m)    Notwithstanding any other provisions of this Declaration (and even though the Residential Hallways, Corridors & Etc. Areas are part of the Residential Units), all Common Cleaning & Janitorial Expenses and Common Cleaning & Janitorial Expense Liability incurred by the Association, and all Common HVAC Expenses and Common HVAC Expense Liability incurred by the Association, and all Common Electric Expenses and Common Electric Expense Liability incurred by the Association, shall be borne by the Owners of the Units, in proportion to the Allocated Interests of the Units. As amongst the Units, each Unit shall pay its Allocated Interests share portion of each of the Common Cleaning & Janitorial Expenses and Common Cleaning & Janitorial Expense Liability, the Common HVAC Expenses and Common HVAC Expense Liability, and the Common Electric Expenses and Common Electric Expense Liability incurred by the Association.

(n)    Notwithstanding any other provisions of this Declaration, if the Unit Owners have by their unanimous written agreement elected to treat any particular expenses incurred by the Association or by any one or more of the Unit Owners in connection with the ownership, management, operation and leasing of any portion of the Building as a Common Expense, then the particular expense shall be a part of the Common Expenses, allocated to and borne by each Owner according to such Owner's Allocated Interest in the Common Elements.

(o)    With respect to any other Common Expenses incurred in connection with any other Limited Common Elements (other than expenses described in the foregoing Items (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), (m) and (n) of this Section 7.1), all such other Common Expenses incurred for the maintenance, repair, replacement, reconstruction, operating (including lighting, providing security, providing HVAC, and providing electricity and other utilities) and

cleaning of, and any separate insurance for or of, such other Limited Common Elements shall be assessed against the Unit or Units to which such Limited Common Element was allocated at the time the expense was incurred, in proportion to the relative Allocated Interests of the Units benefited.

**(p)** **Common Roofs; Rooftop Terrace Areas and Rooftop Terrace Structures**.  See Section 7.5 below.

**(q)** **Common Insurance; Separate Insurance**.  Notwithstanding anything to the contrary contained in this Declaration, the costs and expenses of procuring and maintaining the common property casualty insurance of all the Common Elements, and of any other common liability insurance policy or common other insurance policy, maintained by the Association pursuant to this Declaration shall be allocated amongst the Units based on the Allocated Interests of the Units; even though the common insurance includes insurance coverage for areas that are Limited Common Element. However, the costs and expenses of procuring and maintaining any separate insurance policies that cover and apply only to specific Limited Common Element areas shall be borne solely by the Owner or Owners of the Unit or Units to which such Limited Common Elements are allocated or assigned.

**(r)** **Allocation of Combined Expenses**.  In the event that any Common Expense incurred in connection with any Limited Common Element is incurred on a combined basis with any other Common Expense, then the Association shall allocate a reasonable portion of the combined Common Expense to each applicable Limited Common Element, and among Limited Common Elements shall allocate a reasonable portion of applicable combined Common Expenses among (as appropriate) Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, and Common Expenses attributable to any Limited Common Elements, on the basis of any reasonable and equitable combination of any one or more of the following (as reasonably determined by the Association), to-wit: **(1)** reasonable equitable allocations by the vendors/suppliers of the utilities, services and products; **(2)** metering and/or sub-metering; **(3)** independent engineering analyses; **(4)** the relative square footages of the Unit areas benefited by such combined expenses; **(5)** the actual number of Individual Dwelling Units within any Residential Unit; and/or **(6)** any other objective basis as the Association reasonably deems equitable in determining such allocable pro-rata amount of such combined expenses.  In the event of a disagreement by or among the Unit Owners as to the basis for allocating such combined expenses, then, at the option of any party, the dispute shall be submitted to, resolved by and determined by a court of competent jurisdiction.

**(s)** **Failure of Association to Perform Obligations**.  In the event that the Association fails to perform any of its maintenance, repair, replacement or operation obligations under this Declaration with respect to any Common Elements or any Unit area, and if such failure is not cured within thirty (30) days after written notice from a Unit Owner to the Association and to the other Unit Owners (except in the event of an emergency, then upon such written or e-mail notification as is practicable under the circumstances), such notice setting forth with specificity the maintenance, repair, replacement or operation work with respect to Common Elements or Unit area which is required, then a Unit Owner may (but shall not be obligated to, and without in any waiving or releasing the Association from its obligations under this Declaration) perform such maintenance, repairs, replacement or operation with respect to Common Elements or Unit area as specified in the notice. The Association shall reimburse the Unit Owner for the reasonable costs and expenses of such maintenance, repairs, replacement or operation with respect to Common Elements or Unit area performed by the Unit Owner, within thirty (30) days after the Unit Owner's submission to the Association of paid invoices and other evidence of payment for such maintenance, repair, replacement or operation work. If the reimbursement payment is not paid by the Association to the Unit Owner within said 30-day period, then the unpaid amount shall bear interest at the rate of

eighteen percent (18%) per annum from the end of the 30-day period until the date paid by the Association to the Unit Owner.

**7.2 – Self-Management Provisions**.

(a)     The Association shall not unreasonably withhold its consent and approval to the Commercial Unit Owner self-managing, self-operating and self-maintaining (collectively, "Self-Managing" or "Self-Management") any specific Commercial LCE which is allocated to the exclusive use of the Commercial Unit Owner, at the expense of the Commercial Unit Owner. In connection with any such Self-Management, the Association and the Commercial Unit Owner shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the Commercial Unit Owner regarding such Self-Management of the applicable Commercial LCE. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenant of such Commercial Unit, and of the Security Holders of the first lien Security Interests encumbering such Commercial Unit or encumbering a Master's Tenant's interest in such Unit, is required in connection with any such plan and agreement.

(b)     The Association shall not unreasonably withhold its consent and approval to the Market Rate Unit Owner Self-Managing any specific Market Rate LCE which is allocated to the exclusive use of the Market Rate Unit Owner, at the expense of the Market Rate Unit Owner. In connection with any such Self-Management, the Association and the Market Rate Unit Owner shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the Market Rate Unit Owner regarding such Self-Management of the applicable Market Rate LCE. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenant of such Market Rate Unit, and of the Security Holders of the first lien Security Interests encumbering such Market Rate Unit or encumbering a Master's Tenant's interest in such Unit, is required in connection with any such plan and agreement.

(c)     The Association shall not unreasonably withhold its consent and approval to the LIHTC Unit Owners as a group Self-Managing applicable LIHTC LCE, at the expense of the LIHTC Unit Owners. In connection with any such Self-Management, the Association and the LIHTC Unit Owners shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the LIHTC Unit Owners regarding such Self-Management of the applicable LIHTC LCE. At all times prior to the termination of the LIHTC Compliance Period, the written approval of the Limited Partner of the LIHTC Unit Owner is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenant of such LIHTC Units, and of the Security Holders of the first lien Security Interests encumbering such LIHTC Units or encumbering a Master's Tenant's interest in such Units, is required in connection with any such plan and agreement.

(d)     The Association shall not unreasonably withhold its consent and approval to the Residential Unit Owners as a group Self-Managing applicable Residential LCE and/or the Residential Hallways, Corridors & Etc. Areas, at the expense of the Residential Unit Owners. In connection with any such Self-Management, the Association and the Residential Unit Owners shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the Residential Unit Owners regarding such Self-Management of the applicable Residential LCE and/or the Residential Hallways, Corridors & Etc. Areas. At all times prior to the termination of the LIHTC Compliance Period, the written approval of the Limited Partner of the LIHTC Unit Owner is required in connection with any such plan and agreement. At all times prior to the

termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of any such Residential Units, and of the Security Holders of the first lien Security Interests encumbering each such Residential Unit or encumbering a Master's Tenant's interest in any such Unit, is required in connection with any such plan and agreement.

(e)     So long as each of the Market Rate Owner and the LIHTC Owner consents and approve in writing, the Association shall not unreasonably withhold its consent and approval to the Commercial Unit Owner Self-Managing the Arcade Main Lobby and the Arcade Main Lobby Security System. In connection with any such Self-Management, the Association and the Commercial Unit Owner shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the Commercial Unit Owners regarding such Self-Management of the Arcade Main Lobby and the Arcade Main Lobby Security System. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of any of the Units, and of the Security Holders of the first lien Security Interests encumbering each of the Units or encumbering a Master's Tenant's interest in each such Unit, is required in connection with any such plan and agreement.

(f)     The Association shall not unreasonably withhold its consent and approval: (1) with the written consent of the Commercial Unit Owner, to the Market Rate Unit Owner Self-Managing the Parking Facilities; (2) with the written consent of the Market Rate Unit Owner, to the Commercial Unit Owner Self-Managing the Parking Facilities; or (3) to the Commercial Unit Owner and the Market Rate Unit Owner together Self-Managing the Parking Facilities; in each case at the expense of the Commercial Unit Owner and the Market Rate Unit Owner. In connection with any such Self-Management, the Association, the Commercial Unit Owner and the Market Rate Unit Owner shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the applicable Unit Owners regarding such Self-Management of the Parking Facilities. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of the Commercial Unit and the Market Rate Unit, and of the Security Holders of the first lien Security Interests encumbering the Commercial Unit and the Market Rate Unit or encumbering a Master's Tenant's interest in each such Unit, is required in connection with any such plan and agreement.

(g)     The Association shall not unreasonably withhold its consent and approval to applicable Unit Owners as a group Self-Managing applicable Limited Common Elements allocated or assigned to such applicable Unit Owners, at the expense of the applicable Unit Owners. In connection with any such Self-Management, the Association and the applicable Unit Owners shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the applicable Unit Owners regarding such Self-Management of the applicable Limited Common Elements. At all times prior to the termination of the LIHTC Compliance Period, the written approval of the Limited Partner of the LIHTC Unit Owner is required in connection with any such plan and agreement. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of any of the Units, and of the Security Holders of the first lien Security Interests encumbering each of the Units or encumbering a Master's Tenant's interest in such Units, is required in connection with any such plan and agreement.

(h)     Upon the written approval, request and/or direction by all of the Unit Owners, the Association shall consent to and approve one or more Unit Owners Self-Managing any specific Common

Elements or any specific Limited Common Elements. In connection with any such Self-Management, the Association and the Unit Owners shall enter into a written Self-Management plan and agreement which provides for such Self-Management, and which delineates the respective rights and responsibilities of the Association and the Unit Owners regarding such Self-Management of the applicable Common Elements or of the applicable Limited Common Elements. At all times prior to the termination of the LIHTC Compliance Period, the written approval of the Limited Partner of the LIHTC Unit Owner is required in connection with any such plan and agreement. At all times prior to the termination of the New Markets Compliance Period, the written approval of the NMTC Limited Partner Designated Representative is required in connection with any such plan and agreement. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of any of the Units, and of the Security Holders of the first lien Security Interests encumbering each of the Units or encumbering a Master Tenant's interest in such Units, is required in connection with any such plan and agreement.

(i)     Upon the written approval of all of the Unit Owners, the Association may hire a Unit Owner to manage the Condominium, or may hire a Unit Owner's management company to manage the Condominium. Upon the written agreement of all of the Unit Owners (and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated Representative), the Unit owners may provide for any other arrangement for the management of the Condominium as is practical and expedient, as determined by the Unit Owners; and the Association shall comply with the written agreement of all of the Unit Owners regarding such other arrangement for the management of the Condominium. During the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect, the prior written approval of any Master Tenants of any of the Units, and of the Security Holders of the first lien Security Interests encumbering each of the Units or encumbering a Master Tenant's interest in each such Unit, is required in connection with any such other arrangement for the management of the Condominium.

**7.3 – Incidental Damage to Units.** All incidental damage caused to a Unit by any work on or to the Common Elements done by or for the Association shall be repaired by the Association, and the cost thereof shall be a Common Expense; provided that: **(a)** if such damage is incurred by work on the Commercial LCE, the Commercial Elevators or the Commercial Elevator Shafts, then in such event the cost thereof shall be assessed as Commercial Common Expenses; **(b)** if such damage is incurred by work on the Residential Elevators or the Residential Elevator Shafts, then in such event the cost thereof shall be assessed as Residential Common Expenses; **(c)** if such damage is incurred by work on Parking Facilities, then in such event the cost thereof shall be assessed as Parking Common Expenses; and **(d)** if such damage is incurred by work on the Arcade Main Lobby, then in such event the cost thereof shall be assessed as Arcade Main Lobby Common Expenses.

**7.4 -- Waiver of Claims.** Anything herein to the contrary notwithstanding, the Association agrees that it shall make no claim against a Unit Owner or occupant, and (except as provided in Section 7.3 hereof) each Unit Owner agrees that it shall make no claim against the Association, the members of the Executive Board, officers of the Association, or employees or agents of any thereof, or against any manager retained by the Executive Board or his or its officers, directors, employees or agents, or other Unit Owners, for any loss or damage to any of the Property, or to a Unit or personal property therein, due to a peril insured against by casualty insurance purchased by the Association or by any Unit Owner to the extent of the insurance proceeds recovered under all such policies of insurance, and all such claims, to the extent of such recovery, are hereby waived and released, provided, however, that: **(a)** this waiver shall not apply to negligence, willful misconduct, vandalism or malicious mischief and shall apply only during such time as the applicable policy or policies shall contain a clause or endorsement to the effect that any such waiver and release shall not adversely affect or impair the rights of the insureds to recover thereunder; and **(b)** the foregoing waiver applies only to the extent that the loss or claim is covered by insurance, the foregoing waiver shall not apply to the deductible under any policy of insurance, and the foregoing waiver shall not apply to any claim the aggregate amount of which is Ten Thousand Dollars ($10,000.00) or less. The Association and each Unit Owner agrees that their respective insurance policies shall contain such a clause or endorsement, and each Unit Owner shall furnish evidence reasonably acceptable to the Association of the existence of such a

clause or endorsement.

**7.5    Common Roofs of Building; Rooftop Terrace Areas and Rooftop Terrace Structures**.

       **(a)**    **Common Roofs**.  All costs and expenses of maintaining, repairing and replacing the Common Roofs of the Building are Common Expenses and Common Expense Liability, to be shared in accordance with the Allocated Interests of the Units.

       **(b)**    Except for areas which are Rooftop Terrace Areas, the Unit Owners (and their respective tenants and subtenants and their respective contractors, agents and invitees) shall not enter upon the Common Roofs, and shall not use the Common Roofs, and are prohibited from entering upon and using the Common Roofs, except in all cases upon the prior written consent of the Association such consent being pursuant to the unanimous vote of the Board of Directors of the Association.

       **(c)**    **Residential Rooftop Areas and Rooftop Terrace Structures**.  Notwithstanding that the Rooftop Terrace Areas and the Rooftop Terrace Structures installed on such Rooftop Terrace Areas are Limited Common Element, all costs and expenses of maintaining, repairing and replacing the Rooftop Terrace Areas and any Rooftop Terrace Structure installed on a Rooftop Terrace Area, are Residential Common Expenses and Residential Common Expense Liability, to be shared by the Residential Units in accordance with the Residential Sub-Allocated Expense Shares of the Residential Units.

       **(d)**    The Residential Unit or Residential Units to which the applicable Rooftop Terrace Area is allocated and assigned as Limited Common Element shall have the right to construct and install Rooftop Terrace Structures on said Rooftop Terrace Area, subject to and in accordance with Section 7.6 hereof. Other than Rooftop Terrace Structures, the Residential Unit or Residential Units to which the applicable Rooftop Terrace Area is allocated and assigned shall not construct and install any other structures or improvements on the Rooftop Terrace Area, except in all events with the prior written consent and approval first obtained from the Association.

**7.6    Alterations and Improvements to Limited Common Elements**.

       **(a)**    Notwithstanding anything to the contrary contained in the Declaration, alterations and improvements to Limited Common Elements of the Condominium may be made by Unit Owners, or shall be made by the Association at the direction of Unit Owners, in accordance with the following provisions of this Section 7.6. In no event shall any alterations be made to any portion of the Property that, during the Historic Recapture Period, violates the Historic Standards, or would give rise to a Recapture Event (as defined above) respecting the Historic Tax Credits or otherwise cause a recapture of any Historic Tax Credits relating to the Property.

       **(b)**    **Limited Common Elements Allocated to One Unit**.  The following shall apply to any Limited Common Element of the Condominium that is allocated exclusively to one Unit of the Condominium:

           **(1)**    **Interior, Non-Structural & Etc. Alterations**.  If the applicable Limited Common Element is located within the interior of a Condominium Building, and if the applicable alterations and improvements to such Limited Common Element are non-structural in nature and do not alter or impair any mechanical systems of the Building in the Condominium, then in such event the applicable Unit Owner of the Unit to which the Limited Common Element is allocated shall have the right (at such Unit Owner's sole cost and expense) to perform non-structural alterations and improvements to such Limited Common Element, without the consent or approval of the Association or any other Unit Owners being required; so long as **(A)** the applicable Unit Owner provides the Association, any Master Tenant of the Unit, the Security Holder of the first lien Security Interest encumbering the Unit or encumbering a Master's Tenant's interest in such Unit, at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated Representative, with copies of the plans and specifications for the work and the name(s) of the contractor(s) for the work, thirty (30) days prior to the commencement of any such work; **(B)** during the Historic Recapture Period, the Historic Consultant and the HTC Investor Member

review the plans and specifications and determine that the applicable alterations do not require approval of the Secretary or the SHPO, or the Secretary and the SHPO have reviewed and approved an amendment to the Part 2 Approval regarding such alterations; **(C)** at all times during the performance of the work, each contractor performing the work maintains general comprehensive liability insurance in an amount not less than One Million Dollars ($1,000,000.00), naming the Association as an additional insured, and the applicable Unit Owner provides the Association with certificate(s) of insurance evidencing that each contractor maintains such required insurance, within fifteen (15) days after the Association's request for the same; and **(D)** is compliant with all applicable historic standards and requirements of the Secretary and the SHPO and the applicable Historic Standards for the Building in the Condominium and all conditions thereto.  With respect to any and all applicable alterations and improvements to such Limited Common Element which an applicable Unit Owner performs pursuant to this <u>Section 7.6(b)(1)</u>, the applicable Unit Owner covenants and agrees with the Association that: **(x)** the alterations and improvements shall be performed and completed in accordance with the applicable plans and specifications for the applicable alterations and improvements to such Limited Common Element, in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements; **(y)** such work shall not impair the structural integrity of or lessen the structural support of any portion of the Building in the Condominium, and such work shall not alter or impair any mechanical systems of the Building; and **(z)** the Unit Owner (at its sole cost and expense) shall repair and remedy any damage to the Common Elements and/or to any Unit caused by or resulting from such work.  At all times during the performance of any such work, the Association shall have the right to inspect the work, upon reasonable advance notification to the applicable Unit Owner.

        **(2)**    <u>**Exterior, Structural & Etc. Alterations**</u>.   If any proposed alterations and improvements to such Limited Common Element are structural in nature, or would alter any mechanical systems of the Building in the Condominium, or if the applicable Limited Common Element is located in any exterior area of the Condominium, then the applicable Unit Owner of the Unit to which the Limited Common Element is allocated shall have the right (at such Unit Owner's sole cost and expense) to perform the applicable alterations and improvements to such Limited Common Element, without the consent or approval of any other Unit Owners being required; so long as: **(A)** the Executive Board, during the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect any Master Tenant of the Unit, the Security Holders of the first lien Security Interests encumbering the Unit or encumbering a Master's Tenant's interest in such Unit, and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated Representative have approved in writing the plans and specifications, the contractor(s) and the construction contract(s) for such work, such approval not to be unreasonably withheld; **(B)** during the Historic Recapture Period, the Historic Consultant and the HTC Investor Member review the plans and specifications and determine that the applicable alterations do not require approval of the Secretary or the SHPO, or the Secretary and the SHPO have reviewed and approved an amendment to the Part 2 Approval regarding such alterations; **(C)** at all times during the performance of the work, each contractor performing the work maintains general comprehensive liability insurance in an amount not less than One Million Dollars ($1,000,000.00), naming the Association as an additional insured, and the applicable Unit Owner provides the Association with certificate(s) of insurance evidencing that each contractor maintains such required insurance, within fifteen (15) days after the Association's request for the same; **(D)** no Unit Owner shall enlarge or structurally modify any exterior balcony, porch or terrace without the prior written consent of the Executive Board; and **(E)** is compliant with all applicable historic standards and requirements of the Secretary and the SHPO and the applicable Historic Standards for the Building in the Condominium and all conditions thereto.  With respect to any and all such applicable alterations and improvements to such Limited Common Elements which an applicable Unit Owner performs pursuant to this <u>Section 7.6(b)(2)</u>, the applicable Unit Owner covenants and agrees with the Association that: **(x)** such alterations and improvements shall be performed and completed in accordance with the plans and specifications approved by the Association, during the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect any Master Tenant of the Unit, the Security Holders of the first lien Security Interests encumbering the Unit or encumbering a Master's Tenant's interest in such Unit, and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated

Representative, in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements; **(y)** such work does shall not impair the structural integrity of or lessen the structural support of any portion of the Building; and **(z)** the Unit Owner (at its sole cost and expense) shall repair and remedy any damage to the Common Elements and/or to any Unit caused by or resulting from such work.  At all times during the performance of any such work, the Association shall have the right to inspect the work, upon reasonable advance notification to the applicable Unit Owner.

**(c)** **Limited Common Elements Allocated to More Than One Unit**.  The following shall apply to any Limited Common Element of the Condominium that is allocated exclusively to two or more Unit Owners of Units (with the applicable Unit Owners being the "Benefited Unit Owners"):

**(1)** **Interior, Non-Structural & Etc. Alterations**.  If the applicable Limited Common Element is located within the interior of a Condominium Building, and if the applicable alterations and improvements to such Limited Common Element are non-structural in nature and do not alter or impair any mechanical systems of the Building, then in such event the applicable Benefited Unit Owners of the Units to which the Limited Common Element is allocated shall have the right by their unanimous written agreement (at such Benefited Unit Owners' sole cost and expense) to perform non-structural alterations and improvements to such Limited Common Element, without the consent or approval of the Association or any other Unit Owners being required; so long as **(A)** the applicable Benefited Unit Owners provide the Association with copies of the plans and specifications for the work and the name(s) of the contractor(s) for the work, within fifteen (15) days after the Association's request for the same; and **(B)** during the Historic Recapture Period, the Historic Consultant and the HTC Investor Member review the plans and specifications and determine that that the applicable alterations do not require approval of the Secretary or the SHPO, or the Secretary and the SHPO have reviewed and approved such alterations; and **(C)** at all times during the performance of the work, each contractor performing the work maintains general comprehensive liability insurance in an amount not less than One Million Dollars ($1,000,000.00), naming the Association as an additional insured, and the applicable Benefited Unit Owners provide the Association with certificate(s) of insurance evidencing that each contractor maintains such required insurance, within fifteen (15) days after the Association's request for the same; provided, however that if the LIHTC Unit Owner is one of the Benefited Unit Owners, then at all times prior to the termination of the LIHTC Compliance Period the prior written consent of the Limited Partner of the LIHTC Unit Owner shall be required, and if an NMTC Unit Owner is one of the Benefited Unit Owners, then at all times prior to the termination of the New Markets Compliance Period the prior written consent of the NMTC Limited Partner Designated Representative shall be required, and if the Unit owned by an applicable Benefited Unit Owner is subject to a Master Lease, then the prior written consent of the Master Tenant of the Unit, and of the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in the Unit, shall be required. With respect to any and all such applicable alterations and improvements to such Limited Common Elements which applicable Benefited Unit Owners perform pursuant to this Section 7.6(c)(1), the applicable Benefited Unit Owner covenant and agree with the Association that: **(x)** such non-structural alterations and improvements shall be performed and completed in accordance with the applicable plans and specifications for the applicable alterations and improvements to such Limited Common Element, in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements, including, without limitation, all applicable historic standards and requirements of the Secretary and the SHPO and the applicable Historic Standards for the Building in the Condominium and all conditions thereto; **(y)** such work shall not impair the structural integrity of or lessen the structural support of any portion of the Condominium Building, and such work shall not alter or impair any mechanical systems of the Building in the Condominium; and **(z)** the Benefited Unit Owners (at their sole cost and expense) shall repair and remedy any damage to the Common Elements caused by or resulting from such work.  At all times during the performance of any such work, the Association shall have the right to inspect the work, upon reasonable advance notification to the applicable Benefited Unit Owners.

