# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| WEBSTER UNIVERSITY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| ST. LOUIS LEASED HOUSING ) | |
| ASSOCIATES MASTER TENANT ) | |
| V, LLLP, ) | |
| ) | |
| Defendant. ) | |

<u>**COMPLAINT**</u>

1.     After years of paying excessive Additional Rent and Operating Expenses to its landlord Defendant St. Louis Leased Housing Associates Master Tenant V, LLLP ("SLLHA" or "Dominium"), Plaintiff/tenant Webster University ("Webster") performed a CAM reconciliation audit for its 2023 rent wherein it discovered that Dominium had repeatedly charged Webster for expenses that had no business being paid by Webster. Webster performed another CAM reconciliation audit for 2024 rent, wherein it discovered that Dominium continued to overbill Webster, frequently for the same improper categories of items included in 2023. This overbilling practice has continued into 2025 and 2026, as evidenced by expenses included within the 2025 CAM reconciliation and 2026 CAM budget provided by Dominium. Despite being presented with clear evidence of its

1

improper billing practices, Dominium has refused to refund Webster, which it is contractually obligated to do under the parties' June 4, 2014 Arcade Building Office Lease (the "Commercial Lease"). The Commercial Lease is attached hereto as Exhibit A. Through this lawsuit, Webster seeks: (i) a refund of Additional Rent Webster was charged for and paid for years prior to 2023; (ii) a refund of Additional Rent Webster was charged and paid for 2023 and 2024 that was discovered through the 2023 and 2024 CAM reconciliation audits; and (iii) a refund of Additional Rent Webster was improperly charged and paid for 2025; and (iv) declaratory relief requiring that going forward Dominium be required to maintain proper accounting and charge only those Operating Expense items properly assessable to Webster.

### PARTIES

2.     Webster University is a Missouri nonprofit corporation with a principal place of business located at 470 East Lockwood Avenue, St. Louis, MO 63119.

3.     Defendant Dominium is a Missouri limited liability limited partnership with a business address located at 2905 Northwest Boulevard, Suite 150, Plymouth, MN 55441. Dominium is a subsidiary and affiliate of Dominium Management Services. The partners of the Defendant are St. Louis Leased Housing Associates Master Tenant V, LLC, a Minnesota limited liability

2

company, and St. Louis Leased Housing Associates Master Tenant LP V, LLC, a Minnesota limited liability company. The partners of the Defendant consist of limited liability and sub-limited liability companies, the ultimate members of which are citizens of Minnesota, Arizona, Florida, Texas, and South Dakota. Specifically:

    a.  The members of Dominium are:

    i.  Dominium Holdings I, LLC, a Minnesota limited liability company whose sole member is Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company  as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 -3 Trust (a South Dakota Trust with South Dakota Trust Company as trustee), Armand  Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a Minnesota resident, and Paul Sween, an Arizona resident).

    ii.  Dominium Holdings II, LLC, a Minnesota limited liability company, whose sole member is Dominium Holdings I, LLC, whose sole member, in turn, is Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 -3 Trust (a South Dakota Trust with South Dakota Trust Company as trustee), Armand Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris

3

Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a Minnesota resident, and Paul Sween, an Arizona resident). (iii) Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 -3 Trust (South Dakota Trust with South Dakota Trust Company as trustee), Armand Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a Minnesota resident and Paul Sween, an Arizona resident). b. The members of St. Louis ~~Leasing~~Leased Housing Associates Master Tenant LP V, LLC are: (i) Dominium Holdings I, LLC, a Minnesota limited liability company whose sole member is Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 - 3 Trust (a South Dakota Trust with South Dakota Trust Company as trustee), Armand Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a

4

Minnesota resident, and Paul Sween, an Arizona resident). (ii) Dominium Holdings II, LLC, a Minnesota limited liability company, whose sole member is Dominium Holdings I, LLC, whose sole member, in turn, is Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 -3 Trust (South Dakota Trust with South Dakota Trust Company as trustee), Armand Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a Minnesota resident, and Paul Sween, an Arizona resident). (iii) Polaris Holdings I, LLC, a Minnesota limited liability company. The members of Polaris Holdings I, LLC are the Paul Sween 2018 – 1 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 – 2 Irrevocable Trust (a South Dakota Trust with South Dakota Trust Company as trustee), the Paul Sween 2018 -3 Trust (South Dakota Trust with South Dakota Trust Company as trustee), Armand Brachman, a Minnesota resident, Mark Moorhouse, a Minnesota resident, Jeff Huggett, a Minnesota resident, Chris Barnes, a Minnesota resident, and Dominium SVP Plan, LLC, a Minnesota limited liability company. The members of Dominium SVP Plan, LLC are Armand Brachman, a Minnesota resident, Tim Allen, a Minnesota resident, Brendt Rusten, a Florida resident, John Sipes, a Texas resident, and PSMM Holdings, LLC, a Minnesota limited liability company (whose members are Mark Moorhouse, a Minnesota resident, and Paul Sween, an Arizona resident).