**(2)** **Exterior, Structural & Etc. Alterations**.  If any proposed alterations and improvements to such Limited Common Element are structural in nature, or would alter any mechanical systems of the Building, or if the applicable Limited Common Element is located in any exterior area of the

Condominium, then the applicable Benefited Unit Owners of the Units to which the Limited Common Element is allocated shall have the right by their unanimous written agreement (at such Benefited Unit Owners' sole cost and expense) to perform the applicable alterations and improvements to such Limited Common Element, without the consent or approval of any other Unit Owners being required; so long as: **(A)** the Executive Board has approved in writing the plans and specifications, the contractor(s) and the construction contract(s) for such work, such approval not to be unreasonably withheld; **(B)** during the Historic Recapture Period, the Historic Consultant and the HTC Investor Member review the plans and specifications and determine that the applicable alterations do not require approval of the Secretary or SHPO, or the Secretary and the SHPO have reviewed and approved such alterations; **(C)** at all times during the performance of the work, each contractor performing the work maintains general comprehensive liability insurance in an amount not less than One Million Dollars ($1,000,000.00), naming the Association as an additional insured, and the applicable Benefited Unit Owners provide the Association with certificate(s) of insurance evidencing that each contractor maintains such required insurance, within fifteen (15) days after the Association's request for the same; and **(D)** no Unit Owner shall enlarge or structurally modify any exterior balcony, porch or terrace without the prior written consent of the Executive Board; provided, however, that if the LIHTC Unit Owner is one of the Benefited Unit Owners, then at all times prior to the termination of the LIHTC Compliance Period the prior written consent of the Limited Partner of the LIHTC Unit Owner shall be required, and if an NMTC Unit Owner is one of the Benefited Unit Owners, then at all times prior to the termination of the New Markets Compliance Period the prior written consent of the NMTC Limited Partner Designated Representative shall be required, and if the Unit owned by an applicable Benefited Unit Owner is subject to a Master Lease, then during the Historic Recapture Period and at all times during which a Master Lease of a Unit is in force and effect the prior written consent of the Master Tenant of the Unit, and of the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in the Unit, shall be required. With respect to any and all such applicable alterations and improvements to such Limited Common Elements which applicable Benefited Unit Owners perform pursuant to this Section 7.6(c)(2), the applicable Benefited Unit Owners covenant and agree with the Association that: **(x)** such alterations and improvements shall be performed and completed in accordance with the plans and specifications approved by the Association, in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements, including, without limitation, all applicable historic standards and requirements of the Secretary and the SHPO and the applicable Historic Standards for the Building and all conditions thereto; **(y)** such work shall not impair the structural integrity of or lessen the structural support of any portion of the Building; and **(z)** the Benefited Unit Owners (at their sole cost and expense) shall repair and remedy any damage to the Common Elements and/or to any Unit caused by or resulting from such work. At all times during the performance of any such work, the Association shall have the right to inspect the work, upon reasonable advance notification to the applicable Benefited Unit Owners.

**7.7 – Tax Attributes**. The Unit Owners alone shall be entitled to all of the tax attributes of ownership of their respective Units, any Limited Common Elements assigned thereto and their Allocated Interest in the Common Elements, including, without limitation, the right to claim depreciation or cost recovery deductions, Historic Tax Credits and Low Income Housing Tax Credits. The Association shall have no rights to claim the benefit of or to use any depreciation benefits, Historic Tax Credits and/or Low Income Housing Tax Credits that are currently or may become, available as a result of the improvements constituting part of any of the Common Elements and the Limited Common Elements and the Declarant on behalf of each Unit Owner expressly waives and relinquishes in favor of the other Unit Owners any rights to claim the benefit of or to use any depreciation benefits, Historic Tax Credits and/or Low Income Housing Tax Credits that are currently or may become, available as a result of the improvements constituting part of any of the Common Elements except to the extent of the Unit Owner's Allocated Interest, or constituting part of any of the Limited Common Elements except to the extent the same is assigned to such Unit Owner. Each Unit Owner shall have the sole right to depreciate its Unit, the Limited Common Elements assigned to its Unit and its Allocated Interest in the Common Elements. Each Unit Owner and the Association, as applicable, shall execute and deliver to any other Unit Owner any documentation required to evidence the other's right to claim depreciation benefits on improvements made or property installed by such Unit Owner.

## ARTICLE 8 -- INSURANCE

**8.1 -- Insurance.**

(a)     During the period prior to the date of completion of rehabilitation or construction of the Building, the Association shall maintain or shall cause the Unit Owners or the construction contractor to maintain builder's risk insurance insuring the Building and materials intended to become a part of the Building, in compliance with all insurance requirements of each of the first lien Security Interest encumbering the Commercial Unit, the first lien Security Interest encumbering the Market Rate Unit, the first lien Security Interest encumbering the LIHTC Units, the first lien Security Interest encumbering the Master Tenant's interest in a Master Lease of a Unit, any Master Lease of any Unit, and the organizational documents of each of the Commercial Unit Owner, the Market Rate Unit Owner and the LIHTC Unit Owners.

(b)     Not later than date of completion of rehabilitation or construction of the Building, the Executive Board in the name of the Association for the use and benefit of the Unit Owners and the other Insurance Benefited Parties shall be required to purchase and maintain a "blanket" or "master" property damage insurance policy, for improvements and betterments to the Property; which policy shall be written on a Special Form or "all risks" basis, in amounts equal to the full replacement cost of the Units and all other portions of the Property (including any permanently affixed fixtures, equipment, improvements and betterments within the Units which are owned by the Owner or Master Tenant of the Unit and which are customarily financed by first mortgages, but otherwise not including the personal property contents of the Units), the Common Elements, the Limited Common Elements, and common fixtures, equipment, personalty, and any other personal property owned by the Association; and the policy shall not include any coinsurance provisions or an "Agreed Amount Endorsement". Within a reasonable period after the date of completion of rehabilitation or construction of the Building in the Condominium, the Association shall cause to be performed an insurance historical replacement cost appraisal on the Property by an independent property appraiser to determine the revised estimated historical replacement cost of the existing Property. From time-to-time thereafter as determined by the Executive Board in its discretion, the Association shall (at the direction of the Executive Board) cause to be performed a similar insurance appraisal. The costs of such insurance appraisals of the Property shall be Common Expenses, and the Unit Owners shall pay their Allocated Interests allocable shares of the costs of such insurance appraisals of the Property. From and after the date hereof, the Executive Board shall also obtain all other insurance required: **(1)** under the first lien Security Interest encumbering each Unit or encumbering a Master's Tenant's interest in such Unit (including rental loss insurance and business interruption insurance); and **(2)** under any Master Lease of any Unit. From and after the date hereof, the Executive Board shall also obtain a Commercial General Liability insurance (CGL) policy, which policy of insurance shall insure the Association, the members of the Executive Board, their agents and employees and the Owners of all Units, and the other Insurance Benefited Parties, against any liability, including medical payments, to the public or to the owners, their invitees, tenants and any other Persons who may be on the Property for any reason whatsoever, in the use of any portion of the Property, the liability under which insurance shall be not less than One Million Dollars per occurrence, Two Million Dollars ($2,000,000) in the aggregate and Four Million Dollars ($4,000,000) for Excess/Umbrella Liability coverage. The CGL and Excess/Umbrella Liability policies shall name each of the Insurance Benefited Parties as Additional Insureds, on forms acceptable to those parties. The Builder's Risks and Property Insurance policies shall name each of the Insurance Benefited Parties: **(3)** as Additional Insured (except that each Security Holder shall be named as a mortgagee under a standard mortgage clause, provided that if any Security Holder is named as a payee on any insurance proceeds check with respect to property casualty insurance proceeds attributable to the Common Elements or to the Limited Common Elements, then such Security Holder shall be required to endorse such insurance proceeds check to the order of the Insurance Trustee); and **(4)** with respect to property casualty insurance proceeds attributable to the Units (as distinguished from the Common Elements and Limited Common Elements), as Loss Payee. The Executive Board is further authorized to purchase any other insurance coverage in such reasonable amounts as the Executive Board shall deem desirable. Premiums for such insurance shall be a Common Expense Liability to be paid from the common fund. All policies shall be written in the name of the Executive Board as Trustees for each of the Unit Owners in the Allocated Interests established in this Declaration.

(c)    To the fullest extent practicable, all insurance maintained by the Association pursuant to this Article 8 shall comply with: (1) the insurance requirements applicable to Commercial Unit under the loan documents for the first lien Security Interests encumbering the Commercial Unit or encumbering a Master Tenant's interest in the Commercial Unit; (2) the insurance requirements under any Master Lease of the Commercial Unit; and (3) all requirements of the organizational documents of the Commercial Unit Owner.

(d)    To the fullest extent practicable, all insurance maintained by the Association pursuant to this Article 8 shall comply with: (1) the insurance requirements applicable to Market Rate Unit under the loan documents for the first lien Security Interests encumbering the Market Rate Unit or encumbering a Master Tenant's interest in the Market Rate Unit; (2) the insurance requirements under any Master Lease of the Market Rate Unit; and (3) all requirements of the organizational documents of the Market Rate Unit Owner.

(e)    To the fullest extent practicable, all insurance maintained by the Association pursuant to this Article 8 shall comply with: (1) the insurance requirements applicable to LIHTC Units under the loan documents for the first lien Security Interests encumbering the LIHTC Units or encumbering a Master Tenant's interest in a LIHTC Unit; (2) the insurance requirements under any Master Lease of a LIHTC Unit, and (3) all requirements of the organizational documents of the LIHTC Unit Owners.

(f)    Notwithstanding any provision herein to the contrary, all insurance proceeds collected that are separately attributable to the Commercial Unit itself (as distinguished from any Common Elements and Limited Common Elements) shall be delivered to the Association (if a Minor Casualty) or to the Insurance Trustee (if a Major Casualty) pursuant to Section 8.3 below, provided that at the election of the first lien Security Holder of a Security Interest encumbering the Commercial Unit or encumbering a Master's Tenant's interest in such Unit, the Association or the Insurance Trustee then shall deliver said insurance proceeds pertaining exclusively to said Commercial Unit to said first lien Security Holder to the extent required in the loan documents between said first lien Security Holder and the Owner of the Commercial Unit or the Master Tenant of the Commercial Unit.

(g)    Notwithstanding any provision herein to the contrary, all insurance proceeds collected that are separately attributable to a Market Rate Unit itself (as distinguished from any Common Elements and Limited Common Elements) shall be delivered to the Association (if a Minor Casualty) or to the Insurance Trustee (if a Major Casualty) pursuant to Section 8.3 below, provided that at the election of the first lien Security Holder of a Security Interest encumbering the Market Rate Unit or encumbering a Master's Tenant's interest in such Unit, the Association or the Insurance Trustee then shall deliver said insurance proceeds pertaining exclusively to said Market Rate Unit to said first lien Security Holder of said Market Rate Unit to the extent required in the loan documents between said first lien Security Holder and the Owner of the Market Rate Unit or the Master Tenant of the Market Rate Unit.

(h)    Notwithstanding any provision herein to the contrary, all insurance proceeds collected that are separately attributable to a LIHTC Unit itself (as distinguished from any Common Elements and Limited Common Elements) shall be delivered to the Association (if a Minor Casualty) or to the Insurance Trustee (if a Major Casualty) pursuant to Section 8.3 below, provided that at the election of the first lien Security Holder of a Security Interest encumbering a LIHTC Unit or encumbering a Master's Tenant's interest in such Unit, the Association or the Insurance Trustee then shall deliver said insurance proceeds pertaining exclusively to said LIHTC Unit to said first lien Security Holder to the extent required in the loan documents between said first lien Security Holder and the Owner of the LIHTC Unit or the Master Tenant of the LIHTC Unit.

**8.2 -- Insurance Documentation**. The Executive Board upon written request shall cause to be issued a Certificate of Insurance for all Builder's Risk, Property, Commercial General Liability and Umbrella Excess Liability Insurance Policies to all Unit Owners (and to the members of a Unit Owner), and to any Security Holder of said Unit Owner requesting same, and to any other Insurance Benefited Party requesting same. Said Insurance Certificates shall name each of the Insurance Benefited Parties, as Additional Insureds on

the Commercial General Liability and Umbrella/Excess Liability policies, using Additional Insured endorsement forms acceptable to each Insurance Benefited Party, and shall also contain the standard mortgagee clause naming the Security Holder as an additional insured, and shall contain a minimum thirty (30) day cancellation notice which shall be given to each Insurance Benefited Party to whom a certificate of insurance has been issued, prior to any cancellation of said insurance. The Executive Board upon written request shall cause to be issued Evidence of Property Insurance for Builder's Risk Insurance and (when available) for Property Insurance to all Unit Owners (and to the members of a Unit Owner), and to any Security Holder of said Unit Owner requesting same, and to any other Insurance Benefited Party requesting same. Said Evidence of Property Insurance shall name each of the Insurance Benefited Parties as Additional Insured, and, with respect to property casualty insurance proceeds attributable to the Units (as distinguished from the Common Elements and Limited Common Elements) Loss Payees and Mortgagees, as required under Section 8.1(b) hereof. Said Property Insurance Policy shall contain the "special condominium endorsement," shall provide recognition of any insurance trust agreement, shall contain waiver of rights to subrogation against Unit Owners and Master Tenants, shall provide that said insurance coverage is not to be prejudiced by any act or neglect of an individual Unit Owner or Unit Owners or Master Tenant or Master Tenants which is not within the control of the Unit Owners and Master Tenants collectively and shall provide that said policy is primary in the event that any Unit Owner or any Master Tenant has coverage for the same loss. Full copies of each insurance policy, including policies of Property Insurance, shall also be provided to any Unit Owner, or any member of a Unit Owner requesting such copy, or any other Insurance Benefited Party requesting such copy, within 60 days of the policy Effective Date. **THE POLICIES, HOWEVER, SHALL NOT INSURE THE PERSONAL PROPERTY CONTENTS OF ANY UNIT.**

### 8.3 -- Appointment of Insurance Trustee.

**(a.1)** Declarant, in consideration of the funds loaned to it and in consideration of loans which may hereafter be made by various lenders to Declarant and to Unit Owners and to Master Tenants, does herewith, on behalf of itself, and the future Unit Owners of this Condominium, irrevocably constitute and appoint the initial Insurance Trustee as the initial true and lawful insurance trustee, to receive the proceeds of all fire and extended coverage insurance losses which are Major Casualty events, and does herewith require of the Executive Board that the said Board, on purchasing any fire and extended coverage policy or policies, shall notify the insurance carriers in writing to make all loss proceeds with respect to any Major Casualty events payable to the said Insurance Trustee. In the event of a loss which is a Major Casualty event, the insurance shall be adjusted by the applicable parties set forth in Section 8.3(d) below. Upon such adjustment of the insurance for such loss which is a Major Casualty event, said Insurance Trustee shall have full power and authority to collect insurance proceeds for the losses and to reimburse itself for reasonable expenses for such collection. With respect to a Major Casualty event, the Insurance Trustee shall have full power and authority to execute all documents necessary on its own behalf and on behalf of all insureds and to endorse all checks and drafts on its own behalf and on behalf of the insureds. With respect to a Major Casualty event, the Insurance Trustee shall hold the insurance proceeds in trust for Unit Owners, Master Tenants, for Security Holders, for all other Insurance Benefited Parties and for other lienholders as their interests may appear; and the Insurance Trustee shall disburse such insurance proceeds in accordance with the applicable provisions of Section 8.3(d) hereof and Article 9.

**(a.2)** The insurance proceeds with respect to any Minor Casualty event shall be paid to the Association, and the Association shall divide the insurance proceeds with respect to any Minor Casualty among the Association (with respect to the portion the insurance proceeds attributable to damage to the Common Elements and Limited Common Elements) and each Unit Owner (with respect to the portion of the insurance proceeds attributable to damage to such Unit Owner's Unit). The Association shall adjust the insurance for any loss which is a Minor Casualty event. Upon such adjustment of the insurance for such loss which is a Minor Casualty event, the Association shall have full power and authority to collect insurance proceeds for the losses and to reimburse itself for reasonable expenses for such collection. With respect to a Minor Casualty event, the Association shall have full power and authority to execute all documents necessary on its own behalf and on behalf of the insureds and to endorse all checks and drafts on its own behalf and on behalf of the insureds. With respect to a Minor Casualty event, the

Association shall hold the insurance proceeds in trust for Unit Owners, for Master Tenants, for Security Holders, for other Insurance Benefited Parties and for and other lienholders as their interests may appear; and the Association shall disburse such insurance proceeds in accordance with the applicable provisions of Section 8.3(d) hereof and Article 9.

(a.3)   Unless otherwise agreed in writing by all Insurance Approval Parties, and subject to the provisions of Article 9 hereof, the proceeds attributable to Common Elements and Limited Common Elements shall be disbursed first for the repair or restoration of the damaged property, and Unit Owners, Master Tenants, Security Holders and other lienholders are not entitled to receive payment of said proceeds attributable to Common Elements and Limited Common Elements, unless there is a surplus of proceeds after the Common Elements and Limited Common Elements have been completely repaired or restored, or the Condominium is terminated.  The Insurance Trustee may disburse funds pursuant to Section 9.1 (in the event proceeds are sufficient for reconstruction); provided, however that, notwithstanding any other provisions thereof: **(X)** with respect to any Major Casualty Event, all disbursements of funds by the Insurance Trustee for payment of repair or reconstruction of Common Elements and Limited Common Elements shall require the prior written approval of all of the Units Owners, the Master Tenant of any Unit which is subject to a Master Lease, and each of the following parties (to the extent applicable to an applicable Unit) at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and during the Historic Recapture Period the HTC Investor Member of a Master Tenant; and **(Y)** the Association and the Insurance Trustee shall require the funds to be disbursed pursuant to disbursement escrows or to be disbursed only against surety bonds, completion guarantees, or such other assurances as may satisfy the Insurance Trustee, and the Insurance Trustee shall require that the repair or reconstruction comply with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

**(b)**   In addition, notwithstanding anything to the contrary contained herein, in the event of damage to Common Elements and Limited Common Elements the cost of repair and reconstruction of which exceeds Three Million ($3,000,000) in respect to any one casualty event, the Insurance Trustee shall endeavor to obtain the written consent and approval of the Security Holders of the first lien Security Interests encumbering each of the Units or encumbering a Master's Tenant's interest in each such Unit, to the Insurance Trustee's disbursements of the insurance proceeds attributable to such damage to Common Elements and Limited Common Elements; provided that, if said Security Holders of the first lien Security Interests do not consent and approve the disbursements of the insurance proceeds attributable to such damage to Common Elements and Limited Common Elements, then Insurance Trustee shall proceed to disburse the insurance proceeds attributable to such damage for the repair and replacement of the damaged Common Elements and Limited Common Elements, without the written consent and approval of the Security Holders of the first lien Security Interests being required.

**(c)**   [Intentionally Deleted.]

**(d)**   **When an insured loss or damage to any Common Element or Limited Common Element or Unit occurs, then the following**:

**(1)**   If the estimated cost of repair and restoration of the casualty damage exceeds One Hundred Thousand Dollars ($100,000), then the Association shall notify all Insurance Benefited Parties of the occurrence of the casualty.

**(2)**   The insurance proceeds shall be made payable to the parties as required provided in this Section 8.3(d), and shall be equitably allocated by the Association (if a Minor Casualty) or by the Insurance Trustee (if a Major Casualty) as follows: **(A)** insurance proceeds pertaining exclusively to the Commercial Unit shall be made available solely for repair and reconstruction of the Commercial Unit; **(B)** insurance proceeds pertaining exclusively to the Market Rate Unit shall be made available solely for repair and reconstruction of the Market Rate Unit; **(C)** insurance proceeds pertaining exclusively to each LIHTC Unit shall be made available solely for repair and reconstruction of the LIHTC Unit; and **(D)** all other insurance proceeds, including (but not limited to) insurance proceeds pertaining in whole or in part to the Common

Elements and Limited Common Elements.