## JURISDICTIONAL STATEMENT

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties.

5.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper before this Court because a substantial part of the events or omissions giving rise to the claim occurred within the Eastern District of Missouri and because a substantial part of property that is the subject of the action is situated in this Eastern District of Missouri.

## FACTS COMMON TO ALL COUNTS

### The Arcade Building: Its History and Significance

7.      The Arcade Building is a historic building located in Downtown St. Louis.

8.      Located at 810 Olive, the Arcade Building was built in two stages. The 18-story Wright Building was built in 1906. Then, in 1919, the Arcade Building was constructed to wrap around the existing Wright Building. It features a Gothic Revival architectural style.

9.      The Arcade Building is now a St. Louis City Landmark and is listed in the National Register of Historic Places, as of 2003.

### The Arcade Building: The Declaration and The Structure of Rentable Units

10.    Prior to July 2013, the Land Clearance for Redevelopment Authority of the City of St. Louis, Missouri (the "LCRA") owned the Arcade Building. St. Louis Leased Housing Associates V, LLP closed on its purchase of the property in 2014.

11.    During the LCRA's ownership of the Arcade Building, the LCRA executed and recorded a Declaration of Condominium and By-Laws of Arcade Building Condominium, dated July 8, 2014 (the "Declaration"). The Declaration is attached hereto as Exhibit B.

12.    The Declaration established a condominium ownership structure for the Arcade Building, thereby creating the Arcade Building Condominium.

13.    Broadly speaking and as it pertains to this Complaint, the Declaration established three units within the Arcade Building Condominium: (1) the Market Rate Unit; (2) the Commercial Unit; and (3) the Low Income Housing Tax Credit ("LIHTC") Unit. The units and their composition are as shown in the below table:

| Unit | Floors/Composition |
|------|--------------------|
| Market Rate Unit | Part of 3rd Floor; 15–18th Floors; 80 below grade parking spaces |
| LIHTC Unit | Part of 3rd Floor; 4–14th Floors |
| Commercial Unit | 1st Floor, Mezzanine, and 2nd Floor; 40 below grade parking spaces |

14.    The Market Rate Unit consists of residential apartments leased at market rate.

7

15.     The LIHTC Unit consists of low income residential apartments compliant with requirements for federal low income housing tax credits, as defined under Section 42 of the Internal Revenue Code.

16.     The Commercial Unit is a nonresidential portion on the first few floors of the Arcade Building.

## The Master Lease and The Commercial Lease

17.     The Commercial Lease the subject of this lawsuit is a sublease. Under the Master Lease, Master Landlord St. Louis Leased Housing Associates V, LLLP leases premises to Master Tenant, Defendant Dominium. Under the Commercial Lease, Master Tenant, Defendant Dominium leases a portion of its premises to Webster. To note, a master lease generally refers to a lease wherein a master tenant leases an entire property from an owner and then subleases the property to individual tenants. The diagram below graphically represents the contractual relationships:



18.     In particular, Master Landlord leases the Commercial Unit and Market Rate Unit to Master Tenant/Dominium. (Together, the Commercial Unit and Market Rate Unit are known as the "Landlord Condominium." *See* Ex. A,

8

Commercial Lease § 1.20, with Ex. A being incorporated by reference herein.)

Then, under the Commercial Lease, Master Tenant/Dominium leases the

Commercial Unit (but not the Market Rate Unit) to Webster.

### Operating Expenses and Additional Rent

19.    Under the Commercial Lease, Webster is required to pay Rent, which

consists of Annual Base Rent and Additional Rent. Ex. A, Commercial Lease §

1.35.

20.    Additional Rent is defined as follows:

Subject to the provisions of Section 4.2 and Section 4.3 hereof, Additional Rent means (i) the Tenant Improvement Contribution, (ii) Tenant's Proportionate Share of Operating Expenses; (iii) eighty percent (80%) of separately metered heat and electricity in that Common Area located on the first floor of the Building, consisting of approximately 4,869 square feet, commonly referred to as the "Arcade" as shown on the Floor Plan under Exhibit A; (iv) one hundred percent (100%) of the cost of on-site, in-person building security guard(s) and/or concierge personnel for the Landlord Condominium to the extent provided by Landlord in consultation with Tenant; (v) one hundred percent (100%) of the actual cost of incremental charges relating to any events held exclusively by Tenant in the Common Areas including, without limitation, additional charges for electricity, heat, air conditioning and cleaning; (vi) pro rata share of the cost of cleaning, maintaining, repairing and replacing the Premises Parking Stalls based on the fraction of Tenant's Premises Parking Stalls divided by 129 total underground Parking Spaces in the Building; (vii) one hundred percent (100%) of any capital improvements wholly located within or solely benefiting the Premises; (viii) all real estate taxes payable solely with respect to the Premises; (ix) any insurance solely relating to the Premises, if any; (x) property management fees for the Premises; estimated at such time at five percent (5%) of gross receipts received from Tenant pursuant to this Lease; provided that in no event shall Tenant's