(3.1)    If the casualty damage affects only the Commercial Unit, and if there is a Master Lease in force and effect with respect to the Commercial Unit at the time of the casualty damage, then: **(A)** if the casualty is a Major Casualty with respect to such Unit, then the following parties shall have the sole and exclusive right to adjust, and to determine the use, payment, disbursement and disposition of, the insurance proceeds attributable to the damage to the Commercial Unit, to-wit: the Security Holder of the first lien Security Interest encumbering the Commercial Unit and the Commercial Unit Owner; **(B)** if the casualty is a Major Casualty with respect to such Unit or if a Loan Default then exists under the first lien Security Interest encumbering such Commercial Unit, then (unless the Security Holder of first lien Security Interest encumbering the Commercial Unit and the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Unit approve otherwise in writing) the insurance proceeds pertaining exclusively to said Commercial Unit shall be delivered to the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Commercial Unit (to act as insurance trustee with respect to such insurance proceeds); and **(C)** if the casualty is a Minor Casualty with respect to such Unit, then the insurance proceeds pertaining exclusively to said Commercial Unit shall be delivered to the Unit Owner of such Commercial Unit, or to the first lien Security Holder of said Commercial Unit to the extent required under the loan documents of said first lien Security Holder of said Commercial Unit. In any such event, the Commercial Unit Owner shall repair and restore the Commercial Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

(3.2)    If the casualty damage affects only the Commercial Unit, and if there is NOT a Master Lease in force and effect with respect to the Commercial Unit at the time of the casualty damage, then: **(A)** if the casualty is a Major Casualty with respect to such Unit, then the following parties shall have the sole and exclusive right to adjust, and to determine the use, payment, disbursement and disposition of, the insurance proceeds attributable to the damage to the Commercial Unit, to-wit: the Security Holder of the first lien Security Interest encumbering the Commercial Unit and the Commercial Unit Owner; **(B)** if the casualty is a Major Casualty with respect to such Unit or if a Loan Default then exists under the first lien Security Interest encumbering such Commercial Unit, then, at the election of such Security Holder of said first lien Security Interest encumbering the Commercial Unit, the insurance proceeds pertaining exclusively to said Commercial Unit shall be delivered to said first lien Security Holder of said Commercial Unit; and **(C)** if the casualty is a Minor Casualty with respect to such Unit, then the insurance proceeds pertaining exclusively to said Commercial Unit shall be delivered to the Commercial Unit Owner, or to the first lien Security Holder of said Commercial Unit to the extent required under the loan documents of said first lien Security Holder of said Commercial Unit. In any such event, the Commercial Unit Owner shall repair and restore the Commercial Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

(4.1)    If the casualty damage affects only the Market Rate Unit, and if there is a Master Lease in force and effect with respect to the Market Rate Unit at the time of the casualty damage, then: **(A)** if the casualty is a Major Casualty with respect to such Unit, then the following parties shall have the sole and exclusive right to adjust, and to determine the use, payment, disbursement and disposition of, the insurance proceeds attributable to the damage to the Market Rate Unit, to-wit: the Security Holder of the first lien Security Interest encumbering the Market Rate Unit and the Market Rate Unit Owner; **(B)** if the casualty is a Major Casualty with respect to such Unit or if a Loan Default then exists under the first lien Security Interest encumbering such Market Rate Unit, then (unless the Security Holder of first lien Security Interest encumbering the Market Rate Unit and the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Unit approve otherwise in writing) the insurance proceeds pertaining exclusively to said Market Rate Unit shall be delivered to the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Market Rate Unit (to act as insurance trustee with respect to such insurance proceeds); and **(C)** if the casualty is a Minor

Casualty with respect to such Unit, then the insurance proceeds pertaining exclusively to said Commercial Unit shall be delivered to the Market Rate Unit Owner, or to the first lien Security Holder of said Market Rate Unit to the extent required under the loan documents of said first lien Security Holder of said Market Rate Unit. In any such event, the Market Rate Unit Owner shall repair and restore the Market Rate Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

**(4.2)** If the casualty damage affects only the Market Rate Unit, and if there is NOT a Master Lease in force and effect with respect to the Market Rate Unit at the time of the casualty damage, then: **(A)** if the casualty is a Major Casualty with respect to such Unit, then the following parties shall have the sole and exclusive right to adjust, and to determine the use, payment, disbursement and disposition of, the insurance proceeds attributable to the damage to the Market Rate Unit, to-wit: the Security Holder of the first lien Security Interest encumbering the Market Rate Unit and the Market Rate Unit Owner; **(B)** if the casualty is a Major Casualty with respect to such Unit or if a Loan Default then exists under the first lien Security Interest encumbering such Market Rate Unit, then, at the election of such Security Holder of said first lien Security Interest encumbering the Market Rate Unit, the insurance proceeds pertaining exclusively to said Market Rate Unit shall be delivered to said first lien Security Holder of said Market Rate Unit; and **(C)** if the casualty is a Minor Casualty with respect to such Unit, then the insurance proceeds pertaining exclusively to said Market Rate Unit shall be delivered to the Market Rate Unit Owner, or to the first lien Security Holder of said Commercial Unit to the extent required under the loan documents of said first lien Security Holder of said Market Rate Unit. In any such event, the Market Rate Unit Owner shall repair and restore the Market Rate Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

**(5)** If the casualty damage affects only the LIHTC Unit, then: **(A)** if the casualty is a Major Casualty with respect to such Unit, then the following parties shall have the sole and exclusive right to adjust, and to determine the use, payment, disbursement and disposition of, the insurance proceeds attributable to the damage to the LIHTC Unit, to-wit: the Security Holder of the first lien Security Interest encumbering the LIHTC Unit, the LIHTC Unit Owner, and during the LIHTC Compliance Period the Limited Partner of the LIHTC Unit; **(B)** if the casualty is a Major Casualty with respect to such Unit or if a Loan Default then exists under the first lien Security Interest encumbering such LIHTC Unit, then, at the election of such Security Holder of said first lien Security Interest encumbering the LIHTC Unit, the insurance proceeds pertaining exclusively to said LIHTC Unit shall be delivered to said first lien Security Holder of said LIHTC Unit; and **(C)** if the casualty is a Minor Casualty with respect to such Unit, then the insurance proceeds pertaining exclusively to said LIHTC Unit shall be delivered to the LIHTC Unit Owner, or to the first lien Security Holder of said LIHTC Unit to the extent required under the loan documents of said first lien Security Holder of said LIHTC Unit. In any such event, the LIHTC Unit Owner shall repair and restore the LIHTC Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

**(6)** If the casualty damage affects Common Elements and/or Limited Common Elements only, or affects Common Elements (and/or any Limited Common Elements) and a Unit, then the following provisions shall apply:

**(A)** If the casualty is a Minor Casualty affecting Common Elements and Limited Common Elements only, then the Association shall adjust the amount of insurance proceeds, and the insurance proceeds attributable to such damage shall be paid directly to the Association for the repair and restoration by the Association of said Common Elements and Limited Common Elements in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J** (and the Insurance Trustee shall pay to the Association any such insurance proceeds which are paid to the Insurance Trustee attributable to such Minor Casualty damage to the Common Elements and Limited Common Elements).

**(B)** If the casualty is a Minor Casualty affecting Common Elements, Limited

Common Elements and affecting one or more Units, then the Association and the affected Unit Owners shall adjust the amount of insurance proceeds, and **(1)** the insurance proceeds attributable to such damage to the Common Elements and Limited Common Elements shall be paid directly to the Association, for the repair and restoration by the Association of said Common Elements and Limited Common Elements in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J** (and the Insurance Trustee shall pay to the Association any such insurance proceeds which are paid to the Insurance Trustee attributable to such Minor Casualty damage to the Common Elements and Limited Common Elements); and **(2)** with respect to the insurance proceeds attributable to damage to a Unit, the Association and/or the Insurance Trustee shall pay the insurance proceeds attributable to the applicable party or parties entitled to the same under the foregoing provisions of Clauses (3.1) (3.2), (4.1), (4.2) and (5) of this Section 8.3(d), for the repair and restoration by the applicable Unit Owner of its Unit in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

        **(C)**    If the casualty damage is a Major Casualty, then the Association shall be primarily responsible for the negotiation of the adjustment of the amount of insurance proceeds, but the final agreement on the adjustment of the amount of insurance proceeds shall be subject to the unanimous written agreement of all of the Insurance Approval Parties (such approval not to be unreasonably withheld, conditioned or delayed).

        **(D)**    If the casualty damage to Common Elements and Limited Common Elements is a Major Casualty, then either: **(1)** if the Insurance Approval Parties unanimously approve in writing, then the portion of the Insurance proceeds attributable to the Common Elements and Limited Common Elements shall be disbursed by the Insurance Trustee to the Association for repair and restoration of the Common Elements and Limited Common Elements by the Association in accordance with Section 9.1(d) hereof; or **(2)** otherwise, the Insurance Trustee shall be responsible for causing the repair and restoration of the Common Elements and Limited Common Elements in accordance with Section 9.1(d) hereof.

    **(e)**    The initial or any successor Insurance Trustee may be removed by the unanimous written agreement of all of the Insurance Approval Parties; and, in the event of any such removal, the successor Insurance Trustee shall be appointed by the unanimous written agreement of all of the Insurance Approval Parties. The initial Insurance Trustee shall have the right to resign or appoint a replacement trustee as successor Insurance Trustee with full power of substitution as a successor Insurance Trustee with like powers. In the event that the Insurance Trustee fails to appoint a successor Insurance Trustee, then the successor shall be appointed by the unanimous written agreement of all of the Insurance Approval Parties. All handling of insurance proceeds shall be at no expense to the Insurance Trustee, except that the cost of security bonds, completion guarantees, title escrow distribution charges, if any, shall be at the expense of the Association. Under no circumstances shall the Insurance Trustee be liable for any act or omission except for fraud, gross negligence or wilful misconduct. All insurance shall be placed with companies licensed in the State of Missouri.

**8.4 -- Personal Property Insurance**. Each Unit Owner (at its own cost and expense) shall obtain and maintain: **(a)** its own insurance on the personal property contents of its Unit; **(b)** [intentionally deleted]; and **(c)** its own insurance on any personal property belonging to it, but stored elsewhere on the Property; and the Association shall have no obligation or responsibility to obtain and maintain any such insurance. Within ten (10) days after the from time-to-time request of the Association, each Unit Owner shall provide the Association with copies of the policy or policies of insurance or certificates thereof, evidencing such insurance so required to be maintained by such Unit Owner. The term "personal property" as used in this Article 8 excludes any permanently affixed fixtures, equipment, improvements and betterments within the Units which are owned by the Owner or Master Tenant of the Unit. Pursuant to Section 8.1 hereof, the Association maintains the property insurance for said permanently affixed fixtures, equipment, improvements and betterments within the Units which are owned by the Owner or Master Tenant of the Unit.

**8.5 -- Liability Insurance for Units**.

(a)      **Liability Insurance for Commercial Unit**.  At all times, the Unit Owner of the Commercial Unit shall maintain (at its sole cost and expense), and shall require and cause each tenant occupying any portion of such Commercial Unit to maintain (at such tenant's sole cost and expense), industry standard commercial general liability insurance, which insurance shall be not less than One Million Dollars ($1,000,000) per occurrence, Two Million Dollars ($2,000,000) in the aggregate and Four Million Dollars ($4,000,000) for Excess/Umbrella Liability limits covering the use and operation of the Commercial Unit owned by such Unit Owner or the applicable portion thereof occupied by such tenant.  At all times, the Unit Owner of the Commercial Unit shall name, and shall require and cause each tenant to name, each of the other Insurance Benefited Parties, as additional insureds on such commercial general liability policy or policies of insurance.  Within ten (10) days after the from time-to-time request of the Association, the Unit Owner of the Commercial Unit shall provide, and shall require and cause each tenant to provide, the Association with copies of the policy or policies of insurance or certificates thereof, evidencing such insurance so required to be maintained by such Unit Owner and its tenants.  The Association shall have the right from time-to-time to prescribe uniform minimum coverage amounts for the commercial general liability insurance to be maintained by the Unit Owner pursuant to this Section 8.5(a).

(b)      **Liability Insurance for Market Rate Unit**.  At all times, the Unit Owner of the Market Rate Unit shall maintain (at its sole cost and expense) industry standard commercial general liability insurance, which insurance shall be not less than One Million Dollars ($1,000,000) per occurrence, Two Million Dollars ($2,000,000) in the aggregate and Four Million Dollars ($4,000,000) for Excess/Umbrella Liability limits covering the use and operation of the Market Rate Unit owned by such Unit Owner.  At all times, the Unit Owner of the Market Rate Unit shall name each of the other Insurance Benefited Parties as additional insureds on such commercial general liability policy or policies of insurance.  Within ten (10) days after the from time-to-time request of the Association, the Unit Owner of the Market Rate Unit shall provide the Association with copies of the policy or policies of insurance or certificates thereof, evidencing such insurance so required to be maintained by such Unit Owner.  The Association shall have the right from time-to-time to prescribe uniform minimum coverage amounts for the commercial general liability insurance to be maintained by the Unit Owner pursuant to this Section 8.5(b).

(c)      **Liability Insurance for LIHTC Units**.  At all times, the Unit Owners of the LIHTC Units shall maintain (at its sole cost and expense) industry standard commercial general liability insurance (for the LIHTC Units as a group), which insurance shall be not less than One Million Dollars ($1,000,000) per occurrence, Two Million Dollars ($2,000,000) in the aggregate and Four Million Dollars ($4,000,000) for Excess/Umbrella Liability limits covering the use and operation of the LIHTC Units owned by such Unit Owners.  At all times, the Unit Owners of the LIHTC Units shall name each of the other Insurance Benefited Parties as additional insureds on such commercial general liability policy or policies of insurance.  Within ten (10) days after the from time-to-time request of the Association, the Unit Owners of the LIHTC Units shall provide the Association with copies of the policy or policies of insurance or certificates thereof, evidencing such insurance so required to be maintained by such Unit Owners.  The Association shall have the right from time-to-time to prescribe uniform minimum coverage amounts for the commercial general liability insurance to be maintained by the Unit Owners pursuant to this Section 8.5(c).

## ARTICLE 9 -- DAMAGE, DESTRUCTION, REPAIR AND TERMINATION

**9.1 -- General**.

(a)      Any portion of the Condominium for which insurance is required under Section 8.1 which is damaged or destroyed shall be repaired or replaced promptly by the Association or by the applicable Unit Owner, unless: **(1)** the Condominium is terminated, or **(2)** repair or replacement would be illegal under any state or local health or safety statute or ordinance, or **(3)** Unit Owners owning eighty percent (80%) of the Votes in the Association, including every owner of a Unit or assigned Limited Common Element which will not be rebuilt, Vote not to rebuild pursuant to Section 9.2 hereof.  The cost of repair or replacement in excess of insurance proceeds and reserves shall be a Common Expense Liability.  If the entire

Condominium is not repaired or replaced, then: **(AA)** the insurance proceeds attributable to the damaged Common Elements and Limited Common Elements shall be used to restore the damaged area to a condition compatible with the remainder of the Condominium, **(BB)** the insurance proceeds attributable to Units and Limited Common Elements which are not rebuilt shall be distributed to the Owners of those Units, and the Owners of the Units to which those Limited Common Elements were allocated, and **(CC)** the remainder of the proceeds shall be distributed to all the Unit Owners, Security Holders or lienholders, as their interests may appear, in proportion to Termination Shares (as defined in Section 9.2 hereof) of all Units. If the Unit Owners Vote not to rebuild any Unit in its entirety, then the Unit Owner of the applicable Unit which is not rebuilt shall have the right (but not the obligation) to rebuild its Unit, so long as reconstruction is substantially completed within one hundred eighty (180) days after the date on which the applicable Unit Owner receives insurance proceeds under the preceding Clause (bb). If the Unit Owners Vote not to rebuild any Unit in its entirety, then (unless the applicable Unit Owner rebuilds its Unit pursuant to the immediately preceding sentence) at the end of the 180-day period in the immediately preceding sentence the applicable Unit's Allocated Interest are automatically reallocated upon the Vote as if the Unit had been condemned under Article 10 hereof and the Association shall promptly prepare, execute and Record an amendment to the Declaration reflecting the reallocation. **Notwithstanding the provisions of this Section 9.1, the provisions of Section 9.2 hereof govern the distribution of insurance proceeds if the Condominium is terminated**.

**(b)** In the event of casualty or partial condemnation to the Building, unless all of the Owners of all of the Units in the Building agree not to repair or restore such Building, then each Unit Owner of the Building shall be obligated to repair and restore its Unit as nearly as reasonably practicable, to its conditions prior to such event at its sole cost and expense and such Unit Owner shall be entitled to use any available insurance proceeds which pertain to such Unit which it receives from the Insurance Trustee to pay some or all of such costs; provided, however, that each Unit Owner's repair and restoration obligation as aforesaid under this sentence of this Section 9.1 is subject to prior satisfaction of the condition that the Association has first caused to be repaired and restored Common Elements and Limited Common Elements of the Building to the extent that repair and restoration of such Common Elements and Limited Common Elements is required in order for the Unit Owner to repair and restore its Unit.

**(c)** The "Reconstruction Plan Approval Parties" with respect to an applicable Unit are each of the following parties (to the extent applicable to such Unit), to-wit: (1) the Association, (2) the Unit Owner of the Unit, (3) any Master Tenant of the Unit, (4) the Security Holders of the first lien Security Interests encumbering the Unit or encumbering the Master Tenant's interest in such Unit, (5) at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner, (6) during the New Markets Compliance Period the NMTC Limited Partner Designated Representative, and (7) during the Historic Recapture Period each HTC Investor of the Unit Owner.

**(d)** If the casualty damage to Common Elements and Limited Common Elements is a Minor Casualty, then the Association shall restore applicable damaged Common Element and Limited Common Element areas to substantially the same condition as existed prior to the casualty. If the casualty damage to the Common Elements and Limited Common Elements is a Major Casualty, and if the Insurance Approval Parties unanimously approve in writing disbursement of the insurance proceeds by the Insurance Trustee to the Association, then the Association shall restore applicable damaged Common Element and Limited Common Element areas to substantially the same condition as existed prior to the casualty. If the casualty damage to the Common Elements and Limited Common Elements is a Major Casualty, and if the Insurance Approval Parties do not unanimously approve in writing disbursement of the insurance proceeds by the Insurance Trustee to the Association, then, so long as the Casualty Restoration Conditions and Requirements set forth in **Exhibit J** annexed hereto are satisfied, the Insurance Trustee shall cause the repair and restoration of the applicable damaged Common Element and Limited Common Element areas to substantially the same condition as existed prior to the casualty. All such repair and restoration work shall be performed by the Association or by the Insurance Trustee in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

**(e)** Each applicable Unit Owner shall restore the applicable damage to its Unit to substantially the same condition as existed prior to the casualty; and, if appropriate under the circumstances based on

the extent of the casualty, the applicable Unit Owner shall cause construction plans and specifications to be prepared for such work, which construction plans and specifications shall be subject to the approval of the Reconstruction Plan Approval Parties for such Unit Owner. All such repair and restoration work shall be performed by the applicable Unit Owner in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**.

(f)     All repair and reconstruction work shall be performed in a good and workmanlike manner, free and clear of all mechanic's liens, in compliance with all applicable laws, regulations, building codes and building permit requirements, including, without limitation, all applicable historic standards and requirements of the Secretary and the SHPO and the applicable Historic Standards for the Building and all conditions thereto, and in accordance with the Casualty Restoration Conditions and Requirements annexed hereto as **Exhibit J**. The Insurance Trustee shall require the insurance proceeds funds to be disbursed pursuant to disbursement escrows or to be disbursed only against surety bonds, completion guarantees, or such other assurances as may satisfy the Insurance Trustee.

## 9.2 -- Termination.

(a)     The Condominium may be terminated only by: **(1)** agreement of Unit Owners of Units to which at least ninety percent (90%) of the Votes are allocated; **(2)** written approval of the Security Holders of the first lien Security Interests encumbering the Commercial Unit; **(3)** written approval of the Security Holders of the first lien Security Interests encumbering the Market Rate Unit; **(4)** written approval of the Security Holders of the first lien Security Interests encumbering the LIHTC Units; **(5)** at all times prior to the termination of the LIHTC Compliance Period the written approval of the Limited Partner of the LIHTC Unit Owner; and **(6)** during the NMTC Compliance Period written approval of the NMTC Limited Partner Designated Representative; provided however, that: **(A)** during the Historic Recapture Period, the agreement of one hundred percent (100%) of the Unit Owners and Votes shall be required and the consent of the HTC Investor Member shall be required; and **(B)** the Condominium shall be terminated in accordance with Section 9.2(b) hereof following the occurrence of a substantial casualty, except as otherwise provided in said Section 9.2(b) hereof.

(b)     **Termination By Reason of Substantial Casualty**. Notwithstanding Section 9.2(a) hereof, in the event of the occurrence of a substantial casualty after the expiration of the Historic Recapture Period, if substantial completion of restoration of all of the Building (restoration of all Units, all Common Elements and all Limited Common Elements) following such casualty would take more than eighteen (18) months of construction to complete, then the Condominium shall be terminated (and the Unit Owners shall enter into, execute and record a termination agreement) based on the occurrence of such substantial casualty without the necessity of the approval of such termination by the parties identified in Items (1) to (6) of Section 9.2(a) hereof, unless the parties identified in Items (1) to (6) of Section 9.2(a) hereof agree in writing not to terminate the Condominium by reason of the occurrence of such casualty. In the event of a dispute or disagreement among the parties identified in Items (1) to (6) of Section 9.2(a) hereof as to whether substantial completion of restoration of the Building following a casualty would take more than eighteen (18) months of construction to complete, the matter shall be submitted to and determined by binding arbitration.

(c)     **Termination Shares**. Upon termination of the Condominium, the "Termination Share" of each applicable Unit is the amount determined in accordance with the following provisions. The "Project" is the initial renovation and rehabilitation of the Building performed by the Unit Owners after the recordation of this Declaration, and prior to the initial occupancy of the Units. As part of the Project, the Unit Owners shall execute and provide a final sworn statement of costs (the "Final Cost Statement"), which shall include: **(1)** the total cost of the Project (the "Total Project Cost"); **(2)** the portion of such Total Project Cost which was paid by or in behalf of the Commercial Unit Owner and which is being allocated to the Commercial Unit (the "Commercial Unit Share of Project Cost"); **(3)** the portion of such Total Project Cost which was paid by or in behalf of the Market Rate Unit Owner and which is being allocated to the Market Rate Unit (the "Market Rate Unit Share of Project Cost"); and **(4)** the portion of such Total Project Cost which was paid by or in behalf of the LIHTC Unit Owners and which is being allocated to the LIHTC Units and the amount allocated to each separate LIHTC Unit (for each separate LIHTC Unit, the "LIHTC Unit Share of Project Cost").

The Final Cost Statement, and the amounts included therein as and for the Total Project Cost, the Commercial Unit Share of Project Cost, the Market Rate Unit Share of Project Cost, and for each separate LIHTC Unit the LIHTC Unit Share of Project Cost, are each subject to the review and written approval thereof by the parties identified in Items (1) to (6) of Section 9.2(a) hereof.  Once approved in writing by each of said parties, the as-approved Final Cost Statement is the "Approved Final Cost Statement", and the amounts listed in the Approved Final Cost Statement shall be the final approved Total Project Cost, the Commercial Unit Share of Project Cost, the Market Rate Unit Share of Project Cost, and for each separate LIHTC Unit the LIHTC Unit Share of Project Cost.  The aggregate sum of the Commercial Unit Share of Project Cost, the Market Rate Unit Share of Project Cost, and the total of the LIHTC Unit Shares of Project Cost for all of the LIHTC Units, each as set forth in the Approved Final Cost Statement, shall when added together be equal to the Total Project Cost set forth in the Approved Final Cost Statement.

The Termination Share of the Commercial Unit is the fraction, the numerator of which is the Commercial Unit Share of Project Cost set forth in the Approved Final Cost Statement, and the denominator of which is the Total Project Cost set forth in the Approved Final Cost Statement.

The Termination Share of the Market Rate Unit is the fraction, the numerator of which is the Market Rate Unit Share of Project Cost set forth in the Approved Final Cost Statement, and the denominator of which is the Total Project Cost set forth in the Approved Final Cost Statement.

The Termination Share of each applicable LIHTC Unit is the fraction, the numerator of which is the LIHTC Unit Share of Project Cost for such LIHTC Unit set forth in the Approved Final Cost Statement, and the denominator of which is the Total Project Cost set forth in the Approved Final Cost Statement.

The aggregate total of the Termination Share of the Commercial Unit, the Termination Share of the Market Rate Unit and the aggregate of the Termination Shares of the LIHTC Units, is One Hundred Percent (100%).

(d)      An agreement to terminate shall be evidenced by the execution of a termination agreement or ratifications thereof, in the same manner as a deed, by the requisite number of Unit Owners and by the parties identified in Items (2) to (6) of Section 9.2(a) hereof.  A termination agreement and ratifications thereof shall be Recorded in the office of the Real Estate Records of the City of St. Louis, Missouri.

(e)      The termination agreement may provide that all of the Common Elements and Units of the Condominium shall be sold following termination.

(f)      The Association, on behalf of and with the consent of the Unit Owners, may contract for the sale of real estate in the Condominium, but the contract is not binding on the Unit Owners until approved pursuant to Section 9.2(a) and Section 9.2(d), including the written approvals by the other parties specified in Section 9.2(a). If any real estate in the Condominium is to be sold following termination, title to that real estate, upon termination, vests in the Association as trustee for the holders of all interests in the Units. Thereafter, the Association has all powers necessary and appropriate to effect the sale.  Until the sale has been concluded and the proceeds thereof distributed, the Association continues in existence with all powers it had before termination.  Proceeds of the sale shall be distributed to Unit Owners, Security Holders, and other lienholders, as applicable, as their interests may appear, in proportion to the respective Termination Shares of the Unit Owners. Unless otherwise specified in the termination agreement, each Unit Owner and its successors in interest have an exclusive right to occupancy of the portion of the Property which formerly constituted its Unit.  During the period of that occupancy, each Unit Owner and its successors in interest remain liable for all assessments and other obligations imposed on Unit Owners by the Act, this Declaration and the By-Laws.