property management fee for the Premises be less than $2,500 monthly; provided, further, that for purposes of the management fee calculation, gross receipts shall not include receipts from Tenant for the management fee portion of Operating Expenses, casualty insurance proceeds, or condemnation proceeds; (xi) replacement reserves at the rate of $.75 per rentable square foot of the Premises, per annum provided that such amount may increase annually (starting the day after the end of the first full calendar year of the Term) by an amount equal to the prior year's reserve requirement multiplied by three percent (3%) annually; and (xi) one hundred percent (100%) of the cost of any other agreements, contracts or other obligations entered into by Landlord solely with respect to the Premises including, without limitation, any janitorial contracts solely for the Premises, contracts for service, repair and maintenance of any elevators exclusively serving the Premises or HVAC contracts for HVAC units solely serving the Premises.

The Additional Rent at issue in this lawsuit involves Operating Expenses, certain utilities, and certain parking expenses.

21.    In turn, Commercial Lease § 4.3 defines Operating Expenses and specifically identifies that "'Operating Expenses' shall not include" 18 different categories of expenses, including identifying that "any specific allocation for specific expenses which are solely imposed on the owner of the Market Rate Unit under the Declaration" is impermissible as an Operating Expense.

**Operating Expenses and Additional Rent**

22.    Broadly speaking, Commercial Lease § 4.2 sets up the following framework for assessment of Additional Rent and Operating Expenses:

   a. Prior to Rent Commencement, Dominium provides a good faith projection of Additional Rent and/or Operating expensesExpenses for the current calendar year.

10

b. As soon as practical at the end of the calendar year, Dominium provides Webster with a written notice ("Statement") setting forth a statement of Additional Rent and/or Operating Expenses for the previous calendar year as well as estimated Additional Rent and/or Operating Expenses for the current calendar year. Webster pays any underpayment of Additional Rent within 30 days of receipt of the Statement. Tenant pays estimated Additional Rent as monthly Additional Rent installments in accordance with the Statement.

c. If the Statement shows that Tenant has overpaid projected Additional Rent, Dominium shall at Tenant's option either promptly refund the overpayment or credit such overpayment to the next accruing Additional Rent.

23. The Operating Expenses become part of Additional Rent by operation of Commercial Lease § 1.35(b). That section provides that Additional Rent includes Tenant's Proportionate Share of Operating Expenses. In turn, Commercial Lease § 1.33 defines Tenant's Proportionate Share as "thirty-five and 96/100 percent (35.96%) (calculable as rentable area of the Premises divided by the total rentable area of the Landlord Condominium)." In essence, Dominium adds certain costs and expenses to an expense pool of Operating Expenses, of which Webster pays its proportionate share as Additional Rent.

**Additional Rent and Operating Expenses Audit Rights**

24. Commercial Lease § 4.2 also gives Webster audit rights with regard to Dominium's assessments of Additional Rent and/or Operating Expenses.

25. In particular, within 90 days after receipt of each Statement, Webster may review Dominium's records related to Additional Rent and/or Operating Expenses. Ex. A, Commercial Lease § 4.2.

11

26.    Upon giving notice of objections to Dominium's Statement, Webster has an additional 90-day period to review Dominium's records related to such Statement. Ex. A, Commercial Lease § 4.2.

27.    If Webster's examination accurately discloses an overpayment of Additional Rent, Dominium shall promptly pay to Webster the amount of the overpayment. Ex. A, Commercial Lease § 4.2.

28.    This type of review is known as a CAM (common area maintenance) Reconciliation audit.

### Webster's 2023 CAM Reconciliation Audit

29.    Webster exercised its audit rights with respect to Dominium's 2023 Statement.

30.    Webster began its exercise of the rights on March 28, 2024 when it notified Dominium of its intent to audit the Additional Rent and/or Operating Expenses for calendar years 2023 and 2024 (projected).