(g)      If the Property constituting this Condominium is not to be sold following termination, title to the Common Elements and, if this Condominium contains only Units having horizontal boundaries described in the Declaration, title to all the Property in the Condominium vests upon termination in the Unit Owners as tenants in common in proportion to their respective Termination Shares as provided in Section 9.2(c), and liens on the Units shift accordingly.  While the tenancy in common exists, each Unit Owner and its

successors in interest have an exclusive right or to occupancy of the portion of the Property which formerly constituted its Unit.

(h)    Following termination of this Condominium the proceeds of any sale of real estate, together with the assets of the Association (including insurance proceeds), are held by the Association as trustee for Unit Owners, Master Tenants, Security Holders, and other lienholders on the Units as their interests may appear, in proportion to the respective Termination Shares of the Unit Owners, which monies shall be disbursed and paid as follows:

(1)    **Amounts to be disbursed with respect to the Termination Shares attributable to the LIHTC Units shall be paid as follows**:

<u>First</u>, to the Security Holder of the first lien Security Interest encumbering such Unit to the extent required under the loan documents for such Security Interest;

<u>Second</u>, to the Security Holder of the junior Security Interests encumbering such Unit to the extent required under the loan documents for such Security Interests;

<u>Third</u>, to the LIHTC Unit Owner and the Master Tenant (if any), as their interests may appear in accordance with the applicable Master Lease.

(2)    **Amounts to be disbursed with respect to the Termination Share attributable to the Commercial Unit shall be paid as follows**:

<u>First</u>, to the Security Holder of the first lien Security Interest encumbering the Unit Owner's fee interest in such Unit to the extent required under the loan documents for such Security Interest;

<u>Second</u>, to the Security Holder of the junior Security Interests encumbering the Unit Owner's fee interest in such Unit to the extent required under the loan documents for such Security Interests;

<u>Third</u>, to the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Unit to the extent required under the loan documents for such Security Interest;

<u>Fourth</u>, to the Security Holder of the junior Security Interests encumbering the Master Tenant's interest in such Unit to the extent required under the loan documents for such Security Interests;

<u>Fifth</u>, to the Unit Owner and the Master Tenant (if any), as their interests may appear in accordance with the applicable Master Lease.

(3)    **Amounts to be disbursed with respect to the Termination Share attributable to the Market Rate Unit shall be paid as follows**:

<u>First</u>, to the Security Holder of the first lien Security Interest encumbering the Unit Owner's fee interest in such Unit to the extent required under the loan documents for such Security Interest;

<u>Second</u>, to the Security Holder of the junior Security Interests encumbering the Unit Owner's fee interest in such Unit to the extent required under the loan documents for such Security Interests;

<u>Third</u>, to the Security Holder of the first lien Security Interest encumbering the Master Tenant's interest in such Unit to the extent required under the loan documents for such Security Interest;

<u>Fourth</u>, to the Security Holder of the junior Security Interests encumbering the Master Tenant's interest in such Unit to the extent required under the loan documents for such Security Interests;

<u>Fifth</u>, to the Unit Owner and the Master Tenant (if any), as their interests may appear in accordance with the applicable Master Lease.

(i)    Any excess insurance or condemnation proceeds attributable to Common Elements and

Limited Common Elements which are not used for repair and reconstruction of Common Elements and Limited Common Elements shall be distributed to the Unit Owners, Master Tenants, Security Holders, and other lienholders on the Units as their interests may appear, in proportion to the respective Termination Shares of the Unit Owners, which monies shall be disbursed and paid as provided in the Clauses (1), (2) and (3) of Section 9.2(h) hereof.

(j)  Following termination, creditors of the Association holding liens on the Units, which were Recorded prior to termination, may enforce such liens in the same manner as any lienholder. Any other creditors of the Association shall be treated as if they had perfected liens on the Unit immediately prior to termination. The respective interests of Unit Owners referred to in Section 9.2(f) and Section 9.2(g) are the respective Termination Shares of the Unit Owners.

**9.3 -- Waiver of Subrogation**. Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, the officers and members of the Executive Board, and the Declarant, and their respective employees and agents, for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty, to the extent that such damage is covered by fire or other form of casualty insurance and such Unit Owner's insurance policies contain a waiver of subrogation clause or otherwise provides that this release shall not affect the right of the insured to recover under such policies; provided that, the foregoing waiver applies only to the extent that the loss or claim is covered by insurance, the foregoing waiver shall not apply to the deductible under any policy of insurance, and the foregoing waiver shall not apply to any claim the aggregate amount of which is Ten Thousand Dollars ($10,000.00) or less.

**9.4 -- Damage Caused by Unit Owner, Not Covered by Insurance**. If, due to the negligence or fault of a Unit Owner or a tenant under lease to a Unit Owner, damage shall be caused to the Common Elements or to a Unit or Units owned by others, or maintenance, repairs or replacements shall be required which would otherwise be at the Common Expense, then the Executive Board (in its reasonable discretion) may require that such Unit Owner pay for such damage or such maintenance, repairs and replacements, either: **(a)** if the cost is Ten Thousand Dollars ($10,000.00) or less; or **(b)** if the cost is more than said amount, then to the extent that the damage, or such maintenance, repairs and replacements, is not covered by insurance, and if such Unit Owner does not timely repair and pay for the costs of such maintenance, repairs and replacements, the Association and the other Unit Owner(s) of the Building shall be entitled to the rights and remedies set forth in Section 5.9 above.

**ARTICLE 10 -- CONDEMNATION**

**10.1 -- Condemnation**.

(a)  In the event it shall become necessary for any public agency to acquire all or any part of any of the Units or the Common Elements of the Condominium for any public purpose, the Association is hereby appointed as attorney-in-fact and is hereby authorized to negotiate with such public agency for such acquisition and to execute such instruments as may be necessary for conveyance to any such public agency; provided that as to any Unit, the prior written approval of the Security Holder of the first lien Security Interest encumbering such Unit or encumbering the Master Tenant's interest in such Unit shall be required for any voluntary conveyance of such Unit. Should acquisition by eminent domain become necessary, only the Association and, as to any Unit, the Security Holders of Security Interests, need be made parties, and monies, damage payments or condemnation award shall be held by the Association in accordance herewith for the benefit of the Owners of the Units and the Security Holders of Security Interests.

(b)  If a Unit is acquired by eminent domain, or if part of a Unit is acquired by eminent domain leaving the Unit Owner with a remnant which may not practically or lawfully be used for any purpose permitted by this Declaration, the award shall compensate the Unit Owner for its Unit and Allocated Interest, whether or not any Common Elements are acquired. Upon acquisition, unless the decree otherwise provides, that Unit's Allocated Interests are automatically reallocated to the remaining Units in proportion to the respective Allocated Interests of those Units before the taking, and the Executive Board shall promptly

prepare, execute and Record an amendment to the Declaration reflecting the reallocations. Any remnant of a Unit remaining after part of a Unit is taken under this Section 10.1 is thereafter a Common Element.

(c)    Except as provided in Section 10.1(b), if part of a Unit is acquired by eminent domain, the award shall compensate the Unit Owner for the reduction in value of the Unit and its Allocated Interest, whether or not any Common Elements are acquired. Upon acquisition, unless the decree otherwise provides, **(1)** that Unit's Allocated Interests are reduced in proportion to the reduction in the size of the Unit, or on any other basis specified in the Declaration, and **(2)** the portion of the Allocated Interests from the partially acquired Unit are automatically reallocated to that Unit and the remaining Units in proportion to the respective Allocated Interests of those Units before the taking, with the partially acquired Unit participating in the reallocation on the basis of its reduced Allocated Interests.

(d)    Notwithstanding any provision herein to the contrary, all condemnation and eminent domain proceeds collected (including proceeds collected from a settlement related to eminent domain proceedings) that are separately attributable to the Commercial Unit itself (as distinguished from any Common Elements) shall be delivered to the Security Holder of the first lien Security Interest encumbering the Commercial Unit or encumbering a Master's Tenant's interest in such Unit, to be held and disbursed by such Security Holder in accordance with the terms of such Security Interest.

(e)    Notwithstanding any provision herein to the contrary, all condemnation and eminent domain proceeds collected (including proceeds collected from a settlement related to eminent domain proceedings) that are separately attributable to the Market Rate Unit itself (as distinguished from any Common Elements) shall be delivered to the Security Holder of the first lien Security Interest encumbering the Market Rate Unit or encumbering a Master's Tenant's interest in such Unit, to be held and disbursed by such Security Holder in accordance with the terms of such Security Interest.

(f)    Notwithstanding any provision herein to the contrary, all condemnation and eminent domain proceeds collected (including proceeds collected from a settlement related to eminent domain proceedings) that are separately attributable to a LIHTC Unit itself (as distinguished from any Common Elements) shall be delivered to the Security Holder of the first lien Security Interest encumbering the applicable LIHTC Unit or encumbering a Master's Tenant's interest in such Unit, to be held and disbursed by such Security Holder in accordance with the terms of such Security Interest.

## ARTICLE 11 – NO SUBDIVISION OF UNITS

**11.1 – No Right to Subdivide Units**.  The Units may not be subdivided.  The Individual Dwelling Units located in the Residential Units are permitted and are not a violation of this Section 11.1.

**11.2 -- Partition Walls Within Units**.  The Unit Owner of a Unit may erect partition walls within the Unit to physically divide the Unit into two or more separate spaces, and may lease or sublease one or more of the separate spaces thus formed to tenants or subtenants, without subdividing the Unit, all without the consent of any other Unit Owner. If the Unit Owner of a Unit erects such partition walls and/or leases or subleases portions of the Unit to tenants or subtenants in this manner, then the Unit Owner of the Unit retains full responsibility and liability of a Unit Owner for the entire Unit with respect to the other Unit Owners and the Association, notwithstanding any contrary term in any lease or sublease with the applicable tenant or tenants or subtenants.

## ARTICLE 12 – DECLARANT RIGHTS

**12.1 -- Right of Declarant to Vote**.  Declarant shall have the right to exercise the Votes allocated to Units which Declarant owns and which have not been transferred to third parties.

**12.2 -- Development Rights**.  Notwithstanding any provision hereof to the contrary, at all times and from time to time, until the expiration of the Development Period, Declarant (and its successors, assigns and

mortgagees) shall have the following Development Rights, provided that all Development Rights shall be performed in accordance with the Historic Standards and shall not cause a recapture of Historic Tax Credits and further provided that at all times prior to the termination of the LIHTC Compliance Period, Declarant's right to exercise any Development Rights shall be subject to the prior written consent of the Limited Partner of the LIHTC Unit Owner, and further provided that at all times prior to the termination of the New Markets Compliance Period, Declarant's right to exercise any Development Rights shall be subject to the prior written consent of the NMTC Limited Partner Designated Representative.

(a)    The right to construct, reconstruct, erect, develop, redevelop, demolish, rebuild and relocate all or any portion of the Property, including structural and foundations components of the Property, demising walls, mechanical systems, HVAC systems, electrical systems, plumbing systems, elevators and any other improvements now or hereafter existing on the Property.

(b)    [Intentionally Deleted].

(c)    [Intentionally Deleted].

(d)    [Intentionally Deleted].

(e)    The right to create openings in the walls between the various portions of Building of the Condominium; to extend hallways, lobby and driveway areas in order to provide access, ingress and egress to and from the lobbies, entrances, driveways, ramps, elevators, stairways and other common areas of the Building; and to use and operate such equipment and machinery, and to engage in such other construction activities, as may be necessary or appropriate to complete improvements to the Building.

Declarant hereby reserves the right and privilege for itself (and its successors, assigns and mortgagees) to conduct the activities enumerated in this Section 12.2 until the expiration of the Development Period.

**12.3 -- Allocations of Certain Common Elements**.  Any changes to the initial designations, assignments and allocations of Common Elements as Limited Common Elements allocated and assigned to particular Unit(s) by this Declaration and/or the Plat, shall require the written consent of one hundred percent (100%) of the Unit Owners affected by such changes and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated Representative.  The Declarant acknowledges that the New Markets Tax Credit rules limit the ability of any property including Common Elements originally allocated or assigned to the Commercial Unit or to the Market Rate Unit and financed by any "qualified low-income community investment" proceeds (as defined in Section 45D of the Internal Revenue Code), to be included in the "eligible basis" of a "qualified low-income building" as those terms are used in Section 42 of the Internal Revenue Code, and similarly limit the ability of any Property including Common Elements originally allocated or assigned to a LIHTC Unit and included in the basis of a qualified low-income building to be allocated or assigned to the Commercial Unit Owner (which intends to depreciate its property as nonresidential rental property) or to be allocated or assigned to the Market Rate Unit Owner.

**12.4 – Rights of Declarant's Successors**.  All rights afforded Declarant under this Article 12 shall inure to the benefit of any Security Holder acquiring title to any Unit hereunder by, through or under Declarant, and to any successor declarant to whom Declarant assigns its rights as Declarant, by written assignment instrument Recorded in the real estate records of the City of St. Louis, Missouri.

## ARTICLE 13 -- AMENDMENTS

**13.1 -- Amendments.**

(a)    Without a Vote of the Unit Owners, the Board of Directors of the Association may amend

the Declaration in any manner necessary for the following purposes, to-wit: **(1)** to meet the requirements of insurance underwriters; **(2)** to bring this Declaration into compliance with the Act as amended from time-to-time; and **(3)** to correct clerical or typographical errors or obvious factual errors in this Declaration or any Exhibit to this Declaration.

      **(b)**     Except for amendments authorized and permitted under Sections 13.1(a) hereof, this Declaration may not be amended except upon the prior written consent and approval of: **(1)** if such amendment is a Material Commercial Amendment, then the Security Holders of the first lien Security Interests encumbering the Commercial Unit; **(2)** if such amendment is a Material Market Rate Amendment, then the Security Holders of the first lien Security Interests encumbering the Market Rate Unit; **(3)** if such amendment is a Material LIHTC Amendment, then the Security Holders of the first lien Security Interests encumbering the LIHTC Units; **(4)** at all times prior to the termination of the LIHTC Compliance Period, the Limited Partner of the LIHTC Unit Owner; and **(5)** at all times prior to the termination of the New Markets Compliance Period, the NMTC Limited Partner Designated Representative.

      **(c)**     Subject to Sections 13.1(d) & 13.1(e) hereof, the Unit Owners (acting by and through the Association), upon the affirmative Vote of Unit Owners of Units to which are allocated at least seventy-five percent (75%) of the Allocated Interests, and at least seventy-five percent (75%) of the Votes in the Association, may modify and amend this Declaration by satisfying the procedures set forth in the Act; so long as such amendment to this Declaration is approved in writing by: **(1)** if such amendment is a Material Commercial Amendment, then the Security Holders of the first lien Security Interests encumbering the Commercial Unit; **(2)** if such amendment is a Material Market Rate Amendment, then the Security Holders of the first lien Security Interests encumbering the Market Rate Unit; **(3)** if such amendment is a Material LIHTC Amendment, then the Security Holders of the first lien Security Interests encumbering the LIHTC Units; **(4)** at all times prior to the termination of the LIHTC Compliance Period, the Limited Partner of the LIHTC Unit; and **(5)** at all times prior to the termination of the New Markets Compliance Period, the NMTC Limited Partner Designated Representative.  Each such modification and amendment must be duly Recorded in the Real Estate Records of the City of St. Louis, Missouri, provided, however, that this Declaration and By-Laws shall at all times contain the minimum requirements imposed by Act, and, in particular, with insurance maintained as required by the Act.

      **(d)**     Notwithstanding anything to the contrary contained in this Article 13, each Owner of a Unit shall have the Owner's Reserved Right with respect to such Unit.  By reason of such Owner's Reserved Rights, **(1)** any amendment to this Declaration or the Plat which, if enacted, would, with respect to the applicable Unit, be a Material Condominium Amendment to this Declaration or the Plat, shall require the written approval of the applicable Unit Owner of the applicable Unit; and **(2)** the Owner of a Unit shall have the absolute right to disapprove any amendment to this Declaration or the Plat which, if enacted, would, with respect to the applicable Unit owned by the applicable Unit Owner, be a Material Condominium Amendment to this Declaration or the Plat.

      **(e)**     Notwithstanding anything to the contrary contained in this Article 13, the Association and each Unit Owner and the Security Holders of the first lien Security Interests encumbering the Units shall have the absolute right to disapprove any amendment to this Declaration or the Plat which, if enacted, would, **(1)** alter any provisions of this Declaration relating to the Historic Standards or be inconsistent with the Historic Tax Credits or the requirements of the Secretary or the SHPO, **(2)** give rise to a Recapture Event (as defined above) or otherwise cause a recapture of any Historic Tax Credits relating to the Property, or **(3)** be inconsistent with the requirements of any New Market Tax Credits and/or Low Income Housing Tax Credits relating to the Property (or investments therein) or any portion thereof, or cause a recapture or disallowance of any such Credits.

## ARTICLE 14 -- SECURITY HOLDER AND MASTER LEASE PROVISIONS

**14.1 -- Notice to Association**.  Upon request, each Unit Owner shall be obligated to furnish to the Association the name and address of the holder, insurer or guarantor of any Security Interest encumbering such Unit Owner's Unit, the name and address of any Master Tenant of such Unit, and the

name and address of the holder, insurer or guarantor of any Security Interest encumbering a Master Tenant's interest under a Master Lease of a Unit.

**14.2 – Master Lease Provisions.**

(a)     No act or action under or pursuant to this Declaration, and no exercise of any right or remedy under or pursuant to this Declaration (including, but not limited to, lien rights and default remedies), by the Association, the Executive Board or any Unit Owner, may or shall result in or cause the termination of any Master Lease of a Unit prior to the expiration of the Historic Recapture Period applicable to the Unit which is subject to such Master Lease.

(b)     No act or action under or pursuant to this Declaration, and no exercise of any right or remedy under or pursuant to this Declaration (including, but not limited to, lien rights and default remedies), by the Association, the Executive Board or any Unit Owner, may or shall result in or cause the termination of any Master Lease of a Unit during any period in which there is Security Interest encumbering such Master Lease which Security Interest is held by a bank, savings and loan, insurance company, pension fund or other institutional lender, or which Security Interest is held by any governmental agency.

(c)     In all provisions, cases and circumstances under this Declaration where the consent or approval or agreement or Vote (or similar) of a Unit Owner is required or requested, in the event that the Unit owned by such Unit Owner is subject to a Master Lease, then in such event no such consent or approval or agreement or Vote (or similar) by such Unit Owner shall be valid, binding and effective, unless and until the Master Tenant under such Master Lease (and its constituent members) have reviewed and approved in writing such consent or approval or agreement or Vote (or similar) by such Unit Owner.

(d)     Whenever there is a Master Lease of a Unit, then: **(1)** copies of all reports and notices which are to be delivered to the Unit Owner of the Unit will also be delivered to the Master Tenant of the Unit; and **(2)** all amounts to be paid under the Declaration with respect to a casualty or condemnation will be paid or distributed in accordance with Article 8.

(e)     Whenever there is a Master Lease of a Unit, then, wherever this Declaration provides for or requires the consent, approval or agreement or Vote or right to receive proceeds, receipt of reports, etc., of the Security Holder of a first lien Security Interest, then the consent, approval or agreement or Vote, etc., of the Security Holder of the first lien Security Interest in the Master Tenant's interest in the Master Lease shall be required to be obtained.

(f)     The failure of a Master Tenant of a Unit to respond to any request for consent or approval or agreement or Vote (or similar) shall constitute and be deemed such Master Tenant's denial and disapproval of the applicable request.

**14.3 -- Payments of Charges and Cure of Defaults by Security Holders and Master Tenants.** Security Holders which hold, insure or guarantee a Security Interests, and the Master Tenant under any Master Lease of a Unit, may, jointly or singly, pay taxes or other charges which are in default and which may or have become a charge against the Common Elements and may pay overdue premiums on casualty insurance policies or secure new casualty insurance coverage upon the lapse of an Association policy, and such Security Holders and Master Tenants making such payments shall be entitled to immediate reimbursement from the Association.  The Security Holder of a Security Interest in a Unit, and the Master Tenant under any Master Lease of a Unit, shall have the right to pay any assessments levied by the Association against such Unit, and the right to cure any other default under this Declaration by the Unit Owner of such Unit.  The Association shall: **(a)** accept payment of any assessment levied by the Association against such Unit from the Security Holder of a Security Interest in the Unit, or from the Master Tenant under any Master Lease of a Unit, all the same as if such payment were made by the Unit Owner of such Unit; and **(b)** accept cure of any other default under this Declaration by the Unit Owner of such Unit from the Security Holder of a Security Interest in the Unit, or from the Master Tenant under any Master Lease of a Unit, all the same as if such cure were made by the Unit Owner of such Unit.

**14.4 -- Security Holder's and Master Tenant's Rights**.  Unless provided to the contrary in a Unit Owner's mortgage, the Security Holder of a Security Interest in a Unit or encumbering a Master's Tenant's interest in such Unit shall be entitled to the following rights, and unless provided to the contrary in a Master Lease of a Unit, the Master Tenant under a Master Lease of a Unit shall be entitled to the following rights, to-wit:

(a)    Any restoration or repair of the Condominium after a partial condemnation or damage due to an insurable hazard shall be substantially in accordance with the provisions hereof and the original plans and specifications, unless the approval of the Security Holders of first lien Security Interests on the applicable Units and the approval of the Master Tenants under the Master Leases of the applicable Units so partially condemned or damaged, are obtained.

(b)    Any election to terminate the Condominium after substantial destruction or a substantial taking in condemnation of the Condominium property must be approved by the Unit Owners, the Master Tenants of the Units, the Security Holders of the first lien Security Interests encumbering the Commercial Unit, the Security Holders of the first lien Security Interests encumbering the Market Rate Unit and the Security Holders of the first lien Security Interests encumbering the LIHTC Units, in accordance with Section 9.2(a) hereof.

(c)    No change in the Allocated Interest of a Unit resulting from a partial condemnation or partial destruction of the Condominium project may be effected without the approval of the Security Holder of the first lien Security Interest encumbering the applicable Unit or encumbering a Master's Tenant's interest in such Unit, and the approval of the Master Tenant of the applicable Unit

(d)    Neither a Security Holder that takes title to a Unit through foreclosure or deed in lieu thereof nor a foreclosure sale purchaser of a Unit (collectively, a "Foreclosure Purchaser") shall have any liability for any past due Common Expenses attributed to the Unit acquired by the Foreclosure Purchaser for any time prior to the date such Foreclosure Purchaser takes title to the Unit, except for up to six (6) months' assessments or fines as described in Item (4) of Section 8.4 of the By-Laws.