31.    Webster then engaged CBRE to perform the CAM Reconciliation audit on Webster's behalf.

32.    On or around, June 10, 2024, CBRE requested backup from Dominium as Webster's Landlord to allow CBRE on behalf of Webster to conduct a review of rent payments, operating expenses, real estate tax, and other financial charges or payments related to the Commercial Lease and occurring in 2023. On

12

August 10, 2024, CBRE provided its initial findings of that audit, in which CBRE noted multiple overcharges to Webster and improper assessments of Webster of Additional Rent and/or Operating Expenses by Dominium.

33.    Dominium partially responded to CBRE's initial findings on August 21, 2024 and admitted that some of CBRE's findings in the 2023 audit are accurate. For example, Dominium confirmed that escalation of parking rent by 3% annually was not contractually permitted under the Commercial Lease and offered to refund this amount for the year 2023 as well as 2024. Dominium has in fact refunded the 2023 and 2024 parking overcharges. This admission notwithstanding, Dominium refuses to refund to Webster the escalated parking rent for years prior to 2023. Parking overcharges of at least $22,257.78 remain outstanding.

34.    On September 5, 2024, CBRE provided further audit findings to Dominium in a Lease Audit Report Notice. *See* Ex. C, September 5, 2024 Lease Audit Report Notice.

35.    Following, during a call on September 18, 2024, Dominium admitted that it had not adequately established accounting to track, allocate, and divide expenses for the Building into six different categories representing the Commercial Unit, LIHTC Unit, Market Rate Unit, Residential Administrative and Operating Expenses, Residential Marketing Expenses, and Common

13

Administrative and Operating Expenses. This failure to keep adequate books and records is a basic failure of Dominium's duties and expectations.

36.    On September 30, 2024, Dominium told Webster that Dominium would be engaging Colliers to analyze CBRE's findings. CBRE requested the identity of the Colliers representative with whom CBRE could confer regarding the 2023 CAM reconciliation. Dominium has not provided the name of the Colliers representative, and Dominium has yet to reveal the results of Colliers' review.

37.    On October 30, 2024, Dominium sent an updated CAM reconciliation statement for the year 2023. After receiving Dominium's updated statement, CBRE sent a letter, dated January 21, 2025, updating and finalizing CBRE's analysis of 2023 Operating Expenses with the updated information. A copy of the CBRE January 21, 2025 Lease Audit Report Notice (the "2023 Lease Audit Report Notice") is attached hereto as Exhibit D.

38.    To date, Dominium has failed to resolve, correct, or otherwise refund the overpayments identified in the 2023 Lease Audit Report Notice.

**Webster's 2024 CAM Reconciliation Audit**

39.    On February 12, 2025, Dominium provided the 2024 CAM Reconciliation and the 2025 budgeted CAM costs to Webster.

14

40.     Webster proceeded with its audit rights with respect to that 2024 Statement.

41.     On May 9, 2025, Webster notified Dominium of its intent to audit the Additional Rent and/or Operating Expenses for calendar year 2024.

42.     Dominium failed to timely provide all materials necessary for Webster to conduct the 2024 audit.

43.     Using the materials Dominium did provide, CBRE finalized its Lease Audit Report for the 2024 audit on November 19, 2025, attached hereto as "Exhibit E". *See* Ex. E, November 19, 2025 Lease Audit Report (the "2024 Lease Audit Report").

44.     The 2024 Lease Audit Report noted that errors identified by the 2023 CAM Reconciliation Audit persisted, including Dominium's continued refusal to maintain adequate accounting necessary for CAM reconciliation, Dominium's continued inclusion of "in unit" expenses in the "Market Rate Unit" expense pool, and Dominium's continued refusal to refund parking overcharges from 2019–2022 despite its previous acknowledgment that they were erroneously overcharged.

45.     The report also identified and described multiple categories of improper assessments of Additional Rent for 2024.

46.    To date, Dominium has failed to resolve, correct, or otherwise refund the overpayments identified in the 2024 Lease Audit Report.

**Audit Results and Findings**

47.    As a result of Webster's 2023 and 2024 CAM reconciliation audits, Webster learned that Dominium has been improperly charging Webster Additional Rent and/or Operating Expenses that are not properly assessable to Webster. In particular, for 2023, Dominium improperly charged Webster for certain costs and expenses related to common area utilities, Dominium's internal costs of ownership and business management, Market Rate Unit expenses, portal costs & resident surveys, and insurance. These same improper allocations persisted in 2024 and, worse, Dominium also included improper allocations for legal fees, telephone costs, and capital improvement costs.

48.    These improper allocations resulted in significantly increased Additional Rent for both 2023 and 2024, as more specifically provided below.

16

**A. Common Area Utilities.**

49.    The 2023 Audit demonstrated that $183,275.95 in utilities were improperly and inappropriately included in the expense pool for Operating Expenses for the year 2023.