**14.5 -- Notice to Security Holders and Master Tenants**.  The Security Holder of any duly recorded Security Interest against any Unit, and the Master Tenant under any Master Lease of a Unit for which a notice or memorandum of such Master Lease has been recorded, shall be given copies of any and all notices permitted or required by this Declaration to be given to the Unit Owners or whose Unit is subject to such Security Interest or such Master Lease.  Notices shall be given to Security Holders and Master Tenants under the following conditions:

(a)    Any proposed amendment of the Declaration with respect to the Unit subject to such Security Interest or such Master Lease.

(b)    Any proposed termination of the Condominium;

(c)    Any condemnation loss or any casualty loss which affects a material portion of the Condominium or which affects any Unit on which there is a Security Interest held, insured or guaranteed by such eligible Security Holder, or which affects any Unit which is subject to a Master Lease;

(d)    Any delinquency in the payment of assessments or charges owed by an Owner of a Unit subject to the Security Interest of such eligible Security Holder, insurer or guarantor, or by an Owner of a Unit subject to a Master Lease, where such delinquency has continued for a period of thirty (30) days;

(e)    Any lapse, cancellation or material modification of any insurance policy maintained by the Association.

All notices required to be given to a LIHTC Unit Owner shall also be required to be given to the Limited Partner of the LIHTC Unit Owner.

All notices required to be given to an NMTC Unit Owner shall also be required to be given to the Limited

Partner of such NMTC Unit Owner.

All notices required to be given to a Unit Owner shall also be required to be given to the Master Tenant of such Unit.

**14.6 – Security Holders Failure to Agree or Respond**. To the extent **(a)** the terms of this Declaration require the approval or consent of multiple Security Holders holding a Security Interest in a Unit, **(b)** the approval or consent of each such Security Holder has been requested in accordance with the terms hereof, and **(c)** such Security Holders cannot agree within 30 days after written request for approval or consent, then the decision of the Security Holder of the first lien Security Interest in the Unit shall control with respect to the particular approval or consent requested.

The failure of a Security Holder holding a Security Interest in a Unit to respond to any request for consent or approval or agreement (or similar) shall constitute and be deemed such Security Holder's denial and disapproval of the applicable request.

## ARTICLE 15 -- GENERAL PROVISIONS

**15.1 -- Captions**. The captions of the various Articles and Sections are for purposes of reference only and are not deemed to have any substantive effect.

**15.2 -- Rules and Regulations**. The Executive Board may make reasonable rules and regulations which are not in conflict with or inconsistent with this Declaration governing: **(a)** the window treatments that may be installed within the windows of the Building (including the window treatments that may be installed within the Units); **(b)** exterior signage, awnings, canopies or shutters that may be installed on the exterior of the Building; and **(c)** the use of any Limited Common Elements, any Common Elements and respecting the operation and business of the Condominium, including rules and regulations governing the use of, and the standing of vehicles, in any drive lanes and loading dock areas. The Executive Board may bring such legal actions as it may deem appropriate against Persons violating its rules and regulations and, upon the Executive Board prevailing, the costs and attorney's fees shall be taxed against such party. However, the Executive Board may not enact any rule or regulation: **(x)** which is in conflict with or inconsistent with this Declaration; or **(y)** which has the practical effect of rescinding, overturning or terminating any written approval previously given by the Association to a Unit Owner; excepting upon the prior written consent and approval of the applicable Unit Owner; or **(z)** in the case of any Unit which is subject to a Master Lease, is applicable to such Unit and/or the Master Tenant thereof, unless and until the Master Tenant under such Master Lease (and its constituent members) have reviewed and approved in writing such rule or regulation in writing.

**15.3 -- Manner of Giving Notice**. Notices required to be given to the Executive Board may be delivered to any member of the Board either personally or by certified mail, return receipt requested addressed to such member or officer at his address for notices delivered to each Unit Owner and/or the Declarant in accordance herewith. Notice required to be given to the Declarant or to the Declarant while acting as the Executive Board shall be given by certified mail, return receipt requested at:

        **LAND CLEARANCE FOR REDEVELOPMENT**
        **AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**
        1520 Market Street, Suite 2000
        St. Louis, Missouri 63103

**15.4 -- Acceptance by Grantee**. Each grantee of Declarant by the acceptance of a deed of conveyance of each subsequent purchaser, accepts the same subject to all restrictions, conditions, covenants, reservations, options, liens and charges, and the jurisdiction, rights and powers created or reserved by this Declaration or to which this Declaration is subject, and all rights, benefits and privileges of every character hereby granted, created, reserved or declared, and all impositions and obligations hereby imposed shall be

deemed and taken to be covenants running with the land and shall bind any Persons having at any time any interest or estate in said property and shall inure to the benefit of such Unit Owner in like manner as though the provisions of this Declaration were recited and stipulated at length in each and every deed of conveyance.

**15.5 -- No Waiver**.   No covenants, restrictions, conditions, obligations or provisions contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

**15.6 -- Saving Clause**.  The invalidity of any covenant, restriction, condition, limitation or any other provision of this Declaration or any part of the same shall not impair or affect in any manner the validity, enforceability or effect of the rest of this Declaration.

**15.7 -- Interpretation**.   The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the development and operation of a first-class mixed-use residential and commercial development.  The use of personal pronouns shall be construed to apply to masculine, feminine or neuter gender as the context may require.  Should any provision of this instrument be deemed to violate the Rule against Perpetuities, then such provision shall not be stricken but shall be deemed to continue in force and effect for the longest time permitted under Missouri law or for the life or lives in being plus twenty-one (21) years and ten (10) months thereafter.  If any provision is deemed to be invalid, then the elimination of such provision shall not affect the remaining provisions.

**15.8 -- Bonds**.   Before any Natural Person shall become a member of and serve on the Executive Board, he shall be able to be bonded.  The Executive Board may procure a blanket fidelity bond on themselves individually and collectively for the benefit of all Unit Owners in an amount not less than the estimated maximum of funds, including reserve funds in the custody of the Executive Board at any given time during the term of each bond.  The bond shall be written only by a bonding company approved to write fidelity bonds for Executors and Administrators by the City of St. Louis, Missouri, Probate Court.  The cost of premiums for such blanket bond shall be paid out of the common funds of this Condominium as a general charge and shall not be borne by the individual members of the Executive Board.  The bond shall contain waiver of all defenses based upon the exclusion of Persons serving without compensation from the definition "employee" or similar terms or expressions.  The bond shall provide that it may not be cancelled or substantially modified (including cancellation for non-payment of premium) without 10 days prior written notice to Executive Board.  The bond requirements of this Section 15.8 may be waived in whole or in part upon the written approval of the Unit Owners; which approval may be rescinded by any Unit Owner on thirty (30) days written notice to the other.

**15.9 -- Operative Effect**.  This Declaration shall be of full force and effect upon the Recordation in the Real Estate Records of the City of St. Louis, Missouri.

**15.10 -- Lease of Unit**.  Each Unit Owner shall have the right to lease or sublease all or any portion of the Unit owned by such Unit Owner, subject to the following requirements:

    **(a)**    **Commercial Unit**.  Every lease or sublease of the Commercial Unit or any portion of the Commercial Unit (a "Commercial Lease"), shall be in writing and shall be subject to all the terms and provisions of this Declaration and the By-Laws.  Each such Commercial Lease shall incorporate by reference this Declaration and the By-Laws, and the rules and regulations of the Condominium, shall prohibit all Prohibited Uses; and shall include a provision that any violation by the tenant or subtenant under such Commercial Lease, this Declaration, the By-Laws or said rules and regulations shall constitute a default by the tenant or subtenant under such Commercial Lease.  Notwithstanding anything herein to the contrary, any Commercial Lease which constitutes a Master Lease for purposes of pass-through of the Historic Tax Credits may contain a standstill or similar provision pursuant to which such Commercial Lease may not be terminated during the Historic Recapture Period and any such provision shall be binding on the Association and the Commercial Unit Owner (and the successors in title to the Commercial Unit); provided that the Association and/or the Commercial Unit Owner may still exercise its available remedies at law or in equity; and provided further that the Commercial Unit Owner shall be responsible for curing any violations of

the terms and provisions of this Declaration and the By-Laws by any tenant or subtenant under a lease.

**(b)     Residential Unit**.  Every lease or sublease of a Residential Unit or any portion of a Residential Unit (such as any Individual Dwelling Unit portion of a Residential Unit) (a "Residential Lease"), shall be in writing and shall be subject to all the terms and provisions of this Declaration and the By-Laws.  Each such Residential Lease shall incorporate by reference this Declaration and the By-Laws, and the rules and regulations of the Condominium; and shall include the provision that any violation by the tenant or subtenant under such Residential Lease, this Declaration, the By-Laws or said rules and regulations shall constitute a default by the tenant or subtenant under such Residential Lease.  Notwithstanding anything herein to the contrary, any Residential Lease which constitutes a Master Lease for purposes of pass-through of the Historic Tax Credits may contain a standstill or similar provision pursuant to which such Residential Lease may not be terminated during the Historic Recapture Period and any such provision shall be binding on the Association and the Residential Unit Owner (and the successors in title to the Residential Unit); provided that the Association and/or the Residential Unit Owner may still exercise its available remedies at law or in equity; and provided further that the Residential Unit Owner shall be responsible for curing any violations of the terms and provisions of this Declaration and the By-Laws by any tenant or subtenant under a lease.

**(c)**     In the event that the Association incurs any legal fees, costs or other expenses in connection or by reason of any violation by any tenant or subtenant of a Unit of the terms and provisions of this Declaration, the By-Laws or the rules and regulations, then the applicable Unit Owner shall be responsible for said legal fees, costs and expenses, and upon demand shall pay same to the Association; and if same shall remain unpaid, then same shall constitute an assessment against and a lien upon the Unit, which lien shall be enforceable the same as other assessment liens hereunder; provided that a first lien Security Holder that takes title to a Unit by foreclosure or deed in lieu of foreclosure shall not be responsible for any costs incurred by the Association prior to the date the sheriff's deed or deed in lieu of foreclosure is recorded.

**15.11 -- Financial Statement of Association**.  Upon the from time to time written request therefor to the Executive Board from any of the Persons or parties hereinafter described, the Executive Board shall (within a reasonable time after receipt of such request) furnish and provide to the requesting Person or party a true and correct copy of the financial statement of the Association for the immediately preceding fiscal year.  Each and all of the following Persons or parties shall be entitled, upon written request as aforesaid, to receive such copy of said financial statement of the Association, to-wit: any Unit Owner, any Security Holder of a Security Interest of a Unit, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner, the HTC Investor Member, any prospective purchaser of a Unit, any prospective first mortgage Security Holder to a Unit Owner or to a prospective purchaser of a Unit, and any agency, instrumentality or corporation acting for or in behalf of any such first mortgage Security Holder or prospective first mortgage Security Holder.

**15.12 -- Contracts During the Declarant Control Period**.  All of the hereinafter described contracts or agreements entered into by or in behalf of the Association during (or prior to) the Declarant Control Period shall provide that such contracts or agreements are terminable by the Association without penalty at any time after the termination of the Declarant Control Period upon not more than ninety (90) days written notice to the other party to such contract or agreement.  The foregoing provision shall apply to: **(a)** all management contracts, all employment contracts, and all leases of recreational or parking areas or facilities; and **(b)** all contracts and all leases, including franchises and licenses, to which Declarant or any Affiliate of Declarant is a party.

**15.13 -- Certificate of Substantial Completion**.  Attached hereto as **Exhibit H** and incorporated herein by this reference is a duly executed Certificate of Substantial Completion executed by a registered and licensed engineer or architect, certifying as to the matters which Section 448.2-101.2 of the Act requires to be certified by a registered and licensed engineer or architect.  Said Certificate of Substantial Completion applies to the Units that are shown on the Plat that is described in **Exhibit B** to the Declaration.

**15.14 – Disputes**.

    **(a)**    Other than disputes and disagreements regarding the Owner's Reserved Rights and/or Material Condominium Amendments, in the event of any dispute or disagreement between or among any Owners of the Units, or any questions of interpretation or application of the provisions of the Declaration or the By-Laws, the determination reached by the Board of Directors of the Association shall be deemed presumptively correct. Subject to the remaining provisions of this Declaration and the By-Laws, no such determination shall limit the rights otherwise available to any affected Owner to seek legal redress to reverse or otherwise modify the determination of the Board, but such aggrieved party shall bear the burden of proof in establishing its case.

    **(b)**    Wherever this Declaration or the By-Laws provides for the Association, or the Executive Board, or any Unit Owner, or any other applicable party subject to and governed by the terms of this Declaration and/or the By-Laws (as applicable, the "Responding Party"), to be reasonable, or provides for any such Responding Party not to be unreasonable, with respect to any consent or approval of any matter requested by any other party (the "Requesting Party"); in the event that any such Responding Party withholds, conditions or delays its consent or approval to the matter requested by the Requesting party, then: **(1)** the Requesting Party's sole relief and remedy shall be to seek a legal determination in a court of competent jurisdiction of whether the Responding Party has unreasonably withheld, conditioned or delayed its consent or approval of the matter requested; and **(2)** if the court of competent jurisdiction concludes that Responding Party did not act reasonably, or that the Responding Party acted unreasonably, then the court of competent jurisdiction shall be empowered to enforce by any and all appropriate orders the Responding Party's obligation to be reasonable and/or the Responding Party's obligation not to be unreasonable, including (but not limited to) fashioning and determining a specific remedy that will be enforced, such as ordering the Responding Party to approve or consent to a specific matter requested by the Requesting Party. However, in all events, the Responding Party shall not be liable to the Requesting Party for any damages (whether actual, incidental, consequential or otherwise) that the Requesting Party sustains or incurs by reason of the Responding Party withholding, conditioning or delaying its consent or approval of any matter requested by the Requesting Party.

**15.15 – Conflict Between Declaration & By-Laws**. In the event of a conflict between or among any of the terms, provisions, conditions and definitions of this Declaration, on the one hand, and any of the terms, provisions, conditions and definitions of the By-Laws, on the other hand, then in all such events the terms, provisions, conditions and definitions of this Declaration shall apply, govern, control and prevail, and the terms, provisions, conditions and definitions of the By-Laws shall be construed and amended to implement the intent of the terms, provisions, conditions and definitions of this Declaration; unless the context shall clearly indicates that the terms, provisions, conditions and definitions of the By-Laws are intended to prevail.

**15.16 - Exhibits to Declaration**.

| | | |
|---|---|---|
| Exhibit A | -- | Legal Description of Real Property |
| Exhibit B | -- | Condominium Plat of Arcade Building Condominium |
| Exhibit C | -- | Allocated Interests of Units |
| Exhibit D | -- | Arcade Main Lobby Sub-Allocated Expense Shares of Units |
| Exhibit E-1 | -- | Residential Marketing Sub-Allocated Expense Shares of Residential Units |
| Exhibit E-2 | -- | Residential Sub-Allocated Expense Shares of Residential Units |
| Exhibit F | -- | Parking Sub-Allocated Expense Shares of Commercial Unit and of Market Rate Unit |
| Exhibit G | -- | Existing Easements, Buildings Lines, Restrictions and Other Title Matters of Record |
| Exhibit H | -- | Certificate of Substantial Completion |
| Exhibit I | -- | By-Laws of Arcade Building Condominium Association, Inc. |
| Exhibit J | -- | Casualty Restoration Conditions and Requirements |

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the undersigned has executed this Declaration as of the date first hereinabove stated.

**DECLARANT:**

**LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**

By: _Otis Williams_

Print: _Otis Williams_

Title: _Executive Director_

STATE OF MISSOURI )
                   ) SS
CITY OF ST. LOUIS )

On this _10th_ day of June, 2014, before me appeared _Otis Williams_ to me personally known, who, being by me duly sworn, did say that he/she is the _Executive Director_ of **LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI**, and that said instrument was signed in behalf of said body politic, duly authorized; and said _Otis Williams_ acknowledged said instrument to be the free act and deed of said body politic.

**IN WITNESS WHEREOF,** I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

My term expires: _03/04/2018_

_Linda R. Criss_
Notary Public

LINDA R. CRISS
My Commission Expires
March 4, 2018
St. Louis City
Commission #14658765

This instrument prepared by:

Roger Herman, Esq.
Rosenblum Goldenhersh,
7733 Forsyth Blvd. - 4th Floor
St. Louis, Missouri 63105
Tel. No. 314-726-6868

## EXHIBIT A

### LEGAL DESCRIPTION OF REAL PROPERTY

Parcel 1 (Fee Simple):

A tract of land in City Block 192 of the City of St. Louis and being more particularlydescribed as follows:

Beginning at a point in the North line of Pine Street, 60 feet wide, at its intersection with the West line of 8th Street, 60 feet wide; thence Northwardly along the West line of 8th Street 233.33 feet to a point in the South line of Olive Street, 60 feet wide; thence Westwardly along the South line of Olive Street 135 feet to a point in the East line of a private alley 7.50 feet wide as described in Book 950 Page 151 of the City of St. Louis Records; thence along the East line of said alley 116.67 feet to a point; said point being in the North line of property conveyed to Leo Moser by the Deed recorded in Book 691 Page 200 of the City of St. Louis Records, thence Westwardly 27.04 feet to a point in a 7.5 foot wide private alley as described in Book 3092 Page 543 of the City of St. Louis Records, said point being 4 feet West of the East line of said Alley; thence Southwardly 116.67 feet to a point in the North line of Pine Street; thence Eastwardly 162.04 feet to the point of beginning.

Parcel 2 (Fee Simple):

An undivided 1/2 interest in the following described land:

A lot in Block 192 of the City of St. Louis, being a Private Alley 7 feet 6 inches in width on the South line of Olive Street by a depth of 116 feet 8-7/8 inches to the North line of property conveyedto Leo Moser by deed recorded in Book 691 Page 200 of the City of St. Louis records; bounded East by a line 135 feet West of the West line of 8th Street and West by property now or formerly of Paul Brown Realty and Investment Company.

Parcel 3 (Easement):

A perpetual non-exclusive easements for (i) vehicular ingress and egress, and (ii) construction and maintenance of a Parking Connection and Security Devices, all as defined and set forth in the Access Easement Agreement recorded in Book 07112008 page 102.

<u>**EXHIBIT B**</u>

**CONDOMINIUM PLAT OF REAL PROPERTY**

**Condominium Plat** of the Property described in <u>**Exhibit A**</u>, titled **PLAT OF ARCADE BUILDING CONDOMINIUM** Recorded on the _8_ day of ___July___, 2014, in Book _07082014_ at Page ___0353___ of the Real Estate Records of the City of St. Louis, Missouri.

## EXHIBIT C

### ALLOCATED INTERESTS OF UNITS

| Unit No. | Allocated Interest | Type of Unit |
|---|---|---|
| Unit 1 (A/K/A/ Commercial Unit) | 12.77 % | Commercial Unit |
| Unit 2 (A/K/A/ Market Rate Unit) | 23.94 % | Residential Unit |
| Unit 3 (A/K/A/ LIHTC Unit 3) | 2.50 % | Residential Unit |
| Unit 4 (A/K/A/ LIHTC Unit 4) | 1.77 % | Residential Unit |
| Unit 5 (A/K/A LIHTC Unit 5) | 7.31 % | Residential Unit |
| Unit 6 (A/K/A LIHTC Unit 6) | 7.31 % | Residential Unit |
| Unit 7 (A/K/A LIHTC Unit 7) | 1.78 % | Residential Unit |
| Unit 8 (A/K/A LIHTC Unit 8) | 7.32 % | Residential Unit |
| Unit 9 (A/K/A LIHTC Unit 9) | 6.88 % | Residential Unit |
| Unit 10 (A/K/A LIHTC Unit 10) | 5.684 % | Residential Unit |
| Unit 11 (A/K/A LIHTC Unit 11) | 5.684 % | Residential Unit |
| Unit 12 (A/K/A LIHTC Unit 12) | 5.684 % | Residential Unit |
| Unit 13 (A/K/A LIHTC Unit 13) | 5.684 % | Residential Unit |
| Unit 14 (A/K/A LIHTC Unit 14) | 5.684 % | Residential Unit |
| Totals: | =========== 100% | |

EXHIBIT D

ARCADE MAIN LOBBY SUB-ALLOCATED EXPENSE SHARES OF UNITS

| Unit No. | | Sub-Allocated Expense Share |
|---|---|---|
| Unit 1 (A/K/A Commercial Unit) | | 80.00 % |
| | Square Footage | |
| Unit 2 (A/K/A/ Market Rate Unit) | 91,025 SF | 5.53 % |
| Unit 3 (A/K/A/ LIHTC Unit 3) | 9,415 SF | 0.57 % |
| Unit 4 (A/K/A/ LIHTC Unit 4) | 6,652 SF | 0.41 % |
| Unit 5 (A/K/A LIHTC Unit 5) | 27,530 SF | 1.67 % |
| Unit 6 (A/K/A LIHTC Unit 6) | 27,500 SF | 1.67 % |
| Unit 7 (A/K/A LIHTC Unit 7) | 6,683 SF | 0.41 % |
| Unit 8 (A/K/A LIHTC Unit 8) | 27,552 SF | 1.67 % |
| Unit 9 (A/K/A LIHTC Unit 9) | 25,883 SF | 1.57 % |
| Unit 10 (A/K/A LIHTC Unit 10) | 21,406 SF | 1.30 % |
| Unit 11 (A/K/A LIHTC Unit 11) | 21,406 SF | 1.30 % |
| Unit 12 (A/K/A LIHTC Unit 12) | 21,406 SF | 1.30 % |
| Unit 13 (A/K/A LIHTC Unit 13) | 21,406 SF | 1.30 % |
| Unit 14 (A/K/A LIHTC Unit 14) | 21,406 SF | 1.30 % |
| Totals: | ==========<br>329,270 SF | ==========<br>100% |

<u>EXHIBIT E-1</u>
**RESIDENTIAL MARKETING SUB-ALLOCATED EXPENSE SHARES OF RESIDENTIAL UNITS**

| Unit No. | | Sub-Allocated Expense Share |
|---|---|---|
| Unit 2 (A/K/A Market Rate Unit) | | 60.00 % |
| | **Square Footage** | |
| Unit 3 (A/K/A/ LIHTC Unit 3) | 9,415 SF | 1.58 % |
| Unit 4 (A/K/A/ LIHTC Unit 4) | 6,652 SF | 1.12 % |
| Unit 5 (A/K/A LIHTC Unit 5) | 27,530 SF | 4.62 % |
| Unit 6 (A/K/A LIHTC Unit 6) | 27,500 SF | 4.62 % |
| Unit 7 (A/K/A LIHTC Unit 7) | 6,683 SF | 1.12 % |
| Unit 8 (A/K/A LIHTC Unit 8) | 27,552 SF | 4.63 % |
| Unit 9 (A/K/A LIHTC Unit 9) | 25,883 SF | 4.35 % |
| Unit 10 (A/K/A LIHTC Unit 10) | 21,406 SF | 3.59 % |
| Unit 11 (A/K/A LIHTC Unit 11) | 21,406 SF | 3.59 % |
| Unit 12 (A/K/A LIHTC Unit 12) | 21,406 SF | 3.59 % |
| Unit 13 (A/K/A LIHTC Unit 13) | 21,406 SF | 3.59 % |
| Unit 14 (A/K/A LIHTC Unit 14) | 21,406 SF | 3.59 % |
| Totals: | =========== 238,245 SF | =========== 100% |

EXHIBIT E-2
**RESIDENTIAL SUB-ALLOCATED EXPENSE SHARES OF RESIDENTIAL UNITS**

| Unit No. | Square Footage | Sub-Allocated Expense Share |
|---|---|---|
| Unit 2 (A/K/A Market Rate Unit) | 91,025 SF | 27.65 % |
| Unit 3 (A/K/A/ LIHTC Unit 3) | 9,415 SF | 2.86 % |
| Unit 4 (A/K/A/ LIHTC Unit 4) | 6,652 SF | 2.02 % |
| Unit 5 (A/K/A LIHTC Unit 5) | 27,530 SF | 8.36 % |
| Unit 6 (A/K/A LIHTC Unit 6) | 27,500 SF | 8.35 % |
| Unit 7 (A/K/A LIHTC Unit 7) | 6,683 SF | 2.03 % |
| Unit 8 (A/K/A LIHTC Unit 8) | 27,552 SF | 8.37 % |
| Unit 9 (A/K/A LIHTC Unit 9) | 25,883 SF | 7.86 % |
| Unit 10 (A/K/A LIHTC Unit 10) | 21,406 SF | 6.50 % |
| Unit 11 (A/K/A LIHTC Unit 11) | 21,406 SF | 6.50 % |
| Unit 12 (A/K/A LIHTC Unit 12) | 21,406 SF | 6.50 % |
| Unit 13 (A/K/A LIHTC Unit 13) | 21,406 SF | 6.50 % |
| Unit 14 (A/K/A LIHTC Unit 14) | 21,406 SF | 6.50 % |
| Totals: | ============ 329,270 SF | ============ 100% |

## EXHIBIT F
## PARKING SUB-ALLOCATED EXPENSE SHARES
## OF COMMERCIAL UNIT AND OF MARKET RATE UNIT

| Unit No. | Number of Parking Spaces (Right to Use) | Sub-Allocated Expense Share |
|---|---|---|
| Unit 1 (A/K/A Commercial Unit) | 40 Parking Spaces | 31 % |
| Unit 2 (A/K/A Market Rate Unit) | 89 Parking Spaces | 69 % |
| Totals: | ===========<br>129 Parking Spaces | ===========<br>100% |

## EXHIBIT G

### Existing Easements, Buildings Lines, Restrictions
### and Other Title Matters of Record

4.　Terms and provisions of the Agreement executed by and between Aaron W. Fagin and the Odd Fellows Hall Company datted January 4, 1888 and recorded January 17, 1888 in Book 853 page 222.