50.    This practice continued in the year 2024. The 2024 Audit demonstrated that $195,583.56 in utilities were improperly and inappropriately included in the expense pool for Operating Expenses for the year 2024.

51.    Dominium could not properly charge these utility expenses as Operating Expenses because the costs included areas to which Webster lacked access. For example, the utility expenses charged to Webster by Dominium in both 2023 and 2024 included spaces such as a pool within the building and a yoga studio, neither of which are part of the Commercial Unit or accessible to Webster (as the Commercial Unit tenant).

52.    Under the terms of the Commercial Lease, Webster is obligated to pay only the following utility expenses: 100% of the electricity and gas for the Commercial Lease Premises (Commercial Lease § 1.35(b)(v)); 80% of the electricity and gas for the first-floor common area and elevator (Commercial Lease § 1.35(b)(iii)); and (c) Webster's pro-rata share of electricity and gas for the parking area (Commercial Lease § 4.3).

53.     Webster is not responsible for a share of utilities associated with the Market Rate Unit (e.g., the pool and yoga studio) because Commercial Lease § 4.3 excludes from the definition of Operating Expenses "any specific allocation for specific expenses which are solely imposed on the owner of the Market Rate Unit under the Declaration."

54.     Charging Webster for utilities specific to operating of the Market Rate Unit or for building areas to which Webster lacks access is an unreasonable practice and violates Commercial Lease § 4.3's exclusionary language. This practice is not acceptable under commercial leasing industry standards.

## B. Costs of Ownership

55.     The 2023 Audit also revealed that $27,164.40 in Dominium's internal management expenses were improperly and inappropriately included in the expense pool for Operating Expenses for the year 2023. The 2024 Audit revealed that Dominium had continued this practice and improperly allocated $18,668.66 of Dominium's internal management expenses in the expense pool for Operating Expenses for the year 2024. These improper costs were internal corporate overhead unrelated to the management or operation of the Arcade Building or the Commercial Lease. For example, Dominium charged Webster for employee attendance at leadership conferences and other off-site training, logoed uniforms, and employee parking spaces. Once again, Dominium allocated these

18

items to the Operating Expenses pool and charged Webster a share of these expenses.

56.   There is a difference between Dominium's costs incurred in managing and operating the Landlord Condominium and its costs incurred solely because Dominium is a business with internal business expenses (e.g., employee offsite training). The latter category represents mere corporate overhead for which Commercial Lease § 4.3 provides no means of passing to Webster. These charges have no benefit to the Arcade Building/Landlord Condominium and no benefit to Webster.

57.   In contrast, Commercial Lease § 4.3's recoverable management-related Operating Expenses all relate to management and operations of the Commercial Lease or the Arcade Building/Landlord Condominium. These provisions do not create a vehicle for passing through internal business expenses to tenants like Webster.

58.   Thus, charging Webster for these costs related to Dominium's own internal business management (as opposed to management of the Commercial Lease or Arcade Building) is a breach of the Commercial Lease.

59.   In addition, charging Webster for Dominium's operation of its own business—e.g., employee leadership conferences—is out of line with commercial leasing industry standards.

19

**C.      Market Rate Unit Expenses, Portal Costs & Resident Surveys**

60.    The 2023 Audit demonstrated that $124,941.81 in Market Rate Unit expenses, portal costs, and resident surveys were disguised by Dominium as Operating Expenses and improperly included in the expense pool for the year 2023. The 2024 Audit revealed that Dominium's improper allocations persisted, resulting in an improper inclusion of $76,333.80 to the expense pool.

61.    As examples of these expenses, in 2023 Dominium allocated expenses to Webster for bed bug treatment in unit 1711, garbage disposals, and fitness equipment. In 2024, Dominium allocated expenses to Webster for bed bug treatment in unit 1207.

62.    These sorts of expenses are specifically prohibited by Commercial Lease § 4.3(xviii), which excludes from Operating Expenses "any specific allocation for specific expenses which are solely imposed on the owner of the Market Rate Unit under the Declaration."

63.    In turn Ex. B Declaration §§ 1.1(2)(c)(7)–(9) specifically identifies as Market Rate Administrative & Operating Expenses, "portal costs; resident surveys, leasing incentives, and interest due on security deposits; the costs and expenses to make the Individual Dwelling Units with [sic] Market Rate Unit 'rent ready.'"

20

64.    Further, Ex. B Declaration § 1.1(2)(c)(13) includes with Market Rate Administrative & Operating Expenses "any other items which are any Unit Expenses for the Market Rate Unit."