5.　Terms and provisions of the Agreement executed by and between Agreement the Odd Fellows Hall Company and the Fagire Building Company dated March 21, 1890 and recorded April 10, 1890 Book 950 Page 151, and as modified by the instrument dated February 16, 1917 and recorded August 6, 1920 in Book 3354 page 466, and further modified by the instrument dated March 8, 1917 and recorded August 6, 1920 in Book 3366 page 290.

6.　Terms and provisions of the Indenture executed by and between Conde M. Nast, et-al and the St. Louis Union Trust Company, Trustee, dated February 7, 1918 and recorded June 27, 1918 in 3092 Page 543.

7.　Easement granted to the Bi-State Development Agency of the Missouri-Illinois Metropolitan District, for a light rail system by the License and Easement Agreement dated as of November 22, 1991 and recorded January 16, 1992 in Book 890M page 1822.

8.　Terms and provisions of the Access Easement Agreement executed by and between Paul Brown Developer, L.P. and Arcade Owners, LLC, dated as of June 12, 2008 and recorded July 11, 2008 in Book 07112008 page 102, affects Parcel 3; and Acknowledgment of Consent of Lender executed by Bank of America, NA., dated December 9, 29 and recorded December 16, 2009 in Book 12162009 page 0198.

9.　Terms and provisions of Ordinance No. 55952.of the City of St. Louis, designating a blighted area.

**EXHIBIT H**

**CERTIFICATE OF SUBSTANTIAL COMPLETION**

With respect to the "Property" located in **St. Louis City, Missouri**, being more particularly described on **Exhibit A** to the **Declaration of Condominium of Arcade Building Condominium** to which this **Exhibit H** is annexed, the undersigned *PAUL HOHMANN* a Registered Missouri [Architect or Engineer], No. *A-007801*, hereby certifies: that all structural components and all mechanical systems of all buildings containing or comprising the Units constructed on the Property have been substantially completed in accordance with the plans thereof and therefor. (See Mo. Rev. Stat. §448.2-101).

This Certificate of Substantial Completion applies to the Units that are shown on the Plat that is described in **Exhibit B** to the Declaration.

Dated: July 8 , 2014.

[ARCHITECT or ENGINEER SEAL]

*STATE OF MISSOURI*
*PAUL HOHMANN*
*NUMBER*
*A-007801*
*REGISTERED ARCHITECT*

X _____
Print: PAUL HOHMANN
Registered Missouri Architect or Engineer,
No. A-007801

STATE OF MISSOURI    )
                     ) SS
COUNTY OF ST. LOUIS  )

On this *8TH* day of July, 2014, before me personally appeared *PAUL HOHMANN* a Registered Missouri Architect or Engineer, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that he executed the same as his free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

My term expires: 10/22/16

_____
Notary Public

CHRISTINE A ROBISON
Notary Public, Notary Seal
State of Missouri
St. Charles County
Commission # 12407286
My Commission Expires October 22, 2016

**EXHIBIT I**

**BY-LAWS OF ARCADE BUILDING CONDOMINIUM ASSOCIATION, INC.**
A Missouri Non-Profit Corporation
================================================================================

**INDEX TO CONDOMINIUM BY-LAWS**         **Page**

**Article 1 – Identity** ............................................................................................... 3

**Article 2 – Qualifications and Responsibilities of Condominium Members**................ 3
2.1    Condominium Members ................................................................................ 3
2.2    More Than One Unit Owner ......................................................................... 3
2.3    Registration ................................................................................................ 3
2.4    Prohibition of Assignment, etc. of Member's Share in Funds of Association................ 3

**Article 3 – Members' Meeting and Voting** .......................................................... 3
3.1    Place of Meeting ......................................................................................... 3
3.2    Annual Meetings.......................................................................................... 3
3.3    Special meetings ......................................................................................... 3
3.4    Attendance of Mortgagee At Meeting ............................................................ 4
3.5    Condominium Member in Good Standing ...................................................... 4
3.6    Quorum....................................................................................................... 4
3.7    Voting Power; Association Not to Vote........................................................... 4
3.8    Manner of Casting Votes .............................................................................. 4
3.9    Action by Members Without Meeting.............................................................. 4
3.10   Adjournment When Quorum Lacking ............................................................ 4
3.11   Manner of Acting ......................................................................................... 4
3.12   Statement of Members and Votes................................................................. 4
3.13   Prohibition of Cumulative Voting .................................................................. 5
3.14   Order of Business At Annual and Other Meetings ......................................... 5
3.15   Master Lease Provisions .............................................................................. 5

**Article 4 – Directors**.......................................................................................... 6
4.1    First Board .................................................................................................. 6
4.2    Number and Qualification of Directors .......................................................... 6
4.3    Election of Directors .................................................................................... 6
4.4    Term ........................................................................................................... 7
4.5    Removal and Replacement ........................................................................... 7
4.6    Vacancies ................................................................................................... 7
4.7    Organization Meeting of Newly Elected Board............................................... 8
4.8    Regular Meeting .......................................................................................... 8
4.9    Special Meetings ......................................................................................... 8
4.10   Waiver of Notice .......................................................................................... 8
4.11   Quorum....................................................................................................... 8
4.12   Adjournment When Quorum Lacking ............................................................ 8
4.13   Manner of Acting ......................................................................................... 8
4.14   Executive Board Action Without Meeting ...................................................... 8
4.15   Presiding Officer .......................................................................................... 8
4.16   Compensation of Directors Restricted........................................................... 8
4.17   Powers and Duties of Executive Board ......................................................... 8

**Article 5 – Officers** ............................................................................................ 11
5.1    Designation of Officers ................................................................................ 11
5.2    Election of Officers ...................................................................................... 11
5.3    Term ........................................................................................................... 11

Arcade Building Condominium       **Exhibit I**       RGSZ v.5
**By-Laws of Association**
**Page 1**       Draft Dtd 07/02/14

5.4     Removal .................................................................................................. 11
5.5     Vacancy ................................................................................................. 11
5.6     Powers and Duties of Officers................................................................ 11
5.7     Execution of Agreements, Etc. ............................................................... 12
5.8     Compensation of Officers Restricted....................................................... 12
5.9     Additional Officers .................................................................................. 12

**Article 6 – Directors' and Officers' Indemnity** ............................................. 12
6.1     Indemnification ...................................................................................... 12

**Article 7 – Fiscal Management** .................................................................... 12
7.1     Depository ............................................................................................. 12
7.2     Records of Association ........................................................................... 12
7.3     Fidelity Bonds ........................................................................................ 13
7.4     Payment Vouchers ................................................................................. 13
7.5     Fiscal Year ............................................................................................. 13

**Article 8 – Assessments** ............................................................................. 13
8.1     Obligations of Members to Pay Assessments; Amount of Levy ............... 13
8.2     Allocation of Common Surplus ............................................................... 13
8.3     Preparation of Budget and Levying of Assessment ................................. 13
8.4     Assessment a Lien ................................................................................. 14
8.5     Payment of Assessments ....................................................................... 14
8.6     Lien After Foreclosure ........................................................................... 14
8.7     Reserve Fund and Working Capital Fund ................................................ 15
8.8     Special Assessments ............................................................................. 15
8.9     Common Expenses Associated With LCE or Benefiting Less than All Units............................. 15
8.10    Failure to Prepare Budget and Levy Annual Assessments; Deficiencies in Procedure............... 15
8.11    Assessment Roll; Statement ................................................................... 16
8.12    Default and Enforcement ....................................................................... 16
8.13    Interest on Delinquent Assessments ...................................................... 16
8.14    Rates, Fees and Charges ....................................................................... 16

**Article 9 – No Subdivision of Units** ............................................................. 16
9.1     Prohibitions ............................................................................................ 16

**Article 10 – Compliance, Enforcement, Fines and Penalties** ........................ 16
10.1    Compliance............................................................................................ 16
10.2    Default and Remedies ............................................................................ 16
10.3    Notice of Default and Failure to Cure ..................................................... 17
10.4    Remedy of Abatement in Addition to Other Remedies ............................ 17
10.5    Recovery of Attorney's Fees and Costs .................................................. 17
10.6    Non-waiver of Covenants ....................................................................... 17
10.7    Assessment Lien .................................................................................... 17
10.8    Disputes ................................................................................................ 17

**Article 11 – Amendment** ............................................................................. 17
11.1    Amendment ........................................................................................... 17

**Article 12 – General Provisions** .................................................................. 18
12.1    Rules and Regulations ........................................................................... 18
12.2    Parliamentary Authority .......................................................................... 18
12.3    Intentionally Deleted .............................................................................. 18
12.4    Security Holders Failure to Agree ........................................................... 18
12.5    Compliance with the Act; Severability ..................................................... 19
12.6    Interpretation of By-Laws ....................................................................... 19

=========================================================================

## ARTICLE 1 -- IDENTITY

These are the **By-Laws of Arcade Building Condominium Association, Inc.,** a Missouri Non-Profit Corporation (the "<u>Association</u>" or the "<u>Association</u>").

For the purpose of these By-Laws, the terms specifically defined in the **Declaration of Condominium of Arcade Building Condominium** (the "<u>Declaration</u>"), or in **Section 448 of the Missouri Revised Statutes** (the "<u>Act</u>"), and any laws amendatory thereof and supplemental thereto, shall have the same meaning herein.

## ARTICLE 2 -- QUALIFICATIONS AND
## RESPONSIBILITIES OF CONDOMINIUM MEMBERS

The qualifications and responsibilities of Condominium Members and the manner of their admission into the Association shall be as follows:

**2.1 – Condominium Members**. Each Unit Owner, by virtue of such ownership, shall be a member ("<u>Condominium Member</u>") of this Association, and shall remain a Condominium Member until such time as such ownership ceases for any reason.

**2.2 -- More Than One Unit Owner**. Where more than one Person owns a Unit, all such Persons together shall be and constitute one (1) Condominium Member with respect to the Unit owned by such Persons.

**2.3 -- Registration**. It shall be the duty of each Unit Owner to register its name and the Unit number with the Secretary of the Association. If a Unit Owner does not so register, the Association shall have no duty or obligation to recognize its membership.

**2.4 -- Prohibition of Assignment, etc., of Member's Share in Funds of Association**. The share of a Condominium Member in the funds and assets of the Association cannot be assigned, pledged, encumbered, alienated or transferred in any manner except as an appurtenance to its Unit.

## ARTICLE 3 -- MEMBERS' MEETING AND VOTING

**3.1 -- Place of Meeting**. Meetings of the Association shall be held at the registered office of the Association, or such suitable places within the City of St. Louis, Missouri, convenient to the Condominium Members, as may be designated in writing from time to time by the Board.

**3.2 -- Annual Meetings**. The Condominium Members shall meet at least once a year. The annual meeting of the Condominium Members shall be held on the second Wednesday in July in each year, commencing in **2014**, and if such day shall be a legal holiday, then on the next business day following, at such time and place as is specified by the President or Secretary in the notice of such meeting; provided, that the Board, from time to time, at any regular or special meeting, may designate in writing a different day for the annual meeting. Except as otherwise provided in <u>Article 4</u> hereof, at each annual meeting, the Condominium Members shall elect a Board to serve until the next annual meeting and may transact any other business authorized to be transacted by the Condominium Members.

**3.3 -- Special Meetings**. Special meetings of the Condominium Members may be called at any time by the President or by the Executive Board, and must be called by the President upon receipt of a written request for a special meeting signed by Condominium Members (Unit Owners) of the Condominium representing at least twenty-five percent (25%) of the total Allocated Interests and Votes. No business shall be transacted at a special meeting except as stated in the notice thereof. Such notice shall be in

Arcade Building Condominium     **Exhibit I**     RGSZ v.5
**By-Laws of Association**     Draft Dtd 07/02/14
**Page 3**

writing, shall be sent by United States mail to the addresses of their respective Units or to such other addresses as any Condominium Member may have designated to the President or Secretary, and shall be mailed not less than twenty-one (21) days in advance of the annual or regularly scheduled meeting and at least seven (7) days in advance of any other meeting; provided, however, that such notice may be delivered personally to any Condominium Member if not prohibited by the statutes of the State of Missouri. Proof of such mailing or delivery shall be given by the affidavit of the Natural Person mailing or delivering the notice. Notice of the meeting may be waived in writing by any Condominium Member before or after such meeting.

**3.4 -- Attendance of Mortgagee at Meetings**. Any Master Tenant of a Unit, any Security Holder of a Security Interest encumbering a Unit or encumbering a Master's Tenant's interest in such Unit, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner and the HTC Investor Member may attend and participate in any general or special meeting, but shall have no Vote, unless granted by proxy.

**3.5 -- Condominium Member in Good Standing**. A "Condominium Member in Good Standing" means a Condominium Member with respect to a Unit in respect to which none of the assessments under the Declaration and By-Laws are more than twenty (20) days past due. So long as a Condominium Member is a Condominium Member in Good Standing, the Condominium Member shall be entitled to vote the Votes allocated to the Unit. During any period in which a Condominium Member is not a Condominium Member in Good Standing, the Condominium Member shall not be entitled to vote the Votes allocated to the Unit; provided that the foregoing shall not apply to voting on any amendments to the Declaration and By-Laws.

**3.6 -- Quorum**. A quorum at meetings of the Condominium Members shall consist of Condominium Members who are Condominium Members in Good Standing present, in Person or by proxy, representing at least fifty percent (50%) of the total Votes in the Association.

**3.7 -- Voting Power; Association Not to Vote**. The voting power of Condominium Members shall be based upon the Allocated Interests of the Units owned and the Votes allocated to such Units by the Declaration. When more than one Person is the owner of a Unit, the Votes for that Unit shall be cast as the Unit Owners shall determine, but in no event shall more than the Vote allocated by the Declaration to the Unit be Voted. The Votes allocated to a Unit shall not be split but shall be Voted as a single whole. Notwithstanding anything herein to the contrary, the Association shall not be entitled to cast the Votes allocated to any Unit owned by it during the period of its ownership.

**3.8 -- Manner of Casting Votes**. A Vote may be cast in Person or by proxy. A proxy must be in writing, be signed by all owners of the Unit, the Vote of which are subject to the proxy, and be only to another Condominium Member or to the Master Tenant of a Unit or to a Security Holder of a Security Interest encumbering that Unit or encumbering a Master's Tenant's interest in such Unit, and be filed with the Secretary before the meeting. A proxy shall be valid until revoked in writing by all owners of such Unit.

**3.9 -- Action by Members Without Meeting**. Any action required by law to be taken at a meeting of the Condominium Members, or any action that may be taken at a meeting of the Condominium Members, may be taken without a meeting if authorization in writing, setting forth the action taken is signed by two-thirds (2/3) of the Condominium Members or such higher percentage as may otherwise be required by Missouri Statutes.

**3.10 -- Adjournment when Quorum Lacking**. If a meeting cannot be organized because a quorum has not attended, the meeting shall be adjourned from time to time until a quorum is present.

**3.11 -- Manner of Acting**. When a quorum is present at a meeting, any question brought before the meeting shall be decided by a majority of the voting power present in Person or by proxy, unless express provisions of applicable law, the Declaration, or these By-Laws require a greater Vote.

**3.12 -- Statement of Members and Votes**. At the beginning of each meeting, the Secretary, or other Person designated by the presiding officer, shall certify a statement listing all Condominium Members

present in Person or by proxy at such meeting, the Votes of each, and the total percentage or number of Votes represented at the meeting.

**3.13 -- Prohibition of Cumulative Voting**.  There shall be no cumulative voting.

**3.14 -- Order of Business at Annual and Other Meetings**.  The order of business at the annual meetings of the Condominium Members, and, so far as is applicable and practical, at all other meetings of the Condominium Members, shall be:

(a)     Certification of Condominium Members and Votes present.

(b)     Calling of the roll.

(c)     Proof of notice of meeting or waiver of notice.

(d)     Approval of minutes from previous meetings.

(e)     Reports of Officers.

(f)     Reports of committees.

(g)     Appointment by presiding officer of judges of election.

(h)     Election of Directors for the second and subsequent Boards.

(i)     Unfinished business.

(j)     New business.

(k)     Adjournment.

The presiding officer may vary such order as the presiding officer deems necessary.

**3.15 -- Master Lease Provisions**.

(a)     No act or action under or pursuant to these By-Laws or the Declaration, and no exercise of any right or remedy under or pursuant to these By-Laws or the Declaration (including, but not limited to, lien rights and default remedies), by the Association, the Executive Board or any Unit Owner, may or shall result in or cause the termination of any Master Lease of a Unit prior to the expiration of the Historic Recapture Period applicable to the Unit which is subject to such Master Lease.

(b)     No act or action under or pursuant to these By-Laws or the Declaration, and no exercise of any right or remedy under or pursuant to these By-Laws or the Declaration (including, but not limited to, lien rights and default remedies), by the Association, the Executive Board or any Unit Owner, may or shall result in or cause the termination of any Master Lease of a Unit during any period in which there is Security Interest encumbering such Master Lease which Security Interest is held by a bank, savings and loan, insurance company, pension fund or other institutional lender, or which Security Interest is held by any governmental agency.

(c)     In all provisions, cases and circumstances under these By-Laws or the Declaration where the consent or approval or agreement or Vote (or similar) of a Unit Owner is required or requested, in the event that the Unit owned by such Unit Owner is subject to a Master Lease, then in such event no such consent or approval or agreement or Vote (or similar) by such Unit Owner shall be valid, binding and effective, unless and until the Master Tenant under such Master Lease (and its constituent members) have reviewed and approved in writing such consent or approval or agreement or Vote (or similar) by such Unit Owner.

**(d)**    When there is a Master Lease of a Unit, then: **(1)** copies of all reports and notices which are to be delivered to the Unit Owner of the Unit will also be delivered to the Master Tenant of the Unit; and **(2)** all amounts to be paid under these By-Laws or the Declaration with respect to a casualty or condemnation will be paid or distributed will be paid or distributed in accordance with Article 8.

**(e)**    Whenever there is a Master Lease of a Unit, then, wherever these By-Laws or the is Declaration provides for or requires the consent, approval or agreement or Vote or right to receive proceeds, receipt of reports, etc., of the Security Holder of a first lien Security Interest, then the consent, approval or agreement or Vote, etc., of the Security Holder of the first lien Security Interest in the Master Tenant's interest in the Master Lease shall be required to be obtained.

**(f)**    The failure of a Master Tenant of a Unit to respond to any request for consent or approval or agreement or Vote (or similar) shall constitute and be deemed such Master Tenant's denial and disapproval of the applicable request.

## ARTICLE 4 -- DIRECTORS

**4.1 -- First Board**.  The first Executive Board shall consist of the **three (3) Natural Persons** appointed by the Declarant, and successors to any thereof appointed by Declarant.  Said first Executive Board and officers elected thereby shall serve until their successors have been duly elected and have qualified.

**4.2 -- Number and Qualifications of Directors**.  The Executive Board shall consist of **three (3) Natural Persons**.  The members of the Executive Board ("Director") may be any Natural Persons designated by the Unit Owners, and the Directors do not need to be Unit Owners.  The Commercial Unit shall be entitled to elect and appoint one (1) of the three (3) Directors.  The Market Rate Unit shall be entitled to appoint one (1) of the three (3) Directors. The LIHTC Units, collectively, shall be entitled to appoint one (1) of the three (3) Directors.  Each Director shall serve a one (1) year term.

**4.3 -- Election of Directors**.

**(a)**    **During Declarant Control Period**.  At any time after the Recording of the Declaration prior to the first annual meeting of the Condominium Members, and thereafter at the first annual meeting of the Condominium Members, and thereafter at each subsequent annual meeting during the Declarant Control Period, the Directors shall be elected or appointed by Declarant, or by Persons designated by Declarant.

**(b)**    **After Declarant Control Period**.  Upon the termination of the Declarant Control Period, the Directors shall be elected by the Condominium Members, as follows: **(1)** the Owner of the Commercial Unit shall elect and appoint one (1) Director; **(2)** the Owner of the Market Rate Unit shall elect and appoint one (1) Director; and **(2)** the Owners of LIHTC Units (by LIHTC Unit Owners owning in the aggregate a majority of the Allocated Interests of the LIHTC Units) shall appoint one (1) Director.

At such time as the Declarant initially deeds and conveys the Commercial Unit to a third-party, the Declarant shall cause one (1) of Directors initially appointed by the Declarant to resign; and the Owner of the Commercial Unit shall elect and appoint the successor to such Director.

At such time as the Declarant initially deeds and conveys the Market Rate Unit to a third-party, the Declarant shall cause one (1) of Directors initially appointed by the Declarant to resign; and the Owner of the Market Rate Unit shall elect and appoint the successor to such Director.

At such time as the Declarant initially deeds and conveys any LIHTC Unit to a third-party, the Declarant shall cause one (1) of Directors initially appointed by the Declarant to resign; and the Owners of the LIHTC Units shall elect and appoint the successor to such Director.

(c)    **Directors Elected or Appointed by Commercial Unit**.  In all cases, any Director to be elected or appointed by the Commercial Unit Owner shall be elected or appointed by Commercial Unit Owner.

(d)    **Directors Elected or Appointed by Market Rate Unit**.  In all cases, any Director to be elected or appointed by the Market Rate Unit Owner shall be elected or appointed by Market Rate Unit Owner.