65.    Therefore, Dominium's charging Webster a pro rata share of Market Rate Unit expenses, portal costs, and resident surveys to Webster is a breach of Commercial Lease § 4.3.

66.    Further, it is not acceptable under commercial leasing industry standards for a landlord to charge one tenant for a share of the costs and expenses that are specifically allocated to another tenant.

**D.    Insurance**

67.    The 2023 Audit demonstrated that $139,717.48 in insurance costs specifically attributable to the LIHTC Unit were improperly and inappropriately included in the expense pool for Operating Expenses for the year 2023.

68.    The 2024 Audit found that in 2024 Dominium had once more improperly included within the expense pool for Operating Expenses $167,995.52 in insurance costs specifically attributable to the LIHTC Unit.

69.    Dominium's practice of charging insurance for the LIHTC Unit is not allowable under any provision of the Lease. In fact, Dominium itself leases only the Landlord Condominium from Master Landlord. The Landlord Condominium does not even include the LIHTC Unit and is therefore outside Dominium's own

21

leased premises. It is therefore completely unreasonable for Dominium to charge Webster for insurance unrelated to the Commercial Lease.

70.    Assessing costs for insurance costs for the LIHTC Unit was not permissible under the Commercial Lease.

**E.    Legal Fees**

71.    The 2024 Audit also revealed that Dominium had improperly included within the 2024 Reconciliation $32,909.05 in legal fees billed directly to Webster.

72.    Legal fees are specifically prohibited by Commercial Lease § 4.3(ix), which excludes from Operating Expenses "attorneys' and accountants' fees."

73.    Moreover, Dominium's decision to engage attorneys to respond to basic questions related to an operating expense reconciliation cannot be reasonably construed to be the responsibility of Webster.

22

74.    This practice would not be considered reasonable or customary under commercial leasing industry standards.

75.    Charging Webster for Dominium's legal fees is expressly prohibited by Commercial Lease § 4.3. Therefore, Dominium charging Webster for such expenses is a breach of Commercial Lease § 4.3.

**F.    Telephone Costs**

76.    The 2024 Audit discovered that Dominium had improperly included in the expense pool $24,405.65 in telephone costs for the year 2024. This volume of calls can only be attributed to either contacting prospective residents, or contacting existing residents regarding delinquent rent, both of which are in violation of Commercial Lease § 4.3.

77.    Commercial Lease § 4.3(vi) excludes from Operating Expenses "expenses incurred in connection with negotiations for leases with tenants (including Tenant), other occupants, or prospective tenants or other occupants of the buildings."

78.    Therefore, expenses associated with contacting prospective tenants cannot be properly included as Operating Expenses chargeable to Webster.

79.    As stated above, Commercial Lease § 4.3(xviii) also excludes "any specific allocation for specific expenses which are solely imposed on the owner of the Market Rate Unit under the Declaration." More, Declaration §§ 1.1(2)(d)

23

describes such expenses to be "any specific legal, leasing, operating, and accounting expenses associated on a combined basis with the LIHTC Units and the Market Rate Unit."

80.     Expenses associated with contacting existing residents regarding delinquent rent are only applicable to the Market Rate Unit's expenses, not to the Operating Expenses expense pool for which Dominium charged Webster a pro rata share.

81.     The allocation to Webster of either category of expense is expressly prohibited by the Commercial Lease and is therefore a breach.

**G.    Capital Improvement Costs**

82.     The 2024 Audit found that Dominium had improperly included $119,419.33 in expenses which would qualify as capital improvements. These expenses included the purchase of outdoor furniture, a new elevator hoist rope, and HVAC repairs. Dominium inappropriately allocated these items to the expense pool and charged Webster their proportionate share.

83.     While Commercial Lease § 4.3(k) does allow certain capital improvement costs as Operating Expenses, it specifically provides that the costs must "be amortized by Landlord over the useful life" with "Operating Expenses to include only the cost as so amortized by Landlord during the calendar year for which such computation is made."

24

84. These expenses are capital improvement costs, as they are material and either extend the useful life of the underlying asset or have a useful life of greater than one year. Dominium itself identified these expenses within the section titled "Major Repairs/Capital Improvements."

85. Dominium's allocation to Webster of such capital improvements without regard to amortization schedules is not allowable under any portion of the Commercial Lease and amounts to a breach of § 4.3.

### 2025 CAM Reconciliation and 2026 Budgeted CAM

86. On February 27, 2026, Dominium sent Webster the 2025 CAM reconciliation for the Arcade Building and projected CAM charges for 2026. *See* Ex. F, Dominium's February 27, 2026 Letter (the "2025 CAM Reconciliation Letter"). The 2025 CAM reconciliation includes a breakdown of expenses allocated to Webster for 2025 Additional Rent and/or Operating Expenses. On May 21, 2026, Webster timely notified Dominium of its objection to and intent to audit the Additional Rent and/or Operating Expenses for calendar year 2025.