(e)    **Directors Elected or Appointed by LIHTC Units**.  In all cases, any Director to be elected or appointed by the LIHTC Unit Owners shall be elected or appointed by LIHTC Unit Owners owning in the aggregate a majority of the Allocated Interests of the LIHTC Units.

**4.4 -- Term**.  The term of each Director shall be for one (1) year, or until that Director's successor has been duly elected and has qualified.

**4.5 – Removal and Replacement**.

(a)    **By Declarant**.  Any Director on the first Executive Board, and any Director on any subsequent Executive Board, whom Declarant appointed or elected shall serve at the pleasure of the Declarant, and may be removed and replaced by the Declarant at any time, and from time to time, and with or without cause; and any successor duly appointed by the Declarant shall serve for the balance of the predecessor's term, or until his successor has been duly elected and has qualified.

(b)    **By Owner of Commercial Unit**.  Any Director on any Executive Board whom the Owner of the Commercial Unit appointed or elected shall serve at the pleasure of the Owner of the Commercial Unit, and may be removed and replaced by the Owner of the Commercial Unit at any time, and from time to time, and with or without cause; and any successor duly appointed by the Owner of the Commercial Unit shall serve for the balance of the predecessor's term, or until his successor has been duly elected and has qualified.

(c)    **By Owner of Market Rate Unit**.  Any Director on any Executive Board whom the Owner of the Market Rate Unit appointed or elected shall serve at the pleasure of the Owner of the Market Rate Unit, and may be removed and replaced by the Owner of the Market Rate Unit at any time, and from time to time, and with or without cause; and any successor duly appointed by the Owner of the Market Rate Unit shall serve for the balance of the predecessor's term, or until his successor has been duly elected and has qualified.

(d)    **By Owners of LIHTC Units**.  Any Director on any Executive Board whom the Owners of LIHTC Units appointed or elected shall serve at the pleasure of the Owners of LIHTC Units, and may be removed and replaced by the Owners of LIHTC Units (by LIHTC Unit Owners owning in the aggregate a majority of the Allocated Interests of the LIHTC Units) at any time, and from time to time, and with or without cause; and any successor duly appointed by the Owners of LIHTC Units shall serve for the balance of the predecessor's term, or until his successor has been duly elected and has qualified.

**4.6 -- Vacancies**.  Any vacancy in the Executive Board arising out of the removal, death or resignation of a Director appointed or elected by Declarant shall be filled by appointment made by Declarant.

Any vacancy in the Executive Board arising out of the removal, death or resignation of a Director appointed or elected by the Owner of the Commercial Unit shall be filled by appointment made by the Owner of the Commercial Unit.

Any vacancy in the Executive Board arising out of the removal, death or resignation of a Director appointed or elected by the Owner of the Market Rate Unit shall be filled by appointment made by the Owner of the Market Rate Unit.

Any vacancy in the Executive Board arising out of the removal, death or resignation of a Director

appointed or elected by the Owners of the LIHTC Units shall be filled by appointment made by the Owners of the LIHTC Units.

**4.7 -- Organization Meeting of Newly Elected Board**.  The organization meeting of a newly elected Executive Board shall be held within ten (10) days of its election, at such time and place as shall be fixed by such Directors at the meeting at which they were elected, and no further notice of such organization meeting shall be necessary, providing a quorum shall be present.

**4.8 -- Regular Meeting**.  Regular meetings of the Executive Board may be held at such time and place as shall be determined, from time to time, by a majority of the Directors. Written notice of regular meetings shall be given to each Director, personally or by mail, confirmed facsimile transmission, or telegraph, at least three (3) days prior to the day designated for such meeting, unless such notice is waived in writing. All regular and special Board meetings shall be open to the Condominium Members, and the Condominium Members may attend such regular and special Board meetings.  The Board may meet for executive session meetings that are not open to the Condominium Members.

**4.9 -- Special Meetings**.  Special meetings of the Executive Board may be called by the President and must be called by the Secretary at the written request of one (1) Director.  Not less than three (3) days' written notice of such special meeting shall be given personally or by mail, or telegraph; provided, however, in case the President or any Director determines that an emergency exists, then a special meeting may be called by giving such notice as is possible under the circumstances.  All notices of a special meeting shall be in writing and state the time, place and purpose of such meeting.  No business shall be transacted at a special meeting except as stated in the notice thereof.

**4.10 -- Waiver of Notice**.  Any Director may waive, in writing, notice of a meeting, either regular or special, before or after such meeting, and such waiver shall be deemed equivalent to the giving of notice.

**4.11 -- Quorum**.  A majority of the Executive Board shall constitute a quorum for the transaction of business at any meeting of the Executive Board.

**4.12 -- Adjournment When Quorum Lacking**.  If at any meeting of the Executive Board there shall be less than a quorum present, the majority of those present may adjourn the meeting from time to time until a quorum is present.  At any such adjourned meeting any business that might have been transacted at the meeting as originally called may be transacted without further notice.  If a Director signs the minutes of a meeting, such signing shall constitute the presence of such Director at that meeting for the purpose of determining a quorum.

**4.13 -- Manner of Acting**.  Each Director shall be entitled to one (1) vote, and the act of a majority of the Directors present at a meeting at which a quorum is present shall constitute the act of the Executive Board, unless the act of a greater number is required by these By-Laws, the Declaration, or express provisions of applicable law.

**4.14 -- Executive Board Action Without Meeting**.  Any action required by law to be taken at a meeting of the Executive Board or any action that may be taken at a meeting of the Executive Board, may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all Directors.

**4.15 -- Presiding Officer**.  The presiding officer at meetings of the Executive Board shall be the President.  In his absence the Directors present shall designate one of their number to preside.

**4.16 -- Compensation of Directors Restricted**.  Directors shall receive no compensation for their services, but may be paid for reasonable and actual out-of-pocket expenses incurred in the performances of their duties as Directors.

**4.17 -- Powers and Duties of Executive Board**. All of the powers and duties of the Association shall be exercised by the Board, including those existing under the common law, applicable statutes, the Act, the Declaration, and these By-Laws, as any thereof may from time to time be amended.  Such powers and

duties shall be exercised in accordance with the provisions of applicable law, the Declaration, and By-Laws, and shall include, but not be limited to, the following:

(a)     To elect the officers of the Association.

(b)     To prepare and provide to Condominium Members, and the Limited Partner of the LIHTC Unit Owner and the Limited Partner of each NMTC Unit Owner, annually a report containing at least the following:

(1)     A statement of any capital expenditures in excess of two percent (2%) of the current budget or **Twenty Thousand Dollars ($20,000.00)**, whichever is greater, anticipated by the Association during the current year or succeeding two (2) fiscal years.

(2)     A statement of the status and amount of any reserve or replacement fund and any portion of the fund designated for any specified project by the Executive Board.

(3)     A statement of the financial condition of the Association for the last fiscal year.

(4)     A statement of the status of any pending suits or judgments to which the Association is a party.

(5)     A statement of the insurance coverage provided by the Association.

(6)     A statement of any unpaid assessments due and payable to the Association, identifying the Unit and the amount of the unpaid assessment.

(c)     To adopt and amend budgets and to determine, establish, levy, assess and collect assessments against Condominium Members to pay the Common Expenses of the Condominium and to pay any Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Water & Sewer Utility Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, of the Condominium which are incurred by the Association.

(d)     To use the proceeds of assessments in the exercise of its powers and duties.

(e)     To maintain, repair, replace, and operate the Common Elements.

(f)     To restore, replace and repair improvements as provided in the Declaration.

(g)     To establish and amend rules and regulations which are not in conflict with or inconsistent with the Declaration, and reasonable penalties for infraction thereof.

(h)     To enforce the provisions of the Declaration, these By-Laws, the Act, and the rules and regulations established by the Board or Association, including recovery of monetary penalties and injections, and including purchase of Units, in the name of Association, at foreclosure or other judicial sale.

(i)     To obtain and maintain insurance as provided in the Declaration.

(j)     To contract for management of the Condominium and to delegate to such manager such powers and duties as the Executive Board shall determine, except such as are specifically required by the Declaration, these By-Laws, or the Act, to be done by the Board or the Condominium Members, provided that no such contract shall be entered into for a period exceeding one (1) year and shall provide, at a minimum, that it shall be terminable by the Association, with or without cause, upon thirty (30) days written notice.

(k)    To employ personnel for reasonable compensation to perform the services required for proper administration of the Association and for proper care and maintenance of the Common Elements.

(l)    To pay all Common Expenses of the Condominium, and to pay any Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Water & Sewer Utility Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, of the Condominium which are incurred by the Association.

(m)    To contract for such services for the Condominium as the Executive Board deems necessary or desirable.

(n)    To bring, prosecute, defend, settle and intervene in actions and lawsuits for and on behalf of itself, or on behalf of two (2) or more Condominium Members, with respect to any cause of action relating to the Condominium the Common Elements or to more than one Unit; provided, however, that the prior written consent of the Limited Partner of the LIHTC Unit Owner is required with respect to any such cause of action or lawsuit involving the LIHTC Unit Owner, and the prior written consent of the NMTC Limited Partner Designated Representative is required with respect to any such cause of action or lawsuit involving the NMTC Unit Owner. All costs and expenses incurred in connection with any such action or lawsuit, including settlement thereof, not paid by the opposing party or parties or the Condominium Members benefited thereby, shall be the obligation of the Condominium Members directly involved with or named in such action or lawsuit.

(o)    To establish and dissolve and liquidate, from time to time, reserve accounts for any purpose. The annual budget shall include annual reserves in the minimum amount required by the Act, unless the Unit Owners waive the minimum reserve requirement in accordance with the applicable provisions of the Act.

(p)    To perform such other acts as may be delegated to the Association or Executive Board by applicable statutes, the Declaration, these By-Laws, or the Act, and to perform such other acts as may be incident to or necessary in the performance of the foregoing.

(q)    [intentionally deleted];

(r)    To buy Units, in foreclosure of an assessment lien or at any other time or for any other reason and to sell, lease, mortgage, and otherwise deal in Units from time to time owned by the Association.

(s)    To impose from time to time, and collect, reasonable rates, fees and charges for the use, rental or operation of recreational facilities, if any, and other amenities forming a part of the Common Elements, and the other Common Elements other than Limited Common Elements.

(t)    To grant leases, licenses and concessions not to exceed one (1) year and utility and other easements through and over the Common Elements; provided, however, that after conveyance to Unit Owners other than Declarant or an affiliate of Declarant of Units to which more than fifty percent (50%) of the Votes are allocated, the Association may by resolution of the Condominium Members at a meeting duly called for such purpose grant leases, licenses and concessions in excess of one (1) year and easements through and over the Common Elements.

(u)    To impose and collect reasonable charges, including attorneys' fees, for the evaluation, preparation and Recordation of amendments to the Declaration, preparation of resale certificates required by Section 448.4-109 of the Act, preparation of other documents, statements and certificates required by the Act, or statement of unpaid assessments.

(v)    To provide for indemnification of the Association's officers and directors and maintain officers' and directors' liability insurance.

(w)    To assess against any Unit Owner who fails or refuses to make any payment of the Common Expenses when due, the amount thereof, together with an "Administrative Charge" in the amount hereinafter set forth, not paid by the 10th day of the month in which payment becomes due. In addition to said Administrative Charge, delinquent assessments shall be assessed interest on the amount unpaid as provided in Section 8.13 hereof. The "Administrative Charge" shall be Twenty-Five Dollars ($25.00), for each of the first two late payments by a Unit Owner during any twelve (12) consecutive calendar month period, and shall be One Hundred Dollars ($100.00) for each additional late payment by a Unit Owner during any twelve (12) consecutive calendar month period. The Executive Board, in its reasonable judgment, may waive some or all of the Administrative Charges.

(x)    To assess and levy, after notice and an opportunity to be heard, reasonable fines for violations of the Act, the Declaration, these By-Laws, or the rules and regulations of the Association.

(y)    To keep financial records sufficiently detailed to enable the Association to comply with the Act.

(w)    To perform, comply with and/or satisfy any obligation or act or duty, and to provide any service or function, which any provision of the Declaration expressly or impliedly provides shall be performed or complied with or satisfied or provided by the Association.

## ARTICLE 5 -- OFFICERS

**5.1 -- Designation of Officers**. The officers of this Association shall be a President, a Secretary and a Treasurer, and such other officers (such as one or more Vice-Presidents, Assistant Secretaries and Assistant Treasurers) as the Board may from time to time determine appropriate or necessary, in accordance with Section 5.9 hereof. Each of the President, Secretary and Treasurer, except those who hold office pursuant to Section 5.3 beyond their term as Director, shall be a member of the Executive Board. A Natural Person may hold one or more of such offices at one time, except that the President shall not at the same time hold another office in the Association.

**5.2 -- Election of Officers**. The first Executive Board shall elect the initial officers as soon as practicable after filing of the Declaration. Thereafter, Executive Boards shall elect officers at the organization meeting(s) of the Executive Board as provided in Article 4, and at such other times as the Executive Board shall from time to time determine.

**5.3 -- Term**. Each officer shall serve until the next meeting at which Directors are elected after the organization meeting at which he is elected, and until his successor has been duly elected and has qualified, except that the officers elected by the first Executive Board shall serve until their respective successors have been elected and qualified.

**5.4 -- Removal**. Any officer may be removed, with or without cause, and without notice, by a majority vote of the Directors at any meeting of the Executive Board.

**5.5 -- Vacancy**. Any vacancy in any office shall be filled by the Executive Board, and an officer elected to fill a vacancy shall serve for the unexpired term of his predecessor in office, and until his successor has been duly elected and has qualified.

**5.6 -- Powers and Duties of Officers**.

(a)    **President**. The President shall be the chief executive officer of the Association. He shall have all of the powers and duties that are usually vested in the office of the President of a corporation, including, but not limited to, the duty to preside at all meetings of the Executive Board and of the

Condominium Members at which he is present, and the general supervision over other officers in the management of the business and affairs of the Association.  He shall see that all actions and resolutions of the Executive Board are carried into effect.

**(b)**    **Secretary**.  The Secretary shall keep the minutes of all proceedings of the Directors and the Condominium Members.  He shall attend to the giving and serving of all notices required by law.  He shall keep the records of the Association except those of the Treasurer, and shall perform all other duties incident to the office of a secretary of a corporation.

**(c)**    **Treasurer**.   The Treasurer shall have custody of all intangible property of the Association, including funds, securities and evidences of indebtedness.  He shall keep the books of the Association in accordance with good accounting practices and principles, and shall submit them, together with all his vouchers, receipts, records, and other papers to the Directors for their examination and approval, as often as they may require, and if requested in writing, to the Limited Partner of the LIHTC Unit Owner and to the Limited Partner of each NMTC Unit Owner. He shall deposit all moneys and other valuable effects in the name of or to the credit of the Association in such depositories as may be designated from time to time by the Executive Board, shall disburse the funds of the Association as ordered by the Executive Board, and shall perform all other duties incident to the office of a treasurer of a corporation.  If a managing agent or manager be employed, the Executive Board may designate some or all of the foregoing functions to be entrusted to him or it, subject to overseeing control by the Treasurer.

**(d)**    **Other Officers**.  Other officers shall have such duties, responsibilities, powers and authorities as the Executive Board shall from time to time determine and authorize.

**5.7 -- Execution of Agreements, Etc.**.  All agreements, contracts, deeds, mortgages, or other instruments shall be executed by any two (2) officers or by such other Person(s) as may be designated from time to time by the Executive Board.

**5.8 -- Compensation of Officers Restricted**.  No officer of the corporation shall receive compensation for his services in such capacity, but may be reimbursed for reasonable and actual out-of-pocket expenses incurred in performing his duties.

**5.9 -- Additional Officers**.  The Executive Board may from time to time elect such other officers and designate their powers and duties as it, in its discretion, shall find to be required or desirable to manage the affairs of the Association.  Such additional officers need not be Directors.

## ARTICLE 6 -- DIRECTORS' AND OFFICERS' INDEMNITY

**6.1 -- Indemnification**.  The Association shall indemnify Directors and officers, for such expenses and liabilities, in such manner, under such circumstances, and to such extent, as permitted by the Act, as now enacted or hereafter amended.

## ARTICLE 7 -- FISCAL MANAGEMENT

**7.1 -- Depository**. The depository of the moneys of the Association shall be such bank or banks as from time to time shall be designated by the Executive Board.  Withdrawal of moneys from such depository shall be only by checks signed by any two (2) officers of the Association, or any other Persons as may from time to time be authorized by the Executive Board.

**7.2 -- Records of Association**.  The books, accounts, and records of the Association shall be open to inspection and examination by any Condominium Member of the Association, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner and any Security Holder at all reasonable times; except that the books, accounts, and records of the Association that contain matters that are subject to attorney-client or similar privilege shall not be subject to inspection and examination by

Condominium Members, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner and Security Holders, unless the Board approves otherwise in writing, or except pursuant to the order of a court of competent jurisdiction.

**7.3 -- Fidelity Bonds**.  The Executive Board shall have the right and option to obtain fidelity bonds in accordance with the provisions of the Declaration.  The premiums on such bonds shall be a Common Expense.

**7.4 -- Payment Vouchers**.  Payment Vouchers shall be approved by the Executive Board, unless such authority to approve the same has been delegated to any officer or manager by the Executive Board.

**7.5 -- Fiscal Year**.  The fiscal year of the Association shall be the calendar year; provided that the Directors, from time to time, by resolution, may change the fiscal year to some other designated period.

## ARTICLE 8 -- ASSESSMENTS

**8.1 -- Obligation of Members to Pay Assessments; Amount of Levy**.  Until the Association levies a Common Expense assessment, Declarant shall pay all accrued expenses of the Condominium. Thereafter, each Unit Owner shall be personally severally liable for the assessments for Common Expense (including as applicable any Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Water & Sewer Utility Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, of the Condominium which are incurred by the Association) that are levied against his Unit while a Unit Owner.  Each Unit shall be assessed Common Expense (including as applicable any Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Water & Sewer Utility Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, of the Condominium which are incurred by the Association) in accordance with that Unit's Allocated Interest, Residential Sub-Allocated Expense Share, Arcade Main Lobby Sub-Allocated Expense Share, Residential Marketing Sub-Allocated Expense Share, and Parking Sub-Allocated Expense Share, as the case may be.

**8.2 -- Allocation of Common Surplus**.  Any common surplus shall be allocated to each Unit in accordance with its Allocated Interest, and shall be owned by the Unit Owner of that Unit and credited against that Unit's proportionate share of Common Expenses subsequently assessed.

**8.3 -- Preparation of Budget and Levying of Assessment**.  At least once each fiscal year, beginning with the fiscal year beginning **January 1, 2015**, the Executive Board shall prepare and adopt a budget for that fiscal year **by November 1 of the prior calendar year**, including therein estimates of the amount necessary to pay the Common Expenses (including as applicable any Commercial Common Expenses, Residential Common Expenses, Arcade Main Lobby Security Common Expenses, Arcade Main Lobby Common Expenses, Water & Sewer Utility Common Expenses, Common Cleaning & Janitorial Expenses, Common HVAC Expenses, Common Electric Expenses, Residential Hallway & Etc. Maintenance Expenses, Residential Marketing Expenses, and Parking Common Expenses, of the Condominium which are anticipated to be incurred by the Association), together with amounts considered necessary by the Executive Board for reserves.  Within thirty (30) days after the Executive Board's adoption of any such proposed budget, the Executive Board shall provide a summary of the budget to all Unit Owners and the Limited Partner of the LIHTC Unit Owner and the Limited Partner of each NMTC Unit Owner, and shall set a date for a meeting of the Unit Owners to consider ratification of the budget, which date shall be not less than fourteen (14) days and not more than thirty (30) days after mailing of the summary.  Unless at that meeting a majority Vote of the Unit Owners reject the budget, then the budget is ratified.  In the event that the proposed budget is rejected, then the periodic budget last ratified by the Unit Owners and approved by the Limited Partner of the LIHTC Unit Owner and by the NMTC Limited Partner Designated

Representative shall be continued until such time as the Unit Owners ratify a subsequent budget proposed by the Executive Board and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and at all times prior to the termination of the New Markets Compliance Period the NMTC Limited Partner Designated Representative approve the same. After ratification and approval of each such budget, the Executive Board shall provide each Condominium Member, and the Limited Partner of the LIHTC Unit Owner and the Limited Partner of each NMTC Unit Owner, with a copy and shall give each Condominium Member notice of the assessment made against that Condominium Member's Unit based upon such budget (and, in the case of the LIHTC Unit Owner, at all times prior to the termination of the LIHTC Compliance Period such notice of assessment shall also be provided to the Limited Partner of the LIHTC Unit Owner, and at all times prior to the termination of the New Markets Compliance Period to the Limited Partner of each NMTC Unit Owner), and based upon such Unit's Allocated Interest, Residential Sub-Allocated Expense Share, Arcade Main Lobby Sub-Allocated Expense Share, Residential Marketing Sub-Allocated Expense Share and Parking Sub-Allocated Expense Share, as the case may be; and such notice may also provide for the rate interest to be charged on delinquent payments thereof, if to be other than the rate specified in Section 8.13 of these By-Laws. The assessment shall be deemed levied upon the giving of such notice; provided, however, that the first budget after creation of the Condominium shall be prepared and adopted by the first Executive Board only for the balance of the then fiscal year of the Association, shall be prepared and adopted as soon as practicable after such creation, and notice of the amount of the assessment against each Unit for such balance of the fiscal year shall be given by the Executive Board or Declarant to each Condominium Member and at all times prior to the termination of the LIHTC Compliance Period the Limited Partner of the LIHTC Unit Owner and during the NMTC Compliance Period the Limited Partner of each NMTC Unit Owner, as soon as practicable after adoption of such assessment and shall be deemed levied upon notice thereof given by the Executive Board or Declarant, and shall be due as provided in Section 8.5 hereof.

**8.4 -- Assessment A Lien**. Every assessment shall constitute a lien upon the Unit assessed from the date the assessment is levied prior to all other liens and encumbrances on the Unit except:

    **(1)**      Liens and encumbrances recorded before the recordation of this Declaration;
    **(2)**      A mortgage or deed of trust for the purchase of a Unit recorded before the date on which the assessment sought to be enforced becomes delinquent;
    **(3)**      Liens for real estate taxes and other governmental assessments or charges against the Unit;
    **(4)**      Except for delinquent assessments or fines, up to a maximum of six (6) months' assessments or fines, which are due prior to any subsequent refinancing of a Unit or for any subsequent second mortgage interest.

**8.5 -- Payment of Assessments**. Assessments shall be payable when notice thereof is given, but shall not be delinquent if paid at the times and in the amounts specified by the Executive Board in each such notice. If no times and amounts are specified, 1/12th of the assessment shall be paid on or before the first day of each month of the fiscal year of the Association. Payment shall be made to the Association, or as the Executive Board may from time to time otherwise direct.