87. The 2025 CAM reconciliation demonstrates that Dominium has continued to include, for the calendar year 2025, much of the same categories of improper and prohibited expenses that were identified through the 2023 and 2024 CAM Reconciliation Audits.

88.    Moreover, the CAM expenses identified as attributable to Webster total $725,165.29, a 6.9 percent increase from the 2024 CAM amount (which is already under dispute), and, for reference, a 166 percent increase from the $272,535 identified in the Commercial Lease to be the maximum amount for the first lease year. *See* Ex. A, Commercial Lease § 1.35(b).

89.    In addition, Dominium's budgeted CAM for 2026 totals $781,865.79, a marked increase of over 7.82 percent from the 2025 CAM reconciliation.

**Dominium's Breaches and Damages**

90.    Despite being presented with clear evidence that Dominium has improperly included the above items as Additional Rent and/or Operating Expenses, Dominium has refused to refund Webster for Webster's overpayment.

91.    Dominium has also refused to amend its billing practices, despite being notified that it is in violation of its obligations under the Commercial Lease.

92.    These failures persisted and were not corrected in 2024, despite being made aware of the deficiencies through the 2023 Audit.

93.    As a result of Dominium's refusal to refund the year 2023 overcharges that were identified in the 2023 Audit, Webster sent a Notice of Default to Dominium on June 2, 2025 regarding the Commercial Lease.

94.    As a result of Dominium's breaches and violations of the Commercial Lease, Webster has been damaged in an amount to be proven at trial.

26

## COUNT I BREACH OF CONTRACT

95. 91. Webster University hereby restates and incorporates by reference the allegations in Paragraphs 1 to 9094 as if fully set forforth herein.

96. 92. The Commercial Lease is a binding and enforceable contract between Webster and Dominium.

97. 93. Webster has performed its obligations under the Commercial Lease, including by timely making payment for Additional Rent demanded by Dominium.

98. 94. Dominium has breached the Commercial Lease in at least the following ways:

    a. Allocating to Webster's Operating Expense pool costs and expenses that should not have been included as part of Webster's Proportionate Share of Operating Expenses (Commercial Lease §§ 1.35(b) and 4.3);

    b. Refusing to pay Webster the amount of overpayment of Additional Rent following Webster's 2023 CAM reconciliation audit (Commercial Lease § 4.2);

    c. Refusing to pay Webster the amount of overpayment of Additional Rent following Webster's 2024 CAM reconciliation audit (Commercial Lease § 4.2);

27

d. Failing to maintain adequate internal accounting records such that Dominium could properly identify and segregate those costs and expenses that should be allocated to Webster's Operating Expense pool; and

e. Refusing to refund escalation of parking rent by 3% annual for years prior to 2023.

f. Continuing to allocate in the 2025 CAM Operating Expense pool costs and expenses that should not have been included as part of Webster's Proportionate Share of Operating Expenses.

99. 95. As a result of Dominium's breach, Webster has suffered damages and continues to suffer damages.

WHEREFORE, Plaintiff Webster respectfully prays that this Court enter judgment in Webster's favor; award Webster monetary damages with prejudgment interest; award Webster its costs and expenses of bringing this action; and award Webster any further relief that this Court deems just.

**COUNT II BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

100. 96. Webster hereby restates and incorporates by reference the allegations in Paragraphs 1 to 9599 as if fully set forforth herein.

101. 97. Dominium had a duty of good faith and fair dealing in its performance under the Commercial Lease, including, at least, a duty to charge as

28

Additional Rent only for those Operating Expenses that were properly Webster's responsibility, a duty to reimburse Webster for overpayments made by Webster pursuant to Dominium's previous improper assessments, and a duty to maintain proper internal accounting records such that Dominium could properly identify and segregate those costs and expenses that should be charged to Webster.

102. 98. By assessing improper expense items against Webster, refusing to reimburse Webster after Webster made Dominium aware of its overbilling, and maintaining poor internal accounting of expenses, Dominium has acted in bad faith, has failed to act consistently with the spirit of the Commercial Lease, and has acted to deprive Webster of the benefit of the Commercial Lease.

103. 99. As a result of Dominium's breach of its duty of good faith and fair dealing, Webster has been damaged.

WHEREFORE, Plaintiff Webster respectfully prays that this Court enter judgment in Webster's favor; award Webster monetary damages with interest; award Webster its costs and expenses of bringing this action; and award Webster any further relief that this Court deems just.