**8.6 -- Lien After Foreclosure**. Except for up to six (6) months' assessments or fines as described in Item (4) of Section 8.4 of these By-Laws, the lien of any assessments against a Unit becoming payable after the date of recordation of any mortgage against such Unit shall be subordinate to such mortgage. When ownership of a unit is transferred by foreclosure under the remedies provided in any first mortgage, the lien of any unpaid assessments as to the Unit shall be discharged and extinguished by such foreclosure, and such unpaid assessments shall be paid by the mortgagee, except for up to six (6) months' assessments or fines as described in Item (4) of Section 8.4 of these By-Laws. The Unit and Unit Owner acquiring title under the remedies provided in a Deed of Trust shall be subject only to the lien of assessments which become due after such transfer of title, except for up to six (6) months' assessments or fines as described in Item (4) of Section 8.4 of these By-Laws. Nothing in this Section 8.6 shall be construed as a waiver or release of the obligation of the former owner to pay the delinquent assessments.

Arcade Building Condominium          **Exhibit I**          RGSZ v.5
**By-Laws of Association**          Draft Dtd 07/02/14
**Page 14**

**8.7 -- Reserve Fund and Working Capital Fund**.  All sums collected by the Association from assessments shall be accounted for as follows:

(a)     **Reserve Fund for Replacements**.  To this fund shall be credited all sums collected or set aside for the purpose of effecting periodic maintenance, repairs and replacements of structural elements, and other Common Elements of the Condominium.

(b)     **Working Capital Fund**.  To this fund shall be credited collections of assessments for all Common Expenses for the current year as well as common profits and surplus from the previous year, and not to be credited to the above reserve fund.

The reserve fund for replacements shall be established by the Executive Board and shall be funded by regular installments rather than by extraordinary special assessments.  The reserve fund described above shall be maintained only in such amounts as deemed necessary or desirable by the Executive Board, subject, however, to the preceding sentence.  To the extent maintained, funds therein shall be held in such accounts and with such depositories as the Executive Board, in its discretion, selects.

**8.8 -- Special Assessments**.  In addition to the assessments levied as provided in Section 8.3, the Executive Board, in its discretion, may levy special assessments at such other and additional times as in its judgment are required for:

(a)     **Repair and Maintenance of Common Elements and Operation of the Condominium**.  Maintenance, repair, replacement and restoration of the Common Elements, and operation of the Condominium.

(b)     **Alterations, Improvements and Additions to Common Elements**.  Alterations, improvements, and additions to the Common Elements; provided, however, that any such special assessment involving the expenditure of **Fifty Thousand Dollars ($50,000.00)** or more shall be first approved by the voting Condominium Members of the Association representing at least fifty-one (51%) percent of the total Allocated Interests of the Units and at least fifty-one percent (51%) of the Votes, at a special meeting called for such purpose.

(c)     **Curing of Member's Default**.  Costs and expenses incurred in curing defaults of a Condominium Member pursuant to Section 8.12 hereof or Article 10 hereof.

Special assessments made pursuant to this Section 8.8 shall be deemed levied upon notice thereof being given to the Condominium Members subject to such special assessment, and shall be payable as determined by the Executive Board and as set out in such notice; provided, however, that at all times prior to the termination of the LIHTC Compliance Period any special assessments levied against the LIHTC Unit are subject to the prior written approval of the Limited Partner of the LIHTC Unit Owner, and at all times prior to the termination of the New Markets Compliance Period any special assessments levied against an NMTC Unit are subject to the prior written approval of the NMTC Limited Partner Designated Representative.

**8.9 -- Common Expenses Associated with Limited Common Elements or Benefiting Less Than All Units**.  Except as otherwise provided in the Declaration, and subject to application provisions of the Declaration, **(a)** any Common Expense associated with the maintenance, repair, or replacement of a Limited Common Element shall be assessed against the Unit or Units to which such Limited Common Element was allocated at the time the expense was incurred; and **(b)** the Association may assess any Common Expense benefiting less than all of the Units against the Units benefited in proportion to the relative Allocated Interests of the Units benefited.

**8.10 -- Failure to Prepare Budget and Levy Annual Assessments; Deficiencies in Procedure**.  The failure of the Executive Board to prepare or delay of the Executive Board in preparing any budget, and to levy or in levying assessments, shall not constitute a waiver or release of the Condominium Members'

**Exhibit I**                           RGSZ v.5
                                           **By-Laws of Association**               Draft Dtd 07/02/14
                                                       **Page 15**

obligation to pay assessments whenever the same shall be determined and levied by the Executive Board.

Until a new assessment is levied by the Executive Board pursuant to Section 8.3 each Condominium Member shall continue to pay the assessment previously levied pursuant to Section 8.3 in the same amount and at the same periodic times as levied, or as the Executive Board may otherwise advise in writing. Also, any deficiencies or inadequacies in the procedure followed by the Executive Board in levying an assessment shall not in any way affect its validity or the obligation of Condominium Members to pay such assessment.

**8.11 -- Assessment Roll; Statement**. All assessments shall be set forth upon a roll of the Units, which shall be available in the office of the Association for inspection at all reasonable times by Condominium Members, the Limited Partner of the LIHTC Unit Owner, the Limited Partner of each NMTC Unit Owner and Security Holders, and their duly authorized representatives. Such roll shall include, for each Unit, the name and address of the Condominium Member(s), all assessments levied, and the amount of all assessments unpaid. The Association, upon written request, shall furnish to a Unit Owner, or his authorized agent, or, in the case of the LIHTC Unit, the Limited Partner of the LIHTC Unit Owner, or, in the case of an NMTC Unit, the Limited Partner of the NMTC Unit Owner, a recordable statement setting forth the amount of unpaid assessments currently levied against his Unit. The statement shall be furnished within ten (10) business days after receipt of the request and shall be binding upon the Association and all Unit Owners. For such statement a reasonable fee may be charged by the Executive Board.

**8.12 -- Default and Enforcement**. If any assessment, or installment thereof, remains delinquent for ten (10) days, then that assessment, and all other assessments then a lien against that Unit, may be declared by the Executive Board to be immediately due and payable in full, with interest, without further notice, and may be foreclosed by the Association in the manner provided by the Act.

**8.13 -- Interest on Delinquent Assessments**. Assessments, or installments thereof, paid before they become delinquent shall not bear interest. All delinquent assessments in addition to the administrative charge provided in Section 4.17(w) shall bear interest at the rate of eighteen (18%) per annum, or such lesser interest as is set forth in the notice levying the assessment, but not exceeding the maximum rate of interest allowed by the Act, from the date delinquent until the date paid. All payments upon account shall be applied first to the administrative charge, then to interest, and then to the assessment, or installment thereof, longest delinquent.

**8.14 -- Rates, Fees and Charges**. All rates, fees, charges, fines and penalties imposed by the Executive Board against, or due from, any Condominium Member or Unit may be collected and enforced as an assessment.

**ARTICLE 9 – NO SUBDIVISION OF UNITS**

**9.1 – Prohibitions**. No Unit Owner may subdivide or convert or relocate the boundaries of his Unit. The Individual Dwelling Units located in the Residential Units are permitted and not a violation of the prohibitions in this Section 9.1.

**ARTICLE 10 -- COMPLIANCE, ENFORCEMENT, FINES AND PENALTIES**

**10.1 -- Compliance**. Each Unit Owner shall be governed by and shall comply with the terms, conditions, obligations, and provisions of the Act, the Declaration, these By-Laws, and the rules and regulations, as the same may be amended from time to time.

**10.2 -- Default and Remedies**. A default in or failure to comply with any of the terms, conditions, obligations, and provisions of the Act, the Declaration, these By-Laws, or the rules and regulations, as the same may be amended from time to time, by any Unit Owner or occupant, shall be grounds for relief that may include, without intending to limit the same or to constitute an election of remedies, an action to

recover fines and penalties for such default or failure as determined by the Executive Board, sums due for damages, an injunction, or any combination thereof, and which relief may be sought by the Association or, if appropriate, by any one or more aggrieved Condominium Members, or both.  Also, if any Condominium Member fails to perform any obligation under the Act, the Declaration, these By-Laws, or such rules and regulations then the Association may, but is not obligated to, perform the same for the Condominium Member's account, and for such purpose may enter upon his Unit, may make necessary repairs, advance expenses or other sums necessary to cure the default, and for such expenses and costs may levy a special assessment against the Unit owned by such defaulting Condominium Member.

**10.3 -- Notice of Default and Failure to Cure**.  In the event of any such default or failure, the Executive Board shall promptly serve upon or mail to the defaulting Condominium Member (and its Limited Partner) and each Security Holder of that Condominium Member's Unit, a written notice specifying the nature of the default, the cure thereof, and the time within which the cure shall be effected.  Within the time limit specified in the notice, the defaulting Condominium Member may cure the default specified.

**10.4 -- Remedy of Abatement in Addition to Other Remedies**.  In the event a Condominium Member fails to effect the cure specified by the Executive Board in the notice of default, within the time specified in such notice, where the default is a structure, thing or condition existing in or on the premises of the Condominium Member's Unit, the Board, or its duly authorized representative, shall have the right upon obtaining an order from a court of competent jurisdiction to enter upon the premises of the Condominium Member's Unit in which, on which, or as to which, such default exists, and to abate and remove at the defaulting Condominium Member's expense (and levy an assessment therefor), the structure, thing, or condition constituting the default, and the Executive Board, the Association, and their agents, employees, and representatives shall not thereby be deemed guilty of any manner of trespass.  In addition, in the event of any condition in a Unit which is in the nature of an emergency, the Board (and its duly authorized representatives) shall have the right upon such notice as is practicable and reasonable given the nature of the emergency condition, to enter upon the premises to abate such emergency at the Unit Owner's expense (and levy an assessment therefor), and the Board, the Association, and their agents, employees, and representatives shall not thereby be deemed guilty of any manner of trespass.

**10.5 -- Recovery of Attorneys' Fees and Costs**.  In any proceeding arising because of an alleged default by a Condominium Member, the prevailing party shall be entitled to recover the costs of such proceeding and such reasonable attorneys' fees as may be allowed by the court, with interest thereon at eighteen percent (18%) per annum from the dates such costs are incurred until paid.

**10.6 -- Non-waiver of Covenants**.  The failure of the Association or of any Condominium Member thereof to enforce any term, provision, right, covenant, or condition that may be granted by the Declaration, these By-Laws, the rules and regulations of the Act, as the same may from time to time be amended, shall not constitute a waiver or abrogation of the right of the Association or a Condominium Member to enforce such term, provision, right, covenant, or condition in the future, irrespective of the number of violations or breaches thereof that may have occurred.

**10.7 -- Assessment Lien**.  Assessment liens shall be enforced pursuant to Article 8 hereof, and not pursuant to this Article 10.

**10.8 -- Disputes**.  The Condominium Members, the Declarant, the Association, the Unit Owners agree and provide that any and all disputes and disagreements under or regarding or in connection with the Declaration and/or these By-Laws shall, at the option of any party, be submitted to, resolved by and determined by a court of competent jurisdiction.

### ARTICLE 11 -- AMENDMENT

**11.1 -- Amendment**.

    **(a)**    These By-Laws may only be amended with: **(1)** the affirmative vote of at least seventy-five percent (75%) of the Unit Owners of Units to which Votes in the Association are allocated; **(2)** written

Arcade Building Condominium        **Exhibit I**        · RGSZ v.5
**By-Laws of Association**    Draft Dtd 07/02/14
**Page 17**

approval of the Security Holders of the first lien Security Interests encumbering the Commercial Unit or encumbering a Master's Tenant's interest in such Unit; **(3)** written approval of the Security Holders of the first lien Security Interests encumbering the Market Rate Unit or encumbering a Master's Tenant's interest in such Unit; **(4)** written approval of the Security Holders of the first lien Security Interest encumbering the LIHTC Units or encumbering a Master's Tenant's interest in such Units; **(5)** at all times prior to the termination of the LIHTC Compliance Period, written approval of the Limited Partner of the LIHTC Unit Owner; and **(6)** at all times prior to the termination of the New Markets Compliance Period, written approval of the NMTC Limited Partner Designated Representative.

**(b)** ' The president, treasurer, secretary or assistant secretary of the Association may prepare, execute, certify and Record amendments to these By-Laws pursuant to this Article 11. An amendment to these By-Laws, once made and approved, shall become effective when Recorded in the same manner and place as an amendment to the Declaration.

## ARTICLE 12 -- GENERAL PROVISIONS

**12.1 -- Rules and Regulations**.  The Executive Board may promulgate from time to time such rules and regulations, which are not in conflict with or inconsistent with this Declaration, as it deems reasonable and necessary governing the administration, management, operation, and use of the Common Elements so as to promote the common use and enjoyment thereof by Unit Owners and occupants, and for the protection and preservation thereof.

In addition the Executive Board may adopt such rules and regulations, which are not in conflict with or inconsistent with this Declaration, as it deems reasonable and necessary with respect to Units to provide for the common good and enjoyment of all Unit Owners and their respective tenants, including, without limitation, the right to adopt such rules and regulations with reference to children, animals and leases.  Also, the Executive Board may from time to time establish penalties for infraction of such rules and regulations.  Copies of all such rules and regulations and any amendments thereto shall be furnished to all Condominium Members, and a copy shall be posted or otherwise made available to Condominium Members at the office of the Association. However, failure to furnish or post such rules or regulations shall not affect in any way their validity or enforceability. Any such rule or regulation adopted by the Executive Board may be amended, modified, or revoked, and new and additional rules and regulations may be adopted, by the Condominium Members at an annual or special meeting of the Condominium Members.  Any such act of the Condominium Members shall control over any contrary rule or regulation then or thereafter adopted by the Board.  All rules and regulations shall be equally and uniformly applicable to all Unit Owners, occupants and Units, but need not be equally uniformly applicable if it is determined that such unequal or non-uniform application is in the best interest of the Association or if equal and uniform application is not practicable.

Notwithstanding the foregoing, the Executive Board may not enact any rule or regulation: **(a)** which is in conflict with or inconsistent with the Declaration; or **(b)** which has the practical effect of rescinding, overturning or terminating any written approval previously given by the Association to a Unit Owner; excepting upon the prior written consent and approval of the applicable Unit Owner.

**12.2 -- Parliamentary Authority**.  Robert's Rules of Order, Newly Revised, shall govern the conduct of Association proceedings when not in conflict with the Declaration, these By-Laws, the Act or any statutes of the State of Missouri applicable thereto.  The Chairman of the meeting shall have the authority to appoint a parliamentarian if he deems it necessary.

**12.3 – Intentionally Deleted**.

**12.4 -- Security Holders Failure to Agree**.  To the extent **(a)** the terms of these By-Laws require the approval or consent of multiple Security Holders holding a Security Interest in a Unit, **(b)** the approval or consent of each such Security Holder has been requested in accordance with the terms of these By-Laws or the Declaration, and **(c)** such Security Holders cannot agree, then the decision of the Security Holder of the first lien Security Interest in the Unit shall control with respect to the particular approval or consent

requested.

**12.5 -- Compliance with the Act; Severability**. These By-Laws are established in compliance with the Act. Should any of the terms, conditions, provisions, paragraphs, or clauses of these By-Laws conflict with any of the provisions of said Act, the provisions of said Act shall control.

If any such term, provision, limitation, paragraph or clause of these By-Laws or the application thereof to any Person or circumstance, is judicially held to be invalid, such determination shall not affect the enforceability, validity, or effect of the remainder of these By-Laws, or the application thereof to any other Person or circumstance.

**12.6 -- Interpretation of By-Laws**.  Whenever appropriate the singular number may be read as the plural, and the plural may be read as the singular.  The masculine gender may be read as the feminine gender or as the neuter gender. Compound words beginning with the prefix "here" shall be read as referring to this entire set of By-Laws and not merely to the part of it in which they appear.

[SIGNATURE PAGE FOLLOWS]

The undersigned, the duly elected and acting President and Secretary of the Association, hereby certify that the foregoing By-Laws have been duly adopted by the Association, and are in full force and effect as of the date hereof.

**IN WITNESS WHEREOF,** the undersigned have executed these By-Laws as of the _8th_ day of _July_ 2014.

**ARCADE BUILDING CONDOMINIUM ASSOCIATION, INC.**

By: _Otis Williams_                          By: _____
Print:   **Otis Williams**                    Print:   **Dale Ruthsatz**
Title:   **President**                        Title:   **Secretary**

STATE OF MISSOURI          )
                           ) SS
CITY OF ST. LOUIS          )

On this _10th_ day of June, 2014, before me appeared OTIS WILLIAMS, to me personally known, who being by me duly sworn, did say that he/she is the PRESIDENT of **ARCADE BUILDING CONDOMINIUM ASSOCIATION, INC.**, a Missouri Non-Profit Corporation, and that said instrument was signed in behalf of said corporation, by authority of its Executive Board; and said OTIS WILLIAMS acknowledged said instrument to be the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

My Commission Expires: _03/4/2018_                _Linda R. Criss_
                                                    Notary Public

LINDA R. CRISS
My Commission Expires
March 4, 2018
St. Louis City
Commission #14658765

STATE OF MISSOURI          )
                           ) SS
CITY OF ST. LOUIS          )

On this _10th_ day of June, 2014, before me appeared DALE RUTHSATZ, to me personally known, who being by me duly sworn, did say that he/she is the SECRETARY of **ARCADE BUILDING CONDOMINIUM ASSOCIATION, INC.**, a Missouri Non-Profit Corporation, and that said instrument was signed in behalf of said corporation, by authority of its Executive Board; and said DALE RUTHSATZ acknowledged said instrument to be the free act and deed of said corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the County and State aforesaid, the day and year first above written.

My Commission Expires: _03/4/2018_                _Linda R. Criss_
                                                    Notary Public

LINDA R. CRISS
My Commission Expires
March 4, 2018
St. Louis City
Commission #14658765

Arcade Building Condominium              **Exhibit I**
                                  **By-Laws of Association**
                                      **Signature Page**

### Exhibit J
### Casualty Restoration Conditions and Requirements

**1.    Minor Casualty.**  If a Minor Casualty has occurred, the Net Proceeds (as hereinafter defined) will be disbursed to the Association.  Promptly after receipt of the Net Proceeds, the Association or the affected Unit Owners or Master Tenants shall commence and satisfactorily complete with due diligence the Restoration (as hereinafter defined) in accordance with the terms of the Declaration even if the Net Proceeds are insufficient to fully pay for the Restoration. All work in connection with the Restoration shall be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work on the Property, so that upon completion thereof, the Property shall be at least equal in value and in general utility to the Property prior to the damage or destruction.  The work shall be completed free of any liens, and upon the request of any Security Holder, the Association shall provide the Security Holder with reasonably satisfactory evidence of lien-free completion.  As used herein, the term "Net Proceeds" means the net amount of insurance proceeds payable as a result of casualty to the Property, after deduction of reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees), if any, of collection of the insurance proceeds.  The term "Restoration" means the repair and restoration of the Property following casualty, by fire or otherwise, to the Property or any part thereof.

**2.    Major Casualty.**

    **(a)**    If a Major Casualty has occurred to the Property, the Net Proceeds shall be delivered to the Insurance Trustee and held by the Insurance Trustee in an interest-bearing account. The Insurance Trustee shall make the Net Proceeds available for Restoration, provided that each of the following conditions are met:

        **(i)**    The Insurance Trustee shall be satisfied that any operating deficits and all payments of principal and interest due to the first lien Security Holders will be paid during the period required for Restoration from (A) the Net Proceeds, or (B) other funds of the Association, the affected Unit Owners or the Master Tenants;

        **(ii)**    The Insurance Trustee shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) eighteen (18) months following the Major Casualty, (B) such time as may be required under applicable laws in order to repair and restore the Property to the condition it was in immediately prior to such Major Casualty, or (C) the expiration of the required business interruption insurance coverage and exhaustion of the other funds referred to in Clause (i)(B) above;

        **(iii)**    the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable laws;

        **(iv)**    such Major Casualty does not result in the loss of access to the Property or related property for a period in excess of one hundred twenty (120) days.

    **(b)**    If the conditions set forth in paragraph (a) above are satisfied, the Net Proceeds shall be disbursed by the Insurance Trustee to, or as directed by, the Association from time to time during the course of Restoration, upon receipt of evidence reasonably satisfactory to the Insurance Trustee that (A) all requirements set forth in this Exhibit J have been satisfied, (B) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, (C) all contractors, subcontractors and materialmen have delivered to the Insurance Trustee lien waivers covering all lienable work done and materials supplied in connection with the Restoration (except to the extent of the work and materials to be paid for out of the requested disbursement), and (D) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the reasonable satisfaction of the Insurance Trustee and discharged of record or in the

alternative fully insured to the reasonable satisfaction of the Insurance Trustee by the title companies issuing the title insurance policies to the first lien Security Holders (the "**Title Insurance Policies**").

(c)     All plans and specifications required in connection with the Restoration of a Major Casualty shall be in accordance with the Declaration and subject to prior approval of the Insurance Trustee, such approval not to be unreasonably withheld, and an independent architect selected by the Insurance Trustee (the "**Casualty Consultant**"). The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work in the Property, so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that the Association and the Unit Owners shall not be obligated to restore the Property to the precise condition of the Property prior to such Major Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Major Casualty. The Association and/or the affected Unit Owners shall restore all Property such that when they are fully restored and/or repaired, such Property and their contemplated use fully comply with all applicable laws. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval of the Insurance Trustee, such approval not to be unreasonably withheld, and the Casualty Consultant. All costs and expenses incurred by the Insurance Trustee in connection with recovering, holding and advancing the Net Proceeds for the Restoration, including, without limitation, attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by the Association, the affected Unit Owners or Master Tenants.

(d)     In no event shall the Insurance Trustee be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Exhibit J, be less than the amount actually held back by the Association and/or the affected Unit Owners from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to the Insurance Trustee that the Restoration has been completed in accordance with the provisions of this Exhibit J and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental authorities, and the Insurance Trustee receives evidence satisfactory to the Insurance Trustee that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that the Insurance Trustee will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to the Insurance Trustee that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by the Insurance Trustee or by the title companies issuing the Title Insurance Policies, and the first lien Security Holders receive endorsements to the Title Insurance Policies insuring the continued priority of the liens of the first lien Security Holders and evidence of payment of any premium payable for such endorsement. If required by the Insurance Trustee, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e)     The Insurance Trustee shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of the Insurance Trustee in consultation with the Casualty Consultant, be sufficient to pay in full

the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, the Association or the affected Unit Owners or Master Tenants shall deposit the deficiency (the **"Net Proceeds Deficiency"**) with the Insurance Trustee before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with the Insurance Trustee shall be held by the Insurance Trustee and shall be disbursed first, before the disbursement of any Net Proceeds currently held by the Insurance Trustee are further disbursed, and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds.

(g)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Insurance Trustee after the Casualty Consultant certifies to the Insurance Trustee that the Restoration has been completed in accordance with the provisions of this Exhibit J, and the receipt by the Insurance Trustee of evidence reasonably satisfactory to the Insurance Trustee that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by the Insurance Trustee to the Security Holders, the Unit Owners and Master Tenants as provided in Section 9.2(h) of the Declaration.

(h)    If the Condominium is terminated following the occurrence of a Major Casualty, as provided in Section 9.2(b) of the Declaration, then the Termination Share of each Unit shall be determined as provided in Section 9.2(c) of the Declaration, and all Net Proceeds shall be paid to the Security Holders, Unit Owners and Master Tenants in proportion to the Termination Shares of their respective Units as provided in Section 9.2(h) of the Declaration.

(i)    To assist in the performance of its duties under the Declaration and this Exhibit J, the Insurance Trustee may retain one or more independent insurance consultants or construction disbursing agents, and the reasonable fees and expenses of such consultants and agents shall be payable from the insurance proceeds before any Net Proceeds are disbursed.