### COUNT III UNJUST ENRICHMENT

104. 100. Webster hereby restates and incorporates by reference the allegations in Paragraphs 1 to 99103 as if fully set forforth herein.

29

105. ~~101.~~ Dominium has been enriched by the receipt of Webster's overpayment of Operating Expenses and Additional Rent. Such overpayment, caused by Dominium's overcharging, occurred during at least 2019 to ~~2024~~2025 and continues to today.

106. ~~102.~~ Dominium's enrichment has been at the expense of Webster.

107. ~~103.~~ Dominium's retention of the overpayment of Operating Expenses and Additional Rent has been unjust and remains unjust.

108. ~~104.~~ Dominium has acted wrongfully in failing to return the overpayment of Operating Expenses and Additional Rent to Webster.

109. ~~105.~~ As a result of Dominium's unjust enrichment, Webster has suffered damage.

WHEREFORE, Plaintiff Webster respectfully prays that this Court enter judgment in Webster's favor; award Webster monetary damages with interest; award Webster its costs and expenses of bringing this action; and award Webster any further relief that this Court deems just.

**COUNT IV DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)**

110. ~~106.~~ Webster hereby restates and incorporates by reference the allegations in Paragraphs 1 to ~~105~~109 as if fully set ~~for~~forth herein.

111. ~~107.~~ A real, immediate, actual, justifiable, and substantial continuing controversy exists between Webster and Dominium as to whether Dominium's

assessment and retention of the overpaid Additional Rent violates the terms of the Commercial Lease.

112. ~~108.~~ A real, immediate, actual, justifiable, and substantial continuing controversy exists between Webster and Dominium as to whether Dominium is required under the Commercial Lease to reimburse Webster for the overpayment of Additional Rent and whether Dominium may properly charge certain costs and expenses as Additional Rent and/or Operating Expenses.

113. ~~109.~~ A real, immediate, actual, justifiable, and substantial continuing controversy exists between Webster and Dominium as to whether Dominium has failed to keep adequate books and records to account for and allocate Arcade Building common area maintenance expenses to the specific units, including the Commercial Unit and Market Rate Unit, created by the Arcade Building Declaration.

114. ~~110.~~ There is a bona fide, actual, present, and practical need for a declaration of Webster's right to obtain reimbursement for overpayment of Additional Rent and/or Operating Expenses and to refuse payment for future improperly charged Additional Rent and/or Operating Expenses.

115. ~~111.~~ Webster's interests in the declaration of its rights are actual and adverse to those of Dominium.

31

116. ~~112.~~ All conditions precedent to the relief demanded herein have been performed.

117. ~~113.~~ Webster seeks as a declaration that the following expenses and costs may not be assessed or charged as Additional Rent and/or Operating Expenses under the Commercial Lease:

 a. Escalation of parking rent by 3% annual;

 b. Utility expenses for areas of the Arcade Building to which Webster lacked access, e.g., pool cleaning expenses or yoga studio expenses;

 c. Dominium's costs of ownership for expenses solely related to operating of Dominium's own business, including items like employee leadership conferences or logoed uniforms;

 d. Market Rate Unit expenses, portal costs, and resident surveys;

 e. Insurance costs, largely related to LIHTC Units;

 f. Legal fees;

 g. Telephone costs; and

 h. Capital improvement costs, including outdoor furniture, a new elevator hoist rope, and HVAC repairs.

118. Webster seeks as a declaration that Dominium, intentionally and while withholding material information regarding the validity of the expenses,

32

assessed or charged as Additional Rent and/or Operating Expenses under the Commercial Lease:

    a. Escalation of parking rent by 3% annual;

    b. Utility expenses for areas of the Arcade Building to which Webster lacked access, e.g., pool cleaning expenses or yoga studio expenses;

    c. Dominium's costs of ownership for expenses solely related to operating of Dominium's own business, including items like employee leadership conferences or logoed uniforms;

    d. Market Rate Unit expenses, portal costs, and resident surveys;

    e. Insurance costs, largely related to LIHTC Units;

    f. Legal fees;

    g. Telephone costs; and

    h. Capital improvement costs, including outdoor furniture, a new elevator hoist rope, and HVAC repairs.

119. ~~114.~~ Webster also seeks as declaratory relief a declaration that Dominium be required to implement accurate internal accounting records such that Dominium could properly identify and segregate those costs and expenses that should be charged to Webster.

WHEREFORE, Plaintiff Webster respectfully prays that this Court grant judgment in Webster's favor; declare that the above-listed expenses and costs may

33

not be assessed as Additional Rent and/or Operating Expenses under the Commercial Lease; and award Webster any further relief that this Court deems just.